IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -

                                    S1 09 Cr. 1184 (RJH)

RAJ RAJARATNAM and
DANIELLE CHIESI,

               Defendants

---

**DEFENDANT RAJ RAJARATNAM'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE
<u>DERIVED FROM WIRETAP INTERCEPTIONS OF HIS CELLULAR TELEPHONE</u>**

**<u>REDACTED</u>**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
John M. Dowd (admitted *pro hac vice*)
Terence J. Lynam (admitted *pro hac vice*)
Patricia A. Millett
James E. Sherry (admitted *pro hac vice*)
Isaac J. Lidsky
Anne J. Lee
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4386 (telephone)
(202) 833-2292 (facsimile)

Robert H. Hotz, Jr.
Samidh Guha
One Bryant Park
New York, New York 10036
(212) 872-1028 (telephone)
(212) 872-1002 (facsimile)

May 7, 2010
New York, NY

*Attorneys for Defendant Raj Rajaratnam*

## TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ...................................................................................................1

II.     CONSTITUTIONAL AND STATUTORY FRAMEWORK ...............................................4

III.    STATEMENT OF FACTS ........................................................................................7
        A.    The Government's Nine-Year-Long Investigation of Mr. Rajaratnam ....................7
              1.    1998-2002:  Roomy Khan's First Conviction and Cooperation
                    Effort ......................................................................................................7
              2.    2003-2007:  The SEC's Investigation of Galleon and Mr.
                    Rajaratnam ..............................................................................................10
        B.    November 2007-March 2008:  The Government's Second Use of Roomy
              Khan ...................................................................................................................16
        C.    January 2008:  Khan's Recorded Calls with Mr. Rajaratnam ...............................19
              1.    Galleon's Preparation of Earnings Previews for Fourth Quarter
                    2007 .......................................................................................................19
              2.    Khan's Recorded Calls with Mr. Rajaratnam ...........................................20
        D.    The Government's False and Misleading Wiretap Application ..............................24
              1.    False Probable Cause Allegations:  Credibility of Roomy Khan................25
              2.    False Probable Cause Allegations:  Description of the Recorded
                    Telephone Calls.......................................................................................27
              3.    False Allegations Regarding Necessity......................................................32
        E.    The Government's Subsequent Applications Repeated the Initial
              Application...........................................................................................................35

IV.     ARGUMENT.........................................................................................................36
        A.    The Constitution And Congress Require Strict Adherence To Title III's
              Requirement Of Forthright Governmental Disclosure ..........................................38
        B.    Suppression Is Warranted Because The Government Failed To Provide A
              "Full And Complete" Affidavit That Truthfully Established Probable
              Cause...................................................................................................................41
              1.    The Intentional and Reckless False Statements and Material
                    Omissions are Pervasive ...........................................................................41
                    a.    Misrepresentations and omissions concerning Roomy Khan ........42
                    b.    Distorted summaries of Khan's recorded telephone
                          conversations...................................................................................47
                    c.    The cited information was publicly available.................................52
              2.    Probable Cause Is Absent...........................................................................54
                    a.    Suppression under Franks.................................................................54
                    b.    Statutory suppression under Title III................................................56
        C.    Suppression Is Warranted Because The Government Failed To Provide A
              "Full And Complete" Affidavit That Addressed Truthfully The Necessity
              Of Wiretaps .........................................................................................................57
              1.    Congress Determined That Wiretaps Are Never Necessary For
                    Insider Trading Investigations...................................................................59

        2.    The Government Covered Up Its Multi-Year Successful
              Employment of Traditional Law Enforcement Methods ...........................65
              a.    The investigation began much earlier than reported.....................66
              b.    The government had already obtained voluminous Galleon
                    records...........................................................................................67
              c.    The government had a proven ability to gain access to
                    Galleon's offices ...........................................................................68
              d.    The government's ability to interview witnesses and obtain
                    records...........................................................................................69
        3.    Suppression of Evidence Derived from the Subsequent
              Applications is Also Warranted...................................................................72
    D.    At Least 150 Wiretapped Conversations Must Be Individually Suppressed
       For Failure To Comply With Title III's Minimization Requirement .....................73
V.    CONCLUSION.................................................................................................................76

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Alabama v. White,
496 U.S. 325 (1990)...................................................................................41

Basic, Inc. v. Levinson,
485 U.S. 224 (1998)...................................................................................51

Berger v. New York,
388 U.S. 41 (1967)............................................................................5, 38, 39

Dalia v. United States,
441 U.S. 238 (1979)........................................................................5, 39, 60

Dirks v. SEC,
463 U.S. 646 (1983)................................................................................49, 51

Franks v. Delaware,
438 U.S. 154 (1978)................................................................................ passim

Gelbard v. United States,
408 U.S. 41 (1972)................................................................................ passim

Illinois v. Gates,
462 U.S. 213 (1983)................................................................................41, 43

Johnson v. United States,
333 U.S. 10 (1948)...................................................................................39

Katz v. United States,
389 U.S. 347 (1967)..................................................................................5, 39

Marron v. United States,
275 U.S. 192 (1927)...................................................................................65

Morrison v. Olson,
487 U.S. 654 (1988) (Scalia, J., dissenting)............................................62

Rivera v. United States,
928 F.2d 592 (2d Cir. 1991).......................................................................54

SEC v. Galleon Mgmt., et al.,
No. 09 Civ. 8811 (JSR)..............................................................................75

iii

*United States v. Ailemen,*
  986 F. Supp. 1228 (N.D. Cal. 1997) ...................................................................46, 47, 69, 72

*United States v. Bianco,*
  998 F.2d 1112 (2d Cir. 1993)..................................................................................................54

*United States v. Blackmon,*
  273 F.3d 1204 (9th Cir. 2001) ..............................................................................................71

*United States v. Bynum,*
  485 F.2d 490 (2d Cir. 1973)....................................................................................................75

*United States v. Canfield,*
  212 F.3d 714 (2d Cir. 2000)..............................................................................................41, 54

*United States v. Concepcion,*
  579 F.3d 214 (2d Cir. 2009)................................................................................57, 65, 66, 72

*United States v. Cunningham,*
  113 F.3d 289 (1st Cir. 1997)..................................................................................................71

*United States v. DePalma,*
  461 F. Supp. 800 (S.D.N.Y. 1978).........................................................................................73

*United States v. Dunkel,*
  927 F.2d 955 (7th Cir. 1991) .................................................................................................46

*United States v. Ferguson,*
  758 F.2d 843 (2d Cir. 1985)....................................................................................................41

*United States v. Gagnon,*
  373 F.3d 230 (2d Cir. 2004)............................................................................................41, 43

*United States v. Gigante,*
  538 F.2d 502 (2d Cir. 1976)....................................................................................................39

*United States v. Giordano,*
  416 U.S. 505 (1974)...................................................................................................... passim

*United States v. Gonzalez,*
  835 F.2d 449 (2d Cir. 1987)....................................................................................................44

*United States v. Ippolito,*
  774 F.2d 1482 (9th Cir. 1985) ...............................................................................................57

*United States v. Kahn,*
  415 U.S. 143 (1974)................................................................................................................60

iv

*United States v. Levine,*
  690 F. Supp. 1165 (E.D.N.Y. 1988) ................................................................................63, 64

*United States v. Lilla,*
  699 F.2d 99 (2d Cir. 1983)............................................................................................ passim

*United States v. Marion,*
  535 F.2d 697 (2d Cir. 1976)............................................................................................ passim

*United States v. Masciarelli,*
  558 F.2d 1064 (1977).................................................................................................61, 63, 64

*United States v. Miller,*
  116 F.3d 641 (2d Cir. 1997)........................................................................................57, 66, 72

*United States v. Mondragon,*
  52 F.3d 291 (10th Cir. 1995) ..................................................................................................72

*United States v. Principie,*
  531 F.2d 1132 (2d Cir. 1976)........................................................................................73, 74

*United States v. Rizzo,*
  491 F.2d 215 (2d Cir. 1974)..................................................................................................74

*United States v. Robinson,*
  698 F.2d 448 (D.C. Cir. 1983) ..............................................................................................57

*United States v. Simpson,*
  813 F.2d 1462 (9th Cir. 1987) .......................................................................................52, 72

*United States v. Spagnuolo,*
  549 F.2d 705 (9th Cir. 1977) ................................................................................................39

*United States v. Tortorello,*
  480 F.2d 764 (2d Cir. 1973)....................................................................................................6

*United States v. Ward,*
  808 F. Supp. 803 (S.D. Ga. 1992)..........................................................................................64

*Whitman v. American Trucking Ass'ns, Inc.,*
  531 U.S. 457 (2001)..............................................................................................................61

*Wong Sun v. United States,*
  371 U.S. 471 (1963)................................................................................................................6

**CONSTITUTION**

U.S. Const. Amendment IV ...........................................................................................................5

**STATUTES**

15 U.S.C.
  § 78j(b)................................................................................................................5, 25
  § 78ff.......................................................................................................................25
  § 80b-1 ...................................................................................................................11
  § 80b-3(k)...............................................................................................................12
  § 80b-9 ...................................................................................................................12
  § 80b-4a .................................................................................................................12

18 U.S.C.
  § 1343..................................................................................................................8, 25
  § 1348.......................................................................................................................5
  § 1832.......................................................................................................................8
  § 1956.....................................................................................................................25
  § 2510................................................................................................................ passim
  § 2511.......................................................................................................................6
  § 2515.....................................................................................................6, 7, 56, 60
  § 2516................................................................................................................ passim
  § 2517.....................................................................................................6, 61, 62
  § 2518................................................................................................................ passim

