USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/29/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

RAJ RAJARATNAM and DANIELLE CHIESI,

Defendants.

09 Cr. 1184 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

Defendants Raj Rajaratnam ("Rajaratnam") and Danielle Chiesi ("Chiesi") have

moved to suppress the Title III material gathered by the government's wiretaps of their

respective phones.  Each makes four separate arguments for suppression in full or part:

(1) the government was not entitled to use wiretaps to investigate insider trading, a crime

not specified in Title III; (2) the government's application and supporting affidavits failed

to establish probable cause; (3) the government's application and supporting affidavits

failed to establish the inadequacy of conventional investigative procedures and, therefore,

the "necessity" of using wiretaps; and (4) the government failed to minimize various

conversations.

The Court concludes that defendants' arguments do not justify suppression and

therefore denies both motions.  Because Title III authorizes the government to use

wiretaps to investigate wire fraud, the government was authorized to use wiretaps to

investigate a fraudulent insider trading scheme using interstate wires even though Title III

does not specifically authorize wiretaps to investigate insider trading alone.

With regard to probable cause, Chiesi has failed to show that the government's wiretap application contained material misstatements or omissions, or was otherwise deficient in showing probable cause. Rajaratnam has shown that the government's application omitted and misstated important information regarding the credibility of a key government informant, Roomy Kahn, but suppression is not required because the remainder of the affidavit demonstrated ample reason to find probable cause.

Chiesi has likewise failed to make a preliminary showing that the government's wiretap application was deficient in showing that a wiretap was necessary. As for Rajaratnam, necessity presents a closer question. Earlier this year, the Court found that Rajaratnam had made a substantial preliminary showing that the government recklessly failed to disclose that the SEC had been conducting its own insider trading investigation of Rajaratnam upon which the government's criminal investigation substantially relied. A four-day hearing last month confirms in the Court's judgment that the government failed to disclose the nature and extent of the SEC investigation even though (1) that investigation was the most important part of the criminal investigation at the time of the wiretap application and (2) that investigation employed entirely conventional investigative techniques. Given that an issuing court relies on the government candidly to disclose the full nature and scope of its investigation in order to determine whether a wiretap is necessary, the omissions here are troubling to say the least. But that is not the end of the matter. The hearing also demonstrated that, while the SEC investigation used conventional techniques and was the bedrock of the prosecutor's own criminal investigation, the SEC investigation had nevertheless failed to fully uncover the scope of Rajaratnam's alleged insider trading ring and was reasonably unlikely to do so because

2

evidence suggested that Rajaratnam and others conducted their scheme by telephone. Accordingly, disclosure of all the details of the SEC's investigation that the government recklessly omitted would ultimately have shown that a wiretap was necessary and appropriate.

Finally, the government complied with its statutory responsibility to minimize recording calls unrelated to the crimes the government had probable cause to suspect.

## BACKGROUND

The United States Attorney's Office for this district ("USAO") and the FBI began the criminal investigation resulting in the indictment of Rajaratnam in 2007.[1] The investigation of Chiesi apparently did not begin until later, sometime in mid-2008. In connection with these investigations, the government sought and obtained authorization to wiretap Rajaratnam's and Chiesi's phones.

The government first sought authorization to wiretap Rajaratnam's cell phone in an application submitted to Judge Lynch on March 7, 2008. (Gov't Opp'n to Rajaratnam Ex. 1-A.) Attached to that sworn application was a 53-page affidavit of FBI Special Agent B. J. Kang ("Kang"). (Gov't Opp'n to Rajaratnam Ex. 1-C.) Judge Lynch granted the application for a 30-day wiretap, finding (1) probable cause that Rajaratnam and others were involved, *inter alia*, in wire fraud the extent of which would be revealed through the interception of telephone communications, and (2) that a wiretap was necessary in that normal investigative techniques were or would be unlikely to succeed in uncovering the fraud. (Gov't Opp'n to Rajaratnam Ex. 1-D.) The government began

---

[1] The USAO and the FBI are referred to separately and together as "the government" or, occasionally, "the prosecutor" or "the criminal authorities." The Securities and Exchange Commission is referred to as the SEC throughout.

intercepting communications over Rajaratnam's phone on or about March 10. Thereafter, the government applied for authorization to continue intercepting Rajaratnam's phone for another 30 days. (Gov't Opp'n to Rajaratnam Exs. 2-A, 2-C.) On April 8, Judge Cote granted that application. (Gov't Opp'n to Rajaratnam Ex. 2-D.) The government applied for reauthorization six more times, between May and November of 2008, each application based substantially on intercepts over Rajaratnam's phone, and each application authorized by a judge in this district. (Gov't Opp'n to Rajaratnam Exs. 3-D, 4-I, 5-D, 6-D, 7-D, 8-D.)

On August 13, 2008, the government applied for authorization to wiretap three phones that Chiesi subscribed to and used. (Gov't Opp'n to Chiesi, Exs.1-A, 1-B, 1-C.) Judge Sullivan granted the request that day. (Gov't Opp'n to Chiesi Ex. 1-D.) He approved a second 30-day application on September 12, 2008. (Gov't Opp'n to Chiesi Ex. 2-D.)

On October 16, 2009, Rajaratnam, Chiesi, and others were arrested and charged with multiple counts of conspiracy and securities fraud. The original indictment was returned against both defendants on December 15, 2009, and a superseding indictment was returned on February 9, 2010 (Gov't Opp'n to Rajaratnam Ex. 12).

Both defendants moved to suppress the evidence that the government obtained through the wiretaps on their phones. In connection therewith, Rajaratnam requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) (a "*Franks* hearing"). In *Franks*, the Supreme Court held that, despite the "presumption of validity with respect to the affidavit supporting [a] search warrant", a defendant can challenge an affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly

4

and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause...." *Id.* at 155-56. [2]  The Court denied Rajaratnam's request for a *Franks* hearing regarding probable cause but found that he had "at least established good grounds for holding a *Franks* hearing regarding the veracity of the [Kang] affidavit and the issue *vel non* of whether the necessity requirement has been satisfied." *United States v. Rajaratnam*, 2010 WL 3219333, at **1-2 (S.D.N.Y. Aug. 12, 2010).  The Court reserved judgment on other aspects of the defendants' motion to suppress.  (July 27, 2010 Hr'g Tr. at 157.)  In his post-hearing submission, Rajaratnam asked the Court to reconsider its prior holding regarding probable cause.  (*See* Rajaratnam Post Hr'g Br. at 47-49.) [3]

## DISCUSSION

Rajaratnam's and Chiesi's motions raise essentially the same arguments.  First, they argue that Title III does not authorize the use of wiretaps to investigate insider trading, an offense not specifically mentioned in the statute.  They also argue that the government's wiretap affidavits in this case failed to establish (i) probable cause to use a wiretap and (ii) that wiretapping was necessary to the government's investigation.  Finally, both argue that the government did not properly minimize its interceptions,

---

[2] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court further held that, "[i]n the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

[3] Citations abbreviated "Br.", "Opp'n", or "Rep. Br." refer to the parties' initial submissions.  Citations to papers' abbreviated "Post Hr'g Br.", "Post Hr'g Opp'n" or "Post Hr'g Reply Br." refer to the parties' submissions following the *Franks* hearing.

which they say justifies suppression in part or full.  The Court addresses each of these arguments in turn.

## I.      Use of Title III to Investigate Insider Trading

When a court authorizes a wiretap, Title III requires that it "specify the offenses in connection with which the permission was granted . . . ."  *United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977); *see* 18 U.S.C. § 2518(1)(b)(i), (3)(b), 4(c).  Wiretaps may only be authorized to investigate offenses specified in Section 2516.  *See* 18 U.S.C. § 2516.  Still, the statute recognizes that "a law enforcement officer lawfully engaged in a search for evidence of one crime" may happen upon evidence of another crime not specified in the court's authorization order—and perhaps not specified in Section 2516 either.  *Masciarelli*, 558 F.2d at 1067.  When that happens, "the public interest militates against [the officer's] being required to ignore what is in plain view."  *Id.*  Thus Title III contains what is in some sense a plain-view exception, which allows the government to offer evidence of other crimes when that evidence is obtained during the course of an investigation for an authorized offense.  *See id.*; 18 U.S.C. § 2517(5).  Specifically, Section 2517(5) provides that:

> [w]hen an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, . . . may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter.  Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5).[4]

Under the terms of Section 2517(5), the government can only use wiretap evidence of crimes "other than those specified" in the authorization order or in Section 2516 by obtaining judicial approval "as soon as practicable." The section "does not specify the exact form an application for subsequent approval should take, nor exactly what procedures a court should follow in giving or denying its authorization." *United States v. Gerena*, 653 F. Supp. 974, 978 (D. Conn. 1987). Thus courts in this circuit have looked to Congress's intent in enacting the provision, and have consistently applied the following test: the government must show that "the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976) (quoting S. Rep. No. 90-1097, at 12 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2189). Courts treat these standards less as independent prongs than as various ways of stating the government's obligations. The government must obtain wiretap warrants in good faith— that is, in connection with an offense for which Title III permits wiretapping—not as a subterfuge for gathering evidence of other offenses. If the government does so, any other evidence it happens to intercept will have been intercepted incidentally. *See United States v. Levine*, 690 F. Supp. 1165, 1171 (E.D.N.Y. 1988).

In this case, the government's actions do not reflect subterfuge. The wiretap applications candidly detailed the nature of the scheme for which wiretaps were sought.

---

[4] Section 2517(3) allows for the disclosure of wiretap evidence "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof." 18 U.S.C. § 2517(3).

They described the evidence of an insider trading conspiracy that involved Rajaratnam and Chiesi; they stated that the evidence established probable cause of wire fraud and money laundering; and they noted that the evidence would also establish probable cause of the defendants' participation in securities fraud, although that crime was not an authorized predicate offense under Title III.  (*See, e.g.*, Gov't Opp'n to Rajaratnam Ex. 1-C at 3 & n.1; Gov't Opp'n to Chiesi Ex. 1-C at 3 & n. 1.)  In other words, the government made quite clear that it wanted to use wiretaps to investigate an insider trading conspiracy, and that the investigation would likely uncover evidence of wire fraud and money laundering (offenses for which Title III specifically permits wiretaps) and securities fraud (an offense for which it does not).  *Cf. Levine*, 690 F. Supp. at 1170 ("A factor pertinent to the determination of good faith may be whether the officials concealed from the judge issuing or extending the original warrant the fact that they foresaw a high likelihood that evidence of other crimes would be revealed.  To hide that fact might give rise to an inference of bad faith.").[5]  With all these facts in hand, several judges in this district found probable cause that Rajaratnam and Chiesi had committed or would

---

[5] The issuing judges did not know and could not have predicted that the government would ultimately charge the defendants with only securities fraud, not wire fraud or money laundering.  (*Cf.* Rajaratnam Br. at 63.)  But the government should not be required to charge the crime for which it obtains wiretap authorization.  Although charging a defendant with the crime for which wiretapping was authorized is some evidence of the government's good faith, *see United States v. Levine*, 690 F. Supp. 1165, 1171 (E.D.N.Y. 1988), the converse is not necessarily true.  The government's charging decisions depend on a variety of factors.  That it decides not to charge a defendant with a crime for which it previously sought wiretap authorization does not imply it had no legitimate reason for the wiretap to begin with.

commit the crimes of wire fraud and money laundering.[6]  Accordingly, all authorized the
use of wiretaps in connection with the government's investigation.

Still, defendants say the government should not be allowed to use wiretap
intercepts as evidence of securities fraud here.  They argue that the interception of
communications evidencing securities fraud could not have been incidental, because (1) it
was the government's primary objective; (2) at a minimum it was anticipated; and (3) to
so hold would undermine Congress's intent in enacting Title III.  Each of these
arguments is unavailing.

Defendants contend that the government's primary objective in using wiretaps
was to drum up evidence of securities fraud, as shown by the wiretap applications' focus
on insider trading as opposed to wire fraud.  But defendants' argument unrealistically
assumes a gulf between these two crimes.  Securities fraud does contain an additional
element, "fraud in connection with the purchase or sale of any security"; and wire fraud
does require the "use of interstate wires."  *United States v. Regensberg*, 604 F. Supp. 2d
625, 634 (S.D.N.Y. 2009).  But unlikely is the insider trading scheme that uses no
interstate wires.  Sometimes the government even charges both kinds of fraud for the
same core conduct, a practice that Congress, in the legislative history of the Insider
Trading and Securities Fraud Enforcement Act of 1988, and the Supreme Court have both
endorsed.  *See* H.R. Rep. 100-910, at 29 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043,
6074 (stating that the government can "litigate insider trading cases based on other
provisions of the securities laws and of the general mail and wire fraud statutes"); *United*

---

[6] These findings are entitled to substantial deference.  *See United States v. Wagner*, 989
F.2d 69, 72 (2d Cir. 1993) ("A reviewing court must accord substantial deference to the
finding of an issuing judicial officer that probable cause exists.").

