UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                         :

UNITED STATES OF AMERICA       :

                                         :

   -v-                             :

                                       :     S2 09 Cr. 1184 (RJH)

RAJ RAJARATNAM,           :

                                       :

                 Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S REPLY TO RAJARATNAM'S OPPOSITION TO GOVERNMENT'S MOTION TO PRECLUDE CERTAIN EVIDENCE

The Government respectfully submits this reply to Rajaratnam's opposition to the

Government's motion to preclude Rajaratnam from offering into evidence (a) tape recorded

statements between Adam Smith and Ian Horowitz made several weeks before this trial during

which Horowitz denies knowledge of certain inside information; and (b) statements made

individuals, including Joe Liu, to the Federal Bureau of Investigation ("FBI") when such

individuals are not testifying at trial. *See* Exh. A, Government's March 21, 2011 Letter to the

Court. In his opposition, Rajaratnam argues that the tape recorded statements between Smith and

Horowitz are admissible to demonstrate Smith's bias and that Smith's statements to Horowitz

during the recordings were inconsistent with Smith's prior statements to the FBI. Other than to

state that he "reserves all rights with respect to the evidence concerning proffer statements made

to the FBI by Joe Liu," Rajaratnam does not respond to the Government's motion to preclude

him from eliciting and/or offering out of court statements to the FBI of individuals, including Joe

Liu, who will not testify at trial.

First, with respect to Rajaratnam's argument that the tape recorded conversations between

Smith and Horowitz are admissible to show Smith's bias, Rajaratnam is wrong. Rajaratnam is

free to ask Smith whether he made recorded conversations with others, including Horowitz, at the FBI's direction; how many times Smith made recorded conversations at the FBI's direction; and the FBI's instructions to Smith regarding what to say and what not to say during those recordings. Such questions and Smith's answers will enable Rajaratnam to demonstrate that Smith was cooperating with the Government, that Smith was making recorded conversations at the FBI's direction, and that Smith was willing to make three and more recorded conversations at the FBI's direction. There is absolutely no need to play the recorded conversations between Smith and Horowitz to demonstrate that Smith made recordings, the number of recordings made by Smith, and Smith's intent to make additional recordings at the FBI's direction. The recordings themselves are hearsay and are not admissible under any exception to the hearsay rule. *See, e.g., United States* v. *Williams*, 927 F.2d 95, 100 (2d Cir. 1991) (the district court properly excluded hearsay during cross-examination because the hearsay did not fall within any exception to the hearsay rules.).

Rajaratnam's reliance on *United States* v. *Figueroa*, 548 F.3d 222 (2d Cir. 2008), and *United States* v. *Vasquez*, No. 09-4056, 2011 WL 855850 (7th Cir. Mar. 14, 2011), is misplaced. In *Figueroa*, the Second Circuit held that the district court did not abuse its discretion in restricting the defendant's cross-examination of a witness regarding that individual's possible gang affiliation, but held that the district court abused its discretion in not permitting cross-examination about the individual's tattoos. The Second Circuit did not address whether a party could cross-examine a witness with hearsay, much less hearsay in the form of recorded conversations. In *Vasquez*, the Seventh Circuit permitted cross-examination of a witness with recorded conversations between that witness and her husband because the statements of the

2

witness during the recordings demonstrated that the witness was motivated to lie for the defendant in order to help her husband and her declarations on the recordings constituted prior inconsistent statements. 2011 WL 855850 at *6-8. During trial, the witness testified for the defendant that she asked him to take her to the place where the drug deal took place. *Id.* at *6. If believed, this testimony suggested that the defendant had no idea that a drug deal was taking place and showed up by happenstance at this witness's request. *Id.* Subsequently, the Government uncovered recorded conversations between this witness and her husband (who was allegedly one of the defendant's co-conspirators). During these recordings, the witness acknowledged that she had met with the defendant's lawyer several times and she understood that her husband could get a lower sentence if her husband entered a plea and avoided implicating the defendant in any crimes. *Id.* Therefore, the recorded conversations showed very clearly that the witness had an incentive to lie in order to get her husband a lower sentence. *Id.* at *7. The recordings were also admissible because they were inconsistent with the witness's prior statements under oath. *Id.* The Seventh Circuit further held that the district court should have instructed the jury that none of the statements were being offered for the truth of the matters asserted in the recordings but instead to demonstrate bias. *Id.*

The recorded conversations between Smith and Horowitz are completely different than the recordings admitted in *Vasquez*. Unlike the conversations between the witness in *Vasquez* and her husband, the recordings between Smith and Horowitz were made at the direction of the FBI. Smith's statements, therefore, during those conversations were made under the supervision and at the direction of the FBI. The content of Smith's statements are not relevant and, in fact, are misleading because they were not made freely by him, but rather as part of a ruse set up by

3

the FBI. By contrast, in *Vasquez*, the content of the statements by the witness to her husband were a true and accurate reflection of her motives and bias to make false statements during the trial. They were not made at the direction of any law enforcement agency.

