UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X
                                 :

UNITED STATES OF AMERICA,       :
                                 :

    - v.-                          :

                                 :    S2 09-CR-1184 (RJH)

RAJ RAJARATNAM,              :
                                 :

           Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - X

## **SENTENCING MEMORANDUM ON BEHALF OF RAJ RAJARATNAM**

John M. Dowd
Terence J. Lynam
Jeffrey M. King
Samidh Guha
James E. Sherry
Catherine E. Creely
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

August 9, 2011

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................1

II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT ............................3
        A.      Mr. Rajaratnam's Personal Background And Education..........................................3
        B.      Mr. Rajaratnam's Professional Achievements And Founding  Of The
                Galleon Group .................................................................................4
        C.      Mr. Rajaratnam's Personal And Family Life .........................................................8
        D.      Mr. Rajaratnam's Outstanding Record Of Supporting Needy Organizations
                And Individuals..................................................................................10

III.    THE ADVISORY SENTENCING GUIDELINES....................................................14

IV.     THE NATURE AND SERIOUSNESS OF THE OFFENSE ............................................17

V.      THE CALCULATION OF GAIN UNDER THE SENTENCING GUIDELINES ..........20
        A.      The Government's Methodology Is Flawed And Improperly Inflates The
                Profits On The Trades In Question ........................................................21
        B.      The More Accurate Approach To Calculating Profit ..........................................25
        C.      The Gain Amount Should Not Include "Losses Avoided"....................................26
        D.      The Gain Amount Should Be Limited To Gains Actually Realized By The
                Defendant ..........................................................................................31

VI.     THE GUIDELINES CALCULATION OVERSTATES THE SERIOUSNESS  OF
        THE OFFENSE ...............................................................................35

VII.    NO LEADERSHIP ENHANCEMENT IS APPROPRIATE UNDER USSG
        §3B1.1....................................................................................39

VIII.   NO OBSTRUCTION ENHANCEMENT IS APPROPRIATE UNDER USSG
        § 3C1.1 ...................................................................................44
        A.      Legal Principles ...............................................................................45
        B.      Mr. Rajaratnam Did Not Obstruct Justice...............................................46

IX.     THE NEED TO PROVIDE MEDICAL CARE TO THE DEFENDANT  IN THE
        MOST EFFECTIVE MANNER ..............................................................55

X.      THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES .................58

XI.     CONCLUSION ..................................................................................67

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basic, Inc. v Levinson*,
    485 U.S. 224 (1988)..................................................................................48

*Bateman Eichler, Hill, Richards, Inc. v. Berner*,
    472 U.S. 299 (1985)..................................................................................20

*Bronston v. United States*,
    408 U.S. 352 (1973)..............................................................................46, 50

*Dirks v. SEC*,
    463 U.S. 646 (1983)..................................................................................18

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)..............................................................................21, 22

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ...............................................................25

*In re Northern Telecom Ltd. Securities Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)........................................................25

*SEC v. Monarch Fund*,
    608 F.3d 938 (2d Cir. 1979).................................................................19, 20

*SEC v. Tome*,
    638 F. Supp. 596 (S.D.N.Y. 1986).............................................................20

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).............................................15, 16, 65, 66

*United States v. Ayers et al.*,
    No. 2:03-cr-00183 (N.D. Ala. Dec. 10, 2003) ..........................................62

*United States v. Barbato*,
    No. 00-CR-1028, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002) .........................56

*United States v. Beam*,
    No. 2:03-cr-00197 (N.D. Ala. Aug. 25, 2005) ..........................................62

*United States v. Ben-Shimon*,
    249 F.3d 98 (2d Cir. 2001).......................................................................45

*United States v. Blarek*,
    7 F. Supp. 2d 192 (E.D.N.Y. 1998) .........................................................57

*United States v. Booker,*
543 U.S. 220 (2005)..................................................................................15

*United States v. Brennan,*
395 F.3d 59 (2d Cir. 2005)..........................................................................58

*United States v. Burgos,*
324 F.3d 88 (2d Cir. 2003)..........................................................................44

*United States v. Butler,*
264 F.R.D. 37 (E.D.N.Y. 2010)...................................................................66

*United States v. Carrozzella,*
105 F.3d 796 (2d Cir. 1997)........................................................................40

*United States v. Carter,*
449 F.3d 1287 (D.C. Cir. 2006)...................................................................42

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008)..................................................................15, 58

*United States v. Chiesi,*
1:09-cr-01184-RJH-2……………………………………………….........59

*United States v. Conner,*
217 Fed. Appx. 28 (2d Cir. 2007)...........................................................64, 65

*United States v. Cusimano,*
123 F.3d 83 (2d Cir. 1997)..........................................................................48

*United States v. Cushman,*
123 F.3d 83, 90 (2d Cir. 1997)……………………………………………...66

*United States v. Dorvee,*
616 F.3d 174 (2d Cir. 2010).........................................................................58

*United States v. Dunnigan,*
507 U.S. 87 (1993)……………………..………………………………..…..45

*United States v. Endo,*
635 F.2d 321 (4th Cir. 1980) .......................................................................48

*United States v. Eyman,*
313 F.3d 741 (2d Cir. 2002).........................................................................39

*United States v. Goffer,*
No. 10-CR-00056.........................................................................................48

*United States v. Greenfield*,
    44 F.3d 1141 (2d Cir. 1995).............................................................................42

*United States v. Hariri*,
    1:10-cr-00173-RJH-1……………………………………………………..……60

*United States v. Harris*,
    No. 2:03-cr-00157 (N.D. Ala. Nov. 8, 2004).........................................................62

*United States v. Hartstein*,
    500 F.3d 790 (8th Cir. 2007) ..............................................................................21

*United States v. Hicks*,
    No. 2:03-cr-00375 (N.D. Ala. Sept. 22, 2005) .....................................................62

*United States v. Jiminez*,
    212 F. Supp. 2d 214 (S.D.N.Y. 2002).............................................................56, 57

*United States v. Johnson*,
    284 F.Supp. 273 (D. Mo. 1068).............................................................................48

*United States v. Johnson*,
    567 F.3d 40 (2d Cir. 2009)....................................................................................15

*United States v. Kumar*,
    No. 04 Cr. 846 (E.D.N.Y. Nov. 2, 2006)..............................................................62

*United States v. Kurland*,
    1:10-cr-00069-VM (S.D.N.Y. May 26, 2010)……………………………………59

*United States v. Lanese*,
    890 F.2d 1284 (2d Cir. 1989).................................................................................40

*United States v. Larrabee*,
    No. 98 Cr. 10208 (D. Mass. Feb. 14, 2000)..........................................................67

*United States v. Livesay*,
    No. 2:03-cr-00182 (N.D. Ala. Dec. 14, 2005) .......................................................62

*United States v. Longueuil*,
    No. 1:11-cr-00161 (S.D.N.Y. April 28, 2011)……………………….…….......63

*United States v. Martin*,
    No. 2:03-cr-00191 (N.D. Ala. Sept. 12, 2006) ......................................................62

*United States v. McDermott*,
    No. 00 Cr. 61 (S.D.N.Y. April 27, 2000)...............................................................65

*United States v. McVay*,
   No. 2:03-cr-00195 (N.D. Ala. June 30, 2009) ........................................................62

*United States v. Melendez*,
   41 F.3d 797 (2d Cir. 1994)........................................................................................40

*United States v. Montour*,
   No. CR-09-0214, 2010 WL 3211888 (W.D. Wash. Aug. 12, 2010) ......................48

*United States v. Mueffelman*,
   400 F. Supp. 2d 368 (D. Mass. 2005) ......................................................................16

*United States v. Nacchio*,
   573 F.3d 1062 (10th Cir. 2009) ................................................................................22

*United States v. Oakford Corp.*,
   No. 98-CR-144, 1999 WL 1201725 (S.D.N.Y. 1999) ............................................36

*United States v. Olis*,
   429 F.3d 540 (5th Cir 2005) .....................................................................................22

*United States v. Owens*,
   2:03-cr-00131 (N.D. Ala. Feb. 27, 2006)………………………………………....62

*United States v. Paccione*,
   202 F.3d 622 (2d Cir. 2000).....................................................................................40

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...............................................15, 16, 65, 66, 67

*United States v. Preaceley*,
   628 F.3d 72 (2d Cir. 2010).......................................................................................15

*United States v. Rajaratnam*,
   No. 09-CR-1184...........................................................................................................48

*United States v. Richards*,
   No. 04 Cr. 846 (E.D.N.Y. Oct. 1, 2007)………………………………………...62

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996)..................................................................................55, 56

*United States v. Rosoff*,
   242 F.3d 369 (2d Cir. 2000).....................................................................................64

*United States v. Rosoff*,
   No. 97 Cr. 336 (S.D.N.Y. 1999) ..............................................................................64

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008)............................................................................67

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007)...........................................................................22

*United States v. Shelton*,
   No. 02 Cr. 264 (D. Conn. Jan. 4, 2005) ....................................................63, 64

*United States v. Smith*,
   No. 2:03-cr-00126 (N.D. Ala. Sept. 22, 2005) ...............................................62

*United States v. Vaughn*,
   430 F.3d 518 (2d Cir. 2005)...........................................................................39

*United States v. Ware*,
   577 F.3d 442 (2d Cir. 1999)...........................................................................40

*United States v. Williams*,
   247 F.3d 353 (2d Cir. 2001)...........................................................................20

*United States v. Woghin*,
   No. 04 Cr. 847 (E.D.N.Y. Jan. 16, 2007).......................................................63

*United States v. Zagari*,
   111 F.3d 307 (2d Cir. 1997)...........................................................................45

## STATUTES

18 U.S.C.

   § 1001...............................................................................................................48
   § 3553........................................................................................................ *passim*

## UNITED STATES SENTENCING GUIDELINES

   § 2B1.1.............................................................................................................17
   § 2B1.4.............................................................................................................20
   § 3B1.1.............................................................................................................39
   § 3C1.1.............................................................................................................44
   § 5H1.4.............................................................................................................55

## OTHER AUTHORITIES

SENTENCING COMM'N ANNUAL REPORT FY 2010 *available at*
   http://www.ussc.gov./Data_and_Statistics/AR_SB_Current.cfm............................60

**TABLE OF EXHIBITS**

| Number | Description |
|--------|-------------|
| 1 | Declaration of George Lau |
| 2 | Declaration of Gregg A. Jarrell |
| 3 | Letter from Geoffrey Canada to The Hon. Richard J. Holwell |

## I.   <u>INTRODUCTION</u>

On May 11, 2011, following a seven week trial and twelve days of deliberations, the jury returned a verdict finding Mr. Rajaratnam guilty of the fourteen counts charged in the Second Superseding Indictment.  This Court is now presented with the unenviable task of imposing a sentence that gives fair weight to "the history and characteristics of the defendant" while being "sufficient, but not greater than necessary" to serve the statutory purposes of federal sentencing, *i.e.* promoting respect for the law, providing just punishment, reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and, in this case, ensuring that the defendant continues to receive the life-sustaining medical care he needs.  18 U.S.C. § 3553(a)(2).  This Court's responsibility in sentencing a criminal defendant is always difficult and gravely serious, but is especially so in this case, which the government has relentlessly promoted ever since 2009.  Here, the Court must endeavor to impose a sentence that is no greater than necessary while the government and media unfairly and inaccurately portray Mr. Rajaratnam as the poster child for every wrongful act that has ever been associated with Wall Street.  This Court's duty is by no means simple, but it should be guided by a few simple questions.  Who is Raj Rajaratnam?  What has he done – good and bad?  What purpose will a particular sentence serve, what harms may that sentence cause, and could the same goals be achieved by a different kind of sentence?

The jury in this case convicted Mr. Rajaratnam of nine counts of insider trading and five counts of conspiracy.  Those are serious crimes.  But the Raj Rajaratnam who emerges from the evidence before the Court – including the hundreds of letters submitted on his behalf – bears scant resemblance to the greedy criminal kingpin the government attempts to portray.  In letter after letter after letter, Mr. Rajaratnam's friends, family, business associates, and those who have been the beneficiaries of his abundant philanthropy describe a man remarkable for his kindness, quiet manner, lack of pretense, and boundless generosity.  The record before the Court is also

1

replete with evidence of Mr. Rajaratnam's keen intellect and dogged work ethic, on the basis of which he built one of the largest and most successful investment funds in the world.  With the sole, and significant, exception of his criminal conviction in this case, the evidence shows that Mr. Rajaratnam lived a life that was not just blameless, but exemplary.  He has been not only a law-abiding, tax-paying, productive member of society, but an extraordinary force for good, donating over $45 million of his personal wealth to charitable causes here and abroad.  Whereas the crimes of his conviction had not a single identifiable victim, his charitable acts enriched countless lives – and surely saved more than a few.

To be clear:  Mr. Rajaratnam understands that he has been convicted of serious crimes and that this Court must impose a sentence that reflects the seriousness of those crimes and deters others by demonstrating the consequences of such conduct.  But Mr. Rajaratnam – like every other person paying attention to this case – is already keenly aware that the consequences of insider trading can include the destruction of one's business and reputation, exposure to scorn and public obloquy, and the complete loss of personal dignity and privacy to government surveillance and the media's microscope.  Mr. Rajaratnam also understands that he, like every other person adjudicated guilty in these cases to date, must pay a monetary penalty, provide meaningful and substantial community service, and suffer some form of loss of liberty.  But the extraordinarily lengthy sentence that we expect the government to request would add almost nothing to the deterrent effect already achieved by these proceedings.  Such a sentence would simply ensure that Mr. Rajaratnam will die in prison and will die much sooner than he otherwise would.  The evidence before the Court can leave no doubt:  Mr. Rajaratnam is not a healthy man, and his death will be hastened by a term of imprisonment.  The sentence that we expect the

government to request – which vastly exceeds every other sentence imposed in these cases – is

not fair and is certainly far greater than necessary to achieve the purposes of federal sentencing.

## II.  THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.  Mr. Rajaratnam's Personal Background And Education

Raj Rajaratnam was born in Sri Lanka in 1957, the second oldest of five children and the

son of a business executive and homemaker.  He and his family are Tamil, a minority ethnic

group in Sri Lanka.  Although Mr. Rajaratnam's family lived comfortably by Sri Lankan

standards, his parents taught him the value of hard work, and instilled in him a sense of

responsibility for helping those less fortunate.  As one childhood friend recalls:

> For the people who know Raj, his philanthropy seems natural.  Even though he
> came from a wealthy family in Sri Lanka, as a child of 10 and 12 years old he
> would go around working with landscaping and help a number of families with
> household chores in exchange for a monetary contribution to various charities that
> he was involved with.  I remember my mother looking out of the window and
> feeling amazed by this boy, born with a silver spoon in his mouth working our
> lawn in sweltering Colombo heat to raise a few rupees for his cause.

(05/14/11 Ltr. from G. Coomaraswamy).

At age eleven, Mr. Rajaratnam went to India to attend school, and when he was fourteen,

he went to a boarding school in England.  He attended college at the University of Sussex in

England, graduating in 1980 with a Bachelor of Science in engineering.  Even as a college

student, Mr. Rajaratnam impressed his classmates not only with his intellectual brilliance, but

with his openness and generosity.  As one college friend recalls:

> What endeared me to him during our student years was his willingness to share
> his knowledge.  He would actually sit by my side till the wee hours of the
> morning to explain topics I had difficulties with.  It won't be an exaggeration to
> say that I am not the only one who benefitted from his "generosity" of imparting
> knowledge.  There were fellow students who would at an appointed time convene
> at the cafeteria or in the library to listen to his crisp summations of a particularly
> difficult topic.  Even then, he had a natural inclination toward teaching and
> leading – an extraordinary trait that has made him outstanding amongst his peers.

3

(05/24/11 Ltr. from S. Subramaniam).

Mr. Rajaratnam came to the United States in 1980.  From 1981-83 he attended graduate school at the Wharton School of the University of Pennsylvania.  He graduated from Wharton near the top of his class with a Masters in Business Administration in 1983.  After earning his MBA, Mr. Rajaratnam returned to his native Sri Lanka.  His plan was to work for Chase Manhattan Bank there, but 1983 was a difficult and dangerous time for the Tamil minority in Sri Lanka.  In July of that year, over 2,000 Tamils died as a result of violence directed against them by the Sinhalese majority.  Because of this violence, Mr. Rajaratnam decided to leave Sri Lanka and return to the United States, where he got his start at Chase Manhattan Bank in New York.  Due to the on-going civil war in Sri Lanka, his parents, brothers, and sisters later emigrated to the United States as well.  All became United States citizens.