Pub. L. No. 98-473
  § 1203, 98 Stat. 1837 (1984)...............................................................................61

**OTHER AUTHORITIES**

17 C.F.R.
  § 240.10b-5 ............................................................................................................25
  § 240.10b5-2 ..........................................................................................................25
  § 275.204-2 ............................................................................................................12

Electronic Communications Privacy Act:
  Hearing Before the H. Judiciary Comm., 99th Cong. (1986)...................................61

S. REP. NO. 90-1097 (1968) ........................................................................................59, 60

## TABLE OF EXHIBITS

| EXHIBIT A: DECLARATION OF TERENCE J. LYNAM (with attachments) | |
|---|---|
| 1. | Roomy Khan Criminal Case Docket (02/28/01) |
| 2. | Roomy Khan Criminal Information (08/01/00) |
| 3. | Roomy Khan Criminal Information (02/28/01) |
| 4. | Roomy Khan Plea Agreement (04/02/01) |
| 5. | Government's Sentencing Memorandum (06/25/02) |
| 6. | Roomy Khan Final Judgment and Conditions of Probation (07/01/02) |
| 7. | FBI 302 Memorandum of Interview with Roomy Khan (04/15/99) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 8. | FBI 302 Memorandum of Interview with Roomy Khan (04/27/01) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 9. | FBI 302 Memorandum of Interview with Roomy Khan (06/20/01) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 10. | Government Memorandum of Interview with Roomy Khan (04/16/02) (unredacted[1] copy submitted under seal; redacted copy filed publicly) |
| 11. | SEC Subpoenas to Galleon Management, L.P., *In the Matter of Galleon management, L.P.*, HO-9809 (11/06/03, 12/09/03, 01/15/04, 04/09/04, 05/25/04); SEC Subpoena to Galleon Management, L.P., *In the Matter of The Benchmark Company, LLC*, NY-7470 (10/05/05); SEC Subpoena to The Galleon Group, *In re James Horvath*, NY-07409A (11/30/05) |
| 12. | SEC Notice of Examination and Request for Production of Documents (01/29/07) |
| 13. | SEC Examination Requests for Production of Documents (02/05/07, 02/13/07, 02/16/07, 02/22/07, 03/07/07 (1), 03/07/07 (2), 03/09/07, 03/14/07, 03/22/07, 03/26/07, 03/30/07, 04/04/07, 04/12/07, 04/13/07, 04/17/07, 04/24/07, 05/01/07, 05/04/07) |

---

[1] The redactions appearing in the sealed copies of Exhibits A.10, A.16, A.17, A.18, A.19, A.20, A.21, A.22, and A. 29 are present in the only copies of these documents produced to Mr. Rajaratnam by the government.

| 14. | SEC Subpoenas to Galleon Management, L.P., *In re Sedna Capital Management, LLC*, NY-7665 (05/14/07, 06/08/07); SEC Subpoenas to Raj Rajaratnam, *In re Sedna Capital Management, LLC*, NY-7665 (05/14/07, 06/08/07) |
|---|---|
| 15. | Transcript of SEC Deposition of Raj Rajaratnam, *In re Sedna Capital Management, LLC*, NY-7665 (06/07/07) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 16. | FBI 302 Memorandum of Interview with Roomy Khan (11/28/07) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 17. | FBI 302 Memorandum of Interview with Roomy Khan (12/17/07) (unredacted copy submitted under seal; redacted copy filed publicly); Proffer Agreement Between United States and Roomy Khan (12/17/07) |
| 18. | FBI 302 Memorandum of Interview with Roomy Khan (01/03/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 19. | FBI 302 Memorandum of Interview with Roomy Khan (01/15/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 20. | FBI 302 Memorandum of Interview with Roomy Khan (04/02/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 21. | FBI Confidential Human Source Memorandum of Interview With Roomy Khan (05/28/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 22. | FBI Confidential Human Source Memorandum of Interview With Roomy Khan (05/29/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 23. | Miscellaneous Quarterly Earnings Previews Produced to SEC |
| 24. | Xilinx Earnings Preview for Fourth Quarter of 2007 Prepared by Nadeem Janmohamed (01/11/08) |
| 25. | Intel Earnings Preview for Fourth Quarter of 2007 Prepared by Nadeem Janmohamed (01/14/08) |
| 26. | █████████████████████████████████████████ |
| 27. | Intel Earnings Announcement for Fourth Quarter of 2007 (01/15/08) |

| 28. | Xilinx Earnings Announcement for Fourth Quarter of 2007 (01/17/08) |
|---|---|
| 29. | FBI Confidential Human Source Memoranda of Interviews with Roomy Khan (07/22/08, 09/15/08, 12/02/08)  (unredacted copies submitted under seal; redacted copy filed publicly) |
| 30. | Wiretap Application (03/07/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 31. | Affidavit of B.J. Kang in Support of Wiretap Application (03/07/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 32. | Affidavit of B.J. Kang in Support of Wiretap Application p. 14 (04/08/08) (submitted under seal) |
| 33. | Affidavit of B.J. Kang in Support of Wiretap Application p. 15 (05/16/08) (submitted under seal) |
| 34. | Affidavit of B.J. Kang in Support of Wiretap Application p. 19 (07/15/08) (submitted under seal) |
| 35. | Affidavit of B.J. Kang in Support of Wiretap Application p. 39 (07/15/08) (submitted under seal) |
| 36. | Intel Earnings Guidance for Fourth Quarter of 2007 (10/16/07); Xilinx Earnings Guidance for Fourth Quarter of 2007 (10/18/07); Updated Xilinx Earnings Guidance for Fourth Quarter 2007 (12/05/07) |
| 37. | Jeffries Co. Report on Intel (11/30/07); Thomas Weisel Partners Report on Intel (12/05/07); Bear Stearns Co. Report on Intel (12/06/07); Morgan Stanley Report on Intel (12/11/07); Bank of America Report on Intel (01/02/08); J.P. Morgan Report on Intel (01/04/08); Stifel Nicoulaus, & Co. Report on Intel (01/07/08); Bank of America Report on Intel (01/14/08); Bear Stearns Co. Report on Intel (01/14/08); Pacific Crest Report on Intel (01/14/08); J.P. Morgan Report on Xilinx (12/03/07); JP Morgan Report on Xilinx (12/05/07) |
| 38. | SEC Letter Requests for Prime Broker Records after 03/07/08 |
| 39. | Email from R. Khan (01/10/07) |
| 40. | Transcript of Government's Press Conference (10/16/09) |
| 41. | Government's Minimization Instructions (03/10/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
| 42. | Hearing Transcript (11/05/09) |

| 43. | Galleon Account Statements (01/14/08, 01/17/08) |
|---|---|
| 44. | S. Pulliam, "The Network: The Feds Close In: Fund Chief Snared by Taps, Turncoats," *The Wall Street Journal* (12/30/09) |
| 45. | S. Pulliam, "Galleon Sinks, Informant Surfaces," *The Wall Street Journal* (10/22/09) |
| 46. | P. Carey, "Old Silicon Valley Case Linked to Hedge Fund Scandal," *The San Jose Mercury News* (10/22/09) |
| 47. | CD of Audio Recordings (submitted under seal) |

**EXHIBIT B:  DECLARATION OF LINDI L. BEAUDREAULT**

**EXHIBIT C:  DECLARATION OF GEORGE LAU**

**EXHIBIT D:  DECLARATION OF THOMAS OWEN (with attachments)**

| 1. | Transcript of Recorded Telephone Call Between Raj Rajaratnam and Roomy Khan (01/14/08) (unredacted copy submitted under seal; redacted copy filed publicly) |
|---|---|
| 2. | Transcript of Recorded Telephone Call Between Raj Rajaratnam and Roomy Khan (01/17/08) |

**EXHIBIT E:  DECLARATION OF JEFFREY M. KING (with attachments) (filed under seal)**

| 1. | Summaries of Intercepts that Were Not Minimized |
|---|---|

x

Over a nine-month period in 2008, the FBI secretly recorded over 2,400 private conversations between Mr. Rajaratnam and at least 130 of his colleagues, employees, friends, and family. In October 2009, the government charged Mr. Rajaratnam with more than a dozen felony counts of insider trading and related offenses. Mr. Rajaratnam respectfully moves, pursuant to 18 U.S.C. § 2518(10) and *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress all evidence of the calls intercepted over his cellular phone, and any evidence derived therefrom, on the grounds that the evidence was obtained in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-2522.[2]

## I.   INTRODUCTION

This is the first case in which the government has employed Title III interceptions to investigate insider trading. Insider trading, however, is not an offense for which Congress has authorized the use of wiretaps as part of Title III's carefully limited grant of authority for "employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974). Moreover, in its zeal to break new ground and in an effort to salvage its nine-year pursuit of Mr. Rajaratnam, the government violated its obligation of candor and forthrightness to the court and, as a result, intercepted Mr. Rajaratnam's telephone calls in violation of the Constitution and Title III. The government obtained the court's authorization to use wiretaps based on the sworn affidavit of an FBI agent that was rife with "deliberately or

---

[2] In addition to the calls intercepted over Mr. Rajaratnam's cellular telephone, the government has also produced approximately 15,650 calls intercepted over other people's telephones. While those recordings are not the subject of Mr. Rajaratnam's current motion to suppress, if the government later indicates its intent to use any of those other intercepted conversations against him, Mr. Rajaratnam is an "aggrieved person" under Title III, 18 U.S.C. § 2510(11), and intends to challenge those interceptions at the appropriate time.