*States v. Carpenter*, 484 U.S. 19, 28 (1987) (holding that conspiracy to trade on confidential information was within "the reach of the mail and wire fraud statutes, provided the other elements of the offenses are satisfied"). Here the government had evidence of insider trading with a wire. (*See* Gov't Opp'n to Rajaratnam Ex.1-C ¶¶ 7, 10, 11, 18, 19.) Therefore it makes little sense to call securities fraud a primary objective and wire fraud a "fig leaf" (Rajaratnam Reply Br. at 40).

Of course, there is no denying that, in intercepting communications that would provide evidence of wire fraud, the government expected to get evidence of securities fraud, too. In that way this case is different from the usual one involving Section 2517(5), where the government gets permission to investigate one crime using a wiretap, and while doing so happens upon an entirely different crime. *Cf. United States v. Gotti*, 42 F. Supp. 2d 252, 269–70 (S.D.N.Y. 1999) (Parker, J.) (evidence of access device fraud was incidentally intercepted during the course of a lawfully executed order authorizing the interception of communications relating to money laundering); *United States v. Giordano*, 259 F. Supp. 2d 146, 153–155 (D. Conn. 2003) (evidence of sex offense with minor was incidentally intercepted during the lawfully authorized interception of communications relating to corruption and racketeering activities). Here, by contrast, the government wiretapped phones seeking evidence of conduct that would violate both the criminal statute for which wiretapping was authorized as well as another criminal law. Defendants say that this sort of anticipated interception cannot count as incidental.

If the test were inadvertence, the defendants would be right. But that is not the test. "Incidental," not "inadvertent," is the word used in Title III's legislative history. And, although the Second Circuit has sometimes used the word "inadvertent" in dicta,

more recent authority has implicitly rejected that gloss on the standard. *Compare Marion*, 535 F.2d at 701 ("Without a judge's determination of inadvertence, Title III authorization might rapidly degenerate into . . . the electronic equivalent of a general search warrant.") (internal quotation marks omitted), *and Masciarelli*, 558 F.2d at 1067 (when an officer "inadvertently comes upon evidence of another crime," he should not be required to "ignore" it), *with In re Grand Jury Subpoena Served on John Doe*, 889 F.2d 384, 388 (2d Cir. 1989) (finding that a wiretap, which was expected to reveal evidence of both the authorized crime and another crime, intercepted evidence of the second crime incidentally), *and United States v. Wager*, No. 00-Cr.-629, 2002 WL 31106351, at *2, *4 (S.D.N.Y. Sept. 20, 2002) (finding that evidence of securities fraud was intercepted incidentally, despite the fact that the government's original warrant application had noted that there was probable cause of securities fraud); *see also United States v. McKinnon*, 721 F.2d 19, 22–23 (1st Cir. 1983) ("While an interception that is unanticipated is *a fortiori* incidental, the converse is not true: something does not have to be unanticipated to be incidental. Evidence of crimes other than those authorized in a wiretap warrant are intercepted 'incidentally' when they are the by-product of a bona fide investigation of crimes specified in a valid warrant."); *cf. United States v. Gambino*, 734 F. Supp. 1084, 1094 n.14 (S.D.N.Y. 1990) (deciding not to reach the question whether the standard is "inadvertent" or "incidental"). In *In re Grand Jury Subpoena*, the government expected to, and did, intercept conversations relating to the "theft of federal, state and local taxes," although wiretapping was only authorized in connection with the state law crime of grand larceny for the theft of state taxes. 889 F.2d at 388. Notwithstanding those expectations, and notwithstanding that Section 2516 excludes federal tax crimes, the Second Circuit

11

held that the federal crime evidence was intercepted incidentally because it was a by-product of the government's bona fide investigation of state law crimes. *Id.* Here, too, the interception of evidence of securities fraud was a by-product of the interception of evidence of wire fraud.

According to the defendants, allowing the government to use wiretapping in any insider trading case would subvert the intention of Congress, which has yet to add securities fraud to the list of predicate offenses in Section 2516. (*See* Rajaratnam Br. at 60.) But this Court does not hold that insider trading is always good grounds for a wiretap. It holds only that, when the government investigates insider trading for the bona fide purpose of prosecuting wire fraud, it can thereby collect evidence of securities fraud, despite the fact that securities fraud is not itself a Title III predicate offense. The government must still show, as six judges found that it did in this case, that it is investigating wire fraud in good faith. Defendants would have this Court bar the government from using wiretaps for wire fraud investigations whenever the fraud concerns securities.[7] That is a carve-out Congress has not made and this Court is not permitted to make in its stead.[8]

---

[7] Defendants deny that they are asking for an absolute bar. (July 27, 2010 Hr'g Tr. ("Tr.") at 48.) They say the government may still use a wiretap where it demonstrates a need to do so that is particularized to wire fraud, rather than to insider trading. This makes little sense. To be sure, the government does have an obligation to show why a wiretap is necessary in a particular investigation. But in a wire fraud investigation where the underlying fraud is insider trading, the government's showing of necessity will always be linked to insider trading. (It will be required to show why alternative investigative techniques would not suffice to ferret out the fraud in that case.) In practice the defendants' logic would limit the use of wiretaps to only those kinds of wire fraud, like bank or computer fraud, where the underlying fraud is itself specified in Section 2516. That is not what the statute says.

[8] It is true that, since adding wire fraud to Section 2516, Congress has added other kinds of fraud to the statute—access device fraud in 1986, bank fraud in 1990, aircraft parts

Assuming that the government's wiretap applications established both probable cause and necessity—issues that the Court is about to address—the wiretap applications here were approved in accordance with Title III. Therefore, under Section 2517(5), the government can introduce evidence of insider trading it discovered on the wiretaps as long as the government applied to do so "as soon as practicable." 18 U.S.C. § 2517(5).



[9] Accordingly, the government can introduce wiretap evidence under Section 2517(5).

---

fraud in 2000, computer fraud in 2001—without adding securities fraud. (*See* Rajaratnam Reply Br. at 37.) Congress inserted offenses like bank and computer fraud to Title III because it wanted to permit wiretapping to investigate those crimes even where they do not involve the use of a wire. As the government observed at oral argument, "[n]ot every bank . . . or computer fraud may involve wires. There are cases that don't." (Tr. 56.) Securities fraud may be committed without a wire, too, and in such cases, Title III precludes wiretapping. But that does not mean it precludes wiretapping in insider trading cases where a wire is involved.

[9] The government may have had authorization well before that time. The Second Circuit has long held that "authorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of 'material facts constituting or clearly relating to [the] other offenses' in the application for the continuance." *United States v. Ardito*, 782 F.2d 358, 362 (2d Cir. 1986) (quoting *United States v. Masciarelli*, 558 F.2d 1064, 1067-1068 (2d Cir. 1977)). The government's applications to renew the Rajaratnam and Chiesi wiretaps clearly provided the issuing judges with notice that another offense, securities fraud, was implicated by the intercepts. Because courts "presume . . . that in renewing the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied," *United States v. Marion*, 535 F.2d 697, 703 (2d Cir. 1976), the renewal orders sufficed to provide Section 2517(5) approval. *See United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir. 1973), *cert. denied*, 414 U.S. 866 (1974) ("It is enough [for Section 2517(5)] that notification of the interception of evidence not authorized by the original order be clearly provided in the renewal and amendment application papers.").

## II.     Probable Cause

### A.     Standard

Title III requires that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause that the target phone was and would continue to be used to commit the specified offense of wire fraud.  18 U.S.C. § 2518(1)(b).  "The standard for probable cause applicable to § 2518 is 'the same as the standard for a regular search warrant.'"  *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999) (quoting *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  "While probable cause requires more than a 'mere suspicion' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231) (internal citation omitted).  "[P]robable cause does not demand any showing that a good-faith belief be 'correct or more likely true than false.'  It requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Walczyk*, 496 F.3d at 157 (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983)) (internal citation omitted). "In determining whether probable cause for an eavesdropping warrant exists, the issuing officer need only make a practical, common sense decision whether, given the 'totality of the circumstances' set forth in the affidavit requesting such warrant, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that evidence of a crime will be obtained through the use of electronic

14

surveillance." *United States v. Funderbunk*, 492 F. Supp. 2d 223, 237 (W.D.N.Y. 2007) (quoting *Gates*, 462 U.S. at 238); *see also Diaz*, 176 F.3d at 110.  Allegations in an affidavit "should be read in their entirety and in a common-sense manner with each fact gaining color from the others," rather than "in isolation" from one another.  *Gotti*, 42 F. Supp. 2d at 262.

"[A] reviewing court must accord considerable deference to the probable cause determination of the issuing [judge]."  *Walczyk*, 496 F.3d at 157; *see United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) ("[W]e grant considerable deference to the district court's decision whether to allow a wiretap . . . ."); *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) ("In reviewing a ruling on a motion to suppress wiretap evidence, we accord deference to the district court . . . ."); *United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990), *cert. denied*, 498 U.S. 906 (1990) ("The role of an appeals court in reviewing the issuance of a wiretap order . . . is not to make a de novo determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made.").  The reviewing court's task is "limited to determining whether that judicial officer had a 'substantial basis' for her determination."  *Gotti*, 42 F. Supp. 2d at 262 (quoting *Gates*, 462 U.S. at 239).  Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause.  *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) ("In this situation, the issuing judge's probable cause determination is not due any deference because he did not have an opportunity to assess the affidavit without the inaccuracies.").

Where a defendant makes a preliminary showing that the government's affidavit misstated or omitted material information, *Franks* instructs a district court to hold a hearing to determine if the misstatements or omissions were made intentionally or with reckless disregard, and if so, determine *de novo* whether, "after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005).[10] "Omissions from an affidavit that are claimed to be material are governed by the same rules." *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir. 1985). But "[i]f an affidavit can be challenged because of material omissions, the literal *Franks* approach no longer seems adequate because, by their nature, omissions cannot be deleted." *United States v. Ippolito*, 774 F.2d 1482, 1486 n.1 (9th Cir. 1985). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted).

B.    Rajaratnam's Claims

Rajaratnam contends that the government's application and supporting affidavit dated March 7, 2008,[11] (1) made false allegations regarding Roomy Khan's reliability and

---

[10] The government argues that, "to the extent [the defendants'] challenges . . . don't involve alleged omissions and inaccuracies, the judicial determination warrants considerable deference." (Tr. at 58.) But it is hard to imagine how exactly this would work in practice. Reading the March 7, 2008 Kang Affidavit as a whole, Judge Lynch found probable cause. But how did he reach that conclusion? By relying exclusively on Khan's allegations? By deciding that the Goel tips added something to the case for probable cause? Short of asking Judge Lynch himself, it is not possible to know. Put simply, there are no determinate findings (besides the finding of probable cause itself) for this Court to defer to.

[11] This is the crucial affidavit; if its deficiencies justify suppression, they justify suppression of all the wiretap intercepts, even those obtained on the strength of

(2) mischaracterized other evidence referenced in the affidavits.  As noted, he sought a

*Franks* hearing to probe this issue.[12]  The Court denied defendant's request for a hearing

on the issue of probable cause in summary form in its order of August 15, 2010.  The

Court now sets forth its reasoning.

### 1.    *Legal Standard*

Under *Franks*, a defendant may obtain an evidentiary hearing where (1) "the

defendant makes a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the

warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of

probable cause."  438 U.S. at 155–56.  To have misled knowingly or recklessly, the

government must have done more than make an intentional decision not to include the

information.  Instead, the misleading statement or omission must have been "designed to

mislead" or "made in reckless disregard of whether [it] would mislead."  *United States v.*

---

subsequent applications.  *See United States v. Giordano*, 416 U.S. 505, 531-533 (1974)
(Because "communications intercepted pursuant to the extension order were evidence
derived from the communications invalidly intercepted pursuant to the initial order," they
are "derivative evidence and must be suppressed.").  The converse is also true: if the
March 7, 2008 affidavit adequately supported Judge Lynch's decision to authorize a 30-
day wiretap, any deficiencies in subsequent wiretap applications are of no consequence.
The first 30 days of wiretapping Rajaratnam yielded enough evidence of criminal conduct
to justify renewals of the wiretap.