Second, Rajaratnam is also wrong that the tape recorded conversations between Smith and Horowitz are admissible to show Smith's inconsistent statements. Rajaratnam completely misconstrues the point of Smith's statements on the calls with Horowitz. These recordings were an undercover ruse set up by the FBI. Therefore, by definition, the statements involved an attempt to deceive Horowitz, which is an entirely permissible law enforcement technique. Smith's statements during the calls were—at the direction of the FBI—meant to be deceptive and designed to elicit admissions from Horowitz regarding Horowitz's involvement in past crimes. Rajaratnam should not be able to cross-examine Smith with "inconsistent" or "deceptive" statements that Smith made at the FBI's behest. Those statements on these recordings are not probative of Smith's veracity. They were not made by Smith of his own free will but rather, once again, under the FBI's supervision and at the FBI's direction. Rajaratnam appears to be attempting to put the substance of Horowitz's denials before the jury through the thinly veiled excuse of offering "prior inconsistent statements" of Smith. Since Smith's statements were not made by him of his own volition, they cannot be "inconsistent" with his prior statements to the FBI.

Finally, even though Rajaratnam has not addressed the merits of the Government's argument that he should be precluded from eliciting and/or offering out of court statements to the FBI of individuals, including Joe Liu, who will not testify at trial, the Court should grant that portion of the Government's motion. Rajaratnam has not offered any evidentiary ground,

4

argument, or case law in support of his right to elicit and/or offer out of court statements to the FBI of individuals who will not be testifying at trial. No evidentiary rule, argument, or case law permits Rajaratnam to elicit these out of court statements.

Dated: New York, New York
March 27, 2011

Respectfully submitted,

PREET BHARARA,
United States Attorney for the
Southern District of New York

By: _Reed M. Brodsky_
JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant United States Attorney
212-637-2272/2492/2348

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

                   :

     -against-                    :       S2 09 Cr. 1184 (RJH)

                   :

RAJ RAJARATNAM,           :

         Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S MOTION TO PRECLUDE CERTAIN EVIDENCE

PREET BHARARA
United States Attorney for the
Southern District of New York

Jonathan R. Streeter
Reed M. Brodsky
Assistant United States Attorneys
Andrew Z. Michaelson
Special Assistant United States Attorney
    – Of Counsel –



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 21, 2011

By Hand Delivery

The Honorable Richard J. Holwell
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    United States v. Raj Rajaratnam,
              S2 09 Cr. 1184 (RJH)

Dear Judge Holwell:

      The Government respectfully moves to preclude Raj Rajaratnam, the defendant, from offering certain hearsay evidence that he has indicated an intention to offer at trial. That hearsay, for which there is no exception under the Federal Rule of Evidence, includes: (a) tape recorded statements of Ian Horowitz made several weeks before this trial during which Horowitz denies knowledge of certain inside information; and (b) statements made by Joe Liu to the FBI well after the arrest of Rajaratnam in which Liu denies that he had certain inside information. It is not surprising that Horowitz and Liu denied knowledge or wrongdoing, given that the Government's investigation was fully public at the time of these statements; given that both were ████████ ████████████████████████████████████ prior to denying knowledge of insider trading; and given that both were long ago identified ████████████ ████████. If Rajaratnam seeks to offer Horowitz's and Liu's denials—which the Government does not credit—as evidence at trial, he must call them as witnesses and allow them to be cross examined by the Government. The hearsay rule is directed at precisely such out of court statements, and the defendant cannot offer those statements without calling the witnesses so that the jury can evaluate their credibility.

      First, the Government moves to preclude the defense from using or referring to tape recorded statements of Horowitz during trial. The relevant recordings were made at the direction of the FBI by Adam Smith on January 14, 2011, just after Smith had begun cooperating with the Government. Horowitz was Rajaratnam's (and Smith's) trader at Galleon. Rajaratnam has listed Horowitz as a potential witness he will call at trial.