**B.      Mr. Rajaratnam's Professional Achievements And Founding Of The Galleon Group**

After completing the Chase Manhattan credit training program, Mr. Rajaratnam worked as an Assistant Treasurer and lending officer in the technology group at Chase.  In 1985 he moved to Needham & Company, an investment bank in New York.  Mr. Rajaratnam's first job at Needham was as an analyst, and because of his engineering background, he developed a particular expertise in analyzing technology companies.  For the rest of his career, Mr. Rajaratnam believed that it was important for technology sector analysts to be educated in science and engineering, and often said that it was easier to teach an engineer how to pick stocks than it was to teach engineering to a stock trader.  Mr. Rajaratnam's talents as an analyst were noticed, and within a few years, he was promoted to Needham's Director of Research.  In 1992, he started a hedge fund at Needham and for the first time began managing clients' money.  Mr. Rajaratnam took his fiduciary responsibility as the caretaker of his investors' money very

seriously.  He understood that his investors were entrusting him not only with their money, but with their families' future financial security, and Mr. Rajaratnam worked diligently to identify promising opportunities for his investors.  His efforts were successful, and at the age of thirty-five, he was promoted to Needham's President and Chief Operating Officer.

Mr. Rajaratnam left Needham at the end of 1996, and in January 1997 he formed Galleon, his own hedge fund business in New York.  Mr. Rajaratnam built Galleon from the ground up, based on the fundamental philosophy of producing the best possible returns to investors by coupling fundamental research with active, event-driven trading.  He opened an office with just a few people and, after much hard work, his dream became a reality.  As the Court heard at trial, Galleon grew into a large, successful hedge fund, employing over 150 people with an asset size that grew to approximately $6.5 billion and investors that included state pension funds, private retirement plans, and university endowments, as well as individuals.  Many of Galleon's employees were expert stock analysts holding the kinds of advanced science and engineering degrees that Mr. Rajaratnam believed to be essential to effective analysis, and Galleon developed a well-deserved reputation as one of Wall Street's finest firms for fundamental research.  Over time, Galleon's focus on the technology sector expanded to include funds that concentrated on health care, energy, consumer, and financial companies, each employing its own complement of expert industry analysts, professional traders, and portfolio managers.  Many of the letters the Court has received speak of the intellectual rigor and transparency that Mr. Rajaratnam demanded, and which were the hallmarks of Galleon's research process.  Former Galleon employee Angela Dalton writes:

> Raj was known as an investor who thrived on the research process . . . . He epitomized the Socratic method – analysts would start the day by making sure they had all of the information they could possibly gather on their stocks from the press and the research analysts at various investment banks on the Street.  They

would then head into the morning meeting with their thick black binders of models and research, which Raj insisted they keep given they needed to know all of the numbers to have a proper conversation or to make a pitch on whether [to] buy or sell a particular company's stock.  And while he was great at discerning the big picture as analysts were speaking in the morning meeting, what he really loved to do was dig into the details . . . . And if the morning meeting wasn't enough stock discussion, he also held daily mid-morning meetings in his office with smaller sector teams in which he would dig into their models and ask them for fresh ideas.  He approached people with a warm smile and was known to say constantly, "I want total transparency around here." . . . He would encourage people, "Please just walk into my office!" which I did frequently.  If I went into his office with an idea about the business, he would listen intently and was always very open and willing to discuss any new idea.

(08/01/11 Ltr. from A. Dalton).

Mr. Rajaratnam was the Managing General Partner of Galleon Management, L.P., the investment advisor for the individual funds which together composed the Galleon Group.  He was also a Portfolio Manager for the Technology Fund and managed investments in the Diversified Fund.  In his position at Galleon, Mr. Rajaratnam developed an excellent reputation in the business community, not only as a savvy investor but as a brilliant businessman.  But even more remarkable was how lightly Mr. Rajaratnam wore his success.  This Court has received letter upon letter attesting to Mr. Rajaratnam's humility, openness, and utter lack of pretense.  As Rick Schutte, the former president of Galleon, wrote in his letter to the Court:

People across Wall Street and across Main Street had an incredible respect and admiration for Raj.  They wanted to know him and they wanted others to know they knew him. This ranged from company executives seeking his insights as well as portfolio managers and their analysts at other funds. Investors large and small sought his perspective. I won't mention any by name, but Raj's circle of friends and colleagues was deep and wide, yet he never bragged about the people he knew. Despite all his accomplishments, he's a humble and approachable person, never boasting about his wealth nor his accomplishments. He had an open door policy at Galleon and many people took advantage of it. He was always willing to listen to a viewpoint, always gave a balanced reply, and when he disagreed, he never berated anyone.

(06/06/11 Ltr. from R. Schutte).

6

As the leader of Galleon, Mr. Rajaratnam continued to demonstrate the commitment to his investors that he had first shown at Needham, and he instilled the same commitment in Galleon's employees.  For example, during the financial crisis in 2008, when many hedge funds were restricting withdrawals in order to prevent a "run on the banks" by investors, Mr. Rajaratnam declared that Galleon's investors would remain in charge of their own money and that no restrictions on withdrawals or redemptions would be imposed, even if it meant that Galleon would cease to exist.  Galleon employee, Lukasz Sito, offers this perspective on Mr. Rajaratnam's overriding concern for Galleon's investors:

> Mr. Rajaratnam's concern for his employees was only superseded by his fiduciary duty and responsibility to his investors. In late 2008, at the height of the financial crisis when most funds were implementing "gates" to prohibit their investors from withdrawing funds, Mr. Rajaratnam gathered the entire firm and informed everyone that Galleon will not be putting any gates in place. I remember his exact words being: "All of us here have a fiduciary duty to our investors. As such, we will not be implementing any gates. It is our investors' money, and they have the right to do whatever they want with it, even if it means withdrawing all funds from Galleon and destroying our firm."

(05/05/11 Ltr. from L. Sito).  As it turned out, Galleon survived the financial crisis, but it did not survive the charges in this case, which forced Mr. Rajaratnam to close the fund in 2009.  But Mr. Rajaratnam's first priority after he was charged was not himself, but the return of his investors' capital.  Virtually all of their liquid investments were promptly returned within a matter of weeks in the most efficient manner permissible.[1]  Indeed, Mr. Rajaratnam and Galleon's other officers waived contractual notification periods for investor redemptions and certain fees that Galleon could have charged, so as to return investor money as quickly and completely as possible.  These facts alone stand this case in stark contrast to recent notorious Wall Street frauds involving

---

[1] The limited amount of illiquid investments in the fund have also been returned as quickly as possible and carefully managed to protect investors despite the events which engulfed Galleon.

executives who fleeced investors, lining their own pockets with money literally stolen from investors through fraudulent Ponzi schemes.

A number of the letters the Court has received pay testament to Mr. Rajaratnam's defense of the "underdog," going as far back as childhood, when he would "fight bullies in recess . . . so that the quiet and unrepresented had a voice and a champion."  (05/21/11 Ltr. from R.K. Rajaratnam).  As a member of an ethnic minority group – both in his adopted home in the United States and in his native Sri Lanka – Mr. Rajaratnam knew about the special challenges facing outsiders and underdogs, and he used his success and influence to help others break into the financial industry.  The letter from Susan T. describes this well:

> Raj gave me my first real opportunity to work as a sales trader on Wall Street. Despite having attained an MBA and been previously employed at large accounting and securities firms, as a woman and as a minority, I was not taken seriously by anyone else on Wall Street. Raj gave me the chance to prove myself in the industry and break into a very male-dominated field.  I did well and I owe it all to Raj. Not only did Raj give me the opportunity for a successful career, but at one point in time he also provided me with gratis, extended New York City housing until I found affordable accommodations. Not once did he ever ask for or expect anything in return. He simply wanted to see a hard working, ambitious woman get ahead in life.

(05/26/11 Ltr. from Susan T.).  Similarly, when Galleon employees left the company to start their own investment funds, Mr. Rajaratnam's practice was to support them by investing some of his personal assets with them.

### C.    Mr. Rajaratnam's Personal And Family Life

Mr. Rajaratnam has been married since 1988.  His wife Asha formerly worked in the textile industry and now volunteers her time at non-profit organizations such as the South Asian Youth Action organization in New York, where she serves on the board of directors.  They have three children, ages 14-19, who live with them in New York.  Mr. Rajaratnam also cares for his elderly parents, who live with him.  As described in the letters that the Court has received, Mr.

Rajaratnam has a very close-knit family.  Despite the demands on his time from running a large company, his daily routine was to eat breakfast with his wife and children every morning and return home in time to eat dinner with them almost every night.  As his wife wrote in her letter: "Raj is a family man. His three children know this about their father and many times run home to catch up with Dad to hear him make a joke or just talk about his day.  He regularly declined life's countless events so he could be home with the family."  (06/01/11 Ltr. from A. Rajaratnam).  His children are very close to him and have been devastated by the charges brought against their father, the outcome of the trial, and the thought of possibly losing him from their lives.

Mr. Rajaratnam and his wife instilled in their children a sense of obligation to help the disadvantaged – an obligation that Mr. Rajaratnam himself has more than fulfilled.  In addition to providing for his immediate family and parents, Mr. Rajaratnam provides for many others in his extended family.  For example, when other family members became refuges from Sri Lanka, he purchased homes for them in Canada and England, and helped them when medical expenses or other emergencies struck.  As Mr. Rajaratnam's aunt, Celestine K. Paramananthan, writes:

> [A]bout 16 years ago, my husband and I came to the U.S. to secure medical advice on his illness.  Whilst in the U.S., my husband fell ill and he passed away after a few days of hospital stay.  Our travel insurance did not cover the total of the hospital bill.  When Raj found out that money was still owed, he insisted on paying it off.  It was very kind of him to do that as it was a large sum of money.

(05/08/11 Ltr. from C. Paramananthan).  Even more remarkable were the kindness and selfless generosity that Mr. Rajaratnam showed to non-family members.  The letter received from Mr. Rajaratnam's housekeeper describes this well:

> Since the first day of my job Raj and his wife Asha has been nothing but good to my kids and I. Raj gave my daughter an opportunity to gain insight into the world of Wall Street through an internship and has even help fund her college tuition. Mr. Rajaratnam is always willing to help anyone in need. He has a passion for education and children and will assist in any way he can.

(06/06/11 Ltr. from L. Hutchinson).  The doorman in Mr. Rajaratnam's apartment building writes

similarly when describing how Mr. Rajaratnam reacted to learning that he had cancer:

> When he found out that I was ill, he immediately, on his free time, went to the
> office and asked my supervisor, Mr. Thomas, for my home number. Even though
> he was very busy, he took time out from his busy schedule to call me once a week
> to check on me, as well as writing and sending me letters of encouragement and
> prayer. Through the grueling sixteen rounds of chemo and thirty five rounds of
> radiation, he was always checking on me and always concerned about how I
> would be able to get to the hospital for my treatments. He always offered me
> transportation to and from the hospital so that I could get to my treatments
> without a problem, and this, Your Honor, I will never forget. Your Honor, that
> type of kindness and generosity, shows the character of this great man that I have
> had the pleasure to have known for seven years.

(Undated Ltr. from J. Nuranjo).  A doctor friend of Mr. Rajaratnam relates a similar story:

> When my office was severely affected following the September 11th terror attack,
> Raj was first to offer interim financial help of $250,000 to tide over the crisis.  He
> even offered his office space for me to relocate if that would help.  This level of
> generosity is rare even amongst close friends . . . . It is simply in his nature to do
> what he can without waiting for requests.

(05/25/11 Ltr. from K. Venkat).  Surely it is these simple acts of kindness and generosity,

performed privately and with no fanfare or expectation of recognition, that have led so many of

the people writing to the Court to describe Mr. Rajaratnam as a man with a "heart of gold."

### D.   Mr. Rajaratnam's Outstanding Record Of Supporting Needy Organizations And Individuals

The tsunami that struck his native Sri Lanka in 2004 had a major impact on Mr.

Rajaratnam.  He was in Sri Lanka at the time and personally witnessed the destruction it caused.

As described in the letters the Court received, Mr. Rajaratnam immediately sprang into action,

donating $5 million to build new homes for those who had lost theirs.  He also organized and

solicited donations from others to support his effort.  The letter from Mr. Esufally of Sri Lanka

describes this effort:

> We were enjoying a holiday together when the Tsunami struck the country on
> 26th December 2004 and to this day I remember the largesse and determination

that Raj demonstrated. Whilst many of us were trying to contribute in small ways, Raj structured a much larger effort by convincing some of Sri Lanka's top business leaders to help him in his endeavor to build housing projects in the South, North and East of the country where the tsunami had destroyed so many lives. Of course he funded these efforts, and on behalf of my company, we took up the task of building 300 flats in a Muslim community in the East of the country. Your Honor, words cannot express the gratitude that people of that area feel, and to this day they pray for him. Similarly I know that projects were done that benefited other communities thus giving effect to his desire to help all ethnicities.

(05/08/11 Ltr. from H. Esufally).  Mr. Rajaratnam returned to New York with a keen,

reconfirmed sense of obligation to help the disadvantaged.  Mr. Schutte's letter recalls this period:

[W]hen he returned to the U.S. he organized a charity event and invited many of those [people] in an effort to raise money to help rebuild at least a portion of the destruction. He brought back actual footage that he had filmed as he toured the devastation of an orphanage that he had built and which was completely washed away, along with all its residents. He will never boast about it, but he raised millions and donated millions more and in typical Raj fashion, he did so without regard to race or political background, he treated all as equals. His relationship with local officials and his methodical and disciplined solution to the awful problem was a balance that optimized the best use of the funds.

(06/06/11 Ltr. from R. Schutte).

As many other letters attest, Mr. Rajaratnam put his beliefs into action by using his

financial success to help others in need.  Mr. Rajaratnam has shown that he cares very much for

people in his community here in New York, in his adopted country, the United States, in his

native Sri Lanka and throughout the world.  Locally, he has been a long-standing supporter of the

Harlem Children's Zone (HCZ), a non-profit organization that is bringing high quality

educational, social, and medical services to over 8,000 children and 6,000 adults here in New

York City.  The letter to the Court from Geoffrey Canada, HCZ's President and CEO, describing

his first meeting with Mr. Rajaratnam in 2004, provides a good insight into Mr. Rajaratnam's

genuine concern for helping those in need.  As Mr. Canada describes, they talked about children

being mired in poverty and how the HCZ wanted to change the odds for them through education.

Mr. Canada writes:

> Raj said he had firsthand experience, having grown up in a country where the odds were stacked against large numbers of children.  He said he was struggling with whether he would stay on Wall Street or dedicate his life to helping the disadvantaged.

Mr. Canada continues:

> When that first meeting ended, I was struck by two things:  One, his insistence that the wealthy had an absolute obligation to help the disadvantaged and, two, that he immediately wanted to help, writing a check for $1 million to the Harlem Children's Zone.  There was no press coverage about the donation and no fanfare.  It was a heartfelt gesture from a man who felt it was his duty to give back.

(07/12/11 Ltr. from G. Canada).  Mr. Rajaratnam took Mr. Canada's advice that the best way he could continue to help was to continue his work in the financial industry and give to worthy causes.  Since that first meeting in 2004, Mr. Rajaratnam has donated a total of $10.4 million to the HCZ and did so, as Mr. Canada states, without ever once being asked or ever seeking any public recognition for his generosity.  On his own initiative, he paid for two groups of HCZ children and staff to take a trip to the Galapagos Islands in 2007 and 2008, believing it would be an eye-opening experience for the children of Harlem, as it was for his own children when he took them there.  Mr. Canada states that, far from being the greedy person that others have described, he knows Mr. Rajaratnam to be "kind, thoughtful and self-effacing almost to a fault."

Mr. Rajaratnam has demonstrated his kind generosity in many other ways.  Some examples from the letters include: he paid the school tuition of the son of a former Galleon administrative assistant; he paid the medical bills incurred for the cancer treatment of the doorman in his building; and he paid the educational expenses and medical bills for many members of his extended family.