1

recklessly false statement[s]" and the material omission of statutorily and constitutionally required information. *Franks v. Delaware*, 438 U.S. 154, 165 (1978).

The government's first wiretap application was submitted to District Judge Gerard E. Lynch on March 7, 2008, and was supported by the sworn affidavit of FBI Special Agent B.J. Kang. In that application, and all subsequent applications, Title III obligated the government to provide "full and complete" statements of fact establishing both: (1) probable cause to believe that Mr. Rajaratnam was using his cell phone in furtherance of one or more of the predicate offenses specifically enumerated in 18 U.S.C. § 2516; and (2) the necessity of resorting to a wiretap because less intrusive investigative techniques had failed or would be futile if tried. As with all such *ex parte* applications, Judge Lynch's ability to provide the independent and impartial review that the Fourth Amendment and Title III require was dependent on the government's full, complete, forthright and truthful disclosure in the supporting affidavit.

However, the Kang Affidavit did exactly the opposite, forsaking the obligation of candor and forthcoming disclosure in favor of false statements, strategically selective disclosures, material misdescriptions of evidence, and the wholesale withholding of critical and statutorily required information essential to the court's review of the application. As a result, the court was misled into finding that the Title III requirements were satisfied and issued the requested wiretap authorization. For example, the Kang Affidavit misrepresented and/or did not disclose critical facts about the key witness on whom it was relying for probable cause, Roomy Khan, that were essential to the court's ability to assess her reliability and credibility as a confidential informant. The affidavit asserted that Khan had not yet been charged with a crime when in fact she had been charged and convicted in 2002 for wire fraud. The affidavit also did not disclose that Khan, at the time of this conviction, had made allegations of insider trading *against Mr. Rajaratnam* that

were false and which the government itself acknowledged it had been unable to substantiate. Furthermore, the Kang Affidavit concealed from the court the fact that Khan continued to commit additional crimes during 2004-07 and engaged in obstruction of justice in early 2008 – evidence that was crucial to a fair and impartial assessment of her credibility and reliability.

That is just the beginning of the affidavit's problems. Because the government knew that it could not obtain wiretaps to investigate insider trading, the affidavit offered fig-leaf avowals of an intent to investigate money laundering and wire fraud, which tellingly are crimes with which Mr. Rajaratnam has never been charged. Confessing the government's true motivation, the affidavit then attempted to establish probable cause to believe that Mr. Rajaratnam had used his cell phone in connection with insider trading. But even in that misguided task, the affidavit again resorted to contorting and withholding material information. In particular, the Kang Affidavit purported to summarize two telephone calls that Khan had recorded with Mr. Rajaratnam without his knowledge in January 2008. These summaries were also false and misleading, and recklessly failed to inform the court that the information conveyed was publicly available and that Mr. Rajaratnam was *not trading* in the stocks he discussed – a fact that is acutely relevant to allegations of insider *trading*.

To satisfy Title III's and the Fourth Amendment's requirements of demonstrating that resort to the use of wiretaps was necessary, the government offered only conclusory assertions that were both false and misleading, telling the court that traditional investigative techniques would not work, when those same techniques had worked and were, in fact, continuing to work. Moreover, the government completely ignored Second Circuit precedent requiring it to explain to the court what other investigative techniques had already been attempted and their results, failing to so much as mention the government's nine-year investigation of Mr. Rajaratnam and

his company, Galleon – a lengthy investigation in which Galleon fully cooperated, providing the government with four million pages of records (including instant messages, emails, trade data, and business records), and dozens of hours of sworn testimony, including a lengthy deposition of Mr. Rajaratnam himself. The government also told the court that it did not know where relevant records were kept, when in fact government investigators had spent literally months in Galleon's offices examining its records. Rather than disclose to the court what it later described in a press conference as its "exhaustive" investigation, the government concealed the conventional investigation.     Indeed, the government claimed that it was unable to employ specific conventional investigative techniques that it had *already used*, such as document subpoenas and witness interviews, but which it concealed from the court.

In short, the government intercepted over 2,400 of Mr. Rajaratnam's and at least 130 other individuals' private telephone conversations to investigate a crime for which Congress specifically withheld wiretap authority, and it did so by ignoring its oath and obligation of candor to the court. Genuinely independent judicial review of wiretap applications cannot function, nor can Congress's "overriding congressional concern" for the privacy of the countless individuals whose conversations are recorded, *Gelbard v. United States*, 408 U.S. 41, 48 (1972), be protected, when the government's duty of full and forthright disclosure to the authorizing court is so broadly disregarded. Accordingly, the conversations intercepted on Mr. Rajaratnam's cell phone and all evidence derived therefrom must be suppressed.

## II. CONSTITUTIONAL AND STATUTORY FRAMEWORK

1.     The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

4

seized." U.S. Const. Amend. IV. The Fourth Amendment thus strictly limits the government's use of wiretaps to record private telephone conversations. *Katz v. United States*, 389 U.S. 347, 353 (1967). Moreover, because wiretaps, by their very nature, are conducted without notice to the multiple individuals affected and indiscriminately capture all conversations regardless of relevance, more than the ordinary standard of probable cause used to support "conventional warrants" is required. *Berger v. New York*, 388 U.S. 41, 60 (1967). Instead, for a wiretap to pass constitutional muster, a fully informed court must independently determine that "special facts" demonstrating "exigency," *id*., create a "genuine need" for government officials to secretly intercept private conversations, *Dalia v. United States*, 441 U.S. 238, 250 (1979). That procedure of impartial and fully informed "antecedent justification" is "a constitutional precondition of . . . electronic surveillance." *Katz*, 389 U.S. at 359 (citation omitted).

       **2.**      In the wake of *Berger* and *Katz*, Congress enacted Title III to establish a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard*, 408 U.S. at 46. Title III strictly "limit[s]" the use of wiretaps "to certain major types of offenses and specific categories of crime" that Congress determined necessitate such covert surveillance. 18 U.S.C. § 2510 note (congressional findings); *see Gelbard*, 408 U.S. at 46 (use of wiretaps confined to investigating "specified serious crimes"). Congress did not include securities fraud or insider trading, 18 U.S.C. § 1348; 15 U.S.C. § 78j(b), as authorized predicate offenses, 18 U.S.C. § 2516.

       Even for those crimes for which Congress authorized the use of wiretaps, Title III imposes "important preconditions to obtaining any intercept authority at all." *Giordano*, 416 U.S. at 515. First, Title III requires advance approval by a neutral judicial officer, who must issue a warrant authorizing the wiretap and prescribing precisely which conversations of which

individuals on which telephones may be sought and for what period of time.   18 U.S.C. §§ 2518(1) & (4); *see* 18 U.S.C. § 2510 note ("[I]nterception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court."); *see generally Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963) (Constitution requires "that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police."). The warrant must be predicated on a finding of probable cause to believe that (i) the individual has committed or is about to commit one of the offenses specified by Congress in Section 2516, (ii) communications concerning that offense will be intercepted, and (iii) the particular telephone or device being tapped is itself being used in the connection with the commission of the offense.   18 U.S.C. § 2518(3). The judge must also specifically find that the extraordinary intrusion of a wiretap is necessary because "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."   18 U.S.C. § 2518(3)(c).

To permit fully informed review by the impartial judicial officer, Title III mandates that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause as to the "particular offense" being investigated under Title III, 18 U.S.C. § 2518(1)(b), and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c). *See also United States v. Tortorello*, 480 F.2d 764, 773 (2d Cir. 1973).

Title III broadly prohibits the wiretapping of conversations except in conformity with the statute's "stringent conditions," *Gelbard*, 408 U.S. at 46. *See* 18 U.S.C. §§ 2511, 2517. In addition, § 2515 excludes from use in "in any trial, hearing, or other proceeding in or before any

6

court" "any wire or oral communication [that] has been intercepted" and any "part of the contents of such communication" if the "disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. To enforce that prohibition, Title III authorizes an "aggrieved person" – an individual whose communications were intercepted, 18 U.S.C. § 2510(11) – to seek suppression of any communication that "was unlawfully intercepted" under Title III or the Fourth Amendment. 18 U.S.C. § 2518(10)(a). Title III's statutory rule of exclusion is distinct from and supplements the Fourth Amendment's own "judicially fashioned exclusionary rule," *see Giordano*, 416 U.S. at 524, and it "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," *id.* at 527.

### III. STATEMENT OF FACTS

In order to understand fully the breadth and scope of the misrepresentations presented to Judge Lynch in the wiretap application, the following statement details in full the factual developments that preceded the first wiretap application and were concealed from the court.

### A. The Government's Nine-Year-Long Investigation of Mr. Rajaratnam

#### 1. 1998-2002: Roomy Khan's First Conviction and Cooperation Effort

The FBI began investigating Roomy Khan in late 1998 after receiving a complaint from Intel, her employer at the time, that Khan had misappropriated certain confidential corporate information and faxed it to Galleon's offices in New York. Ex. A.5 at 2-3 (Sentencing Mem.).[3]

---

[3] Intel fired Khan around May 1998 without telling her its reasons. After leaving Intel, Khan worked briefly in Galleon's California office as an analyst, but she was terminated in March 1999 for trading in a personal brokerage account while working there. Khan acknowledges that her private trading activity was the reason her employment with Galleon was terminated. Ex. A.8 at 3 (FBI 302 Mem. (04/27/01); Ex. A.9 at 2 (FBI 302 Mem. (06/20/01)).