[12] Rajaratnam's brief implies that even if a *Franks* hearing is not warranted, the Court
should nevertheless suppress the wiretap intercepts under Section 2518(10)(a)(i) because
the government failed to supply a "full and complete statement" explaining the basis for
probable cause and the reasons why alternative investigative techniques would not be
feasible.  (*See* Rajaratnam Br. at 56; *see also* Tr. at 17 ("The full and complete statement
standard in Title III is actually distinct from the constitutional standard in *Franks*."); Tr.
116–17.)  But that argument, for which the brief cites no authority, is inconsistent with
the law of this circuit.  *See United States v. Bianco*, 998 F.2d 1112, 1125-26 (2d Cir.
1993) (holding that the *Franks* standard governs the determination whether suppression is
appropriate under Section 2518(10)(a)).

*Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990) (formatting normalized)).

The meaning of recklessness is not "self-evident." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010). The Supreme Court in *Franks* did not define the term "reckless disregard" other than to state that "[a]llegations of negligence or innocent mistake are insufficient." *Franks*, 430 U.S. at 171. Nor has the Second Circuit conclusively defined "reckless disregard." *United States v. Perez*, 247 F. Supp. 2d 459, 473 (S.D.N.Y. 2003). Nevertheless, "most circuits that have considered the question have embraced a subjective test for recklessness." *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *26 (S.D.N.Y. Apr. 4, 2007) (Karas, J.).

Under that test, as one court in this Circuit has phrased it, "the question is not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether the defendant in fact entertained serious doubts as to the truth of the subject statements." *United States v. Kunen*, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004) (internal quotation marks omitted); *see also Vilar*, 2007 WL 1075041, at *26 ("[O]ne 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations."). Indeed, numerous lower courts in this Circuit have employed the "serious doubts" language. *See Mandell*, 710 F. Supp. 2d at 373; *Vilar*, 2007 WL 1075041, at *26; *United States v. Harper*, No. 05-CR-6068, 2006 WL 2873662, at *8 (W.D.N.Y. Oct. 6, 2006); *United States v. Goldenberg*, No. 05-CR-1034, 2006 WL 266564, at *4 (S.D.N.Y. Feb. 3, 2006); *Perez*, 247 F. Supp. 2d at 473, 479; *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001); *Kunen*, 323 F. Supp. 2d at 395. Other Courts of Appeals have used the

18

same language. *See United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010); *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008); *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir. 2007); *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002); *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000); *Hart v. O'Brien*, 127 F.3d 424, 449 (5th Cir. 1997), *abrogated in part on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997); *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994).

While the test for recklessness may be subjective, it is not wholly so and there are objective aspects to its application. Thus, "[t]here is a corollary to the 'serious doubt' standard: 'Because states of mind must be proved circumstantially, a fact finder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity of the allegations.' " *Perez*, 247 F. Supp. 2d at 473 (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001)); *see also United States v. Schmitz*, 181 F.3d 981, 986-87 (8th Cir. 1999); *Ranney*, 298 F.3d at 78; *Beard*, 24 at 116; *Vilar*, 2007 WL 1075041, at *27; *Markey*, 131 F. Supp. 2d at 324. Hence, as to any misstatements in the May 7, 2008 affidavit, Rajaratnam must prove either that "(1) the drafters of the affidavit made [a false statement] with knowledge that the statement was false, (2) they had a serious doubt as to the truth of the statement when they made it, *or* (3) they had obvious reason to doubt the veracity of the statement." *Perez*, 247 F. Supp. 2d at 474 (emphasis added).

As might be expected, the guideposts for determining recklessness are different when evaluating the alleged omission of material information. It makes little sense after all to speak of whether the affiant has 'serious doubt' about the veracity of statements not made. Rather the inquiry, at least in this circuit, is whether the "omitted information was clearly critical to assessing the legality of the search." *United States v. Reilly*, 76 F.3d

1271, 1280 (2d Cir. 1996) (internal quotation marks omitted).  Accordingly, with respect to material omissions from the March 7, 2008 affidavit, Rajaratnam must prove that the drafters of the affidavit either intentionally omitted the information or that the omitted information was clearly critical to the affidavit, thereby raising an inference of recklessness.[13]

### 2.    *Knowingly or Recklessly False Statements and Omissions*

In support of probable cause, the March 7, 2008 Kang Affidavit offered several pieces of evidence: (1) statements made by Roomy Khan, a cooperating witness, about exchanging inside information with Rajaratnam; (2) statements Rajaratnam made to Khan in telephone conversations she recorded at the FBI's request; and (3) ███████████

---

[13] There is some disagreement among the Courts of Appeals, and within this Court, as to whether recklessness can be established where a reasonable affiant would know that omitted information would be important to the reviewing court.  That divide stems from the Third Circuit's statement that "omissions are made with reckless disregard if an officer withholds facts in his ken that '[a]ny reasonable person would know was the kind of thing the judge would wish to know.'"  *Wilson*, 212 F.3d at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).  Two decisions have cited this statement in holding that the standard for omissions is whether "any reasonable person would have known that this was the kind of information that the magistrate judge would have wanted to know."  *Perez*, 247 F. Supp. 2d at 474 (Chin, J.); *United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003) (Kaplan, J.) ("[T]he preliminary issue to be resolved is whether Harding has shown that Agent Castro knew or had reason to know the 'facts' he omitted from the search warrant affidavit. If these facts indeed were 'in his ken,' the following question is whether they were the sort of facts a reasonable person would know a judge would want to know.").  On the other hand, in Judge Karas's view, "a test that invokes the mythical 'reasonable person' speaks the language of negligence" which is insufficient for suppression under *Franks*.  *Vilar*, 2007 WL 1075041, at *27.  This Court agrees.  Unlike negligence, reckless disregard connotes "[c]onscious indifference to the consequences of an act."  Black's Law Dict. (9th ed.).  The "serious doubt" standard for misstatements reflects that awareness, as does the corollary that with regard to omissions, recklessness "may be inferred when omitted information was clearly critical to assessing the legality of the search".  *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted).

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

Describing the "Background of the Investigation," the affidavit said that, "[b]eginning in or about November 2007 [Agent Kang] and other FBI agents have had numerous discussions with a cooperating source ('CS-1')" we now know to be Khan. (Gov't Opp'n to Rajaratnam Ex. 1-C at 12.)  According to Agent Kang, Khan "ha[d] been cooperating with the FBI since approximately November 2007." (*Id.* at 13 n. 4.)  Kang further stated that "since at least in or about 2005, [Khan] participated in an insider trading scheme;" that Khan "received the material, nonpublic information from a variety of sources, . . . including RAJARATNAM"; and that Khan "has not yet been charged with any crimes." (*Id.* at 13.)  The affidavit notes that Khan has known Rajaratnam "since in or about the mid-1990s, when [s]he was working at Intel Corp," and that she subsequently "worked for Galleon from approximately mid-1998 through 1999." (*Id.* at 13 n.5.)  It goes on to say that the two exchanged inside information beginning "in or about mid-2005" and continuing till "late 2007." (*Id.* at 13-14.)

This is what the affidavit left out:  The FBI and U.S. Attorney's Office for the Northern District of California began investigating Khan in 1998 when she was working at Intel, in connection with allegations that she was sending inside information about her company to Rajaratnam's firm. (Rajaratnam Br. Ex. A.5 at 2-3.)  In 2001 Khan was indicted and later that year pleaded guilty to felony wire fraud and was sentenced to probation.[14] (Rajaratnam Br. Ex. A.3, A.4 ¶¶ 1–2; Ex. A.6 at 2, 4.)  At Khan's sentencing

---

[14] Khan's 2001 criminal case, No. 01-20029 (N.D. Cal.), remained under seal in the Northern District of California, for reasons not explained, until late 2009.  On October 16, 2009, the government unsealed the criminal complaint against Rajaratnam in this

in 2002, the government emphasized that Khan was cooperating with the government, that it had attempted to establish insider trading by Rajaratnam without success, and that its investigation was "continuing."  (Rajaratnam Br. Ex. A.5 at 3, 7-8.)

The government thinks that none of this makes the Kang affidavit false.  It says that Kang did not mean to imply that the investigation in this district, which began in 2007, was the 'only' time Khan and Rajaratnam were ever investigated for insider trading.  And, according to the government, when Kang said that Khan had not yet been charged, he only meant that she had not been charged in connection with *this* investigation.  The way the government parses Kang's grammar may be literally right.  But the statements were nonetheless misleading, particularly when read with the literally false statement that Khan had been cooperating with the FBI only since November 2007.  And Judge Lynch was invited to conclude that, so far as the government knew, Khan had a clean record when in fact she had previously been charged and convicted of very similar conduct, raising obvious questions as to her credibility.

The government cannot write these omissions off on the theory that Khan's criminal record was not important enough to include in the affidavit.[15]  If that were true,

---

case, which had identified Khan as "CW."  Khan's true identity was reported by the Wall Street Journal on October 22, 2009.  Susan Pulliam, *Galleon Sinks, Informant Surfaces*, Wall St. J., Oct. 22, 2009.  The same day, the *San Jose Mercury News* reported that Khan had pled guilty to wire fraud in 2001 "for leaking proprietary information about Intel" while working there in 1998.  Pete Carey, *Old Silicon Valley Case Linked to Hedge Fund Scandal*, San Jose Mercury News, Oct. 22, 2009.  The *San Jose Mercury News* and Rajaratnam subsequently asked the California district court to unseal the entire case, and, on December 2, 2009, that court granted the unopposed motion.

[15] Indeed, at oral argument the government acknowledged that "in hindsight there is no question [the fact of the earlier investigation of Khan and Rajaratnam] should have been included" (Tr. at 65) and that the government "wish[es] it would have been included" (*Id.* at 66).  This is the type of candor that the Court expects from the government and, frankly, should have been exhibited to Judge Lynch.

why did the government deem it worthy to report that Khan "[ha[d] not yet been charged with any crimes"? (Kang Ex. 1 at 13.) Nor can the government plead ignorance. Agent Kang's own interview memoranda, produced to the defendants in discovery in this case, chart the extent of his knowledge: a December 17, 2007 memo refers to Khan's "past criminal record," and a November 28, 2007 memo refers to "some problems KHAN had in the past with the FBI." (*See* Rajaratnam Br. Ex. A.17 at 2; Ex. A.16 at 2.)[16]

Nor does the Kang affidavit's summary of telephone conversations between Khan and Rajaratnam win high marks for candor. (Gov't Opp'n to Rajaratnam Ex. 1-C at 15-17.) Describing one such conversation, on January 14, 2008, Kang's affidavit said that

> [d]uring this call, CS-1 asked RAJARATNAM what was "going on with the earnings this season," and whether he was "getting anything on Intel." RAJARATNAM proceeded to tell CS-1 that Intel would be up 9 to 10% and then guide down 8% and that margins would be good. RAJARATNAM then asked CS-1 "What are you hearing anything?" CS-1 responded "not really."

(*Id.* at 15–16.) That paraphrase omitted the fact that Rajaratnam had qualified his predictions with "I think." It also skipped a piece of the conversation in which Rajaratnam said that he thought margins the next quarter "will be below," and explained that he took this view "[b]ecause of [sic] the volumes are down, right?" (Rajaratnam Br.

---

[16] Rajaratnam cites additional omissions that supposedly bore on Khan's credibility, but these are not obvious examples of recklessness. For example, in interviews with the FBI Khan denied her involvement in the insider trading scheme before admitting to it. That fact adds little to an assessment of Khan's credibility. It is hardly surprising, or unusual, for an accused individual to deny having committed a crime before confessing to it. Rajaratnam also points to information that came to light after March 2008. In April 2008, Kang learned that, a few months earlier, Khan had deleted an email without telling the government, "because she was scared," and that she had also secretly registered a cell phone in her gardener's name, presumably to hide calls from the government. (*See* Rajaratnam Br. Ex. 20 at 5; Ex. 21 at 1.) These actions are of relevance to Khan's credibility, but the government did not discover them until after it had already gotten wiretap authorization from Judge Lynch in March 2008. (*See* Tr. 90-91; Gov't Opp'n to Rajaratnam at 39-41.)

Ex. D.1 at 2–3.)  In the government's paraphrased version of the conversation,

Rajaratnam seems certain about the Intel numbers without giving any reason why; in the

transcript, Rajaratnam equivocates ("I think") and explains at least why he thought

margins would decline the following quarter ("volumes were down").