Prior to pleading guilty, Smith informed the Government of, among other things, the following: (1) In or around 2009, Horowitz told Smith that Horowitz was going to put shares of a company called Starent in Smith's fund at Galleon and that Smith should not ask Horowitz why; (2) Horowitz allocated approximately 330,000 shares of Starent stock to Smith's fund at the time and allocated Starent stock to other Galleon funds; (3) Starent was Rengan Rajaratnam's "high-conviction" stock; (4) Cisco announced its acquisition of Starent thereafter in or about October 2009, just days before Rajaratnam's arrest; (5) Horowitz was extremely nervous about the Starent trades; and (6) soon after Rajaratnam's arrest, Horowitz expressed concern to Smith that Galleon had been long Starent and another stock, Tandberg, which was also acquired by Cisco shortly before Rajaratnam's arrest. In addition, Smith speculated to the Government that the source of the Starent tip may have been a certain Cisco employee who formerly worked as a sell-side analyst at Prudential.

After Smith started cooperating with the Government, on January 14, 2011, the FBI directed Smith to record conversations with certain individuals, including Horowitz. Before Smith called Horowitz at the FBI's direction, Horowitz knew that █████████ ████████████████████ The FBI directed Smith to raise the Starent trades during calls with Horowitz in an attempt to elicit statements from Horowitz regarding the identity of the tipper. During the recorded calls that followed, Horowitz denied knowledge of the tipper and denied knowledge that there was any issue with Galleon's trading in Starent. *See* draft transcripts of three recorded phone calls between Smith and Horowitz on 1/14/11, Exhibit A, specifically transcript of 1:57 pm phone call. Horowitz also stated during those calls that he was suspicious that Smith was recording the calls for law enforcement. *Id.* at transcript of 2:30 pm phone call, at pg. 1. On January 26, 2011, the Government produced these recordings to the defendant.

During Rajaratnam's opening, Rajaratnam's counsel stated the following:

> Adam Smith will testify he tipped Raj about the acquisition of
> Starent but the evidence will show Raj was building a long position
> in Starent in August and September long before the alleged tips
> and his position was based on fundamental research and analysis.
> The evidence will show that there was extensive public chatter
> about Starent. And you will hear Smith's own voice that this
> accusation was a lie. Smith tried a secret telephone tape recording
> to get his former trader, Raj's trader Ian Horowitz, to confirm that
> they had inside information on Starent and you will hear Horowitz
> reject that suggestion. You will hear Horowitz confirm expert
> fundamental research that supported Raj's trading in Starent. That
> tape recording, that secret tape recording by Smith blew up on him.

(Trial Tr. At 84-85). It is unclear why Rajaratnam's counsel stated that "Smith will testify he

tipped Raj about the acquisition of Starent." The Jencks Act (so-called "3500") material produced by the Government does not contain any such statement and Smith will give no such testimony. Instead, the 3500 material reflects that Smith suspected but did not know who tipped Rajaratnam about Cisco's acquisition of Starent.

The Government moves to preclude Rajaratnam from offering the recordings of Horowitz denying his knowledge about the Starent tip at trial. Those statements are classic hearsay—they are out of court statements that the defense seeks to offer for the truth of the matter asserted—namely that Horowitz did not know about insider trading in Starent. Moreover, Rajaratnam cannot offer Horowitz's out of court statements to impeach Smith's testimony. If he wants to use Horowitz's statements to impeach Smith's testimony, he must bring Horowitz in to testify as a witness before the jury and Horowitz must be subjected to cross examination. Clearly a party cannot impeach one witness's testimony with an out of court statement of another witness.

For example, suppose defense counsel had interviewed Horowitz before trial and Horowitz denied knowledge of insider trading in Starent. Surely even Rajaratnam would not argue that he could then use his counsel's memorandum of that interview (or even an audio recording of that interview) to impeach Smith. Similarly, the fact that the Government's effort to develop evidence against Horowitz—in the form of an undercover recording—did not work is entirely inadmissible. Indeed, it is not at all surprising that effort failed in light of Horowitz's knowledge of the highly public investigation, ▬▬▬▬▬▬▬▬▬ and Horowitz's statement to Smith that Horowitz suspected Smith was "tapping me on the phone trying to get me to say some things." Exhibit A, transcript of 2:30 pm call, at pg. 1. In short, if the defendant wants to offer Horowitz's denials—either as substantive evidence or impeachment of Smith—the defendant must call Horowitz as a witness.