In addition to the HCZ, Mr. Rajaratnam has supported many other worthwhile, needy organizations in the United States with large financial contributions, such as: the New York Fireman's Fund following the attacks on September 11; the Acumen Fund (which fights poverty);

the Robin Hood Foundation (a New York poverty-fighting organization); Say Yes To Education;

NYU Child Study Center; SAYA (supporting South Asian Youth development); his alma mater,

the University of Pennsylvania (to support scholarships for students from third-world countries);

the Injured Marine Semper Fi Fund (to assist wounded Marines, Sailors and their families); the

Give Foundation (addressing urban poverty); City Harvest, and many others.

In addition to the financial assistance he provided after the tsunami devastated his native

Sri Lanka, Mr. Rajaratnam has provided financial assistance to many other organizations in Sri

Lanka and throughout Asia and the world.  As the letter from Mr. Jafferjee of Sri Lanka relates,

Mr. Rajaratnam seeded two charity funds of $5 million each in Sri Lanka in an effort to help

improve the local economy after years of civil war and he invested $1.5 million in a private

hospital company there, not because of any expected return but because the country lacked

quality medical care.[2]  The letter received from Dr. Kazmi describes a $10 million donation he

made to Asia Care, an organization that he helped build to support the healthcare needs of the

poor in Pakistan:

> In 2007 after an illness for which he was hospitalized I presented to Raj the plight
> of people in countries like Pakistan where I come from, that there is no health care
> security for them. Raj decided to fund this effort but more importantly he was so
> generous with his time and effort. It was really astounding that such a busy fund
> manager would spend countless hours developing and laying the foundations of a
> business for the poor in a country whose people he truly felt for: a faraway place
> where a few of his close friends came from. He gave 10 million dollars to this
> effort, in 2008 I moved to Pakistan to start the company. The fruit of Raj's
> dedication to this project is Asia Care Health and Life Insurance Company,
> Pakistan's first dedicated health insurer that today serves the medical needs of
> 80,000 people. The company and Raj's large heartedness without consideration of
> borders has touched the lives of many. He rounded up people and companies from

---

[2] In addition to his charitable giving in Sri Lanka and India, Mr. Rajaratnam established
investment vehicles such as Galleon International and New Silk Route to make equity
investments in companies located in these emerging market countries, which benefitted the local
economies.

> around the world to help Asia Care and continues to do so. After his legal difficulties he expressed sadness that it would be difficult for him to dedicate time and funds to Asia Care, that he had plans to work with me in expanding this work in years to come.

(05/21/11 Ltr. from M. Kazmi).  He has also donated $1.5 million to AIDS Awareness in India.

He has made very sizable donations to the Indian School of Business ($1 million) and other

international development and relief organizations.

More than 10 years ago, he helped to establish the Rajaratnam Family Foundation, to

which he has granted millions of dollars to be donated throughout the United States and the

world to organizations or people in need.   The Foundation, of which he is the primary financial

donor, has donated millions of dollars to charitable organizations for disaster relief and to assist

victims of war and sexual and domestic violence.  The Foundation has also provided computers

and supplies to overseas schools, hospitals, colleges and universities.

As the above summary describes, and as the letters attest, Mr. Rajaratnam's natural

disposition is to help people when he learns of their suffering or needs.  He has supported

organizations in New York and throughout the country and the world that are working to improve

the lives of the less fortunate, fight AIDS and poverty, and assist those suffering from war and

natural disasters.  As the more detailed information provided to the Probation Officer shows,

these donations have totaled at least $45 million.  Mr. Rajaratnam has done this quietly, without

seeking publicity or notoriety.  He is far from the selfish, greedy person that the government

characterized at trial.  He is, as Geoffrey Canada attests, a kind, generous person who is

motivated to help others without ever being asked.

## III.   THE ADVISORY SENTENCING GUIDELINES

This Memorandum is submitted before the Probation Officer has completed or distributed

a first draft of the Pre-Sentence Report.  Therefore, counsel do not know what the advisory

Guidelines range, as calculated by Probation, will be.  However, in light of *United States v. Booker*, 543 U.S. 220 (2005), and as emphasized by the Second Circuit, the Guidelines are advisory only.  They should be treated only as a "starting point," and the Court "must then consider all the [18 U.S.C.] § 3553(a) factors and then undertake an individualized assessment based on the facts presented."  *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009); *see also United States v. Preaceley*, 628 F.3d 72, 84 (2d Cir. 2010) (Guidelines are "only . . . a starting point" and court must "craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.' 18 U.S.C. § 3553(a)(1)") (J. Lynch concurring).  The District Court "may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  "District judges are, as a result, generally free to impose sentences outside the recommended range."  *Id.*

Courts have repeatedly recognized that application of the Guidelines in securities fraud cases can result in advisory sentencing ranges that are unreasonable and inappropriately high.  In *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), a securities fraud case involving material misstatements which artificially inflated a company's stock price, Judge Rakoff found that the loss amount, combined with other enhancements, resulted in "calculations under the guidelines [that] have so run amok that they are patently absurd on their face."  Judge Rakoff thus concluded that the "Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and the human being who will bear the consequences." *Id.*  Similarly, in *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), a "pump and dump" stock scheme, Judge Block found *Adelson*'s criticism of the Guidelines persuasive, noting that the Guidelines are frequently

criticized for the "'piling-on of points.'" *Id.* at 745 (quoting *Adelson*).  After reviewing sentences

in other significant fraud prosecutions such as the Enron, WorldCom, and Computer Associates

cases in which the amount of loss was over $1 billion, Judge Block concluded that that the

defendants' conduct was "simply not in the same league," and imposed sentences of 60 months

"in the face of an advisory Guidelines range of 360 to life." *Id.* at 753-54 (listing table of

sentences in recent fraud prosecutions); *see also United States v. Mueffelman,* 400 F. Supp. 2d

368, 377-78 (D. Mass. 2005) (noting that "issues concerning the blameworthiness of a defendant

found guilty of fraud are more complex than simply measuring the amount of the loss" and

imposing a below-guidelines sentence).

Obviously, Mr. Rajaratnam is "not in the same league" as the Enron, WorldCom, or

Computer Associates defendants either, since those defendants betrayed their own shareholders

and employees.  There has never been any allegation in this case that Mr. Rajaratnam did

anything at the expense of his investors, much less that he squandered anyone's retirement

savings.  And even *Adelson* and *Parris*, securities fraud prosecutions where sentences below the

advisory Guidelines range were imposed, involved actual victims who purchased the stock in

question.  Even so, the courts in those cases criticized a rigid application of Guidelines that have

"run amok," yielding unreasonably severe sentences.[3]  In an insider trading case such as this one,

involving no identifiable victims, the potential for the advisory Guidelines to yield an unfairly

---

[3] In testimony before the Sentencing Commission, Circuit Judge Jon O. Newman criticized the complexity of the Guidelines, particularly the underlying premise that "every increment of offense conduct, no matter how slight, must result in a corresponding increment of punishment."  In criticizing the complexity of the loss table used in fraud and theft cases, Judge Newman stated that "it makes no penological sense to insist that nearly every extra dollar of loss should result in some extra punishment."  U.S. Sentencing Commission Public Hearing Testimony and Transcripts (July 9, 2009) (statement of Judge Jon O. Newman, U.S. Court of Appeals for the Second Circuit),  available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20090709-10/Newman_testimony.pdf.

draconian sentence is even more severe.  This is because the insider trading Guideline takes the loss table from USSG §2B1.1 – which ordinarily gauges the defendant's culpability according to the losses suffered by actual victims – and simply flips it upside down, using exactly the same numbers and exactly the same tiers, but substituting the defendant's gain as a proxy measure of culpability, even when that gain corresponds to no identifiable losses.  But a defendant tippee who profits from illegal trading does not engage in conduct that is as culpable as a defendant who affirmatively steals the same amount from an identifiable victim.

## IV.    THE NATURE AND SERIOUSNESS OF THE OFFENSE

Mr. Rajaratnam was convicted of five counts of conspiracy to commit insider trading (Counts 1-5) and nine substantive insider trading counts regarding trading in the stock of Clearwire (Counts 6-7), Akamai (Counts 8-10), PeopleSupport (Counts 11-12), ATI (Count 13) and Intel (Count 14).  With the exception of the purchases of PeopleSupport stock in Rajiv Goel's account, the government's theory is that Mr. Rajaratnam was a tippee of material nonpublic information from individuals such as Goel, Anil Kumar, Adam Smith, Danielle Chiesi and others and that he executed stock transactions based on that information.  For these trades, Mr. Rajaratnam is not alleged to have breached any fiduciary duty; rather his liability is based derivatively on the tipper's breach.[4]

Mr. Rajaratnam understands that he has been convicted of serious offenses.  But the evidence at trial showed that Mr. Rajaratnam was not the "mastermind" of an insider trading network, as the government and the press have painted him.  Rather, the evidence established that Galleon was a well-run hedge fund employing dozens of analysts, traders, and portfolio

---

[4] For PeopleSupport, because a Galleon representative sat on the company's board, the government's theory was that Mr. Rajaratnam was entitled to know the information at issue, but not execute any trades based on it.

managers, who engaged in thousands of legitimate trades.  The evidence showed that Mr.

Rajaratnam personally engaged in 36,437 stock transactions during the years in question (2005-

09) – an average of 7,287 transactions per year or 30 per trading day.  Tr. at 4702.  The dollar

value of these trades was enormous – totaling $172.1 billion over the 5-year period, or $34.4

billion per year and $142.5 million per trading day.  The government's evidence concerned a

small number of transactions over this period, amounting to 0.3% of Mr. Rajaratnam's total

transactions.  Tr. at 4702-03. Thus, over 99% of his stock transactions are not at issue,

notwithstanding the wiretap interception of approximately 18,000 telephone calls over nine

months during this period.

This data is not offered to excuse the conduct on which the jury based its verdict; it is

offered as context.  Because over 99% of Mr. Rajaratnam's trades were untainted, it is clear that

the vast majority of his trades were the product of Galleon's legitimate analysis and research,

with Mr. Rajaratnam engaging in practices that the Supreme Court has recognized as

"commonplace" and appropriate, *i.e.*, ferreting out and analyzing information "by meeting with

and questioning corporate officers and others who are insiders."  *Dirks v. SEC*, 463 U.S. 646, 658

(1983).  The jury found that on a relatively small number of occasions, Mr. Rajaratnam crossed

the line between obtaining appropriate information and obtaining inappropriate inside

information.  But neither the evidence presented nor the jury's verdict established that Mr.

Rajaratnam was an insider trading "mastermind."

Mr. Rajaratnam cannot be compared to insider trading defendants in some of the other

recent cases, such as lawyers who stole client information regarding corporate deals and traded

on it.  Those defendants, who were not in the business of legitimate investment management and

stock trading, are all guilty of stealing client confidences and breaching fiduciary duties owed

directly to their clients.  In contrast, Mr. Rajaratnam's fiduciary duties ran to his investors and

included a duty to find and trade on promising investment opportunities on their behalf.  *See SEC*

*v. Monarch Fund*, 608 F.3d 938, 942-43 (2d Cir. 1979).  Moreover, the evidence at trial showed

that Mr. Rajaratnam traded many of the stocks at issue every quarter, without any allegation of

receiving inside information concerning them.  For example, DX 4681 was introduced at trial to

show that Mr. Rajaratnam traded multiple times in Intel every quarter for two years and none of

these transactions was alleged to be based on inside information.  The government's evidence at

trial pertained solely to his trading in Intel during a short period preceding the quarterly earnings

announcement on April 17, 2007.  Based on his long experience trading in Intel, there is no doubt

that Mr. Rajaratnam would have traded in Intel in advance of this earnings announcement too,

regardless of anything Rajiv Goel may have told him.  The same is true for the vast majority of

stocks in this case – Mr. Rajaratnam traded them frequently, even during periods not at issue.

There was a wealth of public information available about these stocks, which were generally

widely traded and well-known.  Unlike the lawyer who steals inside information and engages

only in illegal trades, Mr. Rajaratnam traded these stocks frequently, legally, and would have

traded in them regardless of the alleged inside information.  Indeed, the jury was instructed that

they could convict if they found that the alleged inside information was merely a factor

"however small" in his decision to trade in a stock.

        This discussion is not offered to excuse his conduct, as found by the jury.  But an analysis

of the "nature and seriousness of the offense" invites a comparison to Mr. Rajaratnam's overall

trading pattern and practice and, because he was alleged to be a tippee, to the conduct of those

who breached their duty by providing the information to him.  Indeed, because there can be no

insider trading liability without a breach of duty by an insider, the Supreme Court has held that

the tipper's conduct, almost invariably, is more culpable than that of the tippee.  *See Bateman*

*Eichler, Hill, Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985) ("In the context of insider

trading, we do not believe that a person whose liability is solely derivative can be said to be as

culpable as one whose breach of duty gave rise to that liability in the first place."); *SEC v. Tome*,

638 F. Supp. 596, 617 (S.D.N.Y. 1986) (citing *Bateman Eichler* for this proposition).  This is

particularly true where the tippee is a professional investment manager, who has an affirmative

duty to find and exploit attractive investments on behalf of his clients.  *See Monarch Fund*, 608

F.3d at 942-43.  Here, Mr. Rajaratnam should be treated as less culpable, since his liability was

premised on that derivative liability theory of being a tippee, not that he was a tipper who

breached a duty to an employer or client.

## V.      THE CALCULATION OF GAIN UNDER THE SENTENCING GUIDELINES

Under § 2B1.4 of the advisory Guidelines, the base offense level of 8 for insider trading

is to be increased by the "gain resulting from the offense," using the table in § 2B1.1.  The

Guidelines thus require the Court to distinguish gains "resulting from the offense" from gains not

attributable to the offense, since only the former are to be included in the Guidelines calculation.

In an insider trading case, this means separating the gains attributable to the prohibited conduct

(*i.e.*, trading stock on the basis of material, nonpublic information) from gains attributable to

factors unrelated to that conduct, such as gains caused by exogenous market movements or

events unrelated to the material, nonpublic information.

The government has claimed that the profit realized is approximately $63.8 million, and

it is the government's burden to prove this amount by a preponderance of the evidence.  *See*

*United States v. Williams*, 247 F.3d 353, 358 n.1 (2d Cir. 2001) ("The government bears the

burden of proving, by a preponderance of the evidence, facts relevant to sentencing."); *United*

*States v. Hartstein*, 500 F.3d 790 (8th Cir. 2007) (government bears the burden of proving loss

amount under § 2B1.1 in a fraud case).  But this amount massively overstates the gain for several

reasons.

### A.   The Government's Methodology Is Flawed And Improperly Inflates The Profits On The Trades In Question

The starting point for this calculation is to determine which trades should be counted and

what dates, and associated share prices, should be used.  Then the change in share price, if any,

attributable to the inside information should be calculated.  The most accurate way to do so is by

calculating the change in share price on the day in which the alleged inside information is

publicly announced, *e.g.*, the date the company announces its quarterly revenue and earnings, or

the date a corporate acquisition is announced.  The change in share price the day that the

information is publicly released (adjusted as explained below), multiplied by the number of

shares at issue, will most accurately measure the profit that was made as a result of trading on the

basis of the previously unannounced information, and will exclude gains attributable to other

factors.  In contrast, calculating the profit based on share prices days before and after the date of

the public announcement is not appropriate because the share price may fluctuate due to other

market events, such as the launch of a new product or general market movement.  It is not a fair

estimate of the profit made from the inside information to calculate profit based on earlier or

later share prices.

Courts, including the Supreme Court, have recognized the importance in securities fraud

cases of separating offense-related changes in stock price from non-offense-related changes.  *See*

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (Courts must distinguish fraud-related

price movements from movements attributable to "changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions, or other events.").