On April 15, 1999, the FBI interviewed Khan for the first time and asked her whether she had ever provided Mr. Rajaratnam with material, non-public information about Intel.  Ex. A.7 at 1 (FBI 302 Mem. (04/15/99)).  Initially, Khan denied that she had, stating that she had never "disclosed any insider information to him," and that she and Mr. Rajaratnam "did not talk about any inside information from Intel."  *Id.*  After the government threatened to prosecute her, Khan told a different story, promising the agents that "she could tell [them] how Rajaratnam did it and who he gets his information from" if she got immunity "in writing."  *Id.* at 2.

On February 28, 2001, the government filed a Criminal Information charging Khan with one count of wire fraud in violation of 18 U.S.C. § 1343.  Ex. A.2 (Crim. Information).[4]  On April 2, 2001, Khan entered into a Plea Agreement with the government, agreeing to plead guilty to the single wire fraud count.  Ex. A.4 ¶¶ 1-2 (Plea. Agreement).  Khan also agreed to "cooperate" with the government's investigation, in exchange for which the government would forgo charging Khan with any additional offenses and would recommend a reduction in her sentence if she "provided substantial assistance to law enforcement authorities" in the investigation or prosecution of another person.  *Id.* ¶¶ 8-9, 16.  The entire court file relating to Khan's criminal case was placed under seal in 2001.[5]

---

[4] The government had previously filed an Information charging Khan with a single count of theft of trade secrets, 18 U.S.C. § 1832.  Ex. A.3 (Crim. Information).  Khan was never charged with insider trading or conspiracy to commit insider trading, and the charge to which she pled guilty did not describe the information that she allegedly faxed to Galleon as material, non-public information, or that anyone at Galleon traded on the basis of that information.

[5] Ex. A.1 (Khan Criminal Docket).  Mr. Rajaratnam did not learn of Khan's prior conviction until after his arrest on October 16, 2009, when the government unsealed the criminal complaint against him, which identified Khan as "CW."  *See United States v. Rajaratnam et al.*, 1:09-MJ-02306 (S.D.N.Y.) (Crim. Compl. ¶¶ 17-20 (10/15/09)).  Khan's true identity was first reported by the *Wall Street Journal*.  Ex. 45 ( Susan Pulliam, *Galleon Sinks, Informant Surfaces*, WALL ST. J., Oct. 22, 2009).  That same day, the *San Jose Mercury News* reported that Khan had pled guilty to wire fraud in 2001 "for leaking proprietary information about Intel" while she

Khan pled guilty to the wire fraud offense on April 2, 2001, Ex. A.1 (Docket Entry 5), but her sentencing was continued multiple times with the government's consent, *id.* (Docket Entries 17-21). Over the next 17 months, Khan met repeatedly with SEC investigators, FBI agents, and prosecutors from the United States Attorney's Offices for the Northern District of California and the Eastern District of New York, "submitted to several debriefings [and] described her activities and those of other individuals involved in Rajaratnam's [purported] efforts to obtain material, non-public information."   Ex. A.5 at 6-8.   During those debriefings, Khan told a story inconsistent with what she had told investigators prior to being threatened with prosecution. Among other things, Khan alleged that she had provided Mr. Rajaratnam with confidential Intel financial information on several occasions since December 1997, and that Mr. Rajaratnam had offered to pay her for this information. Ex. A.8 at 2-3; Ex. A.9 at 1-2; Ex. A.10 at 1-3 (Gov't Mem. (04/16/02)). Khan also claimed that Mr. Rajaratnam had boasted about his other "insider" contacts, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and unnamed contacts inside Intel, Compaq, and Applied Materials. Ex. A.8 at 3, Ex. A.9 at 2; Ex. A.10 at 2. Khan continued to speak with Mr. Rajaratnam during this period, but assured investigators that she had not told him anything about her legal problems. Ex. A.8 at 3; Ex. A.9 at 2.

Ultimately, the government was unable to substantiate *any* of Khan's allegations against Mr. Rajaratnam, informing the court at Khan's sentencing that "[a]fter an exhaustive analysis of the labyrinth of accounts associated with Galleon," it concluded that Mr. Rajaratnam "[could] not

---

worked at Intel in 1998. Ex. 46 (Pete Carey, *Old Silicon Valley Case Linked to Hedge Fund Scandal*, SAN JOSE MERCURY NEWS, Oct. 22, 2009). This was the first time that Khan's prior conviction was reported in the press, and the first time that Mr. Rajaratnam learned of it. Following these reports, Mr. Rajaratnam filed a motion to unseal Khan's criminal case file, which the District Court granted on December 2, 2009. Ex. A.1 (Docket Entries 35, 43). As explained below, however, Khan's prior criminal case was already well known to the attorneys and agents who presented her to the court in support of the wiretap applications.

9

be tied to illegal insider trading," and that he "did not provide any monetary payment for . . . [the] information" Khan claimed to have provided him. Ex. A.5 at 3, 7.

In April 2002, the government moved for a downward departure from Khan's Guidelines range sentence, *id.*, which the district court granted. On July 1, 2002, Khan was sentenced, under seal, to three years' probation, including a period of six months' home confinement, a fine of $30,000, and restitution of $120,000. Ex. A.6 at 2, 4 (Judgment). Under the terms of her Plea Agreement and probation conditions, Khan was required not to commit any other crimes during the term of her probation. Ex. A.6 ¶¶ 8, 10; Ex. A.4 at 3.

Although the government was unable to corroborate Khan's allegations against Mr. Rajaratnam despite an "exhaustive analysis" of the evidence, it assured the court that "[t]he FBI and SEC investigation into Rajaratnam's activities [was] continuing" and it promised to pursue "several leads [Khan] provided with respect to other sources of information for Rajaratnam." Ex. A.5 at 3, 7.

### 2. 2003-2007: The SEC's Investigation of Galleon and Mr. Rajaratnam

Consistent with its above statement to the court, the government's investigation of Mr. Rajaratnam for insider trading continued uninterrupted. Between 2003 and 2007, the SEC served Mr. Rajaratnam and Galleon with dozens of investigatory requests for documents, voluntary interviews, and sworn testimony. Ex. B ¶¶ 5-7, 14, 16-18, 20-25 (Beaudreault Declaration). Mr. Rajaratnam, in consultation with other Galleon senior management, decided to engage outside counsel to advise it in connection with the SEC's inquiries. In November 2003, Galleon retained Lindi Beaudreault, an attorney who had recently left the SEC's Division of Enforcement after five years of service, to assist in dealing with the SEC's requests. *Id.* ¶¶ 2-4.

Shortly before Ms. Beaudreault began advising Galleon, the SEC had served Galleon with a formal order of investigation concerning allegations that Galleon had obtained material,

10

non-public information about companies. *Id.* ¶ 5. The SEC served requests for documents related to insider trading almost immediately after Ms. Beaudreault began advising the company. In the last two months of 2003, the SEC served Galleon with two document subpoenas requesting, among other things, records of "all incoming or outgoing calls made or received by Galleon employees, partners, officers, or directors since January 1, 2003" as well as records of trades in specific securities. *Id.* ¶ 7; Ex. A.11 (SEC Subpoenas). These requests continued in 2004 and 2005, with no fewer than five additional subpoenas demanding, among other things: (1) records sufficient to identify all securities purchased or sold by Galleon; (2) documents relating to Galleon's policies, procedures, and controls concerning oversight of personnel; (3) documents related to Galleon's trading in various specific securities; and (4) documents "showing Galleon's policies or guidelines concerning the treatment of non-public information concerning publicly traded companies, including all policies concerning trading securities while in possession of material, non-public information." Ex. B ¶ 7; Ex. A.11. The SEC also requested interviews with Galleon employees about these and other matters. Ex. B. ¶ 7.

"Galleon, Mr. Rajaratnam and other Galleon personnel all cooperated with all SEC subpoenas and requests, without regard to whether they were legally obligated to do so" and "made best efforts to comply fully with all SEC subpoenas and requests as written or as modified with the SEC staff's approval." *Id.* ¶ 8. These efforts were "consistent with Galleon's determination and directive to all personnel (fully supported by Mr. Rajaratnam) that it cooperate fully with the SEC in all matters." *Id.*

While these inquiries were ongoing, Galleon, with the support of Mr. Rajaratnam, registered with the SEC as an investment advisor in January 2006, thereby subjecting itself and its employees to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 – § 80b-21, and the

11

rules and regulations promulgated by the SEC pursuant to it.  Ex. B ¶ 10.  Among other things, registration required Galleon to maintain detailed books and records of its business operations, 17 C.F.R. § 275.204-2, and to submit to inspection of those records by SEC examiners upon notice, *id*.  Registration also required Galleon to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information by such investment adviser or any person associated with such investment adviser." 15 U.S.C. § 80b-4a.  As a consequence of registration, the SEC obtained authority to investigate Galleon and its employees for suspected violations through the use of compulsory subpoenas for records and testimony, and to enforce the Act through administrative proceedings and civil actions for injunctive relief or monetary penalties.  *See* 15 U.S.C. §§ 80b-3(k), 80b-9.

      In conjunction with this decision to register, Mr. Rajaratnam directed Galleon's counsel and other personnel to work together "to memorialize and strengthen Galleon's legal and compliance program handbook and policies, including, but not limited to, its portfolio management policy, its personal trading policy, its books and records procedures, its soft dollar documentation and policies, its gifts and entertainment policy and its insider trading policy." Ex. B ¶ 11.  At the direction of Mr. Rajaratnam, Galleon's outside counsel "conducted workshops and seminars on the prohibitions against insider trading for Galleon personnel."  *Id.* ¶ 12.