Kang's affidavit also paraphrased a January 17, 2008 call between Rajaratnam

and Khan:

> During this call, CS-1 asked whether RAJARATNAM had heard anything on
> Xilinx.  RAJARATNAM responded that he thought this quarter would be okay,
> but next quarter would not be so good. . . . RAJARATNAM then said he expected
> Xilinx to be "below the street."  CS-1 asked whether he got "it" from someone at
> the company and RAJARATNAM said yes, somebody who knows.

(*Id.* at 16–17.)  This paraphrase also subtly changed Rajaratnam's answer.  In the audio

recording, Khan asks whether Rajaratnam "got it from somebody at the company or—."

Rajaratnam appears to answer, "Yeah I mean, somebody who knows his stuff."

(Rajaratnam Br. Ex. D.2 at 4.)[17]  That response is more equivocal than the government's

paraphrase (a simple "yes, somebody who knows") lets on.[18]  Such subtle shifts of

---

[17] The government now claims "it is not at all clear from the recording" that this is what
Rajaratnam said.  (*See* Gov't Opp'n to Rajaratnam at 45.)  But, having listened to the
recording for itself, the Court believes the transcript is accurate.  In any event, if the
government truly believed that the recording was ambiguous, it should have said so to
Judge Lynch, not quoted the most inculpatory version of Rajaratnam's words.

[18] Other misstatements about the content of Khan's recordings appear to be instances of
simple carelessness on the government's part.  Kang's affidavit claimed that, when
Rajaratnam asked Khan what she was hearing on Google, she "did not respond." (Gov't
Opp'n to Rajaratnam Ex. 1-C at 16.)  Actually, Khan did respond.  She said, "The
market's been so shitty that I haven't been, it's only now that I've started to do the
work." (Rajaratnam Br. Ex. D.1 at 6.)  This was not an omission designed to mislead.
Indeed, had the government reproduced more of the conversation on Google, more
evidence of probable cause might have emerged.  When Rajaratnam again asked about
Google, Khan said she had no information, and explained, "I told you that lady won't
speak to me."  Rajaratnam's response: "Idiot." (*See* Rajaratnam Br. Ex. D.1 at 7.)  "That
lady" turns out to have been an investor relations person at Google.  The most plausible

meaning are not as compelling as direct misstatements and omissions, however, they evince a lack of frankness that should be found in all *ex parte* applications.

### 3.   *Materiality to Judge Lynch's Decision*

The inaccuracies and inadequacies in the Kang affidavit give the Court pause. Particularly disturbing is the omission of highly-relevant information regarding Khan's prior criminal record for fraud which is "peculiarly probative of credibility." *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977). Still, a *Franks* hearing is required only if the government's misstatements were necessary to Judge Lynch's decision to authorize the wiretap. That is, after setting aside the government's misstatements and adding what it omitted from the affidavit, does the Court find that the affidavit set forth minimally adequate facts to establish probable cause? *See Coreas*, 419 F.3d at 155.

Rajaratnam contends that, with "Khan's lack of credibility and reliability accurately disclosed," her "general allegations" should be "discarded." (Rajaratnam Br. at 55.) This would go too far. True, "a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify." *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (internal quotation marks omitted). But even a criminal informer can provide evidence of probable cause, particularly when other indicia of the evidence's

---

explanation for Rajaratnam's exclamation is that the Google employee refused to provide inside information about her company.

Kang's affidavit also said that Rajaratnam predicted Intel's revenues accurately ("up 9 to 10%). (Gov't Opp'n to Rajaratnam Ex. 1-C at n.8.) The affidavit mistakenly calculated the percentage jump in earnings by comparing earnings in fourth quarter 2007 to fourth quarter 2006, which yielded a percentage increase of 10.5%. What Rajaratnam was actually predicting was the percentage increase in Intel's earnings for the fourth quarter of 2007 as compared to the third quarter of that year (an increase of only six percent). (*See* Rajaratnam Br. at 29-30.)

reliability exist. *See United States v. Fermin*, 32 F.3d 674, 676–77 (2d Cir. 1994),

*overruled on other grounds by Bailey v. United States*, 516 U.S. 137 (1995) (excusing the

government's failure to accurately report a confidential informant's "criminal history and

time as an informant" because the issuing judge would not "have completely discounted

the evidence presented through" the informant, given the informant's "past reliability"

and "corroborating evidence in the affidavit"); *United States v. Levasseur*, 816 F.2d 37,

43–44 (2d Cir. 1987) (holding that the government's failure to outline an informant's

"full history of pre- and post-cooperation criminal activity, drug and alcohol abuse, and

psychiatric problems" did not require a *Franks* hearing, because other "independent and

lawful information" sufficed to establish probable cause).[19]

Here, there were such indicia. For one thing, Khan was a known informant, not

an anonymous tipper. That strengthens the case for believing her. *See Caldarola v.

Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (quoting *Florida v. J.L.*, 529 U.S. 266, 270

(2000)) ("[A]n anonymous tip is '[u]nlike a tip from a known informant whose reputation

can be assessed and who can be held responsible if her allegations turn out to be

fabricated.'"). And, in implicating Rajaratnam in crimes of insider trading, Khan made

statements against her own penal interest. "Admissions of crime . . . carry their own

indicia of credibility—sufficient at least to support a finding of probable cause to search.

That the informant may be paid or promised a 'break' does not eliminate the residual risk

---

[19] Rajaratnam's reply brief points out that none of the cases the government cites—
*Fermin*, *Canfield*, and *Levasseur*, all cases in which the Second Circuit excused the
government's failure to disclose an informant's prior criminal conviction—involved a
prior conviction for fraud. (Rajaratnam Reply Br. at 7 (citing *United States v. Hayes*, 553
F.2d 824, 827 (2d Cir. 1977), for the proposition that a prior fraud conviction is
"peculiarly probative of credibility")). That is true, but it does not mean that Khan's
credibility stood at zero.

and opprobrium of having admitted criminal conduct." *United States v. Harris*, 403 U.S. 573, 583–84 (1971) (plurality opinion).[20]   Khan admitted, among other things, that she had provided Rajaratnam with inside information about Google.   That statement exposed her to greater criminal penalties—by the government's calculation, the profits from trading on this information exceeded $6 million.   (*See* Gov't Opp'n to Rajaratnam Ex. 1-C, ¶ 18 n.9.)

In addition to all this, the government was able to corroborate some of Khan's statements. *See Canfield*, 212 F.3d at 719-20 (quoting *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("[I]f an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration."). Khan told the FBI that Rajaratnam had previously provided her with earnings information on Broadcom; in a call she recorded at the FBI's request, Rajaratnam told her he knew someone "very good" at Broadcom who could give him "the numbers" (Gov't Opp'n to Rajaratnam Ex. 1-C at 17).   Similarly, Rajaratnam's statement on a recorded call that he needed to call "a couple guys" at Xilinx to get information from them squares with Khan's statement to the FBI that Rajaratnam had previously bragged about receiving inside information on Xilinx.   (*Id.* at 16.)   Trading records also provide limited corroboration of certain of Khan's statements.   For example, Khan claimed to have provided Rajaratnam with inside information about Polycom in January 2006 and Google

---

[20] To be sure, even admissions against penal interest are "suspect insofar as they inculpate other persons." *Lilly v. Virginia*, 527 U.S. 116, 138-39 (1999); *see United States v. Bakhtiar*, 994 F.2d 970, 978 (2d Cir. 1993) (statements "made in an attempt to minimize [one's] own culpability, to shift blame to [another], or to curry favor with authorities . . . do not bear the same indicia of reliability as the usual statement exposing a declarant to unpleasant consequences, such as criminal liability").   But that does not mean such admissions are *no* evidence of veracity—especially where, as here, the admissions are not made in an attempt to reduce the individual's share of the blame.

in the summer of 2007; trading records show that Rajaratnam's funds executed profitable trades in those two securities during the relevant time periods. (*See* Gov't Opp'n to Rajaratnam Ex. 1-C n.6, n.9.) Finally, toll records indicate that Rajaratnam repeatedly talked to an Intel insider, Rajiv Goel, in the run-up to earnings announcements in March 2006, April 2007, and February 2008. (*See id.* at 38.)

Given the evidence of corroboration, Khan's allegations of Rajaratnam's criminal conduct provide at least some support for probable cause. But there is more. Rajaratnam's recorded telephone conversations with Khan independently show that he intended to get information about stocks from company insiders. In advance of Xilinx's earnings announcement for the fourth quarter of 2007, Rajaratnam said he thought that "Xilinx this quarter" had "turned out well"; when Khan asked "what do you think they'll do," Rajaratnam said that he needed to "call a couple of guys there at Xilinx." (Rajaratnam Br. Ex. D.1 at 4.) In a conversation with Khan about Broadcom, Rajaratnam told Kang that that "he knew somebody very good there who could give him the numbers but that he had to check." (*Id.* Ex. D.2 at 6.) The specificity of Rajaratnam's comment about Broadcom—he would get "the numbers"—is especially telling. Rajaratnam's alternate explanation for these remarks—that he meant he had to check with company insiders about publicly available information—is hardly more plausible than the government's explanation. That Rajaratnam has an innocent explanation at all, moreover, does not make the remarks irrelevant to probable cause. *See Gagnon*, 373 F.3d at 236 ("[P]robable cause does not demand the certainty we associate with formal trials," and "the fact that an innocent explanation may be consistent with the facts as

alleged . . . does not negate probable cause.").  Here, Rajaratnam's answers created at least a fair probability that insider trading was afoot.

The March 7, 2008 Kang Affidavit also contained summaries of and quotations from intercepts of ███████████████████. ████████████

████████████████████████████████████████

███ These intercepts appear to indicate that ███████████ knowingly obtained inside information and passed it on to others, including Rajaratnam. ███████████

████████████████████████████████████

█████████████████████████████████

██████████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███ Perhaps Rajaratnam accepted the tips innocently, without knowing they were non-public.  But ████████████████████████████████ ██████████████████ there is at least a fair inference that Rajaratnam, a sophisticated investor, knew that.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

This evidence, taken alone, is far from conclusive of Rajaratnam's culpability.

But to suffice for probable cause, it need not have been. *See United States v. Martin*, 426

F.3d 68, 76 (2d Cir. 2005) (calling it a "defect" to "conflate[] evidence of probable cause

to sustain a warrant with proof of a prima facie case," because "probable cause does not

require a prima facie showing" of the crime); *United States v. Bellomo*, 954 F. Supp. 630,

638 (S.D.N.Y. 1997) (Kaplan, J.) ("While the intercepted conversations, considered

separately, may not be dispositive of guilt on the particular issues, that is not the relevant

standard."). Adding it all up, and correcting the affidavit to account for the government's

misstatements and omissions, the Court believes that there were enough facts for Judge

Lynch to have found probable cause.

### C. Chiesi's Claims

The case for probable cause against Chiesi relied exclusively on communications

intercepted pursuant to the Rajaratnam wiretap. Accordingly, were the Rajaratnam

wiretap evidence suppressed, suppression of the Chiesi wiretaps would likewise be

warranted. *See Giordano*, 416 U.S. at 533 (suppressing "derivative evidence" of a

suppressed wiretap). The government has acknowledged as much. (*See* Tr. at 142

("[T]he government concedes that if the Rajaratnam wiretap falls, then the Chiesi one

does also on probable cause.").) But that argument is moot in light of the Court's

decision to deny Rajaratnam's motion for suppression.

Chiesi argues separately that, even if the Rajaratnam wiretap intercepts survive suppression, they do not establish probable cause of her participation in an insider trading conspiracy. Because Chiesi does not suggest that the government misstated facts in its application for authorization to wiretap Chiesi's phones, the usual standard of "deference to the probable cause determination of the issuing [judge]" applies. *Walczyk*, 496 F.3d at 157. So long as the "facts set forth in the application were minimally adequate to support the determination that was made," *Concepcion*, 579 F.3d at 217, suppression is not warranted. *See also Awadallah*, 349 F.3d at 64 ("Ordinarily, a search or seizure pursuant to a warrant is presumed valid.").

█████████████████████████████████████

████████████ The application contained ample support for Judge Sullivan's order authorizing the wiretaps. █████████████████████

█████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████

Consider the following evidence: ███████████████████████

████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

31

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

Other calls provided additional support for probable cause.   ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████  Regardless of whether these facts establish Chiesi's culpability, they are

certainly minimally adequate to support Judge Sullivan's finding of probable cause.

### III.    Necessity

Both defendants argue that the government's wiretap applications failed to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), as Title III requires. Congress required that showing to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  What Title III "envisions is that the showing [of the wiretap's necessity] be tested in a practical and commonsense fashion." *Concepcion*, 579 F.3d at 219 (quoting S. Rep. No. 90-1097, at 12).