Second, the Government moves to preclude Rajaratnam from offering out of court statements to the FBI of individuals who will not testify at this trial. Such statements are hearsay and do not fall within any hearsay exception. In short, the defendant cannot offer an FBI memorandum of an out of court statement or call an FBI agent to testify about out of court statements of individuals who will not testify at this trial. As noted above, if the defendant wants to offer statements of such individuals, he must call them as witnesses.

For example, just prior to openings, the Government learned that Rajaratnam intended to argue to the jury that Joe Liu, ▬▬▬▬▬▬▬▬▬▬▬▬, had denied insider trading allegations to the Government. Prior to trial, the Government produced FBI memoranda ("302s") reflecting denials by Liu that he was involved in any insider trading scheme. As with Horowitz's denials, it is commonplace in a criminal investigation for an individual interviewed by the FBI to deny wrongdoing. But regardless of their falsity or truth, such statements are obvious hearsay for

which no exception applies. Unless Rajaratnam calls Liu as a witness, Rajaratnam may not elicit or suggest—either through questions or otherwise—that Liu denied the Government's allegations.

Rajaratnam's counsel has claimed to the Government that Liu's out of court statements are admissible as "former testimony" of an "unavailable" declarant. This is wrong for two reasons. First, Liu's telephonic interview with the FBI described in a 302 is not "former testimony" under oath in another proceeding as required by Federal Rule of Evidence 804(b)(1). Second, Liu, who lives in Taiwan, is not "unavailable" under Federal Rule of Evidence 804(a)(1)-(5). For example, Rajaratnam could have attempted to secure Liu's testimony "by process or other reasonable means," including through a deposition pursuant to Federal Rule of Criminal Procedure 15. The Government produced the 302 of its telephonic interview with Liu to the defendant on December 7, 2010, three months before this trial started. Rajaratnam had more than ample time to seek the Court's permission to conduct a Rule 15 deposition prior to trial. Having chosen not to do so, Rajaratnam cannot now attempt to put Liu's denials of insider trading—which the Government submits are entirely incredible—into evidence through FBI memoranda. If Rajaratnam wants to present Liu's denials, he must call Liu as a witness and allow the Government to cross examine him.

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

by: _____
JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant United States Attorney

cc (by email):    John M. Dowd, Esq.
                  Terence J. Lynam, Esq.



26 Federal Plaza
New York, New York 10278

| | |
|---|---|
| Date of Call: | 01/14/2011 |
| Time of Call: | 1:40 p.m. |
| Reference: | |
| Parties: | ADAM SMITH (ADAM) |
| | IAN HOROWITZ (IAN) |
| Duration: | Approximately 4 minutes 42 seconds |
| Line: | IAN HOROWITZ cellular phone (917-538-1114) |

| | |
|---|---|
| Ian: | Hello. |
| Adam: | Hello. |
| Ian: | Hello. |
| Adam: | Ian...Ian...are you there? |
| Ian: | Yes,...yes. |
| Adam: | It's Adam. |
| Ian: | Hey, what's going on? |
| Adam: | Hey buddy, where are you? |
| Ian: | I'm in Florida. |
| Adam: | You're in Florida? |
| Ian: | Yeah. |
| Adam: | Uhhh....the annual ahhh |
| Ian: | What's going... |
| Adam: | The annual retreat huh? |
| Ian: | U/I...it's Martin Luther King weekend, so the kids are off from school. I just got down a few, a few minutes ago. |
| Adam: | Oh wow, ok, cool. Were you ahhh.... |
| Ian: | How are you doing? |
| Adam: | Ahhh...ehhh. |
| Ian: | UI (speak over each other). |