Applying the reasoning of *Dura* in the criminal sentencing context, the Second Circuit has admonished that the gain or loss taken into account under the Sentencing Guidelines "must be the result of the fraud," and that the district court must therefore endeavor to identify and remove stock price movements unrelated to the offense. *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007). Likewise, in *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009), the court of appeals remanded for resentencing in an insider trading case where it concluded that the district court had failed to exclude market factors unrelated to the offense from its calculation of gain. And in *United States v. Olis*, 429 F.3d 540 (5th Cir 2005), the defendant in a securities fraud case offered at sentencing the report of an expert "which explored the numerous forces at work on the Dynegy stock price during the relevant periods." *Id.* at 548. The district court refused to consider the report, found a $105 million loss, increased the base offense by 26 levels, and sentenced the defendant to 292 months incarceration. The court of appeals reversed and remanded for resentencing, finding error in the refusal to consider the report or take into account the impact of extrinsic factors on the stock price decline. The court of appeals found that the report demonstrated that the stock price declined during the period in question "in tandem with the stocks of other publicly traded companies in the energy marketing and trading business." These factors and others in the report suggested that "attributing to Olis the entire stock market decline … would greatly overstate his personal criminal culpability." *Id.* On remand, Olis was resentenced to a drastically reduced sentence of 72 months, below the revised Guidelines range.

As explained below, the government's claim that Mr. Rajaratnam made $63.8 million in insider trading profits is incorrect because its methodology for calculating this amount is flawed. A more accurate estimate of the alleged profits that Galleon realized is $36,358,313 (excluding losses avoided) or $41,710,839 (including losses avoided), with Mr. Rajaratnam personally

realizing approximately $7,460,633 of that amount.  *See* Declarations of George Lau, former Galleon CFO, and Professor Gregg Jarrell (attached hereto as Exs. 1 & 2).

Although the government introduced some evidence regarding alleged profit in the form of summary testimony from FBI Agent Barnacle, Agent Barnacle admitted that he "didn't do an event study" and indeed "didn't perform any analysis" to exclude price movements not attributable to the inside information.  Tr. at 3551.  Instead, Agent Barnacle admitted that he "treated the entire increase in the stock price, upon the announcement of the news, as insider trading gain."  *Id.*[5]  And the jury was neither asked nor required to find the amount of alleged profit in order to reach its verdict.  Therefore, the profit, or gain, must now be determined for purposes of the guideline calculation.  The $63.8 million amount testified to by Agent Barnacle artificially inflated the amount of profit because it did not focus solely on the change in share price attributable to the alleged inside information.  To calculate profit, the prosecutors had Agent Barnacle compare the price of the shares on the day that Mr. Rajaratnam bought the shares in question to their price on the day that Mr. Rajaratnam sold the shares – in other words, the FIFO (first in, first out) method.  But this methodology is flawed because it indiscriminately includes all movements in the share price between the date of the original purchase and the date of the final sale of the shares.  In particular, the government's methodology improperly includes: (1) all movements in the stock price that occurred after the shares were initially purchased but *before* the announcement of the alleged inside information; and (2) all movements in the stock price that occurred *after* the public reaction to the company's announcement of the alleged inside information until the date of sale, even if that date is days or weeks afterwards.  In both cases, the

---

[5] Agent Barnacle did not testify as an expert witness, but as a summary witness who performed calculations at the direction of the prosecutors.  Tr. 3549-50.

government's methodology improperly includes gains other than the gains "resulting from the offense" which are to be considered under §2B1.4. This methodology does not focus solely on the change in stock price attributable to the public announcement of the inside information. Instead, the government's methodology incorrectly includes changes in share price attributable to events other than the announcement of the inside information (*e.g.*, unrelated new product launches and/or financial releases; overall market movement as a whole). As a result, the government's methodology artificially inflates the alleged profit. And this methodological error results in serious computational errors in this case because Mr. Rajaratnam often purchased and held the stock positions for a period of weeks, or even months, before selling them.

For example, Intel announced its first quarter 2007 results after the market closed on April 17, 2007. The market would have reacted to this information during the trading day on April 18. If the shares were not sold until April 19 or even a week later on April 26, then other events, such as general market movement or other company-specific news (*e.g.*, a new product launch), could have intervened to affect the share price.[6] By comparing the price upon sale to the purchase price, the government used a methodology that did not limit the price gain solely to the inside information. This artificially increased the alleged profit and is unfair to the defendant. Similarly, under the government's method, if Mr. Rajaratnam purchased the shares days or weeks before the public announcement (which he often did), any increase in price during that period is also included as gain, without regard to whether the increase relates to the alleged inside information or other market events.

---

[6] In fact, Agent Barnacle's worksheets show that Mr. Rajaratnam held some of these Intel shares in the fund until May 3, 2007 and Barnacle calculated gain through that period. GX 3534-N at 7, 8.

### B.       The More Accurate Approach To Calculating Profit

Because the gain under § 2B1.4 is supposed to reflect the gain based on the inside

information and not due to other market events, a more accurate way to measure the gain is to

calculate the increase in share price on the day of the company's public announcement, or the

following day if the announcement is made after the market closes.  Then that price increase

should be multiplied by the number of shares of that stock at issue in funds that Mr. Rajaratnam

managed on the day of the announcement, with the result yielding the gain, if any, resulting from

having the alleged inside information before the rest of the market knew it – in other words, the

"gain resulting from the offense."

At trial, Mr. Rajaratnam presented testimony from Professor Gregg Jarrell, an economist

at the University of Rochester, and former chief economist at the Securities and Exchange

Commission.  Professor Jarrell was accepted by the Court as an expert witness.  Unlike Agent

Barnacle, who "didn't perform any analysis," Tr. at 3551, Professor Jarrell testified that he

reviewed the trading in all the stocks at issue in the case and performed "event studies" for each

of them.  Event studies are routinely accepted as the appropriate means of analyzing the stock

price impact of allegedly material, nonpublic information in securities trading, and indeed are

sometimes required by courts as the only accurate means of measuring insider trading gain.  *See*,

*e.g.*, *In re Northern Telecom Ltd. Securities Litig.*, 116 F. Supp. 2d 446, 460-61 (S.D.N.Y. 2000)

(finding proposed expert testimony "fatally deficient" in a securities case when it did not include

an event study); *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 245 F.R.D. 147, 170

(S.D.N.Y. 2007) (noting that "numerous courts have held that an event study is a reliable method

for determining . . . the market's responsiveness to certain events or information.")  As Professor

Jarrell explained at trial and as set forth in the attached Declaration (Ex. 2), these event studies

measured the change in share price attributable to the alleged inside information.  As described in

his Declaration, Professor Jarrell calculated the excess return attributable to the inside

information and applied it to the number of shares at issue.  Using this methodology, the total

profit for all the stocks at issue is $36,358,313 (excluding losses avoided) and $41,710,839

(including losses avoided).  *See* Jarrell Declaration, ¶¶ 23-25.   But as explained below, Mr.

Rajaratnam himself did not realize this amount.  Instead, Mr. Rajaratnam individually would

have realized approximately $7,460,633 of this amount in performance fees and some return on

his own investment in the funds, but in reality he received much less because the Galleon

portfolios were not profitable in 2008 and no performance fees were paid.

**C.**  **The Gain Amount Should Not Include "Losses Avoided"**

In its calculation of the gain amount, the government has included so-called "losses

avoided," as well as profit, for trades in Intel and Google.  For certain trades in Goldman Sachs,

it has included solely "losses avoided."[7]  None of these amounts should be included in the gain

calculation because they are not part of the "gain resulting from the offense."

a.    Intel.  The government introduced evidence that Mr. Rajaratnam had shorted

1,150,00 shares of Intel in the Galleon Technology Fund on April 9 and 10, 2007.  Mr.

Rajaratnam then bought a total of 1,150,000 shares to cover that short position on April 13 and

April 16, 2007.  On April 16 and 17, 2007, he then took an opposite or "long" position, by

buying shares of Intel expecting the share price to rise.  Intel announced its first quarter 2007

revenue and earnings after the market closed on April 17, 2007.  The next day, the share price

increased slightly.  As set forth in GX 6, the government's gain figure for Intel totals $2,481,271,

of which $882,915 represents "losses avoided" by covering the short position, and the rest

---

[7] The total "losses avoided" that the government included in its $63,812,164 gain amount
is $9,995,730.

represents profit on the long position, *i.e.*, the shares purchased on April 16 and 17 that increased in price after the announcement.  *See* GX 6.

The government's theory is that the total gain represents both actual gain from buying shares and later selling at a profit, as well as the loss amount avoided on the short sales that were covered before the long position was established.  This position lacks a factual basis and is inherently contradictory.  First, it assumes losses on the short position that would only have occurred had Mr. Rajaratnam held that position through Intel's public announcement on April 17, 2007, when the share price went slightly up, not down.  But Mr. Rajaratnam covered the short position on April 13 and 16, and there is simply no factual basis on which to conclude that he would have held that position – and incurred the losses that the government alleges – through the announcement date.  Second, the government's calculation also includes gains that were realized on the long position that was held as of the April 17 public announcement.  Thus, the gain calculation is based on holding both short and long positions in the stock of Intel at the same time, which makes no sense, as the government's own witness, FBI Agent Barnacle, testified when presenting the government's calculations:

> Q:    You can't hold a short position and a long position at the
>       same time, can you?
>
> A:    It wouldn't make sense.  No, you wouldn't do that.
>
> Q:    So when he sold his short position, he was out of it and he
>       went into the announcement long, correct?
>
> A:    He sold his short position, covered it and went long, correct.

Trial Tr. 2569-70

To hold a short position and a long position at the same time would mean a stock trader was acting at cross purposes to himself, as the short position is taken with the hope and expectation of a decline in price, whereas the long position is based on the expectation of an

increase in price.  Therefore, calculating "losses avoided" based on the assumption that a short

position would be held through the public announcement and not eliminated by covering, while

at the same time taking a long position by buying and holding shares before the announcement,

is inherently contradictory, would never happen and, as the government's own witness stated,

"wouldn't make sense."  The government's "loss avoided" calculation lacks a factual basis (as

the short position was eliminated and there is no basis for assuming that Mr. Rajaratnam would

have held that position through the announcement) and assumes irrational conduct (being both

long and short at the time of the earnings announcement).  Therefore, the "losses avoided"

component is not a "reasonably foreseeable" component of gain for the Intel trading at issue and

should not be counted.[8]

      b.    <u>Google</u>.  The government's calculation for Google totals $18,264,041 as gain, of

which $5,312,250 is "losses avoided."  GX 62.  Here, the "losses avoided" pertains to the

elimination of a long position before the Google public announcement of its quarterly results.

Mr. Rajaratnam sold a total of 135,000 shares of Google on July 13, 2007, which he had

purchased previously in the Galleon Tech and Diversified Funds.  GX 60.  He then began

establishing a short position in Google by shorting the stock and buying put options, through

July 19, 2007, in advance of the earnings announcement after the market closed on July 19.

When the public announcement was made, Google's share price declined, so the short position

that was held at that time was profitable.  However, the 135,000 shares that he had previously

purchased had been sold six days before the announcement.  The government's calculation

speculates about what would happen if these shares were held through the public announcement.

---

[8] The table in § 2B1.1 is actually designed to apply to loss, not gain.  Application Note
3(A)(i) states that actual loss is "the reasonably foreseeable pecuniary harm that resulted from
the offense."  Similarly, the gain should be reasonably foreseeable as well.

Just as with Intel, it would make no sense for Mr. Rajaratnam to continue to hold those shares with the expectation that they would increase in price, while at the same time holding a short position expecting a decline in price. Nor did he do so. The long position was sold on July 13. There is no factual basis to assume they would have been held through the announcement, while also shorting the stock. Therefore, it is unreasonable to count "losses avoided" as gain based on those shares being held through the announcement, while also including the profit on the short position actually held through the announcement. The $5.3 million in "losses avoided" should not be included.

   c. <u>Goldman Sachs</u>. The government's entire calculation of gain on the Goldman Sachs October 2008 transaction is based on "losses avoided" of $3,800,565. GX 77. Mr. Rajaratnam purchased 150,000 shares of Goldman Sachs stock for $122 per share on October 21, 2008, which he sold three days later on October 24 for $97 per share, for a loss of $25 per share. GX 76. These transactions occurred during the nationwide financial crisis in 2008, when Lehman Brothers failed and other financial institutions, including investment banks like Goldman Sachs, were in a very precarious position. The government's allegation was that Mr. Rajaratnam received inside information that Goldman Sachs was losing money at that time, equal to a loss of $2 per share for the quarter. However, Goldman Sachs was not due to report its quarterly revenue and earnings at that time and in fact did not report them until December 16, 2008. Goldman's share price declined from approximately $97 on October 24 (when Mr. Rajaratnam sold his shares) to approximately $75 when it announced its quarterly results on December 16. The government's "losses avoided" calculation is based on the assumption that Mr. Rajaratnam would not have sold the Goldman Sachs shares "but for" the alleged inside information, and instead would have held the shares all the way to December 16 when he would

have experienced an even greater loss.  The "losses avoided" is calculated on the difference in share price between when Mr. Rajaratnam actually sold (October 24, when the price was $97) and the price after the public announcement of Goldman Sachs' financial results on December 16 (*i.e.*, $75).

The government's losses avoided calculation is speculative and unreasonable.  It assumes that an experienced, professional money manager like Mr. Rajaratnam would be completely unaware of the nationwide financial crisis and the deteriorating stock market in the latter part of 2008, when the market as a whole lost approximately one-third of its value and financial stocks declined significantly.  It unreasonably assumes that Mr. Rajaratnam would have ignored the fact that Goldman Sachs' share price was falling precipitously during this period.  Indeed, it fell from $122 on October 21 to $97 on October 24, a 20% decline in just the three days that Mr. Rajaratnam held the shares.  It assumes that Mr. Rajaratnam would have been unaware of this decline and would have blindly held his Goldman Sachs shares even as its share price continued to decline from $97 all the way to $75 in December (a 38% decline from the original $122 purchase price).  It also assumes that Mr. Rajaratnam would have ignored all the negative public reports that involved Goldman Sachs and negatively affected its stock price at that time, *e.g.*, the public reports that Goldman Sachs was laying off 10% of its workforce and that its major investment of $7.1 billion in the Industrial and Commercial Bank of China had significantly deteriorated.

The government's assumptions are unrealistic and entirely speculative.  The fact is Mr. Rajaratnam did *not* hold onto the Goldman Sachs shares until December but sold them in October.  Calculating "losses avoided" as if he held them through December 16 is not a reasonable estimate of gain.

**D.**     **The Gain Amount Should Be Limited To Gains Actually Realized By The Defendant**

As explained above, the $36.3 million figure is a more accurate measure of the Galleon trading profit from the inside information underlying the jury's verdict than the government's $63.8 million figure.  But this number also overstates Mr. Rajaratnam's culpability, since it represents the gain to Galleon and its investors rather than to Mr. Rajaratnam himself.  The amount received by Mr. Rajaratnam individually ($7,460,633) is the fairer amount to use, since it represents the defendant's own gains from the conduct at issue.  As the Background to § 2B1.4 explains, "gain" is the "total increase in value realized through trading in securities *by the defendant* or persons acting in concert with the defendant or to whom the defendant provided inside information." (emphasis added).  The defendant, Mr. Rajaratnam, did not realize anywhere near the $63.8 million in alleged profits that the government claims.  The vast majority of these profits (whether using the government's figure or the $36.3 million amount explained above) were realized by Galleon's investors.   Like many hedge funds, Galleon Management L.P. had a "2 and 20" fee structure that it charged the funds for the investment management services it provided.  That is, Galleon Management L.P. generally charged a fund an annual management fee of 2% of the total assets under management in that fund, and if it made a profit for the fund on an annual basis, it also generally charged a fee of 20% of the profit realized by the fund.  Lau Declaration, at ¶ 8.[9]  The 20% share of these profits was calculated on an annual basis, based on the overall profitability of the fund for the year; it was not calculated on a stock-by-stock transaction basis.  Profitable trades were offset by unprofitable trades.  Only if the fund as a whole was profitable for the year did Galleon Management L.P. realize a 20% share in the profits.  If the fund was unprofitable for the year, then no performance fee was earned and that deficit had

---

[9]   As the Lau Declaration states, the annual management fee was sometimes less than 2%.

to be made up the following year before Galleon Management shared in any of the profits for the following year.[10]

The fees that Galleon Management L.P. realized did not all go to Mr. Rajaratnam. These fees were used to pay for overhead expenses, including compensation for Galleon's many employees and portfolio managers. Although he generally owned the largest single partnership percentage in Galleon Management L.P., Mr. Rajaratnam was not the sole partner. If the funds were profitable and fees were earned, other partners shared in the fees (after expenses) as well. As Mr. Lau, Galleon's former CFO, estimated for the funds for which he was the PM, Mr. Rajaratnam received approximately 50% to 65% of the fees that Galleon obtained. Lau Declaration at ¶¶ 11-13. Mr. Rajaratnam also was an investor in the Galleon funds, by both direct investments he made in the funds and in the form of deferred compensation to which he was entitled from Galleon. Lau Declaration at ¶ 6.[11] Using the government's $63.8 million gain figure, Mr. Lau calculated that Mr. Rajaratnam would have realized at most a pre-tax gain of $13,371,053 from this amount. Lau Declaration at ¶ 23.