      On January 29, 2007, the SEC advised Galleon that it intended to conduct a routine field examination of Galleon's records spanning the period January 3, 2006 through December 31, 2006, and requested, among other things, documentation of Galleon's compliance program and extensive customer and trading information.  *Id.* ¶ 14; Ex. A.12 (SEC Examination Notice). Shortly after advising Galleon of its examination, the SEC sent a team of examiners to Galleon to conduct an on-site examination.  Beginning in February 2007 and continuing for several

12

months, a team of SEC examiners was regularly on Galleon's premises. Ex. B ¶ 15. Over the

next year, the SEC issued at least 18 additional requests for information "concerning virtually all

of Galleon's funds, touching nearly every aspect of its business and seeking among other things,

information regarding Galleon's most profitable trades during the examination period and the

production of numerous emails and [instant messages] from Galleon employees, including Mr.

Rajaratnam." *Id.* ¶ 16; Ex. A.13 (SEC Exam. Requests).

The SEC also sought and received permission to interview several Galleon employees,

including Mr. Rajaratnam. Ex. B ¶¶ 17-18. On March 9, 2007, Mr. Rajaratnam was interviewed

by the SEC staff and "answered every question posed to him," addressing matters including: (1)

where Mr. Rajaratnam gets his trading ideas; (2) what degree of influence he exerts over other

Galleon portfolio managers; (3) whether Mr. Rajaratnam speaks with insiders at the companies

whose stocks he trades; (4) his relationship with Rajiv Goel, an Intel employee; and (5) Galleon's

trading in specific securities including Advanced Micro Devices, ATI, Intel, and Marvel —stocks

that Mr. Rajaratnam is charged with illegally trading in the present action. *Id.*

At the same time as the Galleon examination, the SEC was also conducting a formal

enforcement investigation of Sedna Capital Management, a hedge fund run by Mr. Rajaratnam's

brother, Rengan. *Id.* ¶ 20. Although Sedna had no affiliation with Galleon, it was clear by mid-

2007 that the SEC was using the Sedna investigation to investigate Mr. Rajaratnam and Galleon

for insider trading. *Id.* ¶ 21. In May 2007, the SEC served Galleon with a subpoena for records;

additional subpoenas to Galleon and Mr. Rajaratnam followed in June 2007. *Id.*; Ex. A.14 (SEC

Subpoenas). Although purportedly issued in connection with the Sedna investigation, each of

those subpoenas mention Sedna exactly once: in the caption. Ex. A.14. The substance of the

subpoenas was directed at Mr. Rajaratnam and Galleon, requesting, among other things, trading

13

blotters reflecting all Galleon securities transactions since September 1, 2005, personal trading and investment information for Mr. Rajaratnam, calendars and scheduling information for Mr. Rajaratnam and others, and all records of trading in specific securities, including Advanced Micro Devices (one of the stocks Mr. Rajaratnam is charged with illegally trading in the present case). Ex. B ¶ 20; Ex. A.14. In response to these subpoenas, Galleon produced over four million documents, without objection. Ex. B ¶ 22.

The documents that Galleon produced between 2003 and 2007 provided the SEC with a detailed record of nearly every aspect of Galleon's operations. Among many other things, Galleon produced: (1) thousands of emails, instant messages, chat room posts, and other written communications; (2) trading data; (3) telephone records; (4) detailed records of Galleon's research and analysis into dozens of companies, including analysts' financial models, weekly research reports, and quarterly earnings previews; (5) records of Galleon's contracts with and compensation of various consultants; (6) records identifying Galleon's investors and the amounts of their investments; (7) datebooks, schedulers, and other calendar appointments for several Galleon employees including Mr. Rajaratnam; and (8) records documenting Galleon's compliance systems, procedures, and training of employees. *Id.*

In addition to its document subpoenas, the SEC also deposed Raj Rajaratnam for approximately seven hours on June 7, 2007. *Id.* ¶ 23. That deposition was conducted by Andrew Michaelson, then an SEC attorney, but now a Special Assistant United States Attorney prosecuting Mr. Rajaratnam. "Mr. Rajaratnam answered every question under oath posed to him" by Mr. Michaelson. Ex. B ¶ 24. Mr. Michaelson's examination made little reference to Sedna, asking instead numerous questions about insider trading, such as: "Are you familiar with the term 'Inside Trading'? So do you believe it's wrong?"; "Do you recall any instance where

14

you've come into contact with information that you believed was material and non-public in any respect...?"; "Has Galleon ever made a trade on the basis of non-public information?  Have you ever suspected that anyone at Galleon ever engaged in insider trading?"; and "Are you familiar with a Rumi81 [Roomy Khan's screen name] [sic] instant message address?  Did you ever talk to Rumi about AMD?"  Ex. A.15 at 77-78, 80, 113, 184 (Rajaratnam Deposition Tr.); Ex. B ¶ 23.

Mr. Michaelson also asked numerous questions about Galleon's research process, the respective roles and responsibilities of portfolio managers, analysts, and traders in the Galleon organization, and Mr. Rajaratnam's communications with persons inside and outside Galleon.  Ex. A.15 at 52-61, 84-89, 96-99, 105-08, 127-34, 143-48, 156-61, 164-66.    In responding to these questions, Mr. Rajaratnam provided a detailed picture of Galleon's research and analysis operations, explaining that Galleon employed approximately 34 full-time analysts, each focused on specific companies, to advise Galleon's various portfolio managers on their investments in those companies.  *Id.* at 56-61, 80, 170.  Mr. Rajaratnam explained how Galleon's analysts communicated their recommendations during Galleon's daily morning meetings, informally through emails and chat room posts, and formally in their weekly reports, quarterly earnings previews, and trading positions in their mock, or "paper," portfolios.  *Id.* at 57-61. With respect to quarterly earnings announcements of public companies, Mr. Rajaratnam explained in detail how he routinely formulated specific predictions about companies' financial performance in advance of earnings announcements based on published guidance by those companies, sell-side analyst reports from Wall Street firms, and the analysis and recommendations of Galleon's analysts.  *Id.* at 133-35, 137-38, 157-161.  He discussed at length how he utilized those analyses and predictions in deciding whether to trade each quarter.  Mr. Rajaratnam also testified that he shares his investment ideas with people outside his company, including other analysts and fund

15

managers with whom he discusses these ideas at conferences and dinners sponsored by brokers and other organizations, or in telephone conversations, and how he occasionally uses the word "source" as a synonym for analysis that "you put [] all together" from Galleon's own analysts and/or outside analysts.  *Id.* at 89-91, 101-02, 109-12, 141-43, 151-54.  Mr. Rajaratnam's deposition transcript comprises 188 pages.  The SEC also obtained recorded testimony from six other Galleon employees.  Ex. B ¶ 25.

In sum, as a result of the SEC's investigations of Mr. Rajaratnam and Galleon between 2003 and 2007, the government obtained more than four million pages of business records and extensive depositions and/or interviews of 20 different Galleon employees, including both an interview and lengthy deposition of Mr. Rajaratnam himself.  *Id.* ¶¶ 22-25.  Although the SEC's investigations of Galleon and Sedna appeared to wind down in late 2007, this quietude did not signal that the government's investigation was over.  Instead, it merely marked the point at which the government shifted from the conventional investigative techniques it had been using for the last nine years in favor of a wiretap.

**B.  November 2007-March 2008: The Government's Second Use of Roomy Khan**

Among the records that Galleon produced to the SEC was a January 9, 2006 instant message to Mr. Rajaratnam from "Roomy81," the screen name of Roomy Khan.  That message concerned the stock of a company named Polycom, and stated, in its entirety: "donot [sic] buy plcm till i het [sic] guidance; want to make sure guidance OK."  This document was shared with the FBI, which questioned Khan about her communications with Mr. Rajaratnam concerning Polycom and other companies on November 28, 2007.[6]  When questioned by FBI agents B.J.

---

[6] During the November 5, 2009 hearing before Magistrate Judge Katz, Assistant United States Attorney Joshua Klein confirmed that the SEC had obtained this document during an "audit" of Galleon.  Ex. A.42 at 7 (Hearing Transcript).

Kang and Catherine Queally about the message, Khan said that she "does not speak to people about their companies because of the trouble she got into with the FBI several years ago," and specifically denied that she provided any information to Mr. Rajaratnam. Ex. A.16 at 1, 4 (FBI 302 Mem. (11/28/07)). Khan also said that she believed Mr. Rajaratnam "only speaks to her because he is being nice." *Id.* at 4. The agents also questioned Khan about her trading in the securities of Hilton around the time of its takeover by a private equity firm, which she claimed to have learned about through "broker chatter." *Id.* at 3. Khan told the agents that she understood that "if [she did] not cooperate with the government this time [she would] go to jail." *Id.* at 5.

According to the FBI's memoranda, Khan was interviewed by the government at least 33 times over the ensuing months pursuant to a series of "proffer agreements" with both the U. S. Attorney's Office and the SEC, including AUSAs Lauren Goldberg and Joshua Klein, and SEC Senior Counsel Andrew Michaelson (who had deposed Mr. Rajaratnam earlier that year). In the course of those subsequent meetings, Khan reversed position on a number of claims she had made during the November 28, 2007 meeting, eventually admitting to engaging in a long-running pattern of insider trading in the securities of a number of companies between 2004 and 2007, including while she was still on probation for her prior wire fraud conviction.