Like a court reviewing an affidavit containing misstatements or omissions as to probable cause, a court reviewing an affidavit for necessity must "decide if the facts set forth in the application were minimally adequate to support the determination that was made." *Torres*, 910 F.2d at 231.  In that determination, "generalized and conclusory statements that other investigative procedures would prove unsuccessful" do not suffice. *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983).   At the same time, however, Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Concepcion*, 579 F.3d at 218; *see also United States v. Scala*, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) ("[A] reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required . . . .")

(internal quotation marks omitted).[21] The government is not "required to exhaust all

conceivable investigative techniques before resorting to electronic surveillance."

*Concepcion*, 579 F.3d at 218; *see also Fury*, 554 F.2d at 530 ("At the outset we note that

the purpose of these 'other investigative techniques' requirements is not to foreclose

electronic surveillance until every other imaginable method of investigation has been

unsuccessfully attempted, but simply to inform the issuing judge of the difficulties

involved in the use of conventional techniques.") (internal quotation marks omitted).

"Rather, the applicant must state and the court must find that normal investigative

procedures have been tried and failed or reasonably appear to be unlikely to succeed if

tried...." *Giordano*, 416 U.S. at 515. Put another way, "an affidavit offered in support of

---

[21] In her briefs and at oral argument through counsel, Chiesi claims that the standard is
exhaustion of ordinary investigative techniques. (*See* Chiesi Br. at 13; Chiesi Reply Br.
at 6-7; Tr. at 137-139.) Chiesi quotes language from an opinion of the Tenth Circuit that
phrases the requirement in terms of exhaustion. *See United States v. Castillo-Garcia*, 117
F.3d 1179, 1188 (10th Cir. 1997), *overruled on other grounds by United States v.
Ramirez-Encarnacion*, 291 F.3d 1210 (10th Cir. 2002) ("[W]e require the government to
prove *exhaustion*—either by attempt or explanation of why the method would not work—
of all 'reasonable' investigatory methods.") (emphasis added). However, even that
statement refers to exhaustion "either by attempt *or explanation*", and the Tenth Circuit
has elsewhere described its decisions in this area as "repeatedly h[o]ld[ing] that law
enforcement officials are not required 'to exhaust all other conceivable investigative
procedures before resorting to wiretapping.'" *United States v. Edwards*, 69 F.3d 419, 429
(10th Cir. 1995) (quoting *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir.), *cert.
denied*, 484 U.S. 903 (1987)). That is the law in this Circuit. *See United States v. Torres*,
901 F.2d 205, 231 (2d Cir. 1990) (The "purpose of the statutory requirements is not to
preclude resort to electronic surveillance until after all other possible means of
investigation have been exhausted by investigative agents . . . ."); *United States v. Young*,
822 F.2d 1234, 1237 (2d Cir. 1987) ("[T]here is no requirement that any particular
investigative procedures be exhausted before a wiretap may be authorized") (internal
quotation marks omitted); *see also United States v. Valdez*, 90-793 (JFK), 1991 WL
41590, *2 (S.D.N.Y. Mar. 19, 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991) ("The law is
clear in this circuit that the requirements of section 2518 were not intended to turn
electronic surveillance into a tool of last resort.").

a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible." *Lilla*, 699 F.2d at 103.

    A.    <u>Rajaratnam's Claims</u>

    In his motion, Rajaratnam argued that suppression was warranted because the March 7, 2008 affidavit failed to disclose, *inter alia*, (1) the nature and extent of the lengthy SEC investigation that preceded the wiretap request, and a prior FBI investigation of Rajaratnam's connection to insider trading; (2) the voluminous evidence the SEC was able to collect using conventional techniques; and (3) the prosecutor's total access to and use of that evidence prior to the submission of its wiretap application to Judge Lynch.   (*See* Rajaratnam Br. at 65-73.)  In an opinion issued last month, the Court found that Rajaratnam had "at least established good grounds for holding a *Franks* hearing regarding the veracity of the March 7, 2008 affidavit and the issue *vel non* of whether the necessity requirement has been satisfied." *United States v. Rajaratnam*, No. 09-CR-1184, 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010).  A four-day hearing was held from October 4 through October 7, 2010.  At that hearing, Rajaratnam presented four witnesses: Lindi Beaudreault*,* former counsel to Rajaratnam and Galleon; Andrew Michaelson, formerly an attorney at the Division of Enforcement at the Securities and Exchange Commission ("SEC"); Special Agent Kang; and Lauren Goldberg, a former Assistant United States Attorney who led the investigation by the USAO and drafted the March 7, 2008 affidavit.  The Court's findings based upon the hearing record are set forth below.

### 1. Misstatements and Omissions

The *Franks* hearing established that the criminal authorities in this case made a glaring omission. They failed to disclose to Judge Lynch that the SEC had for several years been conducting an extensive investigation into the very same activity the wiretap was intended to expose using many of the same techniques the affidavit casually affirmed had been or were unlikely to be successful. A judge hearing an *ex parte* application relies entirely on the government's representation that it has disclosed all material facts. But how could Judge Lynch assess whether conventional investigative techniques had failed or were likely to fail without even knowing that they were presently being used in an ongoing SEC investigation upon which the prosecutor and FBI were relying—almost entirely—to construct their own case? Of course, there is nothing wrong in their piggybacking the SEC investigation provided they were not improperly directing it. But the Court is at a loss to understand how the government could have ever believed that Judge Lynch could determine whether a wiretap was necessary to this investigation without knowing about the most important part of that investigation—the millions of documents, witness interviews, and the actual deposition of Rajaratnam himself, all of which it was receiving on a real time basis and all of which was being acquired through the use of conventional investigative techniques. It is all well and good to now argue that these tools proved inadequate—and the Court ultimately accepts that contention—but it would have been far better for Judge Lynch to have been in a position to make that decision for himself.

The USAO and FBI first learned about the on-going investigation in March 2007, when the SEC referred an investigation of insider trading by Rajaratnam and his brother

Rengan Rajaratnam, a principal at Sedna Capital Management, LLC. (Kang Ex. 3; *Franks* Tr. at 95.) The SEC had opened its investigation, which was formally captioned an investigation of Sedna, on September 21, 2006. (Michaelson Ex. 1-A.)[22] On March 26, 2007, the USAO and FBI requested access to the SEC's investigative file (Michaelson Ex. 12) and three days later, the USAO and the FBI held the first of what would be numerous meetings with the SEC to discuss the course of its investigation. (*See* Kang Ex. 3.) Over the next year leading up to the March 7, 2008 wiretap application, the SEC "ke[pt] the criminal authorities up to speed" (*Franks* Hr'g Tr. at 132-133) and met and spoke with them regularly to discuss the investigation. (*See id.* at 128, 732; Kang Exs. 3, 6, 7, 10, 11, 13, 14, 15, 17, 18, 20, 21, 23, 24, 25.) The SEC also provided the criminal authorities with documents of particular note as well as chronologies outlining circumstantial cases of insider trading and identifying likely sources of inside information regarding several different companies. (Kang Exs. 4, 21, 22; Michaelson Exs. 59 84, 94, 95, 96, 97, 98, 100, 101, 106, 120.) Accordingly, the USAO and FBI either knew about or had access to "the best of what the SEC could produce." (*Franks* Tr. at 827-28.)

That was quite a bit to say the least. In early 2007, the SEC Office of Compliance Inspections and Examinations (OCIE) began an on-site examination of Galleon. (*Franks* Tr. at 112, 367; Michaelson Ex. 10.) As part of that investigation, OCIE made nearly two dozen requests for numerous classes of documents, including trading records, telephone

---

[22] Since November 5, 2003 the SEC had also been conducting a technically separate but somewhat related investigation into insider trading at Galleon. (Beaudreault Ex. 4.) The SEC had served Galleon with numerous subpoenas and requests for a variety of documents, including trading and telephone records, and a complete record of Galleon e-mails and instant messages (IMs) from November 2003 through June 2005. (Beaudreault Ex. 5; *Franks* Tr. at 29-35.) Galleon produced documents in response to these requests and subpoenas, which included the standard Form 1662 warning that information provided to the SEC could be used in a criminal proceeding. (*Franks* Tr. at 30, 33.)

records, and a complete record of e-mails and IMs sent and received by Rajaratnam and others in 2006. (*Franks* Tr. at 35-36, 112-120.) OCIE also interviewed eighteen Galleon employees and twice interviewed Rajaratnam himself, once in February and once in March of 2007, regarding insider trading. (*See id.* at 62-69.)

As part of the SEC investigation, Rajaratnam was deposed on June 7, 2007. (*See* Michaelson Ex. 45.) He was asked numerous questions regarding insider trading at Galleon, trading in various technology stocks, IMs exchanged with Roomy Khan, and his connections to executives at several publicly traded companies. Rajaratnam denied that he ever traded on, had any sources of, or even received any inside information. (*Franks* Tr. 347-54; Michaelson Exs. 45 at 77, 84, 184.) The SEC also deposed five other individuals associated with Sedna and/or Galleon, none of whom admitted to insider trading. (Michaelson Exs. 46-50; *Franks* Tr. 190-93, 346-47.)

Following the Rajaratnam deposition, the SEC served Galleon with additional subpoenas for various documents, including trading records, investor lists, and Rajaratnam's contact lists, hard drive, bank records, and calendar. Galleon produced four million pages of documents in response to the subpoenas, including several hundred thousand e-mails and almost fifty thousand pages of IMs. (*Franks* Tr. 38-40.) These documents suggested that Rajaratnam was exchanging inside information by telephone. (*See Franks* Tr. 398-408, 702; Gov't Exs. 17, 24, 32.) As part of its investigation, the SEC also served 221 subpoenas on banks, clearing houses, telephone companies, and issuers of publicly traded securities prior to March 7, 2008. (Michaelson Exs. 52-56; *Franks* Tr. at 195-97.)

The USAO and FBI knew about all of this.  They knew about the OCIE investigation, including that Galleon had produced documents and that the OCIE had interviewed Galleon employees, including Rajaratnam.  (*Franks* Tr. at 508-12, 731.)  They knew that Rajaratnam had been deposed and they received a transcript of that deposition as well as of the five others the SEC had taken.  (Michaelson Exs. 45, 51, 72; *Franks* Tr. at 190-92, 507, 739-41).  In fact, they knew in advance that the SEC was going to depose Rajaratnam and, according to documents introduced at the hearing, met with the SEC in part to "talk[] strategy" regarding that deposition.  (Michaelson Ex. 26-A; Tr. 139-45; 733-39.)  They knew that the SEC had issued over two hundred subpoenas from Galleon and third parties, that the SEC had received millions of documents in response, and that they had full access to those documents.  (*Franks* Tr. 729-31.)  They knew from the SEC's chronologies that the SEC was building circumstantial cases of insider trading and identified several possible sources of inside information, including Khan and Rajiv Goel.  (*See, e.g.* Michaelson Exs. 93-99; *Franks* Tr. at 732.)  And they knew from the same chronologies that the SEC had identified twelve individuals as potential interviewees (Michaelson Ex. 84 at 2; *Franks* Tr. at 256-58, 703-4) and hoped to review some additional records.  (Michaelson Ex. 120.)

The USAO and FBI also knew that the SEC investigation was the most important part of their own.  Indeed, Agent Kang testified that the SEC knew more about the investigation than he did.  (*Franks* Hr'g Tr. at 614.)  When asked by the Court to describe what the federal criminal authorities did other than rely on the SEC, the government prosecutor testified that the USAO and FBI had largely devoted their time to analyzing the information they were receiving from the SEC, "assimilating their own analyses of

what all this information meant...." (*Franks* Hr'g Tr. at 828-29.)  Though the criminal

authorities "independently obtained some of [their] own records, phone records, trading

records, bank records", the prosecutor testified that "[w]hatever [they] obtained through

grand jury subpoenas would *supplement* what the SEC had provided." (S*ee id.* (emphasis

added.))   The criminal authorities did not themselves review the SEC's investigative file

but instead relied on the SEC to provide the most important documents.  (*Franks* Tr. at

124, 614, 685.)  And they decided to approach and interview Roomy Khan (and her

broker) in large part based on information provided by the SEC.  (*See Franks* Tr. at 813.)

The USAO and the FBI also knew that all of this evidence was being developed

through conventional investigative techniques.  But this was not disclosed to Judge

Lynch.  Title III requires "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be

unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  By failing to

disclose the substance and course of the SEC investigation, the government made what

was nearly a full and complete *omission* of what investigative procedures in fact had been

tried.  That omission deprived Judge Lynch of the opportunity to assess what a

conventional investigation of Rajaratnam could achieve by examining what the SEC's

contemporaneous, conventional investigation of the same conduct was, in fact, achieving.