| | |
|---|---|
| Adam: | Ummm...what ahhh...so, so you uhhh were you in the city last week? |
| Ian: | I was...where was I last week...I was in the city for one night, one day...yes last week. |
| Adam: | Ok. |
| Ian: | But UI you went to CES I was going to try to come and see you but then I was like when you told me you were at CES. |
| Adam: | Yeah, yeah, yeah. Ummm, so what, are you just landing at the airport or are you back home already? |
| Ian: | No, no...I'm, I'm I just got into ahhh like I'm just having lunch with the family but I just walked away. |
| Adam: | Ok, alright cool. |
| Ian: | How, how are you doing? |
| Adam: | Ummm...ehhh. Ehh you know...ehhh. |
| Ian: | Bus, business wise or the other thing wise? |
| Adam: | Ahhh a little bit of both...a little bit of both. |
| Ian: | Oh really? |
| Adam: | Yeah. |
| Ian: | Ahhh (sighs). |
| Adam: | What ahhh, what have you heard recently? |
| Ian: | It's been dead, dead, dead quiet...like I saw him like two three weeks ago and he gave me a whole speech about how like you know he, he's no, he no like the government want him to cooperate and you know like he's like I you know like that he's not cooperating that the woman is going to plead guilty that he's going to go to trial and that's been it. |
| Adam: | The ahhh the other chick? |
| Ian: | Yeah, the other chick is going to plead guilty. |
| Adam: | Ahhhh and he's gonna go to trial? |
| Ian: | And he's going to go to trial. That's what I heard from him. |
| Adam: | Ahhh so fuck alright. Ummm, yeah I mean you've seen all this other shit though right? |
| Ian: | Yeah, but like I see, I see it but I don't like, I don't have I don't even know where to like any of those things or those people like they even said like I read one of the wire one of the wire taps they said Galleon wasn't even a client of theirs. |
| Adam: | Yeah, I don't think we were, right? You don't remember.... |
| Ian: | No, he said it. |
| Adam: | I don't... |
| Ian: | The guy, no the guy said it on the wire because when he goes what happened was one of the guys that got arrested who the AMD guy who got arrested he says Oh my God I see them trading AMD and the other guy goes Galleon was not a client of ours. |
| Adam: | Galleon was not, yeah. No I never even heard of the what was it Primary Global UI. |
| Ian: | I never heard, I never heard of any of these consultants or anything like this. |
| Adam: | I think we used like GLG, but I think that was about the extent of it. |

| | |
|---|---|
| Ian: | Yeah, I don't, I think this goes beyond us at this point...and then I saw and and then the other thing I saw was that the other guy who lost their bid to lose the trial. |
| Adam: | Which one? |
| Ian: | Ok (talking to someone in background). Ummm that the other guys like the Ruby and those guys I read their case that they tried to get... |
| Adam: | Oh, yeah, yeah, yeah. |
| Ian: | That they tried to get it dismissed....and they couldn't get...and they got it thrown out. |
| Adam: | So, they're going to plead guilty too probably right? |
| Ian: | I, I don't know and then their lawyer if you read the document, the lawyer said that in one of the that that she's assuming that some of them are going to plead guilty as well. But from my end it has been dead quiet. |
| Adam: | Ok. Yeah...ummm. |
| Ian: | Not for you huh? |
| Adam: | No...and ummm it's unclear...nothing is you know, it's not nothing so which is not good, but it's also not you know, not like.... |
| Ian: | I'm going to be in the city next week, I'll come by and we can talk more is that better? |
| Adam: | Ummm, yeah that's probably better or is there like a land line I could call you later over there? |
| Ian: | Yes, ummm let me get you.... |
| Adam: | Just, just call my cell, call my cell later. |
| Ian: | I'll call, I'm going to call you like in 20 minutes when I get to their house. |
| Adam: | Ok, cool. |
| Ian: | And then you, and then you'll tell me how to call you back. |
| Adam: | Ok, cool. |
| Ian: | Alright? |
| Adam: | Yeah, just...well just...you know just call ahhh yeah call my cell...just call my cell when you get there and then I'll and then... |
| Ian: | Should I call this number you called me on or your cell number? |
| Adam: | Call....ahhh call my 646...yeah 206... |
| Ian: | Yeah, how about I call you on this number and then ahhh and then I will ahhh we'll talk. |
| Adam: | Ok cool. |
| Ian: | Bye. |