As discussed above, the government's $63.8 million amount overstates the alleged profit because of the flawed method by which it was calculated and because it includes "losses avoided." But no performance fee is earned by Galleon on "losses avoided," only on actual profit. Therefore, Mr. Rajaratnam did not share in any performance fee for "losses avoided" because Galleon received none.

---

[10] Using the government's alleged gain amount of $63,812,164, and assuming that the funds overall were profitable for the year and the gains were not offset by other losses, the 20% performance fee realized by Galleon would amount to $12,762,432.

[11] As explained in the Lau Declaration (¶ 9), the management fee plus a portion of the performance fee that Galleon Management, L.P. charged the funds approximately equaled the operating costs it incurred for rent, utilities, equipment and other ordinary business expenses.

To summarize, and as set forth in the attached Declarations of George Lau (Ex. 1) and Gregg Jarrell (Ex. 2), the more accurate calculations are:

|  | **Proceeds From Trades At Issue** | **Portion of Proceeds Realized By Defendant** |
|---|---|---|
| Excluding losses avoided | $36,358,313 | $7,460,633 |
| Including losses avoided | $41,710,839 | $8,535,836 |

Because the Background to § 2B1.4 states that "gain" is the total value realized "by the defendant," it is appropriate to use the amount actually realized by Mr. Rajaratnam without including "losses avoided", *i.e.*, $7,460,633. The Galleon investors realized 80% of the trading profit and they were not alleged to be "persons acting in concert" with Mr. Rajaratnam, nor to be persons "to whom the defendant provided inside information" as provided in § 2B1.4. Similarly, of the remaining 20% (the performance fees realized by Galleon), 35% to 50% were used to cover overhead and pay employees and other Galleon partners. These individuals were not alleged to be acting in concert with Mr. Rajaratnam nor to be persons to whom he provided inside information. Therefore the amount actually realized by the defendant, $7,460,633, should be used as the gain for Guidelines purposes.

But even that amount overstates the amount of gain actually realized by Mr. Rajaratnam because it incorrectly assumes that he was compensated based on the performance of individual stocks, when in reality he was compensated based on the performance of the portfolios that he managed. If, for any given year, a portfolio was not profitable, Mr. Rajaratnam received no performance fee, regardless of how any individual stock within the portfolio performed. This fact is especially important in this case since, in 2008, when the financial crisis hit all the country's financial markets, none of the Galleon funds made a profit, so Galleon Management received no performance fee from the funds, and hence none went to Mr. Rajaratnam. Lau

33

Declaration, at ¶12.  As shown in the attachment to the Lau Declaration, for four of the stocks (Akamai, Clearwire, eBay and Goldman Sachs), a profit is calculated for these stocks even though the transactions were in 2008 and the funds had no overall profit for the year and hence no performance fee was realized by Galleon Management or by Mr. Rajaratnam.

Moreover, when all the stocks for which the government alleged insider trading are considered, there was no profit at all, because Mr. Rajaratnam's fund actually lost more money than it made on his alleged insider trades.  The government alleged that Mr. Rajaratnam engaged in insider trading in AMD as well, and did not dispute the evidence presented by the defendant at trial that Mr. Rajaratnam's trades on AMD *lost* $67 million, using the government's own methodology.  *See* DX 4694.  The government omitted this loss amount from its calculation of profit from insider trading.  When this amount is compared to the government's $63.8 million figure for the other 13 stocks, there is no gain at all "resulting from the offense," and thus no enhancement under §2B1.1.  The trial evidence also shows that Mr. Rajaratnam lost nearly $5 million on his alleged insider trading in Business Objects.  *See* DX-4675M.

The loss on AMD is significant also because it underscores the inappropriateness of using the §2B1.1 loss table, which is designed for fraud and theft cases, as a proxy measure of culpability in insider trading cases.  The fraud table treats a Madoff-type fraud (where the defendant presumably knew how much he was bilking his investors) identically with insider trading, where the defendant still incurs risk and has no way of knowing exactly how much profit he will make or if he will make any profit at all, as AMD demonstrates.  For this reason as well, the focus should be more on the sentencing factors listed in the statute, §3553, than the arbitrary calculations derived from the fraud loss table.

**VI.     THE GUIDELINES CALCULATION OVERSTATES THE SERIOUSNESS
OF THE OFFENSE**

Application Note 19 to Guideline § 2B1.1 lists various departure considerations,

including a downward departure in cases in which "the offense level determined under this

guideline substantially overstates the seriousness of the offense."  USSG § 2B1.1 Application

Note 19(C).  In this case, if the offense level is calculated on a purported gain of $63.8 million,

then the offense level does indeed overstate the seriousness of the offense.

The use of the fraud loss table in § 2B1.1 as a proxy for gain in insider trading cases

plays a big role in overstating the offense level. The table is designed to apply when a defendant

has caused a real or intended loss to a victim.  In a securities fraud case where investors were

defrauded of their money (such as the Madoff case), the loss table serves a useful function in

quantifying the out-of-pocket loss to the victim, recognizing that a greater loss causes greater

harm, and assigning longer sentences accordingly.  In an insider trading case such as this one,

however, there is no victim who suffered a loss.  Instead the loss table is used for a purpose for

which it was not designed, *i.e.*, to measure culpability based on gain.  But the amount of gain

bears no connection to the amount of harm or level of culpability– it is simply a function of how

much capital the defendant decided to invest in a given stock trade and whether the trade turned

out to be profitable or (as in the case of AMD) unprofitable.  The more shares purchased, the

more potential for gain and for loss as well.  The amount of gain does not even bear any

relationship to the underlying culpable conduct – *i.e.*, the misappropriation of confidential

corporate information by the tipper – or the number of times the tipper stole information and

breached a duty.  For example, the same amount of gain might be based on a single, large trade

based on information misappropriated only once, or multiple trades based on multiple

misappropriations and breaches.  In addition, unlike the losses normally contemplated by the

table in § 2B1.1, the amount of gain realized on a securities trade is largely outside of the

defendant's control, owing to the irreducible unpredictability of how the market will react to the

publication of a certain piece of information and the change in share price that will result.  And

of course, the degree to which the Guidelines overstate the seriousness of the offense would be

greatly exacerbated if the Court were to consider not only the gains accruing to Mr. Rajaratnam

himself, but the total gains accruing to the Galleon funds and their investors.  *See United States v.*

*Oakford Corp.*, No. 98-CR-144, 1999 WL 1201725, *10 (S.D.N.Y. 1999) (finding that

Guidelines overstated seriousness of offense where "each of the defendants personally realized

only a small portion of the overall gain or profits" of a scheme substantially similar to insider

trading).

     Because Mr. Rajaratnam managed billions of dollars in the Galleon Technology and

Diversified Funds, it was typical for him to purchase (or short) millions of dollars of stock in any

one trade.  The stocks at issue (*e.g.*, Google, Intel, etc.) had very large market capitalizations, so

even if Mr. Rajaratnam made a $25 million purchase, it was not a significant amount of the

overall capitalization.  Galleon had an internal guideline that it would not invest more than 10%

of its assets in any one stock.  Individual portfolio managers such as Mr. Rajaratnam followed

this guideline.  Therefore, even though he purchased large amounts of stock in some of the

companies at issue, these purchases were also a relatively small percentage of the overall assets

of the fund.

     For example, one of the largest gains in the government's calculation is a purported gain

of $18.2 million from profits and "losses avoided" in Google.  Mr. Rajaratnam often purchased

large amounts of Google's stock, and did so in the quarters preceding and following the quarter

in question.  The large purchases in July 2007 that were at issue here were not unusual.  However,

Google's market capitalization on June 27, 2007 was $151.9 *billion.* DX 1048 at 2. The $18.2

million profit was significant only because Mr. Rajaratnam typically made large purchases, and

not because his conduct was any more culpable or serious than if he made a smaller purchase,

particularly given that he personally received only a fraction of any profit.[12]

Another example is Intel, for which the government has calculated a gain of $2.4 million.

This amount all relates to the Intel earnings announcement on April 17, 2007. Intel released a

mix of somewhat positive and negative news on that date. The market's reaction was an increase

in the share price of only 37 cents from the previous day's price (from $20.98 to $21.35).

However, because Mr. Rajaratnam had purchased a large amount of Intel stock, his purchases

realized a profit of approximately $1.6 million. (The remaining portion of the $2.4 million "gain"

is the "losses avoided" discussed previously). Thus, a large gain was realized from a small

movement in the stock price and a relatively small investment of the fund's assets. Calculating

gain in this manner overstates the serious of the offense.

The same can be said for all the stocks and transactions on the government's gain

calculation list. All these purchases represented a relatively small percentage of the assets Mr.

Rajaratnam was responsible for investing.[13] The conduct might be considered more culpable and

serious if he had violated Galleon's Guidelines and invested 25% or 50% of the funds' total

---

[12] Google, along with Hilton and Polycom, is one of the stocks that is the subject of the conspiracy count involving Roomy Khan. Mr. Rajaratnam's Motion for Judgment of Acquittal focuses particularly on the paucity of evidence regarding the Khan conspiracy count. At the time of this filing, the Court still had this motion under advisement. If the Motion is granted regarding the Khan count and these three stocks are not considered, then the gain amount and the corresponding Guideline range will be significantly reduced.

[13] With the exception of PeopleSupport, Galleon did not hold a significant number of shares of any of the companies in question that would trigger an SEC 13D filing (required when more than 5% of the shares are acquired). The gain that the government alleged in PeopleSupport was relatively small ($151,949) and related to the trading in Rajiv Goel's account, not in Galleon's account.

assets in any one of the stocks at issue, in an effort to capitalize on the alleged inside information. But he did not do that.  His purchases were a relatively small percentage of the fund size and the stock's market capitalization and were in keeping in size with other trades that are not at issue; the profit or gain is simply a function of the fund size being very large.  However, his conduct is no more serious than if he had invested $100,000 in any one of these stocks and made a $25,000 profit on each.  Therefore, an offense level calculated on the basis of the large gain amounts overstates the seriousness of the offense.

Moreover, Jury Instruction 31-D, "Use of the Information," provided that the jury could find this element satisfied if they were persuaded "that material nonpublic information given to the defendant was a factor, however small, in the defendant's decision to purchase or sell the stock."  This instruction permitted the jury to convict despite the wealth of public information that the defendant established was available and known to Galleon and Mr. Rajaratnam personally about each of the stocks and the transactions at issue, *e.g.*, anticipated earnings announcements, acquisitions, restructurings, and other events.  As discussed previously in this memorandum, Mr. Rajaratnam traded the stocks at issue frequently, including in quarters when there is no allegation of inside information.  And as a professional money manager who traded an average of $141.5 million worth of stock per day, it is fair to conclude that he would have traded them regardless of any inside information he allegedly received.  The jury's verdict establishes that they found only that inside information was a factor – and indeed could have been a very small factor – in the decision to trade in any of the stocks.  Therefore, a downward departure is appropriate to account for the likelihood that the inside information had a relatively small impact on Mr. Rajaratnam's trading decisions.

In light of the jury being instructed that even if the defendant was going to buy the stock based on other, legitimate factors, and the inside information was only a small factor, it could still convict, it overstates the seriousness of the offense to ignore that fact at sentencing and attribute *all* the profit to the inside information.  Because the vast majority of this trading would have occurred anyway, and the vast majority of this profit realized anyway, without any alleged inside information, then *all* the profit should not be considered to be gain from illegal stock trading.  It overstates the seriousness of the offense, based on the evidence produced at trial, to treat it that way.  For this reason as well, a downward departure is appropriate.

## VII.   <u>NO LEADERSHIP ENHANCEMENT IS APPROPRIATE UNDER USSG §3B1.1.</u>

The government requests a four-point role enhancement under §3B1.1 based on the theory that Mr. Rajaratnam was the "organizer or leader of a criminal activity that involved five or more participants."  For this enhancement to apply, the government must prove by a preponderance of the evidence: (i) that Mr. Rajaratnam was an organizer or leader of criminal activity; and (ii) that the criminal activity involved five or more participants.  *See United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005); *United States v. Eyman*, 313 F.3d 741, 745 (2d Cir. 2002).  The Court should reject the proposed enhancement because the government has failed to establish either prong of this test.  Instead, to reach a number of "five or more participants," the government has impermissibly aggregated participants across several separately charged and factually distinct conspiracies.  And the government has not carried its burden of proving that Mr. Rajaratnam was an "organizer or leader" of other participants in the separate bilateral tipper/tippee insider trading conspiracies that were the basis for his conviction.

A person may be counted as a "participant" in criminal activity under §3B1.1 only if that person would be independently criminally responsible for the commission of the offense.  *See*

USSG §3B1.1, cmt. 1; *United States v. Carrozzella*, 105 F.3d 796, 802 (2d Cir. 1997). If the

Court imposes an enhancement under §3B1.1, it must make specific, record findings as to the

identities of the "participants" to be counted. *See United States v. Ware*, 577 F.3d 442, 453-54

(2d Cir. 1999); *United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir. 1989). Critically, as the

language of §3B1.1 itself makes clear, all five participants must have been involved in *the same*

criminal activity in order for the enhancement to apply. *See* §3B1.1 (referring to "*a* criminal

activity that involved five or more participants"). Individuals may not be aggregated as

"participants" under §3B1.1 if the evidence shows that they participated in separate and distinct

crimes, even if those crimes were closely related. *See*, *e.g.*, *United States v. Paccione*, 202 F.3d

622, 624-25 (2d Cir. 2000) (participants in arson conspiracy would not be aggregated with

participants in subsequent insurance fraud based on arson); *United States v. Melendez*, 41 F.3d

797, 800 (2d Cir. 1994) (individuals convicted of receiving stolen property would not be

aggregated with participants in theft where recipients had no "advance knowledge of the theft,

much less participated in its planning or execution").

Here, the government has identified nine alleged "participants" to be counted – Anil

Kumar, Rajiv Goel, Roomy Khan, Danielle Chiesi, Rajat Gupta, Adam Smith, Rengan

Rajaratnam, Kris Chellam, and Krish Panu. But the Indictment did not charge, and the evidence

at trial did not show, that these nine individuals participated in the same "criminal activity."

Rather, the Indictment charged one count of conspiracy involving Kumar, another involving

Goel, another involving Khan, another involving Chiesi, and another involving Smith. Far from

being the same "criminal activity," these separate counts described distinct insider trading

conspiracies which occurred during different periods of time (not all of which overlapped) and

involved different co-conspirators, different stocks, different information, different inside sources,

and different trades.  As the Court correctly instructed the jury, each of these counts described "a separate crime," Tr. at 5610-11, and there was simply no evidence offered at trial that any one of these alleged "participants" was involved in any way with the separately charged conspiracies involving the other participants.  For example, the government offered no evidence whatsoever that Goel participated in, or indeed was even aware of, the conspiracy with Chiesi, or that Khan participated in, or was even aware of, the conspiracy with Kumar.  The government has thus failed to offer any evidence of "a criminal activity" in which all of the individuals participated.