Khan's new version of events first began to emerge during a December 17, 2007 interview with Agents Kang and Queally and two AUSAs. Khan was represented by counsel during that interview, which was conducted pursuant to a "proffer agreement" with the government.    Ex. A.17 at 1 (FBI 302 Mem. (12/17/07)).    According to Agent Kang's memorandum of the interview, Khan stated that she contacted Mr. Rajaratnam in mid-2005 looking for a job; and that she needed to find work because "her expenses and debts became overwhelming," but she had "difficulties trying to obtain employment because of her past

17

criminal record." *Id.* at 2. According to Khan, "Rajaratnam asked her what companies she had an 'edge' on," which she understood to mean "what 'good read' she had on companies." *Id.* Khan claimed that she told Mr. Rajaratnam that she had an "edge" on Polycom. *Id.*

During that same interview, Khan made a number of statements that she would later recant. For example, Khan claimed that she purchased Hilton stock shortly before the company was acquired by a private equity firm "because at the time, Paris Hilton was incarcerated so Khan thought this could be good publicity for the hotel." *Id.* at 10. Khan told a similar story during a subsequent meeting with investigators on January 3, 2008, claiming that "there was a lot of news about how Paris Hilton was publicizing herself, so Khan randomly picked Hilton to trade." Ex. A.18 at 4 (FBI 302 Mem. (01/03/08)). But in April 2008, Khan recanted her twice-told Hilton story, telling investigators that she had obtained, and traded on the basis of, material, non-public information about the Hilton acquisition from a Moody's analyst named Deep Shah who was involved in the transaction. Ex. A. 20 at 1-4 (FBI 302 Mem. (04/02/08)). Although Khan herself did not admit Shah's involvement until April, the government's interview memoranda reflect that it had detected her lie much earlier, *e.g.*, its January 15, 2008 interview with Khan reflects questioning about Shah, his role at Moody's, and Khan's relationship with Shah through her cousin,              . Ex. A.19 at 2 (FBI 302 Mem. (01/15/08)).

In addition to changing her story, Khan also took affirmative steps to obstruct the government's investigation, even while represented by counsel, and even while ostensibly cooperating. For example, Khan destroyed a document relevant to the government's

18

investigation near the end of February 2008 "because she was scared." Ex. 20 at 5.[7]  Khan also

obtained a secret cellular telephone in her gardener's name in December 2007 (again, while

ostensibly cooperating) "because [she] was 'extremely petrified' speaking to the FBI agents the

first time" and "wanted to hide the extent of [her] telephone calls." Ex. 21 at 1-2 (FBI Mem. at

1-2 (05/28/08)).[8]  Khan also admitted that she used this secret telephone to contact Deep Shah

(her source on the Hilton takeover) "in order to create a cover story for their communications

around the time of the Hilton trade." Ex. 22 at 5-6 (FBI Mem. at 1-2 (05/29/08)). Shah, who has

been charged by criminal complaint in connection with this matter, remains a fugitive to this day.

## C.  January 2008: Khan's Recorded Calls with Mr. Rajaratnam

### 1.  Galleon's Preparation of Earnings Previews for Fourth Quarter 2007

As Mr. Rajaratnam had explained during his June 2007 deposition, Galleon employed

more than 30 full-time research analysts, each of whom was responsible for "following" a

number of companies and for advising Galleon's portfolio managers based upon their analysis of

those companies. Ex. A.15 at 54-59. One of the analysts' core responsibilities was to prepare

financial models for the companies they followed and, in advance of quarterly earnings

announcements, an "earnings preview" for those companies, which they distributed to Galleon's

portfolio managers for use as a guide when making trading decisions prior to the next earnings

announcement. *Id.* at 128-133, 157-61. These earnings previews included publicly available

information such as the company's own publicly released earnings and revenue guidance and the

---

[7] It is not clear when or how the government learned that Khan destroyed evidence. The earliest reference to the issue appears in the government's memorandum of its April 2, 2008 interview with Khan.

[8] As with Khan's document destruction, it is not clear when or how the government learned of her use of this secret cell phone. The earliest reference to the issue appears in the government's memorandum of its May 28, 2008 interview with Khan.

19

Wall Street consensus view on the company's expected earnings and revenue, as well as the analyst's own analysis and predictions about it. *Id.* By late 2007, the government knew of Galleon's practices with respect to earnings previews because it had received dozens of such previews in response to the subpoenas it previously served on Galleon, and had specifically questioned Mr. Rajaratnam about his trading habits around earnings announcements. *Id.*; Ex. A.23 (Misc. Earnings Previews Produced to SEC).

Consistent with this usual practice, Nadeem Janmohamed, one of Galleon's technology sector analysts, prepared and circulated earnings previews for a number of technology companies in advance of the announcement of fourth quarter 2007 earnings, including an earnings preview for Xilinx on January 11, 2008 and for Intel on January 14, 2008. Ex. A.24 (Xilinx Preview); Ex. A.25 (Intel Preview). These previews contained the companies' own publicly-announced revenue guidance for the prior quarter, estimates of revenue and earnings for the prior quarter, estimates of revenue guidance that the companies would issue for the current quarter, and observations on the attractiveness of buying or avoiding the stock. In these earnings previews, Mr. Janmohamed recommended that Galleon's portfolio managers "avoid" Intel (meaning to take no position) in advance of its earnings announcement, Ex. A.25, and with respect to Xilinx, that Galleon's portfolio managers short the stock, Ex. A.24.

## 2. Khan's Recorded Calls with Mr. Rajaratnam

On January 14, 2008, Khan placed a call to Mr. Rajaratnam on his office phone, which he returned from the same phone (not the cell phone for which wiretapping authority was later sought). Unbeknownst to Mr. Rajaratnam, Khan recorded the call at the government's urging. As reflected in the transcript of that conversation, Khan asked Mr. Rajaratnam about his views on Intel, which was due to report its quarterly earnings later that week:

> ROOMY KHAN: What's going on with the earnings this season? Are you hearing anything on Intel, or –
>
> RAJ RAJARATNAM: Intel I think will beat the current estimates by, they'll be up like 9 to 10 percent and then guide down 8 percent.
>
> ROOMY KHAN: So you think they'll be up 9 to 10 percent.
>
> RAJ RAJARATNAM: What?
>
> ROOMY KHAN: Up 9 to 10 and guide down 8 percent?
>
> RAJ RAJARATNAM: Yeah.
>
> ROOMY KHAN: And what about the margins? Do you have any color on the margins?
>
> RAJ RAJARATNAM: Margins I think will be good this quarter but next quarter will be below. You know?
>
> ROOMY KHAN: So what do you think of the stock?
>
> RAJ RAJARATNAM: I'm not involved. I don't think – I'm not trading Intel anymore. They're a f[***]ing pain in the ass stock.

Ex. D.1 at 2-3 (Transcript of Recorded Call (01/14/08)). The views that Mr. Rajaratnam expressed to Khan regarding Intel conformed in every particular to the earnings preview that Galleon's analyst, based on publicly available information, had prepared and circulated earlier that day—including the analyst's recommendation to avoid trading the stock. Ex. A.25.

Khan also asked Mr. Rajaratnam about his views on Xilinx:

> ROOMY KHAN: Hey so, did you hear anything on Xilinx?
>
> RAJ RAJARATNAM: I think this quarter is okay. Next quarter not so good.
>
> ROOMY KHAN: Yeah? How do you think they'll -- what do you think they'll do?
>
> RAJ RAJARATNAM: I haven't made the call I have to make. I got to call and I got to call a couple of guys there at Xilinx.

21

Ex. D.1 at 4. As with Intel, Mr. Rajaratnam's view that "this quarter turned out well" was based on his analyst's earnings preview, which had forecast fourth quarter revenues slightly higher than "street" expectations. Ex. A.24. Mr. Rajaratnam's statement that he needed to call ▮▮▮▮▮ was a reference to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.

The day after this call, January 15, 2008, Intel publicly announced its revenues and earnings for the fourth quarter of 2007 and provided guidance for the first quarter of 2008. Ex. A.27 (Intel Earnings Announcement). As it turned out, Mr. Rajaratnam's predictions (and the Galleon analyst's previews) were wrong in a number of respects. Most significantly, Intel announced revenue for the fourth quarter of 2007 of $10.7 billion, an increase of only 6% over the third quarter of 2007, *id.*, whereas Mr. Rajaratnam had predicted an increase of 9 to 10%, a difference of some $300 million to $400 million.

Khan called Mr. Rajaratnam again on January 17, 2008 – this time on his cell phone – and recorded the call, which is one of only two recordings on the "target" phone that was offered as probable cause for the wiretap. During that call she noted that he had been wrong about Intel, and asked him for his views on Xilinx. As during the January 14 call, Mr. Rajaratnam stated his analyst's view that the current quarter turned out well but the next quarter would be down:

> ROOMY KHAN:  Hey so, did you hear anything on Xilinx?
>
> RAJ RAJARATNAM:  I think this quarter is okay.  Next quarter not so good. Where is the stock?

Ex. D.2 at 3 (Transcript of Recorded Call (01/17/08)). Later, Khan asked Mr. Rajaratnam about Xilinx again, and this time attempted without success to lead Mr. Rajaratnam into admitting that his view was based on inside information:

22

> ROOMY KHAN:  Right.  So Xilinx you think this quarter is okay and next quarter not so good?
>
> RAJ RAJARATNAM:  Yeah, below the street.
>
> ROOMY KHAN:  Below the street.
>
> RAJ RAJARATNAM:  Yeah.
>
> ROOMY KHAN:  And you got it from somebody at the company or?
>
> RAJ RAJARATNAM:  Yeah, I mean, somebody who knows his stuff.