The government strenuously argues that it did not "hide" the existence of the SEC

investigation from Judge Lynch.  But this misses the point.  If anything, passing

references to having "reviewed trading records and other information provided by the

SEC" (Kang Ex. 1 at 15) obscures the fact that, on the record before the Court, the

prosecutor's investigation was, in sum and substance, the SEC investigation, and its

results up until March 2008 were the product of entirely conventional investigative techniques not disclosed to Judge Lynch.  In light of the fact that the Kang Affidavit all but ignored the SEC investigation—the elephant in the room—the boilerplate representation that "alternative investigative techniques have been tried or appear unlikely to succeed if tried" (Kang Ex. 1 at 38) remains just that—boilerplate.

As might be expected, this broad omission also rendered several specific statements in the affidavit misleading.  For example, the affidavit blandly assures Judge Lynch that interviewing Rajaratnam and other targets is an "investigative route" that is "too risky at the present time."  (*Id.* at 44-45.)  Yet during that same time period, the SEC, after asking the criminal authorities if they had any objection (*Franks* Tr. at 133, 142), had interviewed or deposed under oath over twenty Galleon employees, including two interviews and a day-long deposition of Rajaratnam.  The results of these interrogations were promptly provided to the prosecutor and, in the case of Rajaratnam, the prosecutor met with the SEC beforehand to discuss "strategy."  (Michaelson Ex. 26-A; Tr. 139-45; 733-39.)  The government now contends that the interview results were useless and disclosure of a criminal as opposed to an SEC investigation would have been harmful.  Perhaps so, but that is the very decision a reviewing court, not the government, should be making.

Cut of the same cloth is the representation that the conventional use of search warrants "is not appropriate at this stage of the investigation, as the locations where . . . records related to the scheme have not been fully identified, if at all."  (Kang Ex. 1 at 47.)  At that stage in the investigation—unknown to Judge Lynch—the government had, in fact, accumulated or had access to four million Galleon documents obtained through

either SEC or grand jury subpoenas and had built a compelling circumstantial case of

insider trading in several securities. (*See* Kang Exs. 4, 21, 22; Michaelson Exs. 59 84,

94, 95, 96, 97, 98, 100, 101, 106, 120.) Moreover, the files were so extensive that the

government had not had the time to review them all and was relying on the SEC to do so.

(*Franks* Tr. at 124, 614, 685.) This is precisely the nuts and bolts of an investigation that

must be presented to a court if it is to fulfill its function of determining whether

conventional investigative techniques are likely to prove inadequate.[23]

Though less compelling, the Court is also troubled by the Kang affidavit's

reference to the acquisition and review of trading records as an investigative technique.

While acknowledging that it had reviewed "certain" trading records, the affidavit goes on

to state that requesting more records "would jeopardize the investigation" because

"clearing firms . . . sometimes alert traders to the requests." (Kang Ex. 1 at 44.) Fair

enough, but it would have been informative to have also disclosed that the SEC had

already issued over two hundred subpoenas for, *inter alia*, trading records, and that the

grand jury had issued such subpoenas as well, all apparently without jeopardizing its

investigation. The Court, of course, is not charged with fly-specking the government's

affidavit and does not seek to do so. But stepping back to look at the forest, the

government in this case did not merely omit some discrete piece of information possibly

---

[23] For much the same reason, the boilerplate assertion that "the issuance of grand jury
subpoena likely would not lead to the discovery of critical information," (Kang Ex. 1 at
43) blinks reality. Grand jury subpoenas and SEC subpoenas had already led to a
mountain of incriminating circumstantial evidence as the impressively detailed
chronologies prepared by Mr. Michaelson fully attest. The government contends that the
reference to the inefficacy of grand jury subpoena was only meant to refer to witness
subpoenas. But of course that is the problem with falling back on boilerplate; unless
brought alive by disclosure of the course of the particular investigation at hand,
boilerplate serves little purpose.

relevant to a reviewing court's analysis of necessity; it failed to disclose the heart and soul of its investigation, without which a reasoned evaluation of the necessity of employing wiretaps was impossible.

## 2. Suppression Analysis

Of course, the government's omission is the beginning rather than the end of the Court's suppression inquiry, for a misleading affidavit alone is not grounds for suppression. While the *Franks* analysis discussed above is typically employed to evaluate misstatements and omissions relating to probable cause, the Second Circuit has extended the *Franks* analysis to other Title III requirements for obtaining a warrant. *See United States v. Bianco*, 998 F.2d 1112, 1125-26 (2d Cir. 1993) (applying *Franks* to 18 U.S.C. § 2518(11)(a)(ii), which requires that the government explain why "specification of the place of interception is not practical"). And district courts in this Circuit have done so with respect to the issue of necessity in particular. *See United States v. King*, 991 F. Supp. 77, 88-90 (E.D.N.Y. 1998); *United States v. Sanchez-Flores*, No. 94-CR-864, 1995 WL 765562, at *5 (S.D.N.Y. Dec. 29, 1995). *Cf. United States v. Guerra-Marez*, 928 F.2d 665, 670-71 (5th Cir. 1991); *United States v. Cole,* 807 F.2d 262, 267-68 (1st Cir. 1986); *Ippolito*, 774 F.2d at 1485 ("although *Franks* dealt specifically with probable cause, its reasoning applies [to Title III's necessity requirement] as well"). Thus, to warrant suppression on the issue of necessity, Rajaratnam must establish (1) that the omissions from the Kang Affidavit regarding the necessity of using wiretaps were the product of the government's "deliberate falsehood" or "reckless disregard for the truth", and (2) that, after inserting omitted information and setting aside misstatements, the

affidavit fails to establish necessity.  *See Coreas*, 419 F.3d at 155.   Rajaratnam has

made the former showing but not the latter.

### a.  Reckless Disregard

Having heard the testimony of the government witnesses at the *Franks* hearing,

the Court comfortably concludes that no one acted with the deliberate intent to mislead

Judge Lynch.  Recklessness, however, is another matter.  As discussed in the probable

cause analysis, recklessness may be inferred when omitted information was "clearly

critical" to assessing the legality of employing a wiretap.  *Reilly*, 76 F.3d at 1280.  Here

the issue is whether the omission of information regarding the nature and scope of the

SEC investigation upon which the government's own investigation was based would

have been critical to Judge Lynch in assessing whether conventional investigative

techniques would (or had) failed and, therefore, a wiretap was necessary.  The Court,

putting itself in the shoes of the original reviewing court, has already answered that

question in the affirmative.

The government demurs, arguing that it could not have acted recklessly in failing

to disclose a "more detailed description of the SEC investigation" because it "did not

view that investigation as an investigative technique under control of the Criminal

Authorities."  (Gov't Post Hr'g Opp'n at 22, 26).  The Court finds this argument

unpersuasive for several reasons.  As an initial matter, the government's description of

the underlying issue as simply whether a "more detailed" description of the SEC

investigation was warranted reflects the very fundamental flaw in the original Kang

affidavit.  The issue is not the accuracy of passing references to having received discrete

pieces of information from the SEC.  The issue is whether the government should have

informed the reviewing court of the array of conventional investigative techniques contemporaneously being employed by the SEC to unearth significant evidence of insider trading, all of which was at the core of the government's own criminal investigation. Furthermore, the government's contention that disclosure was somehow inappropriate because it did not and could not "control" the SEC investigation is formalism carried to its extreme.  And, of course, it does not address the proper inquiry under the first prong of the *Franks* analysis:  whether it was "clearly critical" to the reviewing court's analysis of the necessity issue to be informed that conventional investigative techniques were then being employed by the SEC and relied upon by the government, all at the time that the government was providing boilerplate assurances that alternative investigation techniques "appear unlikely to succeed."

### b.  *Materiality*

#### i.  Legal Standard

A showing that the government acted recklessly is only half of Rajaratnam's burden.   Rajaratnam also bears the burden of proving that the misstatements and omissions were material.   Indeed, under *Franks*, "[t]he ultimate inquiry on a motion to suppress is…not whether the affidavit contains false allegations or material omissions, but whether after putting such aside, there remains a residue of independent and lawful information sufficient" to support the affidavit. *Ferguson,* 758 F.2d at 848. In making that determination, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support" the affidavit. *United States v. Trzaska*, 111 F.3d 1019, 1027-28 (2d Cir. 1997); *see also Canfield*, 212 F.3d at 718.  And omissions should also be corrected.  *See Ferguson*, 758 F.2d at 848.  A court,

therefore, "should…delete false or misleading statements and insert the omitted truths revealed at the suppression hearing." *Ippolito*, 774 F.2d at 1486 n.1.

One further issue deserves mention.  The Supreme Court has stated that "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971).  Citing that statement, Rajaratnam repeatedly argues that the Court should not consider many of the government's arguments as to the sufficiency of a corrected affidavit because those arguments are "post-hoc rationalizations" that the government did not make in the initial application.  (*See, e.g.*, Rajaratnam Post Hr'g Reply Br. at 13.)  Rajaratnam's argument that this would give the government "a free second bite at the application apple" (Rajaratnam Post Hr'g Reply Br. at 5) is appealing, but overly simple.

As an initial matter, *Whiteley* is not exactly "controlling Supreme Court precedent." (Rajaratnam Post Hr'g Reply Br. at 21.)  That case involved a challenge to the sufficiency of a warrant application, not a *Franks* proceeding regarding the truth of an application. *See Whiteley*, 401 U.S. at 564.  Since a *Franks* proceeding requires deleting falsehoods and correcting omissions, the entire premise of the *Franks* approach is that the court must consider information that did not appear in the original affidavit.  In that case, arguments about what that affidavit would have meant necessarily involve inferences that were not explicitly made in the original affidavit.  Indeed, the Eighth Circuit has held *Whiteley* inapplicable to *Franks* for precisely that reason. *See United States v. Finley*, 612 F.3d 998, 1003 n.7 (8th Cir. 2010).

What is more, Rajaratnam's argument that "the remaining content is simply the *factually* corrected affidavit" and does not "include a supplementary *advocacy* piece" (Rajaratnam Post Hr'g Reply Br. at 5 (emphasis in original), elides the fact that, because the Court does not literally rewrite the affidavit, the exact content of the "remaining content" is amorphous.   Rajaratnam's distinction comes close to tying the government's hands in arguing the materiality point. *Cf. United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) (reasoning in *Franks* proceeding related to probable cause that "if the challenger is permitted to marshal all exculpatory facts, fairness dictates that the government be allowed to support the affidavit with additional inculpatory information known to the affiant at the time the affidavit was made").   More importantly, it also is inconsistent with the purpose of both Title III and the Fourth Amendment, for, as Rajaratnam himself notes, "[t]he point of the Fourth Amendment…is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence" but that it "require[s] that those inferences be drawn by a neutral magistrate…." *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).  Therefore, the Court will draw its inferences from the totality of facts presented in the government's wiretap application as well as those omitted therefrom.

### ii.    Application

The March 7, 2008 affidavit, as corrected, would have informed the issuing judge that Rajaratnam had been under investigation for insider trading since 1998 when the U.S. Attorney's office in San Francisco began investigating Roomy Khan; that Khan cooperated in the investigation of Rajaratnam as part of a plea agreement; that the SEC began investigating Rajaratnam and Galleon in 2002; that the SEC had interviewed

eighteen Galleon employees and deposed Rajaratnam and others under oath; that the SEC had issued over two hundred subpoenas and obtained millions of pages of documents, including telephone records, trading records, e-mails, and IMs; that all the evidence was shared with the government through regular meetings during the course of the investigations; and that the evidence thus gathered enabled both the SEC and the government to develop substantial circumstantial evidence of insider trading by Rajaratnam and numerous associates in the securities of several companies.  Finally, the evidence gathered led directly to the FBI's interviews of Roomy Khan during which she "flipped" and provided the government with direct evidence of insider trading by Rajaratnam.

Given the advances made in both investigations through the application of conventional investigative techniques, it is surely incorrect to say that these investigative procedures had "failed" in an abstract sense.  But Rajaratnam's characterization that "the government's conventional investigation had yielded a veritable mountain of evidence" oversimplifies the case.  (Rajaratnam Post Hr'g Reply Br. at 19.)  On the other hand, the government repeatedly understates what it found in that "mountain" of evidence, careful analysis of which, after all, enabled the criminal authorities and the SEC to identify multiple sources of inside information and flip Khan, thereby developing additional leads.  The government's suggestion that these were only 'weak or non-existent' circumstantial cases" (Gov't Post Hr'g Opp'n at 38) cannot be squared with the minute-by-minute analyses of IMs, toll records, and trading records prepared by the SEC and spoon-fed to the government.