CALL ENDS



26 Federal Plaza
New York, New York 10278

| | |
|---|---|
| Date of Call: | 01/14/2011 |
| Time of Call: | 1:57 p.m. |
| Reference: | |
| Parties: | ADAM SMITH (ADAM) |
| | IAN HOROWITZ (IAN) |
| Duration: | Approximately 13 minutes and 12 seconds |
| Line: | IAN HOROWITZ land line (561-498-5165) |

| | |
|---|---|
| Ian: | Hello. |
| Adam: | Yo. |
| Ian: | Alright, you're scaring the shit out of me. |
| Adam: | Yeah, well. I'm not doing so well. |
| Ian: | What's going on? |
| Adam: | Well, you know there's, there's this shit in Taiwan all of my fucking ahhh contacts won't talk to me anymore. |
| Ian: | Ok. |
| Adam: | So, and then look I, I...you can read my tone of voice. |
| Ian: | Yeah. |
| Adam: | You can maybe take a guess. I don't want to be too explicit about anything. |
| Ian: | I, I could like...go ahead. |
| Adam: | What? |
| Ian: | Go ahead. |
| Adam: | Yeah, no, no, no that's you can figure it out. I mean it doesn't really mean anything conclusively, but you know now my wheels are turning again and you know I'm thinking especially about 2009, right? |
| Ian: | Ok. |
| Adam: | And I think, I'm not thinking about anything before that. |
| Ian: | Ok. |

| | |
|---|---|
| Adam: | Right, so. I don't know if you can take a guess at what that might be. |
| Ian: | (sighs) |
| Adam: | You know. |
| Ian: | Gimme a time frame. |
| Adam: | 2009. |
| Ian: | The whole year? |
| Adam: | Well, you know what was...see what I need to, what I need to do is figure out if there's any, anything I need to be worried about shit that I owned you know in that time frame. Ummm. |
| Ian: | I don't, I, I, I.... |
| Adam: | I can think of one right? |
| Ian: | Ok. I don't think of any. |
| Adam: | I think of one...S. |
| Ian: | Ok. |
| Adam: | Right. |
| Ian: | Right. |
| Adam: | I mean is there...I, I think that's probably it right? |
| Ian: | For you? |
| Adam: | Yeah. |
| Ian: | Or for just the 2009 year. I don't think there's anything. |
| Adam: | Why? Because that one is not a problem? |
| Ian: | It's not. I don't see anything in...I'm just looking from what I see from the complaint that's filed against him. |
| Adam: | Yeah, yeah, yeah, yeah. There's no discussion of the complaint against him on any of that stuff that happened in 2009. |
| Ian: | No, listen I UI, I, honestly am not sure what you're referring to but I'm just basing on all the stocks that are against, filed against him. |
| Adam: | No, no, no, no....ahh this is a different discussion. I'm thinking of Starent. |
| Ian: | Ok, what about it. |
| Adam: | Well, I want to imply to you that for some reason I have to believe there is a a question about things that happened in 2009. |
| Ian: | Ok. |
| Adam: | Right? |
| Ian: | Ok. |
| Adam: | And I'm just trying to catalogue cause I, I, I honestly can't remember anything else that happened besides that one. |
| Ian: | Ok. |
| Adam: | ...that we could even a question, right? |
| Ian: | Right, and I don't think, I don't why that's a question. I understand because of what happened to the stock, but I don't understand why it wasn't like we knew anything. |
| Adam: | We didn't? |
| Ian: | No, I have no way... |
| Adam: | I, I ....you didn't I didn't right? |

| | |
|---|---|
| Ian: | Neither one of us did...we had the stock it was on the it was like one of those type of plays we were all playing for. |
| Adam: | Yeah. |
| Ian: | Not for, nothing to do with takeovers it was a top long. |
| Adam: | Right, oh it was ok. |
| Ian: | I'm confused because that's why I don't understand like because it was a top long of ours and was it was a breaking out stock when the whole market was going higher. |
| Adam: | Right. |
| Ian: | No, I'm not, that's why I'm a little confused like I, yeah I know a guy, I know what happened to the stock, but I had no, we, I didn't it's not like I knew anything pertaining to it. I had no idea. |
| Adam: | Yeah, forget that one. Was there anything else? |
| Ian: | Nothing. |
| Adam: | Yeah, nothing, that's what I thought too. |
| Ian: | But I'm being like dead serious cause that's the only one I could you know if you're saying cause of if it was an acquisition like that uh first of all we were never in it for that reason and the whole reason why we were doing the whole play because it was a whole new it was a it was a it was my understanding it was Rengan's top long for like three or four months. |
| Adam: | He had it all, he that all written up right? |
| Ian: | It was his top long for three or four months that's why we were riding it...it was like one of those plays that it was a star and the stock was breaking out. |
| Adam: | Yup. |
| Ian: | ...and they kept raising its price target over and over and over. |
| Adam: | Fuck. Ummm and... |
| Ian: | Like I had no idea that who the the acq you know like zero clue that they were going to be acquired, I had no idea. |
| Adam: | Yeah, but they probably did, right? |
| Ian: | I have no idea, it's not, but they never relay that to me...they never said to me oh this is ...it was never like that. |
| Adam: | Yeah, yeah. |
| Ian: | You know as far always it was never like that what so ever. |
| Adam: | And I think also I mean like he wrote he wrote now that I remember in his weekly send out emails constantly right about.... |
| Ian: | This is his top long forever. |
| Adam: | Yeah. Ok. |
| Ian: | Now, that may if it was very it was a top long for his for another reason I have no fucking idea. |
| Adam: | Right, right. |
| Ian: | I never had those conversations with them what so ever. |
| Adam: | What other stocks... |
| Ian: | Like, I would have thought for you to be nervous would be all the things that were involved like names that were implied in like that additional 18 stocks that Ali Far |