The government also offered evidence at trial which, it claimed, showed involvement by Smith, Rengan Rajaratnam, Gupta, Panu, and Chellam in the so-called "Galleon Conspiracy" charged in Count 1.  But the government's evidence did *not* establish a single criminal activity in which all of these individuals jointly participated.[14]  Even viewing this evidence in the light most favorable to the government, it suggested at most that Mr. Rajaratnam was involved in a number of separate conspiracies, each of which involved one or two – but never all – of these individuals.  For example, the government offered evidence that Mr. Rajaratnam conspired with Rajat Gupta to trade in the securities of Goldman Sachs, but it offered no evidence at all that Smith, Chellam, Panu, or Rengan Rajaratnam were aware of – much less that they participated in – this activity.  Conversely, the government offered evidence (in the form of a single recorded telephone call) that Mr. Rajaratnam conspired with Panu and Chellam to trade in the securities of Spansion, but no evidence to suggest that Gupta, Smith, or Rengan Rajaratnam knew of or participated in this

---

[14] Although the jury convicted on Count 1 and must therefore have found that a conspiracy existed, it certainly is not the case that the jury must have credited *all* of the evidence that the government offered under the rubric of Count 1.  For example, it is entirely possible that the jury convicted on Count 1 because it unanimously found that a conspiracy existed between Mr. Rajaratnam and Gupta to trade in the stock of Goldman Sachs without also crediting the government's much sparser evidence of a conspiracy between Mr. Rajaratnam and Kris Chellam to trade in the securities of @Road.

activity.  Obviously, the Court's analysis under §3B1.1 is not controlled by the fact that the

Indictment lumped all of this conduct under a single count.  The Court's decision must be based

on what the evidence actually shows, and it simply does not show any single criminal activity in

which all of these individuals participated.  Finally, as to some of these individuals – particularly

Panu and Chellam, who have not been charged with any crimes – the trial evidence was simply

too thin to conclude that they would be independently criminally liable for any of their actions, a

necessary prerequisite to finding that they "participated" in a criminal activity under §3B1.1.  *See*

USSG §3B1.1, cmt. 1.

     The evidence also does not support the contention that Mr. Rajaratnam "organized" or

"led" any of the individuals the government has identified in the commission of any criminal

activity.  As to this element, the critical inquiry is whether Mr. Rajaratnam "exercised some

control over others involved in the commission of the offense" or "played a significant role in the

decision to recruit or to supervise lower-level participants."  *United States v. Greenfield*, 44 F.3d

1141, 1146 (2d Cir. 1995) (internal quotations omitted).  The enhancement does *not* apply where

the defendant and the other participants in the criminal activity were "equal partners," *id.* at 1147,

or where the defendant acted merely as a "hub" or "orchestrator" without actually controlling the

other participants, *United States v. Carter*, 449 F.3d 1287, 1299 (D.C. Cir. 2006).

     With respect to Kumar, Goel, Gupta, Chiesi, and Khan, the evidence (viewed in the light

most favorable to the government) suggested nothing more than bilateral, arms-length tipper-

tippee insider trading conspiracies between equal partners.  Chiesi and Khan were portfolio

managers like Mr. Rajaratnam, and the evidence indicated, at most, that they would provide Mr.

Rajaratnam with investment ideas in exchange for the same.  The government produced no

evidence to suggest that Mr. Rajaratnam controlled or directed Chiesi's or Khan's criminal

activities, and indeed Chiesi and Khan have both pled guilty to insider trading activity which did *not* involve Mr. Rajaratnam at all.  Likewise, Gupta, Kumar, and Goel were all sophisticated businesspeople and senior executives at some of the largest and most successful companies in America, and the government offered no evidence to indicate that Mr. Rajaratnam somehow controlled or directed their actions.  Kumar testified that Mr. Rajaratnam never proposed an insider trading arrangement, and that his relationship with Mr. Rajaratnam as an advisor evolved over time to include passing information about McKinsey's clients.  Tr. at 256, 271-72, 631-32, 634-35, 640-41.  Goel similarly testified that he gave Mr. Rajaratnam inside information simply because the two were "good friends."[15]  And as to Gupta, the government's evidence indicated nothing more than that Mr. Rajaratnam occasionally asked Gupta questions about Goldman Sachs which Gupta chose to answer, with no identifiable benefit provided in return.  In none of these cases does Mr. Rajaratnam's conduct amount to the kind of criminal "leadership" of others that would trigger an enhancement under §3B1.1.

The government also contends that Mr. Rajaratnam organized and led the Galleon employees it has identified – Smith, Panu, Chellam, and Rengan Rajaratnam.  But as to these individuals, the Court must distinguish between Mr. Rajaratnam's legitimate role as the Managing Partner of Galleon and his alleged role as an organizer or leader of criminal activity.

---

[15] *See* Tr. at 1575-76.

Q.  Why did you give Mr. Rajaratnam confidential information about Intel's quarterly earnings in April 2007 before it was disclosed to the public?

A.  Raj and I were very good friends.  He was a good man to me.  I was a good person to him.  And we shared a lot of conversations.  And I gave him the information.

Q.  Why did you give him the information, confidential information about the Clearwire deal prior to that information becoming public?

A.  For the same reasons, we were very good friends, as a friend I shared information with him.

Section 3B1.1 provides an enhancement only where the defendant organized or led others in "criminal activity."  USSG §3B1.1.  The enhancement it is not triggered simply because the defendant organized or led employees in legitimate business activities, and then also conspired with those employees in criminal activities.  Thus, the Second Circuit held that it was improper to apply §3B1.1 to a defendant who conspired with one of his employees to cash stolen checks where there was no evidence that the defendant directed or controlled the employee in the criminal activity as distinct from his "legitimate employment."  *See United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003).  The same is true here.  Although it is certainly true that Mr. Rajaratnam "organized" and "led" Galleon's employees in connection with Galleon's legitimate business, there is no evidence that he did so in connection with criminal activity, and no evidence of a criminal relationship with Smith, Panu, Chellam, or Rengan Rajaratnam apart from that of a simple co-conspirator.  Notably, the Court heard testimony from only one of these individuals – Smith – and he never testified that Raj directed him to obtain inside information.  And Smith, like Chiesi and Khan, has admitted to insider trading activity in which Mr. Rajaratnam was *not* involved at all.  The idea that these individuals were "led" in their criminal activity by Mr. Rajaratnam is belied by the simple fact that they have all admitted to engaging in criminal activity without him.

## VIII.   <u>NO OBSTRUCTION ENHANCEMENT IS APPROPRIATE UNDER USSG § 3C1.1</u>

The government requests a two-point enhancement under USSG §3C1.1 based on the theory that Mr. Rajaratnam "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" by giving false answers to questions posed to him during his deposition by the Securities and Exchange Commission in June 2007 in connection with its investigation into Sedna, a hedge fund run by Mr. Rajaratnam's brother.  Notably, the

government did not consider any of the testimony given by Mr. Rajaratnam during the Sedna deposition important enough to charge criminally, or even bring to the attention of Judge Lynch when it sought a wiretap in this case.  Nevertheless in discussions with defense counsel, the government has identified several answers given by Mr. Rajaratnam during the Sedna deposition that it contends were perjurious.  Each will be addressed in turn.

###### A.      Legal Principles

Where the government seeks an enhancement under USSG §3C1.1 based on alleged perjured testimony, it bears the burden of proving by a preponderance of the evidence "that the defendant (1) willfully (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997).  The government must therefore prove all of the elements of the enhancement plus all of the elements of perjury under the federal definition.  *See United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)).  In a case like this, where the government alleges that the perjury was committed in a separate civil proceeding, it must prove that the perjury was material both to the criminal case and to the civil proceeding in which the testimony was given.  *See Zagari*, 111 F.3d at 329.  Moreover, the government must prove that the defendant acted "'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory' – *i.e.*, that the defendant committed perjury rather than simply providing false testimony."  *Id*. (quoting *Dunnigan*, 507 U.S. at 94).   "[T]he court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." USSG §3C1.1 cmt. 2.

The government must also establish that the defendant's answers were literally false in response to the questions asked; answers which are merely non-responsive, incomplete, or literally true yet misleading, are insufficient to constitute perjury, and thus to trigger application of the enhancement.  *See Bronston v. United States*, 408 U.S. 352, 358-59 (1973).  In such circumstances, "it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination."  *Id.*

Finally, a defendant's denial of guilt is insufficient to trigger the enhancement unless the denial itself constitutes perjury under oath.  *See* USSG §3C1.1 cmt. 2.

### B.      Mr. Rajaratnam Did Not Obstruct Justice

At the outset, it is important to note the context in which the Sedna deposition took place.  In June 2007, the SEC was ostensibly investigating events at Sedna, a fund run by Mr. Rajaratnam's brother in which Mr. Rajaratnam was merely an investor.  The subpoena compelling Mr. Rajaratnam's attendance at the deposition carried a Sedna caption, and Mr. Rajaratnam and his counsel reasonably expected that the deposition would concern Sedna and Mr. Rajaratnam's limited role as a passive investor at Sedna.  In preparing for the Sedna deposition, Mr. Rajaratnam and his attorneys accordingly focused on Sedna.  They did not prepare to answer questions about insider trading, events at Galleon, or specific securities transactions that occurred years earlier.  These facts are all plainly pertinent to Mr. Rajaratnam's state of mind and current recollection at the time of the deposition, and thus relevant to assessing whether Mr. Rajaratnam gave knowingly false answers.  And in assessing whether Mr. Rajaratnam acted with the willful intent to obstruct justice, it must also be remembered that during the course of the seven hour Sedna deposition, Mr. Rajaratnam gave hours upon hours of testimony whose truthfulness has never been questioned, including helpful testimony in which he

identified individuals – including Roomy Khan and Rajiv Goel – subsequently charged as Mr. Rajaratnam's co-conspirators in this case.

Given the size and breadth of Galleon's operations and work, it is simply unfair to enhance Mr. Rajaratnam's sentence based on his answers to questions that he was not fully prepared to address.  The government's effort to seek these sentencing enhancements from the Sedna deposition smacks of fundamental unfairness and overreaching.  Simply put, Mr. Rajaratnam did not obstruct justice in the Sedna investigation through his answers about his work at Galleon.  Each of the government's citations of supposedly false testimony in Mr. Rajaratnam's Sedna deposition should be rejected for independent reasons, as described below.

1. **General Denials of Wrongdoing**

The government has identified two pieces of testimony which amount to nothing more than general denials of wrongdoing:

a.  **Tr. at 77:16-18**

**Q:  Have you ever come into possession of material, non-public information?**

**A:  Me personally, no.**

b.  **Tr. at 184:6-11**

**Q:  Has Galleon ever made a trade on the basis of non-public information?**

**A:  Not to my knowledge.**

**Q:  Have you ever suspected that anyone at Galleon ever engaged in insider trading?**

**A:  No.**

This testimony does not satisfy the federal definition of perjury because the questions required a lay witness to provide legally conclusory answers.  The terms "material," "non-public," "on the basis of," and "insider trading" are all legal terms of art carrying specific legal definitions, as evidenced by the fact that this Court gave the jury in this case pages and pages of

instructions on the meaning and application of these terms.  Accordingly, Mr. Rajaratnam's answers to these questions were, at best, lay opinion about legal issues and cannot constitute perjury under the federal definition.  *See*, *e.g.*, *United States v. Endo,* 635 F.2d 321, 323 (4th Cir. 1980) ("[S]tatements which present legal conclusions are considered opinion and cannot form the basis of a perjury conviction."); *United States v. Johnson*, 284 F.Supp. 273, 279-80 (D. Mo. 1068) (Legal opinions or conclusions of law are not false statements under 18 U.S.C. sec. 1001.); *United States v. Montour*, No. CR-09-0214, 2010 WL 3211888 at *4 (W.D. Wash. Aug. 12, 2010) (striking a statement related to a perjury charge from the indictment when the question that elicited the statement was "purely legal").

Moreover, even when the definitions of these terms are properly understood, it is rarely clear as a matter of fact whether a particular piece of information is "material" or "non-public," regardless of its source, since neither characteristic can be evaluated without reference to the total mix of information then available about the securities in question.  *See*, *e.g.*, *United States v. Cusimano*, 123 F.3d 83, 89 n.6 (2d Cir. 1997) (information can lose its character as non-public when it is disseminated through press releases, SEC filings, trade publications, analyst reports, newspapers, magazines, rumors, word of mouth, or other sources); *Basic, Inc. v Levinson*, 485 U.S. 224, 231-32 (1988) (a fact is material if a reasonable investor would view it as significantly altering the total mix of available information).  Nor is it necessarily clear whether any particular trade was made "on the basis of" material, non-public information, particularly since the definition of that legal element is a matter of considerable dispute among the courts.  *Compare United States v. Rajaratnam*, No. 09-CR-1184, Tr. at 5624 (S.D.N.Y. 2011) (instructing the jury that the "use of information" element is satisfied if the material, nonpublic information was "a factor, however small" in Mr. Rajaratnam's trading decision) *with United States v. Goffer*, No.

10-CR-00056, Tr. at 2015 (S.D.N.Y. 2011) (instructing the jury that it must find that the material, nonpublic information was a "substantial factor" in the trading decision in order for the "use" element to be satisfied).  Obviously, Mr. Rajaratnam had no opportunity to check, before answering this question, whether any of the information he had ever come into possession of was "material" and "non-public," much less whether any of the dozens of other portfolio managers and traders at Galleon had ever traded "on the basis of" material, non-public information.  The evidence is therefore insufficient to support an inference that Mr. Rajaratnam willfully answered this question in a manner he knew to be false.

Finally, Mr. Rajaratnam's answer to this question amounts to nothing more than a general denial of wrongdoing.  It is the Department of Justice's policy not to prosecute in such circumstances, *see* U.S. Attorney's Manual 9-42.160, because such general denials do not meaningfully obstruct or impede the government's investigation.  The same is certainly true here, as there is no indication whatsoever that Mr. Rajaratnam's answers to these most general and conclusory of questions impeded the government's investigation in any respect, particularly where the examiner made no effort to follow-up on either answer.

## 2.  Question Regarding Galleon's Use of Consultants

The government has also identified the following testimony concerning Galleon's use of consultants:

### a.  Tr. at 85:10-13

**Q:  To your knowledge does Galleon pay anybody to serve as a consultant to Galleon providing insight or analysis?**

**A:  I know we do but I don't know who. . . .**

Presumably, the government contends that this answer was false because Mr. Rajaratnam knew that Anil Kumar had been employed by Galleon as a consultant.  But Mr. Rajaratnam's

answer was literally true in response to the question asked.  The question, posed in June 2007, was phrased in the present tense – "*does* Galleon pay anybody to serve as a consultant…?"  In June 2007, Anil Kumar was not being paid as a consultant to Galleon, or for any other purpose. The most recent contract with Pecos Trading had ended in 2005, with the final payments to Pecos occurring in early 2006.  *See* Tr. at 664-65.  The next payment to Kumar was a single payment in January 2007.  *See* Tr. at 556.  At the time of the deposition in June 2007, Galleon had no existing consulting relationship with Kumar.  And there is no evidence in the record that Mr. Rajaratnam himself was aware of any specific relationships between Galleon and other consultants that would render his answer – "I know we do but I don't know who." – knowingly false.

To the extent the government believes that Mr. Rajaratnam's answer was evasive, even if literally true, the answer cannot sustain a charge of perjury, since it was the examiner's responsibility "to flush out the whole truth with the tools of adversary examination."  *Bronston*, 408 at 358-59.  In this case, the examiner did not.

**3.   Questions Regarding Galleon Investors**

The government has also identified the following testimony concerning Galleon investors:

**a.   Tr. at 84:12-16**

**Q:  ….[S]itting here today are you aware of any investors in Galleon who are consultants to issuers?**

**A:  What do you mean by issuers?**

**Q:  Publicly traded companies.**

**A:  Not that I know of.**

**b.   Tr. at 138:22-23**

**Q:  Do any investors in Galleon work for AMD?**

**A: No.**

Presumably, the government contends that these answers were false because Anil Kumar was a Galleon investor and a consultant to various issuers, including AMD, through his employment at McKinsey. But there is no evidence in the record to indicate that Mr. Rajaratnam was generally aware of the identities of Galleon's investors. Even if Mr. Rajaratnam had been aware of the fact that Kumar opened investments in Galleon in 2003, Galleon had literally hundreds of different investors, and there is no indication, and no evidence to support an inference, that in answering these questions in June 2007 Mr. Rajaratnam was willfully attempting to deceive the SEC by concealing Kumar's identity, rather than simply failing to recall that one investor out of hundreds was also a consultant. Once again, the examiner failed to follow up with questions that might have narrowed the focus of the inquiry or jolted Mr. Rajaratnam's recollection.

Finally, as to the second piece of testimony (Tr. at 138:22-23), there is no evidence that Mr. Rajaratnam knew his answer to be literally false, if indeed it was. Anil Kumar did not "work for AMD." He worked for McKinsey. It would have been reasonable for Mr. Rajaratnam to interpret this question as referring to people employed by AMD, in which case his answer was literally true. And it is not even clear from the record that Kumar was performing any work for AMD at the time of the SEC deposition in June 2007, much less that Mr. Rajaratnam knew he was performing such work. The last "tips" from Kumar concerning AMD for which there is any record evidence were the "tips" about the ATI acquisition in July 2006, *see* Tr. at 356, and the next AMD-related "tips" for which there is any record evidence were the "tips" about the fab lite deal in 2008, *see* Tr. at 412-13.