*Id.* at 4.  Once again, Mr. Rajaratnam's view that Xilinx's revenues for the next quarter would be "below the street" was consistent with his analyst's earnings preview, which had forecast earnings guidance for the first quarter of 2008 below "street" expectations.  Ex. A.24.  And Mr. Rajaratnam's statement that he got his Xilinx information from someone "who knows his stuff" was a reference to his analyst, Mr. Janmohamed, whose job was to "know his stuff" about Xilinx and the other companies he followed.[9]

Near the end of the call, Khan asked Mr. Rajaratnam if had any information about Broadcom's earnings:

> ROOMY KHAN:  Hey, what about Broadcom?  Have you checked on Broadcom?
>
> RAJ RAJARATNAM:  I know somebody very good there okay who can give me the numbers, but I'll come back on the weekend and then I'll check.

*Id.* at 6.   As Mr. Rajaratnam had testified during his deposition, speaking to company representatives in order to gather publicly available information about the company, its supply chain, and its competitors, was a routine part of the factual research that went into formulating Galleon's investing strategies, including earnings previews.  Ex. A.15 at 100-02, 105-09, 110-13.

---

[9] Mr. Rajaratnam had testified specifically about Mr. Janmohamed's role as the analyst assigned to Xilinx during his June 7, 2007 SEC deposition.  Ex. A.15 at 161-63.

Later that day, Xilinx publicly announced its revenues and earnings for the fourth quarter of 2007 and provided guidance for the first quarter of 2008. Ex. A.28 (Xilinx Earnings Announcement). Although Mr. Rajaratnam had correctly predicted that the fourth quarter of 2007 "turned out well," he and Mr. Janmohamed were wrong about Xilinx issuing guidance for the first quarter of 2008 below "street" expectations. In fact, Xilinx issued revenue guidance of $470 million to $489 million, in line with street expectations of approximately $481 million. *Id*.

Khan continued to contact Mr. Rajaratnam throughout 2008 and spoke to him at least three more times. At the government's insistence, Khan recorded the calls at least once more and was also intercepted on wiretapped calls. Ex. A.29 (FBI Mems. (07/22/08, 09/15/08, 12/02/08)).

### D. The Government's False and Misleading Wiretap Application

On March 7, 2008, the government submitted an *ex parte* application to Judge Lynch seeking authorization to intercept wire communications over Mr. Rajaratnam's cell phone (the "Target Phone"). Ex. A.30 (Wiretap App. (03/07/08)). The application was supported by the sworn affidavit of FBI Special Agent B. J. Kang. Ex. A.31 (Kang Aff. (03/07/08)).[10] The initial application sought to tap Mr. Rajaratnam's cell phone for 30 days. As explained in paragraph 6 of the affidavit – the sole paragraph under the heading "SUBJECTS AND OFFENSES" – the

> application is submitted in connection with a investigation of an insider trading scheme in which individuals have been receiving and then transmitting to others material, nonpublic information regarding certain public companies' earning results and planned merger and acquisition activity ("the Inside Information") for the purpose of executing profitable securities transactions, and in which the Inside Information has been misappropriated by individuals in violation of their fiduciary and other duties to their employers.

---

[10] Unless otherwise specifically noted, all citations to "Kang Aff." refer to the first such affidavit, dated March 7, 2008.

*Id.* ¶ 6. Fifty-six of the affidavit's 97 paragraphs addressed the government's investigation of securities fraud and insider trading, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2. *Id.* Only four paragraphs mentioned an investigation of money laundering, in violation of 18 U.S.C. § 1956, or wire fraud, in violation of 18 U.S.C. §1343, and none of them make any substantive supporting allegations. *Id.* at ¶¶ 2, 6, 31, 44. The affidavit also included a footnote acknowledging that securities fraud is not an offense for which Congress has authorized the use of wiretaps. *Id.* n. 1.

### 1.   False Probable Cause Allegations: Credibility of Roomy Khan

To support the affidavit's general probable cause allegations, Agent Kang described the "background of the investigation," stating that "[b]eginning in or about November 2007, I and other FBI agents had numerous discussions with a cooperating source ('CS-1')," now known to be Roomy Khan. *Id.* ¶ 15. Agent Kang stated that CS-1 had "participated in an insider trading scheme" since 2005, but had not yet "been charged with any crimes." *Id.* Agent Kang added that, "CS-1 has been cooperating with the FBI since approximately November 2007. CS-1 is not being paid and information s/he has provided has proven to be reliable and has been corroborated by, among other things, trading records, pen register data, and telephone records." *Id.* n. 4.

These representations were knowingly false. By the time Agent Kang submitted his affidavit to Judge Lynch he knew that: (1) Khan not only had "been charged with . . . crimes," she had already been convicted of felony wire fraud (as reflected in the criminal docket under seal in the Northern District of California since 2001), which led to her first cooperation agreement with the government;[11] (2) Khan had been cooperating with the government's

---

[11] Agent Kang's own interview memoranda documented his knowledge of Khan's criminal record. His December 17, 2007 memorandum refers to "her past criminal record." Ex.

investigation of Mr. Rajaratnam since 1999, not November 2007, as reflected in her initial FBI interviews; and (3) Khan had not "proven to be reliable," but instead had previously made allegations against Mr. Rajaratnam that the government was unable to establish – all while ostensibly cooperating with the government.  Agent Kang also knew and failed to disclose that Khan had repeatedly changed her story, had destroyed evidence, and had colluded with another witness to obstruct the government's investigation.[12]

Following these representations regarding the history of the government's dealings with CS-1 and the circumstances affecting her credibility, Agent Kang described CS-1's allegations against Mr. Rajaratnam.  According to Kang's affidavit, CS-1 claimed that in mid-2005 Mr. Rajaratnam asked her what companies she "had an edge on" and that she understood Mr. Rajaratnam "to be asking what companies CS-1 was able to receive inside information from or about." *Id.* ¶ 16.  However, this allegation is contradicted by Agent Kang's own memorandum of his interview with Khan, which states:

---

A.17 at 2.  His November 28, 2007 interview memorandum refers to "the trouble she got into with the FBI several years ago." Ex. A.16 at 2.

[12] The government subsequently repeated its description of Ms. Khan as "reliable" in its April 8, 2008 application to renew the wiretap on Mr. Rajaratnam's cell phone – *after* its own memoranda show that it had learned of Khan's destruction of relevant documents. *Compare* Ex. A.32 n.4 (Kang Aff. (04/08/08) *with* Ex. A.20 (FBI 302 Mem. (04/02/08)).  By the time of its May application, the government gave up using the word "reliable" to describe Roomy Khan, Ex. A.33 n. 4 (Kang Aff. (05/16/08)), but this deletion and change in characterization was neither highlighted nor otherwise brought to the court's attention in that, or any subsequent, application.  Also, by that time the government was basing its probable cause allegations primarily upon the conversations intercepted pursuant to the earlier authorizations, which were the fruit of the initial unlawful interceptions.  Agent Kang's memoranda of his interviews with Khan document that he knew Khan had changed her story in a number of respects before he submitted his first affidavit to Judge Lynch on March 8, 2008.  Exs. A.16-A.19.  And it is clear from the government's confidential human source memoranda that Agent Kang was aware of Khan's "secret cell phone" and her collusion with Deep Shah before he submitted his sworn affidavits to the court in July, August, September, October, and November 2008.  Exs. A.21-A.22.

> Because of her mounting financial problems, Khan decided to
> reach out to Rajaratnam for employment in mid 2005 . . . .
> Rajaratnam asked her what companies she had an "edge" on.
> Because Khan had worked for Rajaratnam before, *she knew that*
> *Rajaratnam meant what "good read" she had on companies.*

Ex. A.17 at 2.  There is nothing suspicious about Mr. Rajaratnam asking Khan, who was then

seeking a job as a stock analyst with Galleon, which companies she had a "good read" on.

Indeed, in Mr. Rajaratnam's SEC deposition, Mr. Michaelson questioned him about whether

certain individuals had a "good read" on certain stocks or sectors, which Michaelson explained

meant "expertise."  Ex. A.15 at 91.  But in order to convince the court that Mr. Rajaratnam had

done something improper, Agent Kang substituted an incriminating falsehood ("inside

information") for Khan's actual words.

### 2.   False Probable Cause Allegations: Description of the Recorded Telephone Calls

**a.**    Agent Kang represented that on or about January 14, 2008, "after CS-1 began

cooperating with the Government, CS-1 placed a consensually recorded call to RAJARATNAM

by calling RAJARATNAM's work phone," and that Mr. Rajaratnam subsequently called CS-1

from his office telephone (not the target cell phone), a call which was recorded with CS-1's

consent.  Kang Aff. ¶ 18.  Agent Kang represented to the Court the following regarding the call:

> During the call, CS-1 asked RAJARATNAM what was "going on
> with the earnings this season," and whether he was "getting
> anything on Intel."  RAJARATNAM proceeded to tell CS-1 that
> Intel would be up 9 to 10% and then guide down 8% and that the
> margins would be good.  RAJARATNAM then asked CS-1, "What
> are you hearing anything?"  CS-1 responded "not really."  CS-1
> later asked RAJARATNAM about Xilinx.    RAJARATNAM
> responded: "Xilinx this quarter I think worked out well . . . . I
> haven't made the call I have to make I gotta call ███████
> ███████████████████████████████████████ and I
> gotta call a couple of guys there at Xilinx."  RAJARATNAM also
> asked CS-1 what CS-1 was hearing on Google.   CS-1 did not

> respond.   RAJARATNAM told CS-1 that he would check on
> Xilinx and that CS-1 should call him back in the next few days.