However, "failure" in the Title III sense is not an abstract proposition.  "Just because the government had achieved some success in collecting evidence through [a confidential source] does not demonstrate the success of 'normal investigative procedures' under Title III." *Gambino*, 734 F. Supp. at 1103.  As the government rightly points out, if that were so, a wiretap would never be approved because a showing of probable cause would negate necessity and a showing of necessity would negate probable cause. *Cf. United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) ("[T]he fact that the government may have been able to indict him in the absence of evidence obtained through the use of a wiretap does not preclude a finding of necessity.").

Many of the same documents that were used to compile the SEC chronologies strongly suggested that Rajaratnam had been careful to exchange nearly all of his inside information by telephone. (*See Franks* Tr. 398-408, 702; Gov't Exs. 17, 24, 32.) "[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975); *see also Lilla*, 699 F.2d at 105 n. 6 ("If the crimes in question were planned and consummated only by means of telephone…the argument that wiretapping was the only option might seem more persuasive."). Rajaratnam argues that "the government cannot satisfy the statutory requirement of necessity simply by defining the goals of its investigation so expansively that no investigative technique, including wire surveillance, could ever satisfy them." (Rajaratnam Post Hr'g Br. at 45.) True, but the fact that the SEC's investigation had identified certain sources did not preclude a showing that a wiretap was necessary to confirm those sources and fully uncover

Rajaratnam's network of sources.[24]  *See United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir. 1976) (rejecting suppression where "even though state or federal officers may have garnered sufficient information without the use of wiretaps to support an indictment….there was every reason to believe that additional co-conspirators were involved who could not be successfully investigated without wiretapping"); *United States v. Blount*, 30 F. Supp. 2d 308, 312 (D. Conn. 1997) (rejecting suppression where investigation "reflected the need for additional information to tie conclusively into the conspiracy not only those targeted by and named in the application, but others then unidentified" because "[t]hose added purposes buttressed the government's claim that though successful to a degree, the methods used had not entirely succeeded").[25]

Rajaratnam responds that if the government believed it needed more evidence "there was absolutely nothing to prevent the USAO, FBI, and SEC from continuing to use these same techniques to develop additional evidence going forward based on the leads already developed." (Rajaratnam Post Hr'g Reply Br. at 15.) Not so says the

---

[24] A corrected affidavit would also have disclosed that the criminal authorities had made use of grand jury subpoenas to obtain documents from third parties.  However, Rajaratnam introduced no evidence that any of these records produced anything of value. The original affidavit also represented that the government had tried to conduct physical surveillance but had failed because Rajaratnam and his confederates worked in large office buildings and traveled frequently.  (*See* Kang Ex. 1 at 39-42.)  Other than the government's slapdash efforts to perform surveillance and thereby touch all the bases in its wiretap application, nothing adduced at the *Franks* hearing cast doubt on the accuracy of the representation itself.

[25] *Cf. United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009) ("If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."); *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) ("The government's demonstrated need for a wiretap as a means of identifying all coconspirators and the roles they occupied in the structure of the conspiracy is sufficient for a finding of 'necessity' under the statute.").

government.  Despite the development of circumstantial evidence that led to flipping

Roomy Khan in early 2008, the criminal authorities say they had "hit a bit of a wall" by

March 2008.  (*Franks* Tr. at 814.)  Not surprisingly, both parties' positions are

overstated.  It is likely true, as Rajaratnam contends, that the government could have

developed more evidence by conventional means and proceeded to indictment of at least

some alleged co-conspirators.  Indeed, the government asserts that this is the very first

time that wiretaps have been used in an insider trading investigation. (Michaelson Ex. 2

at 4.)  It is clear that conventional techniques have at least proven adequate in the past.

But whether they were or would be adequate in the present cases requires a more

particular inquiry.

Could or should the government have done more with conventional techniques to

test whether a wiretap was "necessary"?  It is hard to make that argument with regard to

document subpoenas, search warrants, and other forms of documentary investigation.

Over four million documents from targets and third parties had already been gathered.

Analysis of the documentary evidence was fairly sophisticated and while this revealed

much circumstantial evidence of insider trading it also confirmed what one would expect:

insider trading is typically conducted verbally.  Thus it seems reasonably unlikely that

additional documents would have produced qualitatively different evidence.

Rajaratnam argues that the criminal authorities "had not finished doing their own

homework by actually completing their review of the documentary evidence that [the

SEC] had obtained."  (Rajaratnam Post Hr'g Reply Br. at 15.)  Given that Rajaratnam so

strenuously argues that the SEC and the criminal authorities were effectively one and the

same, his argument that the USAO and FBI needed to rework the analysis provided by

the SEC is unconvincing. Particularly where the documents suggest that defendants were careful not leave a paper trail, there is little reason to believe that Judge Lynch would have required the criminal authorities to repeat the SEC's effort. *See Steinberg*, 525 F.2d at 1131. While it is theoretically possible that the criminal authorities could have found a needle in the haystack, that search hardly would have been "cost-effective", *Ippolito*, 774 F.2d at 1486, and the government is not "required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Concepcion*, 579 F.3d at 218. Moreover, at least one court in this Circuit has rejected a *Franks* challenge premised in part on the ground that criminal authorities relied on other agencies' reports about their own files. *See United States v. Pappas*, 298 F. Supp. 2d 250, 265 (D. Conn. 2004) (rejecting *Franks* challenge where FBI agent "fail[ed] to disclose in his affidavit the fact that he did not physically review the Arizona DEA's and FBI's files" in part because "the inclusion of this information in the affidavit would not have precluded a finding that the Government satisfied the necessity requirement").

The criminal authorities also had other options. They could have introduced undercover agents, but Rajaratnam points to no reason why Judge Lynch should have doubted "the difficulty of introducing a[n undercover agent] into this close-knit scheme." (Kang Ex.1 at 47.) Whether additional witness interviews were "reasonably unlikely to succeed" presents a much closer question. As an initial matter, a properly drafted affidavit would have (and should have) disclosed that the SEC interviewed numerous Galleon employees, including Rajaratnam himself, and had identified at least twelve other potential interviewees based on trading records, phone records, and IMs. However, none of the people the SEC interviewed admitted any insider trading and the most useful

piece of information they provided was that Rajaratnam was friends with Rajiv Goel.   In this respect, at least, it appears that the SEC, and by inference the criminal authorities, had "hit a wall" of sorts.   Where an investigation develops strong circumstantial evidence of wrongdoing but then is confronted by "stonewalling" by witnesses, the case for wiretapping is surely strengthened.

The FBI, however, seemed to have more success than the SEC.   When the FBI interviewed Roomy Khan, she agreed to cooperate, identified sources of information, and recorded phone calls with Rajaratnam.   (Michaelson Exs. 109, 110; Goldberg Ex. 17; *Franks* Tr. at 753.)   And none of this compromised the covert nature of the criminal investigation.   It is therefore natural to ask why the FBI could not have tried to flip any of the twelve other potential interviewees that the SEC had identified, including Rajiv Goel. And if the government is correct that witnesses take a criminal investigation more seriously than one conducted by the SEC (*Franks* Tr. at 639-40, 654-55, 799-801), it may be inferred that attempting to interview or seek the cooperation of other witnesses was a conventional technique that would, in fact, be likely to succeed.

Two reasons emerged from the hearing, however, as to why it made sense to approach Khan but not others.   First, it was suggested that Khan "was the only one that [the criminal authorities] had what [they] felt to be convincing enough evidence that made an approach a reasonable risk to take."   (*Franks* Tr. at 813.)   Khan's prior conviction coupled with damaging IMs, call logs and trading records made this a fair judgment.   Second, and indisputably, Khan's agreement to cooperate against Rajaratnam in 2002 made her "a good candidate for cooperation" in the present case.   (*Franks* Tr. at

812-13.)  So there was a good reason to start with Khan, and given her unique posture, her cooperation does not necessarily imply that other targets could also be flipped.

Rajaratnam dismisses the risks that a failed approach to other targets could compromise the criminal investigation since the existence of the SEC investigation would have likely been known by other targets.  But the Court sees this as a closer question of judgment.  The Court is aware that "[d]istrict courts must remain vigilant in ensuring that…reasoning[] based more on efficiency and simplicity than necessity[] will not justify a wiretap." *Concepcion*, 579 F.3d at 220.  However, Title III only requires a showing that traditional techniques are "*reasonably* unlikely to succeed"; "a reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required . . . ." *Scala*, 388 F. Supp. 2d at 404 (internal quotation marks omitted); *see also Concepcion*, 579 F.3d at 218; *Fury*, 554 F.2d at 530.  Rajaratnam, who bears the burden of proof, *Franks*, 438 U.S. at 155-56, has not introduced any evidence other than the success of the Khan approach that suggests that attempting to flip other witnesses was a risk-free strategy that rendered a wiretap unnecessary.  And the government's contention that Roomy Khan was a special case is not unreasonable.  In that circumstance, suppression based on speculation that alternative strategies might have been effective seems inappropriate. *See United States v. Shipp*, 578 F. Supp. 980, 989 (S.D.N.Y. 1984) (Weinfeld, J) ("Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic, if not naive."), *aff'd sub nom. United States v. Wilkinson*, 754 F.2d 1427 (2d Cir. 1985).

Finally, Rajaratnam argues that "[t]he government has conspicuously failed to cite any case, from any jurisdiction, ever, that found a wiretap to be necessary under the circumstances that a corrected affidavit would disclose in this case." (Rajaratnam Post Hr'g Reply Br. at 16.) As an initial matter, that argument seems to saddle the government with Rajaratnam's own burden of proof. *See Franks*, 438 U.S. at 155-56. And Rajaratnam himself fails to cite any case where a court found a wiretap unnecessary in the circumstances that a corrected affidavit would have disclosed here.[26]  Rajaratnam cites *United States v. Aileman*, 986 F. Supp. 1228 (N.D. Cal. 1997), but suppression in that case was based in part on the fact that the criminal authorities "made little meaningful effort, before [they] applied for the wiretap, to draw on the resources or the expertise of the Customs Service, the IRS, the INS, the FBI, or the Canadian office of the DEA" or a related investigation conducted by Canadian authorities. *Id.* at 1301, 1314. The entire premise of Rajaratnam's *Franks* challenge is that the criminal authorities here did exactly the opposite with respect to the SEC.

---

[26] The dearth of decisions ordering suppression is hardly surprising, since, with the exception of *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), and *United States v. Concepcion*, No. 07-CR-1095, 2008 WL 2663028 (S.D.N.Y. July 1, 2008), *rev'd* 579 F.3d 214 (2d Cir. 2009), the Court is not aware of any case in this Circuit where a court found a wiretap unnecessary in any circumstance. *Concepcion* was reversed by the Second Circuit, *see* 579 F.3d 214, and *Lilla* is distinguishable because, unlike the corrected affidavit here, which would have described an extensive investigation to determine the identity of Rajaratnam's sources, the affidavit in that case "merely asserted that 'no other investigative method exists to determine the identity' of individuals who might have been involved" with the drug dealer from whom the officers had already purchased drugs and, to all appearances, could easily approach again. *See id.* at 104. Rajaratnam argues that "[t]he fact that the Second Circuit considered *Concepcion* to be 'exceptionally close,' even though *none* of these conventional techniques were available to the criminal investigators in that case, simply shows how far short of the statutory demonstration of necessity a corrected affidavit would fall in this case." (Rajaratnam Post Hr'g Reply Br. at 16 (emphasis in original).) That argument is misplaced because the allegedly available techniques in that case—confidential informants and physical surveillance—were likely unavailable here.

Instead, *United States v. Zolp*, 659 F. Supp. 692, (D.N.J. 1987) seems the most apposite decision.  In that case, which involved a securities fraud scheme regarding a company called Laser Arms, the government's wiretap applications claimed that:

> participants in securities fraud schemes conduct much of the unlawful side of their business over the telephone; such participants are aware the paper documentation involved in their business is subject to being subpoenaed and they thus often prepare such documentation so as to conceal wrongdoing; the confidential informant's knowledge of, and anticipated testimony on, the conspiracy would be insufficient to bring about convictions of all participants in the conspiracy; surveillance and searches of the premises would be insufficient to reveal the full extent of the conspiracy; and, because many of the suspects were aware of the pending SEC investigation into Laser Arms, they were particularly cautious about infiltration and "normal" governmental surveillance.