|        |                                                                                 |
|--------|---------------------------------------------------------------------------------|
| Adam:  | talked about.                                                                    |

Adam: The like WFR...

Ian: Right, and Nvidia's like things that could have been inferred that you, that you, you know you and the analysts knew best about those stocks. Those are the only things that I would think that you would have to be you know like if even you had anything to do with it.

Adam: Right. I mean those were all legitimate resources.

Ian: But, so that's what I don't understand like I'm a little confused by what you're freaking out about unless you're not telling me something.

Adam: Yeah, I'm not telling you something.

Ian: Ok.

Adam: You know, I just I'm worried about M&A and I'm worried about it in 2009.

Ian: Ok.

Adam: I don't want to say more than that.

Ian: Ok.

Adam: Ummm, what was there any other stock that I can't even remember like any other name that got bought out...whether it was luck or not you know and obviously we didn't know ahead of time any of that, but which one would even you know somebody on the outside question? BOBJ (Business Objects). That was in 2008 right? Yeah.

Ian: Ummm, oh then you would have to deal with the IBM Java.

Adam: Java was never bought?

Ian: No it was bought by Oracle.

Adam: Ohhhh, yeah.

Ian: And that's mentioned in Danielle Chiesi's complaint.

Adam: Ohhh, so that's her issue, but I don't think we even owned it when it got bought.

Ian: I, I, I was actually away in I was away in Califor...I was in ahhh, I was in ahhh Colorodo.

Adam: Yeah, yeah, yeah I remember.

Ian: I wasn't even there.

Adam: They were jumping and screaming when that thing happened.

Ian: I wasn't even in town, so I don't even know, but those are the only two things I could think of that you know...I'm being honest...so...

Adam: I think you're right, I think you're right. Alright, I mean and I think you know so we didn't own the shares for Java so that can't, that can't be it, so the only one was Starent and he had a huge write up covering the whole thing, right?

Ian: He...it was his top long.

Adam: Right...and like you know ummm Raj has never said anything about that guy ummm you know I don't want to say his name from Pru.

Ian: I have no idea who you are talking about.

Adam: Ahhh, Inder.

Ian: I have no, seriously I don't even know who that is.

Adam: Ok. Alright. I'll tell you this whole ummm business is making me pretty nervous dude.