4. **Question Regarding Persons With Access To Inside Information About AMD**

The government has identified the following testimony concerning individuals with access to inside information about AMD:

a. **Tr. at 141:10-13**

> **Q:  Do you have reason to believe that anyone with whom you do communicate about AMD has access to inside information about AMD?**
>
> **A:  No.**

Presumably, the government contends that this answer was false because Anil Kumar testified that he had access to inside information about AMD which he shared with Mr. Rajaratnam.  But this testimony could not sustain a perjury conviction for a number of reasons. First, it called for a legally conclusory lay opinion as to whether or not any of the individuals Mr. Rajaratnam spoke to about AMD had access to "inside information" – that is, material, non-public information – about AMD.  As discussed above, that sort of answer cannot constitute perjury.

In addition, like the testimony identified at Tr. 138:22-23 concerning Galleon investors who "work for AMD," there is no evidence that Mr. Rajaratnam's answer was anything other than literally true in response to the question asked.  Once again, the examiner's question was phrased in the present tense:  "Do you have reason to believe that anyone with who you *do communicate* about AMD *has access* to inside information about AMD."  There is simply nothing in the record to indicate that Mr. Rajaratnam communicated with anyone who had access to inside information about AMD in 2007, nor is there any evidence in the record that Anil Kumar had access to inside information about AMD in 2007 at the time of the Sedna deposition.

**5.  Question Regarding AMD's Acquisition Of ATYT**

The government has also identified the following testimony concerning AMD's

acquisition of ATI:

**a.  Tr. at 114:17-20**

**Q:  Did you have any reason to believe that AMD was going to acquire ATYT**
**before the announcement of the acquisition?**

**A:  No.**

Presumably, the government contends that this answer was false because Anil Kumar

testified that he told Mr. Rajaratnam that AMD was going to acquire ATYT before the

announcement of the acquisition.  But it is undisputed that there was a great deal of public

discussion and rumor that ATYT was going to be acquired.  The fact that Mr. Rajaratnam did not

even mention that public information shows that he did not willfully intend to conceal material

facts but instead interpreted the question as asking whether he knew for a fact that AMD was

going to acquire ATYT.  As Anil Kumar himself testified, Mr. Rajaratnam was in fact skeptical

that this acquisition would occur.  *See* Tr. at 765.  Moreover, by the time of the June 2007

deposition, that announcement had occurred almost a full year earlier.  In the intervening year,

Mr. Rajaratnam had traded literally millions of shares of hundreds of different securities for just

as many different reasons.  It is unreasonable to infer from Mr. Rajaratnam's answer that he

willfully intended to conceal material facts about securities transactions that occurred a full year

earlier.  Indeed, the fact that Mr. Rajaratnam's answer made no reference to the widespread and

perfectly innocent public speculation about this acquisition suggests that by the time of his

deposition in 2007 he simply did not recall the information he possessed about a possible ATYT

acquisition in 2006.

**6.  Questions Regarding Kris Chellam And Xilinx**

The government has identified the following testimony concerning Kris Chellam and

Xilinx:

**a.  Tr. at 164: 25-165:5**

**Q:  Did you base any of your decisions to trade in Xilinx on any information obtained from Kris Chellam?**

**A:  I would not compromise him, I would not speak to Kris on Xilinx.**

**Q:  So your answer to that question is no?**

**A:  No.**

**b.  Tr. at 167:1-3**

**Q:  Did you have any communications with Kris Chellam regarding this release before it came out?**

**A:  No.**

Here, the evidence is simply insufficient to support the conclusion that Kris Chellam told

Mr. Rajaratnam anything about Xilinx during the period that Chellam was employed at Xilinx

before joining Galleon in 2007.  Although the government presented evidence of certain phone

traffic between Mr. Chellam and numbers associated with Galleon (though not necessarily Mr.

Rajaratnam), these telephone calls occurred during the period when Mr. Chellam was negotiating

and planning his move to Galleon.  *See* Tr. 3619-20.  Thus, there is a perfectly innocent reason

why Mr. Chellam would have been calling Galleon around this time and no evidence at all that

Mr. Chellam told Mr. Rajaratnam anything about Xilinx.  Notably, the jury did not need to

conclude otherwise in order to convict on Count 1, since Count 1 also included the government's

evidence and allegations about Mr. Rajaratnam's alleged conspiracy with Adam Smith and Rajat

Gupta, among others.  The jury certainly could have convicted on Count 1 without crediting the

government's meager evidence as to Kris Chellam and Xilinx.  Accordingly, the record evidence simply cannot support a finding that Mr. Rajaratnam's answers to these questions were perjurious.

## IX.   THE NEED TO PROVIDE MEDICAL CARE TO THE DEFENDANT IN THE MOST EFFECTIVE MANNER

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant . . . with needed medical care in . . . the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  As the Court is aware from the confidential information submitted to the Probation Officer, Mr. Rajaratnam faces several significant and challenging medical issues at the present time, which are expected to worsen in the near future.  The Bureau of Prisons will simply not be able to manage these issues and provide the care that Mr. Rajaratnam requires.  Any significant term of incarceration would seriously threaten his well-being and be life-threatening.  Furthermore, if he is incarcerated, the Court will lose all jurisdiction over him and will not be able to reconsider the sentence in light of his declining health and the medical care that BOP provides or fails to provide.

The relevant guideline is § 5H1.4, which provides:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the cases from the typical cases covered by the Guidelines.  An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

USSG §5H1.4.

Decisions from this district and this circuit recognize that departures are appropriate when a defendant faces severe medical problems.  In *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), the defendant, a state police Sheriff, was convicted of mail fraud and violations of

the Travel Act based on a scheme to extort money from the deputies he appointed.  The district

court departed from the Guidelines-range sentence of about three years imprisonment and

imposed a sentence of three months probation, six months home confinement, and 500 hours of

community service.  The court justified the departure based on the defendant's "good acts" and

his compromised health, which the Second Circuit described as follows:  "He had a kidney

transplant some 20 years ago, and as a result of the drugs prescribed for his kidney trouble,

Rioux developed bone problems requiring a double hip replacement. His doctor stated that

Rioux's condition required regular doses of medication and blood tests."  *Id.* at 654.  On appeal

of the sentence by the government, the Second Circuit held that the district court did not abuse its

discretion by imposing the non-prison sentence based on its consideration of Rioux's health

problems.  *Id.* at 663.

In *United States v. Barbato*, No. 00-CR-1028, 2002 WL 31556376 (S.D.N.Y. Nov. 15,

2002), the defendant, who had a history of serious heart problems, pled guilty to using

"extortionate means to collect extensions of credit."  The district court (Judge Kram) granted a

downward departure from a Guidelines range sentence of 24-30 months imprisonment based on

the defendant's health conditions and sentenced him to 12 months of home confinement and 2

years of supervised release.  Notably, the court imposed the sentence of home confinement even

though the government presented evidence that the Bureau of Prisons was able to provide

adequate treatment for the defendant's conditions.  The court noted that "[i]t is often relevant,

though not always controlling, whether the BOP can provide adequate care."  *Id.* at *4.

In *United States v. Jiminez*, 212 F. Supp. 2d 214, 215 (S.D.N.Y. 2002), the defendant pled

guilty to illegally reentering the United States after deportation.  The district court (Judge Lynch)

held that a downward departure from a Guidelines-range sentence of 57 to 71 months

56

imprisonment was appropriate where the defendant "suffered a grievous physical injury in the form of a brain aneurism, that leaves her literally a different person than the one who committed" the offense.  *Id.* at 216.  Significantly, Judge Lynch considered at length and rejected the government's contention that the district court may only depart downward based on the defendant's medical condition where the Bureau of Prisons is unable to provide adequate treatment, holding that "*Even where the Bureau has generally adequate facilities for treatment of a disease, however, special circumstances may justify a departure on this ground* . . . . [I]n the present case, the Bureau's ability to treat defendant's medical conditions is not to the point, since her condition is relevant to the purposes of sentencing not because imprisonment will endanger her health, but because it reduces her danger to society and renders lengthy imprisonment, in the words of 5H1.4, less 'efficient' and more 'costly' than necessary to meet the goals of punishment." (emphasis added).  *Id.* at 215.

In *United States v. Blarek*, 7 F. Supp. 2d 192 (E.D.N.Y. 1998), the defendant was convicted of racketeering and money laundering in connection with a narcotics conspiracy.  The district court departed downward from a Guidelines range sentence of 135 to 168 months based on the defendant's HIV-positive status.  Although the court found that "federal prisons do provide appropriate medical care to those who are infected by HIV," it also found that "incarceration is likely to be detrimental to this defendant's health, resulting in a lessening of his present life expectancy" due to his inability to continue a complex "holistic" treatment regimen which included a "strict" diet, regular exercise, acupuncture, "vitamins and other natural supplements," as well as traditional drug treatments "under the close supervision of a medical professional."  *Id.* at 212.  The district court imposed a sentence of 48 months imprisonment and 3 years supervised release.

Following these precedents, and as set forth in detail in the medical information

submitted to the Probation Officer, Mr. Rajaratnam has serious medical problems present to an

unusual degree such that a significant downward departure under this provision is warranted.

## X.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Just as Mr. Rajaratnam should not receive a sentence that overstates the seriousness of his

offense, he should not receive a sentence that is unjustifiably disparate from sentences imposed

in other securities fraud cases.  Section 3553 provides that the sentencing court shall consider

"the need to avoid unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The Second Circuit has

acknowledged this requirement, noting on multiple occasions that it is the sentencing court's

duty to impose a sentence sufficient, but not greater than necessary, to comply with the purpose

of § 3553(a), including the need to avoid unwarranted sentencing disparities.  *See, e.g.*, *United

States v. Brennan*, 395 F.3d 59, 69 (2d Cir. 2005); *United States v. Dorvee*, 616 F.3d 174, 182-83

(2d Cir. 2010); *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008).

The government called three cooperating witnesses at trial – Adam Smith, Rajiv Goel and

Anil Kumar – who testified that they supplied Mr. Rajaratnam with inside information.  With all

three of these individuals, Mr. Rajaratnam was the tippee, the recipient of information from

individuals who decided to convey company-specific information to him, either voluntarily or in

response to inquiries from Mr. Rajaratnam.  These individuals have also engaged in other

criminal activity, including tax violations for failure to report income and overseas accounts and

insider trading unrelated to Galleon.  None of these individuals has been sentenced yet.

Danielle Chiesi pled guilty to three conspiracy counts, one of which involved Mr.

Rajaratnam (Count 5 in this case).  This Court sentenced her to 30 months incarceration, two

years of supervised release and 250 hours of community service.  As the government described

in its sentencing memorandum, Ms. Chiesi worked at a major hedge fund and was an

experienced analyst and portfolio manager with over 20 years experience.  The government

described her activity as "engaging in insider trading schemes of broad dimensions." *United

States v. Chiesi*, Government's Sentencing Memorandum at 1 (June 13, 2011) (Docket Entry

284).  Even so, Ms. Chiesi's 30 month sentence was below the Guidelines level contained in her

PSR.  The evidence at Mr. Rajaratnam's trial showed that he and Ms. Chiesi would occasionally

talk on the phone and exchange information about various companies.  Mr. Rajaratnam, like Ms.

Chiesi, was an experienced analyst and portfolio manager.  His conduct, which formed the basis

of the five conspiracy counts for which he was convicted, was similar to hers, in that he spoke to

a number of individuals about the market, obtained information about different companies, and

bought or sold stock or caused others to do so, in his hedge fund.  In order to avoid unwarranted

sentencing disparities, Mr. Rajaratnam's sentence should reflect that similarity, even taking into

account the benefit Ms. Chiesi received for acceptance of responsibility.  The government's

vastly disproportional recommended sentence fails to do so.

     Mark Kurland worked at New Castle Partners, where he was the managing partner and

Ms. Chiesi's boss.  He pleaded guilty to one count of securities fraud and one count of

conspiracy and was sentenced to 27 months, which was also below the level of 30 to 37 months

recommended by the advisory Guidelines.  *United States v. Kurland*, 1:10-cr-00069-VM

(S.D.N.Y. May 26, 2010) (Docket Entry 40).

     Ali Hariri was also sentenced by this Court after pleading guilty to one count of securities

fraud and one count of conspiracy relating to his disclosures of information to Ali Far, who

formed his own hedge fund after leaving Galleon. The advisory Guidelines recommended a

sentence of 24 to 30 months, but the Court imposed a below Guidelines sentence of 18 months

incarceration.  In imposing the sentence, the Court stated that "what the courts should be focused

on in these cases is not so much dollars but what is the actual nature of the conduct at stake and

what is the risk to a fair marketplace for this type of behavior."  *United States v. Hariri*,

Sentencing Tr. at 16-17 (Nov. 8, 2010).

The sentences in these other cases demonstrate that a sentence below the Guideline level

is common.  Indeed, the United States Sentencing Commission's most recent Annual Report

shows that nearly 60% of all sentences imposed in the Second Circuit in fiscal year 2010 were

below the Guidelines range.  U.S. SENTENCING COMM'N ANNUAL REPORT FY 2010, Sourcebook

Table N-2, *available at* http://www.ussc.gov./Data_and_Statistics/AR_SB_Current.cfm.  Almost

63% of those sentences were below the Guidelines range even without "government sponsorship."

*Id.*  In the Southern District of New York in particular, almost half of all sentences imposed in

2010 (over 700 sentences) were below the Guidelines range.  *Id.* at Appendix B, New York,

Southern.

Avoidance of unwarranted sentencing disparity is frequently cited as at least a partial

justification for a downward departure or other below-Guidelines sentence.  *Id.* at Tables 25A

and 25B (avoidance of unwarranted sentencing disparity cited as reason for a below-Guidelines

sentence or downward departure 2,939 times).  Defendants in fraud cases received a below-

Guidelines sentence or a downward departure over 3,000 times in 2010.  *Id.* at Table 27.  Of

those defendants sentenced under § 2B1.1 in 2010, 3,461 received a below-Guidelines sentence.

*Id.* at Table 28.  Only nine defendants were sentenced for insider trading under § 2B1.4 last year.

*Id.*  Eight of those nine defendants received a downward departure or otherwise received a

sentence below the indicated Guidelines range.  *Id.*  The ninth defendant received a sentence

within the Guidelines range.  *Id.*

A review of sentences imposed in cases concerning securities fraud and conspiracy to

commit securities fraud in the last 25 years also reveals that courts typically impose sentences

below the suggested Guidelines range in securities fraud cases, including cases involving insider

trading.  This is true even in cases where the conduct at issue was objectively more serious than

what the jury found Mr. Rajaratnam guilty of (*i.e.* in cases where the defendant was found guilty

of obstruction, perjury, and/or providing false statements, where the economic impact of the

conduct was significantly greater, or where the defendant breached a fiduciary duty by acting as

a tipper).  Mr. Rajaratnam's sentence should not be disparately higher than the sentence of a

defendant who was convicted of even more culpable conduct.  Such a sentence would be

unreasonable and inconsistent with § 3553(a).