*Id.* Agent Kang's paraphrase of this conversation implies that Mr. Rajaratnam was providing

Khan with material, non-public information about Intel's and Xilinx's anticipated earnings

announcements. However, Mr. Rajaratnam was simply restating publicly available information

reflected in the report of Galleon's own analyst – a fact that Agent Kang could easily have

confirmed simply by checking the earnings guidance that Intel and Xilinx had posted on their

websites in October and December 2007, Ex. A.36 (Intel and Xilinx Earnings Guidance), and the

written reports that Galleon and other Wall Street analysts prepared on these companies. Before

making the wiretap application, the government was well aware that Galleon's analysts,

including Mr. Janmohamed, prepared earnings previews in advance of earnings announcements

and that Galleon's portfolio managers often traded based upon those previews.[13] Agent Kang did

not inform the court about these reports or that he had failed to check whether Mr. Rajaratnam's

information was consistent with them.  Agent Kang also neglected to mention that numerous

Wall Street analysts were making nearly identical predictions about Intel and Xilinx during that

quarter, which represents publicly available information that should have been disclosed in the

affidavit.  Ex. A.37 (Published Analyst Reports).

   Agent Kang's description of ▮▮▮▮▮▮ as the ▮▮▮▮▮▮▮▮▮▮▮▮▮ although

technically correct, failed to include the significant fact that ▮▮▮▮▮▮▮▮▮▮▮▮

---

[13] In fact, the government had subpoenaed and received dozens of these previews,
including previews on Intel and Xilinx prepared by Mr. Janmohamed. Ex. A.23. Agent Kang
acknowledged that he had reviewed Galleon records that he had obtained from the SEC. Kang
Aff. at 15 (n.6), 16 (n.9), 31 (¶ 30(e)), 35 (¶ 30(m)), 37-38 (¶ 34), 44 (¶ 39). But instead of doing
a simple check of the publicly available information and internal Galleon analysis that the
government could easily have obtained, Agent Kang falsely represented to the court that he could
not obtain records from Galleon, notwithstanding the fact that the government had done so many
times before.

28

████████████████████████████████████████████████—a fact that Agent Kang was

aware of from his interviews with Khan, Ex. A.17 at 6, and which Mr. Rajaratnam had testified

about during his deposition, Ex. A.15 at 70.  Disclosure of this omitted information would have

revealed that Mr. Rajaratnam was referring to ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████ Moreover, the SEC's on-line database, a publicly

available resource, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███.

Finally, Agent Kang omitted that part of the conversation which revealed that Mr.

Rajaratnam had *no* position in Intel and was not even trading any Intel stock at the time of the

January 14, 2008 call, a fact plainly inconsistent with Agent Kang's insinuation that Mr.

Rajaratnam was engaged in insider trading in Intel's stock, and a fact that Agent Kang could

have confirmed simply by reviewing Galleon's trading records. Similarly, Mr. Rajaratnam had no

position in Xilinx or Broadcom at the time of this call with Khan, another fact that Agent Kang

could have easily checked. Ex. A.43 (Account Statements).

Following his description of this call, Agent Kang stated in Footnote 8 that he had

reviewed publicly available information and confirmed that Intel announced earnings the

following day that were up approximately 10.5% from the fourth quarter of the prior year.  Kang

Aff. n. 8. The footnote suggested that Mr. Rajaratnam had predicted Intel's revenues accurately.

In fact, he had been significantly off the mark.  Agent Kang's footnote focused on a fourth

quarter year-to-year revenue comparison, *i.e.*, fourth quarter 2007 to fourth quarter 2006.

However, the 9-10% figure that Mr. Rajaratnam discussed with Khan concerned the increase in

revenues in the *fourth* quarter of 2007 compared to the *third* quarter of 2007 – a fact readily

apparent from a review of Mr. Janmohamed's Intel earnings preview. Ex. A.25. In fact, Intel's

fourth quarter 2007 revenue was only 6% higher than the third quarter 2007 revenue, which was

substantially short of the 9-10% increase that Mr. Rajaratnam estimated to Khan. Ex. A.27. This

3-4% shortfall in the revenue estimate that Mr. Rajaratnam discussed with Khan represented

approximately $300-$400 million in lower actual revenue realized by Intel, hardly an indication

of inside information. The inaccuracy of Footnote 8 is confirmed by the fact that, beginning with

the wiretap application dated July 10, 2008, the government changed the footnote to accurately

describe Intel's revenue announcement but did not inform the court of its earlier error. Ex. A.35

n.8 (Kang Aff. (07/10/08)). By then the government had already exploited the false information

it initially presented, thereby obtaining the initial wiretap authorization, and then utilized its

fruits in the follow-on wiretap applications.

     **b.**     Agent Kang also paraphrased Mr. Rajaratnam's January 17, 2008 telephone call

with Khan. With respect to their discussion of Xilinx, Agent Kang alleged:

> CS-1 asked whether RAJARATNAM had heard anything on
> Xilinx. RAJARATNAM responded that he thought this quarter
> would be okay but next quarter would not be so good . . . .
> RAJARATNAM then said that he expected Xilinx to be "below the
> street." CS-1 asked whether he got "it" from someone at the
> company and RAJARATNAM said yes, somebody who knows.

Kang Aff. ¶ 19. This time, Agent Kang simply supplied the critical language that he needed in

order to suggest that Mr. Rajaratnam was trafficking in inside information. As the transcript of

this call shows, in response to Khan's question whether he obtained the Xilinx information from

"someone at the company," Mr. Rajaratnam did not reply "yes, somebody who knows."   He

replied: "Yeah, I mean, somebody who knows his stuff." Ex. D.2 at 4. The affidavit failed to

inform the court that Galleon employed dozens of analysts, at a cost of millions of dollars per

year, whose sole responsibility was to "know their stuff" with regard to the companies they followed – facts that Mr. Rajaratnam had testified about during his SEC deposition. Ex. A.15 at 56-61, 80. Agent Kang's summary, asserting that Mr. Rajaratnam said he got the information "from someone who knows" was materially false and misleading and clearly designed to suggest that the source of the information was someone inside Xilinx. Furthermore, as noted previously, Mr. Rajaratnam had no trading position in Xilinx at the time of this call, a fact that Agent Kang also failed to disclose.

> c.      Agent Kang also summarized Mr. Rajaratnam's comments about Broadcom:

> > CS-1 also asked Rajaratnam whether he had anything on Broadcom. Rajaratnam responded that he knew somebody very good there who could give him the numbers but that he had to check.

Kang Aff. ¶ 19. This summary suggested that Mr. Rajaratnam was referring to material, non-public information from a company insider, but Agent Kang knew from Mr. Rajaratnam's SEC testimony – yet did not tell the court – that it was a routine part of formulating trading strategies for Galleon's analysts to meet and speak with company representatives. A.15 at 100-02; 105-09, 110-13. Finally, as with Xilinx and Intel, Agent Kang failed to disclose that Mr. Rajaratnam had no trading position in Broadcom at the time of this call.

> d.      After misrepresenting the contents of the two telephone conversations that Khan recorded with Mr. Rajaratnam, Agent Kang padded his affidavit with ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████.

31



### 3.   False Allegations Regarding Necessity

Agent Kang then made a series of misrepresentations for the purpose of satisfying the critical requirement that wire interceptions were necessary because conventional investigative techniques either had not worked or would be unsuccessful if tried. As to each conventional technique addressed, Agent Kang claimed that the technique could not be used because it would compromise the secrecy of the government's investigation – without ever disclosing to Judge Lynch that the very same techniques had already been or currently were being used with success, and with the full cooperation of Galleon and Mr. Rajaratnam.

32

Agent Kang began this key portion of his affidavit by asserting that "wire surveillance is a necessary tool to identify and develop evidence against" Mr. Rajaratnam due to "the limits of other investigative techniques." Kang Aff. ¶ 35. He then represented that the "[u]se of a federal grand jury does not appear to be a promising method of investigation." *Id.* ¶ 38. Agent Kang explained that "[w]itnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the fraudulent activities under investigation. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily." *Id.* He further claimed that "[t]he issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert [Mr. Rajaratnam and other] target subjects to the pendency of this investigation." *Id.*

With regard to trading records, Agent Kang represented that he had "reviewed certain trading records, including bluesheet data showing trading activity in Intel and Polycom, that [he] obtained from the SEC," and that he "discussed these records with SEC personnel." *Id.* ¶ 39. He further stated that it would be too risky to seek additional records from securities clearing firms, however, because "when securities clearing firms are asked for such trading records, they sometimes alert the traders to the requests." *Id.*

As to witness interviews, Agent Kang stated that "[i]nterviewing or arresting [Mr. Rajaratnam or other target subjects] and attempting to obtain their information or cooperation in investigating fraudulent activities of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time." *Id.* ¶ 40. Agent Kang explained that "a failed interview of [Mr. Rajaratnam or others] would seriously compromise the entire insider trader investigation, because if [Mr. Rajaratnam or others] declined to cooperate, they would alert other target subjects and it would become difficult, if not