*Id.* at 710.  Like Rajaratnam here, Zolp argued (a) that the "affidavits failed to set forth details of [a] SEC civil proceeding against Laser Arms and thus failed to advise the judge to whom the initial wiretap application was directed that normal investigative surveillance techniques had already proven effective in the investigation" and (b) that "the judges to whom the applications were made might not have authorized the wiretaps had they been made aware of the success which 'normal' investigative techniques had already achieved."  *Id.*  But the court found this argument "unpersuasive" where "the judges to whom the wiretap applications were made were aware that non-wiretap techniques had produced information against Laser Arms at least sufficient to suspend trading in Laser Arms stock" but "the affidavit [wa]s explicit that 'normal' techniques were unlikely 'to determine the complete scope of the RICO conspiracy and related predicate offenses in which [the targets] [we]re involved, and to identify the other participants and the roles played by such other participants.'"  *Id.* at 710-11.  Just so, with the affidavit, as corrected, here.

C.    Chiesi's Claims

Chiesi also argues that the government failed to demonstrate necessity in its initial August 13, 2008 wiretap application.  She makes two arguments.  First, she accuses the government of misstating information in the August 13, 2008 Kang Affidavit.  (Chiesi Br. at 10, 16 n.9 & n.10.)  Second, she says that the government did virtually no investigation of her before requesting wiretap authorization—in other words, that there were not minimally adequate facts to justify Judge Sullivan's order authorizing wiretaps of her phones.  (Chiesi Br. at 10-11, 14-20.)  Both arguments are unavailing.[27]

1.    *False or Misleading Statements or Omissions in the August 13 Kang Affidavit*

Chiesi argues that the August 13, 2008 Kang Affidavit made various false statements.  Unlike Rajaratnam, Chiesi does not request a *Franks* hearing to probe the government's conduct in preparing its first application, on August 13, 2008, for authorization to wiretap her phones.  Instead, she appears to argue that suppression is warranted based on the allegations made in her brief.  However, there is "a presumption of validity with respect to the affidavit supporting the search warrant", *Franks*, 438 U.S. at 171, and Chiesi's allegations do not come close to showing that the affidavit was false

---

[27] Chiesi also incorporates all of Rajaratnam's arguments regarding necessity, "because those allegations are nearly identical to and form the basis of the necessity allegations with respect to the necessity of the wiretaps over the Chiesi Phones." (Chiesi Br. at 15 n.7.)  Were that true, Chiesi would have the same right to a *Franks* hearing that the Court granted Rajaratnam.  It is not true, however, because there is no indication that the SEC investigation extended to Chiesi and her sources.  The omission of that investigation is the most glaring problem that Rajaratnam identifies in the government's March 7, 2008 affidavit.  But it has little relevance to Chiesi.



or misleading or that the government drafted it with "reckless disregard", never mind that its "remaining content is insufficient." *Id.* at 156.[28]

Chiesi also cites the affidavit's claims that ████████████████████ ████████████████████, claims she calls "clearly unsupportable," "self-contradictory," and "untrue." (Chiesi Br. at 16 n.9 & n.10, 17.) Chiesi, for example, believes that it was misleading for the government to say that

---

[28] *Franks* itself states that this standard applies "at that hearing," *Franks v. Delaware*, 438 U.S. 154, 156 (1978), but given that the *Franks* standard is designed to ensure that a "challenger's attack must be more than conclusory," *id.* 171, it would make no sense that a defendant who chose to challenge an affidavit without a hearing could win suppression by satisfying a lower standard.



Finally, Chiesi accuses the government's affidavit of internal inconsistencies

There is no internal inconsistency here.

For all these reasons the Court finds no evidence that the government knowingly or recklessly misled Judge Sullivan. The Court therefore finds no reason to disregard the "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

2.      *Minimally Adequate Facts in the Affidavit to Justify Wiretap Authorization*

Chiesi nevertheless attacks the sufficiency *vel non* of the August 13, 2008 Kang Affidavit's necessity section on the ground that it too closely resembled the necessity section in the March 7, 2008 Kang Affidavit in support of wiretap authorization for Rajaratnam's phone. The Second Circuit has held that "generalized and conclusory

59

statements that other investigative techniques would prove unsuccessful" are inadequate to satisfy the necessity requirement. *Lilla*, 699 F.2d at 104. True enough, but Judge Sullivan has made a considered determination that the August 13, 2008 Kang Affidavit adequately supported a finding that wiretaps were necessary to the government's investigation of Chiesi. And, absent any misstatements, that determination is entitled to "considerable deference," *Concepcion*, 579 F.3d at 217 & n.1, with the reviewing court's task limited to ensuring that the application was "minimally adequate to support the determination that was made," *Miller*, 116 F.3d at 663.

The August 13, 2008 Kang Affidavit was particularized enough to Chiesi to pass muster under this standard of review. ██████████████████ ████████████████████████████ ██████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████████████ ████████████████████████████ ████████████ The fact that the Rajaratnam warrant affidavit closely parallels the Chiesi one is similarly unproblematic. Where boilerplate accurately depicts the facts on the ground, Title III requirements are satisfied. *See United States v. Herrera*, No. 02-CR-0477, 2002 WL 31133029, at *2 (S.D.N.Y. Sept. 23, 2002) (Kaplan, J.) (upholding use of "boilerplate" language, noting that it "should come as no surprise that the facts supporting the conclusion that the alternative methods would be unavailing often are similar from one narcotics operation to another").

Chiesi also argues that the August 13, 2008 Kang Affidavit is insufficient on its face because the government failed to first try a number of conventional techniques ████ ███████████████████████████████████████████████ ███████████████████████████████ ███████████████████████[29] But "[a]gents are not required to resort to measures that will clearly be unproductive." *Terry*, 702 F.2d at 310. Even assuming that the use of alternative techniques would have achieved some measure of success, the government was entitled to use a wiretap if necessary to achieve other investigatory objectives.[30] *See Gambino*, 734 F. Supp. at 1103; *United States v. Cartagena*, 593 F.3d 104, 110 (1st Cir. 2010) ("Even if traditional investigative procedures produce some results, the *partial* success of the investigation does not mean that there is nothing more to be done.") (emphasis in original) (internal quotation marks and alterations omitted).  In this case, the government provided a "reasoned explanation" that "square[d] with common sense," *Scala*, 388 F. Supp. 2d at 404, as to why only a wiretap would achieve all of its investigatory goals.  That "is all that is required." *Shipp*, 578 F. Supp. at 989.

---

[29] ███████████████████████████████████████ ████████████████ But "[t]here is no rule on the amount of time investigators must try and fail, using other methods, before turning to a wiretap application." *United States v. Cartagena*, 593 F.3d 104, 110 (1st Cir. 2010) (brackets in original) (internal quotation marks omitted).

[30] Chiesi also contends that other insider trading investigations have succeeded without using Title III, and this one could have too.  But on that logic Title III would never justify wiretapping for types of investigations that sometimes succeed without wiretaps.  That is not the law.

In sum, the government fulfilled its statutory responsibility to "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Torres*, 901 F.2d at 231. At the least, minimally adequate facts existed to justify Judge Sullivan's decision authorizing the wiretaps of Chiesi's phones.

## IV.    Minimization

Rajaratnam and Chiesi both challenge a number of intercepts because they say the government failed to minimize properly. Title III requires that eavesdropping "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). Every wiretap order must contain a provision mandating minimization in accordance with Title III. *See id.* Here, the judges who authorized wiretapping of both defendants' telephones included such a provision in their orders of authorization. Therefore the question is "whether the [g]overnment obeyed the provision in carrying out the wiretaps." *United States v. Salas*, 07-CR-0557, 2008 WL 4840872, at *6 (S.D.N.Y. Nov. 5, 2008) (Koeltl, J.).

The minimization requirement "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978). It "only requires a reasonable effort to minimize the interception of irrelevant calls." *United States v. McGuinness*, 764 F. Supp. 888, 900 (S.D.N.Y. 1991) (citing *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973), *cert. denied*, 417 U.S. 936 (1974)).

Compliance is measured by the reasonableness of the monitoring agents under the circumstances. *See Scott*, 436 U.S. at 139; *Salas*, 2008 WL 4840872, at *6. Reasonableness is gauged "in the context of the entire wiretap, as opposed to a chat-by-chat analysis." *McGuinness*, 764 F. Supp. at 901. "[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute . . . . [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903 (1974). Even "where the percentage of nonpertinent calls is relatively high," their interception may still be reasonable in some cases. *Scott*, 436 U.S. at 140. And "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Id.* Moreover, the "minimization requirement does not extend to calls lasting two minutes or less." *Salas*, 2008 WL 4840872, at *6 (citing *Bynum*, 485 F.2d at 500); *see United States v. Capra*, 501 F.2d 267, 275–76 (2d Cir. 1974).

The government has the burden to show that it properly minimized intercepts. *See United States v. Rizzo*, 491 F.2d 215, 217 n.7 (2d Cir. 1974). Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, "a substantial number of non-pertinent conversations have been intercepted unreasonably." *United States v. Menendez*, No. 04-219, 2005 WL 1384027, at *3 (S.D.N.Y. June 8, 2005) (citing cases); *United States v. Ianniello*, 621 F. Supp. 1455, 1470 (S.D.N.Y. 1985) (Weinfeld, J.).

A.    Rajaratnam's Claims

In support of his claim that the government failed to comply with the minimization requirement, Rajaratnam cites 150 calls that were non-pertinent but were still recorded.  (*See* Rajaratnam Br. at 74.) ██████████████████████████

████████████████████████████████████████████████ ██

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ In these circumstances the government's conduct in monitoring the Rajaratnam wiretap was objectively reasonable. *See Salas*, 2008 WL 4840872, at *7 (failing to minimize 11 calls out of 1,541 "was not objectively unreasonable"); *Bynum*, 485 F.2d at 500 ("[N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated.").

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

64

Considering the "nature and scope of the criminal enterprise under investigation," *Pichardo*, 1999 WL 649020, at *6, the small number of interceptions to which Rajaratnam raises any objection at all, ████████████████████████ ██████████████████████████ the Court finds that the government acted objectively reasonably under the circumstances.  No suppression is required.

B.     Chiesi's Claims

Chiesi claims that 155 calls ████████████████████████ ██████████████████████████ pertained solely to personal issues.  She contends that the government made virtually no effort to minimize these recordings. (Chiesi Br. at 32.)  The Court disagrees.  ████████████████████ ████████████████████████████████████████ ██████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ That the calls contained both personal and pertinent content, however, does not make them non-pertinent altogether.  Nor does it mean that the calls should have been terminated for veering into the speakers' personal lives.  As Judge Koeltl noted in *Salas*, "[s]ome allowance must . . . be made for the fact that conversations can shift topics, and it would be unreasonable for surveilling agents to minimize each call that did not begin as incriminating." *Salas*, 2008 WL 4840872, at *7; *see Ianniello*, 621 F. Supp. at 1471 ("It

is common, of course, for conversations to treat more than one subject, and entirely

possible for such dialogues to be comprised of discussion of innocent matters,

interspersed with topics of a criminal nature.  The statutory requirement of minimization

does not mean that only communications exclusively devoted to criminal subjects may be

intercepted."). ███████████████████████████████████

████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

The government's efforts here were at least as good as those upheld in *Salas*.

████████████████████████████████████████████████████

 2008 WL 4840872, at *7.

Even assuming that all of Chiesi's contentions are right, the Court finds the government's conduct objectively reasonable under the circumstances.

**CONCLUSION**

For the foregoing reasons, Rajaratnam's and Chiesi's motions **[86, 90]** to suppress are denied.[31]

SO ORDERED.

Dated: New York, New York
November **24**, 2010

Richard J. Holwell
United States District Judge

---

[31] By letter dated May 12, 2010, Chiesi also moved to suppress evidence that the government had obtained pursuant to wiretaps of phones used by C.B. Lee and Ali Far. That motion is denied. First, as Chiesi implicitly acknowledges, evidence obtained from the Rajaratnam and Chiesi wiretaps supports probable cause for wiretapping Lee's and Far's phones. (*See* May 12, 2010 Letter at 2.) Second, Chiesi has not established that the government's October 14, 2008, application to wiretap Lee's and Far's phones was deficient in describing why wiretaps were necessary. Chiesi says that the government only attempted physical surveillance of Lee once, and that its October 14 affidavit closely resembled the August 13, 2008 affidavit. This argument fails for exactly the reasons articulated above in the section rejecting Chiesi's motion to suppress based on the government's failure to establish necessity.