| | |
|---|---|
| Ian: | Look what's coming down with everything. You got me freaking out right now. |
| Adam: | Yeah. Well I wish I could say don't worry about it, I mean for you I have no idea, right, I mean look from my perspective I went to Taiwan once, once, once a, once a quarter for what eight years. |
| Ian: | Right. |
| Adam: | And now, all this, you know I know Primary Global is all about you know U. S. and ummm and ahhh expert network shit but I think if you read between the lines what they're really looking at is tech contacts in Taiwan. |
| Ian: | Gotcha.. |
| Adam: | Ok so I've been through all the stuff that's been in their complaints and I you know that has to do with Raj and Danielle but ummm I honestly and I think I'm fine its its this other shit that got me worried its like the egregious stuff if you looked at it from the outside ummm you know that hasn't been covered....and you know this may end up being nothing and we're all going to laugh about it some day and.... |
| Ian: | No, but you got to be extra paranoid. I get it. |
| Adam: | Hyper paranoid. |
| Ian: | But, it is there a reason...did someone say this name to you to be nervous about or are you just thinking out of the box. |
| Adam: | Not that specific one. No. |
| Ian: | Ok. |
| Adam: | It was more topical you know '09 ahhh M&A thing...so...ummm don't freak out I mean don't like you know you don't need to do anything and there's nothing... |
| Ian: | There's nothing for me to do I can't freak out about something that I have really don't have anything to know or deal with. |
| Adam: | Yeah, and, and....same ahhh on my side I'm just being hyper vigilant. |
| Ian: | Right, but you sound terrible and I let you know this like I haven't heard you call me in God knows how long so you got me a little freaked out. |
| Adam: | I, I know, I know, I know....I didn't go to work today. |
| Ian: | So, you got to, so obviously someone called you. |
| Adam: | Yeah. |
| Ian: | And you don't think this has anything to do with all the Ali Far stuff and all those other stocks? |
| Adam: | Ahhhh, my inference is not, my inference is that it has to do with this dude from Prudential. |
| Ian: | Really. |
| Adam: | Yeah. |
| Ian: | Let's just...you, you have more detail on that. |
| Adam: | No, it's a complete guess. |
| Ian: | I don't even know who this guy is from Prudential but ok. |
| Adam: | Well, he used to be at Prudential right? |
| Ian: | I don't know, I, I honestly not really sure what we're talking about here so... |
| Adam: | Yeah, any way. Umm so when are you back? |
| Ian: | I'm back Monday, I'll be back, I'll be in Wednesday. |

| Adam: | You'll be in the city on Wednesday. |
| Ian: | Yeah. |
| Adam: | Alright, I'll call you back if anything else comes up. |
| Ian: | Are you ok, I'm sorry that you...you know. |
| Adam: | Yeah, no ahhhh I don't don't and don't you know don't ahhh just give me a call when you're back. |
| Ian: | Well, should we, should we plan to meet on Wednesday. |
| Adam: | Ummm, perhaps, just call, call, you're back on Monday. |
| Ian: | Yeah, I'm back late Monday...like Adam I don't know what you're like ummm I'm really considering I don't even know these you and I I I know I don't know any off these people...you don't know any of these people I don't why you're so freaked about this. |
| Adam: about | Ummm, yeah UI...look I don't want to loop you into anything so don't worry me it'll probably going to end you know with me ummm having some more legal bills. |
| Ian: | Ok. |
| Adam: | But, ummm I'm not sure. Ummm alright, so call me when you get back. |
| Ian: | Ok. |
| Adam: | And I'll call you if there's anything before then. I, I strongly believe that it won't be. |
| Ian: | Ok. |
| Adam: | But you know, my spidy sense is tingling a little bit, be careful alright. |
| Ian: | Ummm, I'm sure you know listen...Ok. I'm not sure what I have to be careful about, but Ok. |
| Adam: | No, no, no I mean just call me when you get back. |
| Ian: | Ok. |
| Adam: | Ok. |
| Ian: | Bye. |
| Adam: | Peace. |

CALL ENDS



26 Federal Plaza
New York, New York  10278

| | |
|---|---|
| Date of Call: | 01/14/2011 |
| Time of Call: | 2:30 p.m. |
| Reference: | |
| Parties: | ADAM SMITH (ADAM)<br>IAN HOROWITZ (IAN)<br>UNKNOWN FEMALE (UF) |
| Duration: | Approximately 1 minute and 4 seconds |
| Line: | IAN HOROWITZ land line (561-498-5165) |

| | |
|---|---|
| UF: | Hello. |
| Adam: | Hi, is Ian Horowitz there it's Adam Smith. |
| UF: | Yes, please hold on. |
| Ian: | Hello. |
| Adam:<br>to | Hey, hey, I'm not, I'm not trying to freak you out or anything like that I just need know and be 100% on top of all this shit that could potentially be an exposure from Inder you know. |
| Ian: | I don't know who that guy is. |
| Adam: | Ok, but I do you know and uhhh. |
| Ian: | Like, I feel like that you're...the questions you are asking me are like you are tapping me on the phone trying to get me to say some things. |
| Adam: | Are you serious? Dude, come on. |
| Ian: | Yeah. |
| Adam: | You kidding me? |
| Ian: | That's why I ask, like I don't get it. |
| Adam: | Well, I, I'm telling you 100% that's not the case. |
| Ian: | Ok. |
| Adam: | I'm freaking out myself, Ok. |

| Ian: | Ok. |
| Adam: | Alright. |
| Ian: | I'll see you when I get back. |
| Adam: | Alright.  Bye. |

CALL ENDS