Courts have imposed sentences below the Guidelines-suggested range even in cases

involving the largest financial frauds in history – frauds with identifiable victims.  Executives of

HealthSouth, for example, were involved in a $2.7 billion accounting scandal, which included

conspiracy to commit securities fraud – vastly in excess of the amount at issue in this case.  Press

Release, Department of Justice, HealthSouth Founder and Former CEO Richard Scrushy

Charged in $2.7 Billion Accounting Fraud Conspiracy (Nov. 4, 2003) *available at*

http://www.justice.gov/opa/pr/2003/November/03_crm_603.htm.  Of the HealthSouth employees

who were charged and pleaded guilty, the longest sentence was five years.  *See United States v.*

*Owens*, 2:03-cr-00131 (N.D. Ala. Feb. 27, 2006) (Docket Entry 35).  Most of the other accused

employees served little or no prison time.[16]

Similarly, executives at Computer Associates were involved in a $2.2 billion accounting

fraud – again, vastly in excess of the amount at issue in this case – and received sentences below

the applicable Guidelines range.  *United States v. Kumar*, No. 04 Cr. 846 (E.D.N.Y. Nov. 2, 2006)

(Docket Entry 223 at 2) (calculating the monetary value of the fraud at $2.2 billion).  Sanjay

Kumar, the CEO, pleaded guilty to securities fraud, conspiracy to commit securities fraud, and

obstruction related to his role in the scheme.  He was sentenced to 12 years in prison.  *United*

*States v. Kumar*, No. 04 Cr. 846 (E.D.N.Y. June 4, 2007) (Docket Entry 342).  Stephen Richards,

Computer Associates' head of sales, pleaded guilty to multiple counts of securities fraud,

conspiracy to commit securities fraud, filing false statements, obstruction, and perjury.  He was

sentenced to seven years in prison.  *United States v. Richards*, No. 04 Cr. 846 (E.D.N.Y. Oct. 1,

2007) (Docket Entry 352).[17]  In considering the applicable offense level of 50 and the

corresponding life sentence, the court rejected such a sentence as "presumptively unreasonable in

the extreme" such that it "shock[ed] the conscience" of the court.  *United States v. Kumar*, No.

04 Cr. 846 (E.D.N.Y. Nov.  27, 2006) (Docket Entry 295 at 65-66); *United States v. Richards*, No.

---

[16] *See United States v. Martin*, No. 2:03-cr-00191 (N.D. Ala. Sept. 12, 2006) (36 months)
(Docket Entry 66); *United States v. Smith*, No. 2:03-cr-00126 (N.D. Ala. Sept. 22, 2005) (27
months, later reduced to 24 months) (Docket Entries 22 & 38); *United States v. Harris*, No. 2:03-
cr-00157 (N.D. Ala. Nov. 8, 2004) (5 months) (Docket Entry 57); *United States v. Livesay*, No.
2:03-cr-00182 (N.D. Ala. Dec. 14, 2005) (5 months) (Docket Entry 83).*United States v. McVay*,
No. 2:03-cr-00195 (N.D. Ala. June 30, 2009) (3 months) (Docket Entry 81); *United States v.*
*Beam*, No. 2:03-cr-00197 (N.D. Ala. Aug. 25, 2005) (3 months) (Docket Entry 21); *United States*
*v. Hicks*, No. 2:03-cr-00375 (N.D. Ala. Sept. 22, 2005) (no prison) (Docket Entry 26); *United*
*States v. Ayers et al.*, No. 2:03-cr-00183 (N.D. Ala. Dec. 10, 2003) (no prison) (Docket Entries 60
& 84).

[17] Three years later, upon Mr. Richards' motion, the court re-sentenced him to time served.
No. 04 Cr. 846 (Oct. 21, 2010) (Docket Entry 367).

04 Cr. 846 (E.D.N.Y. Nov. 14, 2006) (Docket Entry 297 at 17, 21-22, 25).  Steven Woghin,

Computer Associates' General Counsel and Senior Vice President, pleaded guilty to conspiracy

to commit securities fraud and obstruction.  He was sentenced to two years even though the

Guidelines range applicable to him was similar to the one applicable to Kumar and Richards.

*United States v. Woghin*, No. 04 Cr. 847 (E.D.N.Y. Jan. 16, 2007) (Docket Entry 12 at 2; Docket

Entry 19).  Ultimately, Woghin's sentence was reduced to 13 months with the remainder of the

original two year sentence to be served in home confinement.  No. 04 Cr. 847 (E.D.N.Y. May 9,

2007) (Docket Entry 21).

     More recently, Donald Longueuil pled guilty to one count of conspiracy and one count of

insider trading.  *United States v. Longueuil*, No. 1:11-cr-00161 (S.D.N.Y. April 28, 2011) (Docket

Entry 76).  Mr. Longueuil admitted to participating in a wide-ranging fraud involving numerous

participants over a period of more than four years, and also admitted to obstruction in connection

with his destruction of a flash drive and hard drives that he feared contained evidence of his

conduct.  *See* Press Release, Dept. of Justice, Former Research Analyst and Portfolio Manager

Sentenced in Manhattan Federal Court to 30 Months in Prison for Insider Trading (July 29, 2011)

(available at http://www.justice.gov/usao/nys/pressreleases/July11/

longueuildonaldsentencingpr.pdf).  His plea agreement contained a presumptive guidelines range

of 46-57 months and a stipulated forfeiture amount of approximately $1.25 million.  *See* No.

1:11-cr-00161 (Docket Entry 111).  Longueuil nevertheless received a below-Guidelines

sentence of 30 months.  *See* Press Release.

     Even in cases where the defendant does not plead guilty or provide assistance to the

government, sentences in securities fraud cases are frequently below the Guidelines range.  For

example, in *United States v. Shelton*, No. 02 Cr. 264 (D. Conn. Jan. 4, 2005), Kirk Shelton was

found guilty of conspiracy to commit securities fraud and filing false statements with the SEC in connection with his role in an accounting scandal at Cendant Corporation, where he was a vice president. When the fraud was reported, Cendant's market value dropped $14 billion in one day. No. 02 Cr. 264 (D. Conn. July 13, 2005) (Docket Entry 1604 at 5). The Guidelines range for Shelton's sentence, as calculated by the Probation Office and the government, was 151-188 months. *Id.* (Docket Entry 1604 at 4). Shelton received a below-Guidelines sentence of 120 months. *United States v. Shelton*, No. 02 Cr. 264 (D. Conn. Aug. 4, 2005) (Docket Entry 1635) (also ordering restitution of $3.275 billion).

In *United States v. Rosoff*, No. 97 Cr. 336 (S.D.N.Y. 1999), Michael Rosoff and his co-defendant Mitchell Brater were convicted of conspiracy and securities fraud. Rosoff was also convicted of obstruction and making false statements. Rosoff and Brater were ordered to pay over $650 million in restitution, which was presumably equivalent to victim loss. *See* discussion of sentence in *United States v. Rosoff*, 242 F.3d 369 (2d Cir. 2000). Even in light of such a large loss, Rosoff was sentenced to 87 months in prison and Brater received a sentence of 108 months. *Id.*

In *United States v. Conner*, 217 Fed. Appx. 28 (2d Cir. 2007), the Second Circuit affirmed a below-Guidelines sentence in an insider trading case. Chad Conner was convicted of conspiracy and 81 counts of insider trading. He was originally sentenced to 50 months but the sentence was subsequently reduced to 36 months because of a venue issue with some of the insider trading counts. *See* Appellant's Br. at 2-3, Aug. 11, 2006, *available at* 2006 WL 5309744). The ultimate sentence was still below the applicable Guidelines range of 37-46 months. *Id.* at 8. It is notable that the Probation Office recommended a sentence of only six months. *Id.* at 6. Although the court did not impose the substantially lower sentence suggested

in the presentence report, it did find that a downward departure was warranted based on 18

U.S.C. 3553(a).  *See Conner,* 217 Fed. Appx. 28 (affirming the district court's below-Guidelines

sentence, arrived at by granting a one-level departure for extraordinary circumstances pursuant to

Section 3553).  Because the sentence was reasonable and based on an appropriate analysis of the

§ 3553 factors, the Second Circuit affirmed it.  *Id.*

James McDermott was found guilty of trading on the basis of material nonpublic

information he received while he was President, Chairman, and CEO of Keefe, Bruyett & Woods,

Inc.  *United States v. McDermott*, No. 00 Cr. 61 (S.D.N.Y. April 27, 2000).  In addition to trading

for his own benefit, he also tipped at least one other person in violation of his fiduciary duty to

his employer.  He was sentenced to a below-Guidelines sentence of only eight months in prison

for each count, to be served concurrently.  *United States v. McDermott*, No. 00 Cr. 61 (S.D.N.Y.

Aug. 3, 2000) (Docket Entry 96).  The range applicable to McDermott's offense was in excess of

20 months, but the judge found that a downward departure was warranted based on McDermott's

family circumstances, his exemplary community service, and acts of kindness.

Lennox and Lester Parris were convicted of conspiracy to commit securities fraud, six

counts of securities fraud, conspiracy to commit witness tampering, and obstruction.  *United

States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).  The court declined to impose the

Guidelines sentence of 360 months to life, finding that such a severe sentence was not "sensible"

in light of the conduct and was, therefore, not "realistic." *Id.* at 751.  Citing *United States v.

Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), Judge Block agreed with Judge Rakoff's criticism

of the Guidelines in securities fraud cases and, after analyzing sentences in other cases,

concluded that the 60-month prison sentence he imposed was not "unusually lenient."  *Id.* at 745.

He went on to note that the conduct in the Enron, WorldCom, and Computer Associates cases

wreaked "unimaginable losses on major corporations and, in particular, on their companies' employees and stockholders, many of whom lost their pensions and were financially ruined." *Id.* at 746. Despite that, the sentences in those cases were less than the low end of the applicable Guidelines range in *Parris*, contributing to Judge Block's conclusion that a below-Guidelines sentence was appropriate. *Id.*

Eric Butler was convicted of conspiracy to commit securities fraud, securities fraud, and wire fraud. *United States v. Butler*, 264 F.R.D. 37 (E.D.N.Y. 2010). The government argued that the applicable Guidelines range was life imprisonment. *Id.* at 38. Although the court stated that the defendant's actions had a "severe" impact on the international short- and long-term securities markets, caused "vast damages," and "laid bare the pernicious and pervasive culture of corruption in the financial services industry," it found that a sentence of 60 months was appropriate. *Id.* The court reasoned that the defendant's family would benefit from the defendant's presence at home, both financially and psychologically, and that the defendant's strong support network and positive reaction to post-arrest supervision suggested a high probability of rehabilitation. *Id.*

In this case, assuming that the PSR largely adopts the government's gain amount and other guideline factors, then a Guidelines sentence would not only overstate the seriousness of Mr. Rajaratnam's offense, it would also be disparately higher than sentences imposed in other securities fraud cases in this jurisdiction and elsewhere, in contravention of § 3553(a)(6). The cases discussed above are only a few examples of securities fraud cases where the court imposed a sentence below the Guidelines range. Based on the review of applicable cases, full Guidelines

66

sentences appear to be the exception rather than the rule.[18]  This is probably because, as several courts have concluded, the sentencing Guidelines as applied to securities fraud have "so run amok that they are patently absurd on their face."  *Adelson*, 441 F. Supp. 2d at 515; *Parris*, 573 F. Supp. 2d at 745.

## XI.    <u>CONCLUSION</u>

As in all criminal cases, the Court's responsibility in sentencing Mr. Rajaratnam is one of grave seriousness and profound consequences.  The sentence that Your Honor imposes will define what remains of Mr. Rajaratnam's life, as well as the lives of his wife, three teenage children, and other family members.  Our system of justice entrusts the Court with this solemn responsibility in the faith that the Court alone can rise above the emotion, fanfare, and hyperbole to discern what is fair and just.

At the outset of this memorandum, we encouraged the Court to ask itself a few simple questions: Who is Raj Rajaratnam?  What has he done – good and bad?  What purpose will a particular sentence serve, what harms may that sentence cause, and could the same goals be achieved by a different kind of sentence?   We respectfully submit that the answers to those questions compel a sentence substantially below the advisory Guidelines range.

---

[18] When courts impose a sentence within the Guidelines range, it is frequently at the very bottom of the range.  *See, e.g.*, *United States v. Cushman*, 123 F.3d 83, 90 (2d Cir. 1997) (affirming a 24-month sentence in an insider trading case where the Guidelines range was 24-30 months); *United States v. Royer*, 549 F.3d 886, 904-05 (2d Cir. 2008) (affirming a 135-month sentence in an insider trading case when the applicable Guidelines range was 135-168 months); *United States v. Larrabee*, No. 98 Cr. 10208 (D. Mass. Feb. 14, 2000) (Docket Entry 128) (tipper defendant convicted of nine counts of insider trading, the same number as Mr. Rajaratnam, sentenced to only 21 months in prison, the minimum sentence indicated by the applicable Guideline).

**Who is Raj Rajaratnam?  What has he done – good and bad?**

The true Raj Rajaratnam is revealed in the hundreds of letters that this Court has received from individuals young and old, rich and poor, from all over the world, who unanimously attest to Mr. Rajaratnam's kindness, humility, generosity, and character.  Some of these people knew Mr. Rajaratnam as a loving and devoted husband and father.  Others knew him as a demanding, but eminently fair and approachable, boss.  Others as a loyal and generous friend.  Still others were the beneficiaries of Mr. Rajaratnam's extraordinary philanthropy.  Their letters reveal Mr. Rajaratnam as a man who gave both his time and tens of millions of dollars to deserving philanthropic efforts here and abroad – efforts which helped to feed, house, educate, and provide medical treatment to some of the neediest people in the world in their hour of greatest need.  They also reveal Mr. Rajaratnam to be a man who unhesitatingly lent his generous assistance not only to family, but to friends and acquaintances like his housekeeper or doorman when they needed medical care or help with their children's tuition.  Just as important, they show him to be a devoted husband and father, a fair boss, a brilliant investor and businessman, and a humble, caring human being.  To these, we as defense counsel make our small addition:  Over the last two years, we have come to know Raj Rajaratnam.  We have lived and breathed with him every day as he endured the unimaginable pressure of these proceedings and the public attention they received.  In every respect and at every moment, Mr. Rajaratnam behaved as a true gentlemen and a man of enormous strength and courage.  We trust that Your Honor observed these qualities at trial even through Mr. Rajaratnam's silence.  We hope that this memorandum has explained why Mr. Rajaratnam now seeks Your Honor's leniency not as a matter of kindness, but as a matter of fairness, taking into account Mr. Rajaratnam's personal history and characteristics – including his failing health – and balancing them against the need for effective law enforcement.

68

Mr. Rajaratnam has been convicted of serious crimes, but against these the Court must balance a lifetime of truly remarkable and commendable achievements and actions.  In this case, that balance tips strongly in favor of a sentence well below the advisory Guidelines range.

**What purpose will a particular sentence serve, what harms may that sentence cause, and could the same goals be achieved by a different kind of sentence?**

Mr. Rajaratnam's failing health and the unique constellation of ailments ravaging his body mean, quite simply, that a lengthy period of imprisonment will constitute a death sentence and result in the permanent and final separation of Mr. Rajaratnam from his family.  Mr. Rajaratnam's chances of survival will be greatly diminished by a long sentence of imprisonment. We respectfully submit that a sentence substantially below the Guidelines range, however that is calculated, which takes into account Mr. Rajaratnam's failing health, combined with further conditions, including a financial penalty and extensive community service, is appropriate in this case.  Such a sentence would by no means return Mr. Rajaratnam to the life he enjoyed before his arrest, nor would it exempt Mr. Rajaratnam from a meaningful loss of liberty.  It would simply save him from a loss of life.

This is consistent with all the factors laid out in the statute.  Section 3553 states that a sentence must give fair weight to "the history and characteristics of the defendant" while being "sufficient, but not greater than necessary" to serve the seven purposes of federal sentencing.  A sentence of imprisonment that would surely shorten Mr. Rajaratnam's life is one that fails to give fair weight to the history and characteristics of this defendant and is much greater than necessary given that the factors listed in § 3553 have been and can be satisfied in other ways.  In sum, the §3553 sentencing factors, in combination with Mr. Rajaratnam's serious health conditions, weigh strongly in favor of a sentence well below the advisory Guidelines range, including a monetary fine and conditions of substantial and meaningful community service.  The structure of such a

potential community service component is laid out in detail in the letter to the Court from

Geoffrey Canada of the Harlem Children's Zone (attached hereto as Ex. 3).

We appreciate the Court's consideration of the points raised in this Memorandum and in

the information submitted to the Probation Officer.

Respectfully submitted,

John M. Dowd
Terence J. Lynam
Jeffrey M. King
Samidh Guha
James E. Sherry
Catherine E. Creely
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

August 9, 2011

**CERTIFICATE OF SERVICE**

I, James E. Sherry, hereby certify that a true and correct copy of the foregoing Sentencing

Memorandum on behalf of Raj Rajaratnam was served on August 9, 2011 via ECF filing

notification and email on the following counsel of record:

AUSA Jonathan R. Streeter
AUSA Reed Brodsky
SAUSA Andrew Z. Michaelson
United States Attorney's Office
The Silvio J. Mollo Building
Southern District of New York
New York, NY 10007