UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
                                    :
UNITED STATES OF AMERICA,           :
                                    :
         - v. -                     :       S2 09 Cr. 1184 (RJH)
                                    :
RAJ RAJARATNAM,                     :
                                    :
              Defendant.            :
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


                              PREET BHARARA
                              United States Attorney for the Southern
                              District of New York

JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant U.S. Attorney
     - Of Counsel -

## **TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  OFFENSE CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Conduct Proven at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.  Rajaratnam's Conspiracy With Anil Kumar . . . . . . . . . . . . . . . . . . . . . . 6

        2.  Rajaratnam's Conspiracy With Rajiv Goel . . . . . . . . . . . . . . . . . . . . . . 7

        3.  Rajaratnam's Leadership of the Galleon Conspiracy . . . . . . . . . . . . . . . . 9

        4.  Rajaratnam's Conspiracy With Danielle Chiesi . . . . . . . . . . . . . . . . . . . 10

        5.  Rajaratnam's Conspiracy With Roomy Khan . . . . . . . . . . . . . . . . . . . . 10

        6.  Rajaratnam's Methods To Cover Up His Crimes . . . . . . . . . . . . . . . . . . 12

    B.  Additional Relevant Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.  Criminal Conduct With Ali Far . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.  Corrupting a Cisco Executive . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.  Criminal Conduct of Craig Drimal and Zvi Goffer . . . . . . . . . . . . . . . . 18

        4.  Criminal Conduct in the Late 1990s With Roomy Khan . . . . . . . . . . . . . . 19

    C.  Insider Trading: Business as Usual for Rajaratnam . . . . . . . . . . . . . . . . . . . 19

III.  APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.  Nature and Circumstances of Rajaratnam's Criminal Offenses . . . . . . . . . . . . . 24

    B.  History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . 27

    C.  The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . 27

D.  Application of Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    1.  Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        a.  Goldman Loss Avoidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        b.  Additional Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    2.  Leadership Role Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    3.  Obstruction Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E.  The Appropriate Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

V.  REMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## I.   __INTRODUCTION__

Raj Rajaratnam's criminal conduct was brazen, arrogant, harmful, and pervasive.  He corrupted old friends. He corrupted subordinates.  He corrupted entire markets.  Day after day, month after month, year after year, Rajaratnam operated as a billion-dollar force of deception and corruption on Wall Street.

Rajaratnam repeatedly leveraged the power of money and his position as the head of a 7-billion dollar hedge fund to induce friends, employees, and associates to participate in his criminal activities.  Although already rich, Rajaratnam did this to drive up his personal wealth through profitable trading in his hedge fund.  He did it to make sure that investors did not pull their money out of Galleon and to attract new money to his fund.  And he did it because of his egomaniacal desire to triumph over his competitors on Wall Street.  That was what he cared about: money and success. What he did not care about, at all, was the extensive harm that he left in his wake: harm to the capital markets; harm to the average, ordinary investors who played by the rules; harm to the companies whose secret information was misappropriated; and harm to the lives of those he corrupted.  Although particular investors on the other side of Rajaratnam's illegal trades are not easily identifiable, there should be no question that ordinary investors paid the price for Rajaratnam's crimes and that public companies were harmed by Rajaratnam's repeated theft of corporate secrets.

Rajaratnam arrogantly believed that he would never be caught, and he rigorously followed a system to ensure that he would not be.  He paid off insiders indirectly.  He left cover emails in Galleon's files.  He obtained and disseminated inside information by phone and in person, avoiding any written record of his illicit communications.  He bought and sold stock to

2

show a pattern of legitimate trading when, in fact, he was trading based on inside information.

He believed (wrongly) that his dishonest system enabled him to practice unfair insider trading

with impunity.  He had no respect for the law, and has not accepted responsibility for his crimes.

The Government respectfully submits that this Court should sentence Rajaratnam to a

very substantial term of imprisonment that is proportionate to the historic nature of his crimes.

He is arguably the most egregious violator of the laws against insider trading ever to be caught.

He is the modern face of illegal insider trading.  To reflect the seriousness of Rajaratnam's

extraordinary and extensive criminal activities, to deter others—particularly in the hedge fund

and money management world—from engaging in a crime that is far too rampant, and for all of

the other reasons articulated below, the Government respectfully submits that this Court should

impose a sentence within the applicable guidelines range of 235 to 293 months' imprisonment.[1]

In addition, the Court should remand Rajaratnam to the custody of the United States Bureau of

Prisons upon sentencing him.

## II.    **OFFENSE CONDUCT**

### A.    **Conduct Proven at Trial**

On May 11, 2011, the jury returned a verdict of guilty on all fourteen counts in Indictment

S2 09 Cr. 1184 (RJH) against Rajaratnam.  The evidence at trial established that Rajaratnam, the

head of Galleon, was the leader of multiple conspiracies to obtain and then trade securities based

on material, nonpublic information.  The evidence also established that Rajaratnam repeatedly

executed (or caused to be executed on his behalf) securities trades based on material, nonpublic

---

[1]The Government has not determined where within the applicable guideline range of 235 to 293 months' imprisonment it will ask the Court to sentence the defendant.  After the record is more fully developed, it will make that determination and inform the Court.

information relating to the following: (1) the acquisition of @Road; (2) a corporate reorganization of Advanced Micro Devices; (3) the earnings of Akamai; (4) the acquisition of ATI Technologies; (5) the earnings of Business Objects; (6) the multi-billion dollar investment in Clearwire; (7) layoffs at eBay; (8) the earnings of and Warren Buffett's investment in Goldman Sachs; (9) the earnings of Google; (10) the acquisition of Hilton; (11) the acquisition of Integrated Circuit Systems; (12) the earnings of Intel; (13) the earnings of Intersil; (14) the acquisition of PeopleSupport and the closing of that acquisition; (15) the earnings of Polycom; (16) the potential acquisition of Spansion; (17) the earnings of Synaptics; (18) the potential acquisition of Vishay; and (19) the earnings of Xilinx.

From 2003 through 2009, Rajaratnam led at least five separate conspiracies to commit insider trading. First, Rajaratnam was the leader of a multi-year insider trading conspiracy with Anil Kumar, a senior partner at one of the most prestigious consulting firms in the world, McKinsey & Company, Inc., and traded based on illegal tips from Kumar about AMD, ATI, eBay, Business Objects and other companies. (*See* Counts Four and Thirteen). Second, Rajaratnam was the leader of a multi-year insider trading conspiracy with Rajiv Goel, an Intel executive, and traded based on illegal tips from Goel about Intel and Clearwire. (*See* Counts Three, Six, Seven, and Fourteen). Third, Rajaratnam was the leader of a multi-year insider trading conspiracy with former and current employees of Galleon, and traded based on illegal tips from Kris Chellam, Krish Panu, Adam Smith, inside sources at Morgan Stanley (Kamal Ahmed) and Intersil, Rajat Gupta (a then-member of the Board of Directors of Goldman Sachs, and the former head of McKinsey), and Joe Liu's inside source at Synaptics. (*See* Count One.) Fourth, Rajaratnam engaged in an insider trading conspiracy with Danielle Chiesi, and exchanged illegal

4

tips with Chiesi relating to AMD, Akamai, and other securities.  (*See* Counts Five, Eight, Nine,

and Ten).  Fifth, Rajaratnam engaged in a multi-year insider trading conspiracy with Roomy

Khan, and exchanged illegal tips with Khan relating to Hilton, Google, Polycom, and other

securities.  (*See* Count Two).  The evidence at trial demonstrated that, as a result of Rajaratnam's

illegal insider trading schemes, Rajaratnam's hedge fund reaped at least $64 million in illicit

profits and avoided losses.

The evidence at trial against Rajaratnam was overwhelming.  It included: (I) wiretap

recordings of Rajaratnam with Kumar, Goel, Smith, Chiesi, Chellam, Panu, Gupta, Rengan

Rajaratnam ("Rengan"), Liu, and others demonstrating that Rajaratnam schemed repeatedly to

obtain and trade based on inside information; (ii) Kumar's testimony about his agreement to

provide Rajaratnam with multiple illegal tips, including AMD's acquisition of ATI in 2006, and

the elaborate schemes Rajaratnam used to pay Kumar and to conceal those payments; (iii) Goel's

testimony about his agreement to provide Rajaratnam with multiple illegal tips relating to Intel's

earnings in April 2007 and the multi-billion investment in Clearwire in 2008, and Rajaratnam's

gifts to Goel and profitable inside trades in Goel's brokerage account to encourage those tips;

(iv) Smith's testimony about his agreement to share inside information with Rajaratnam,

including illegal tips relating to the acquisition of ICST and the earnings of other securities, and

Rajaratnam's instructions on how to cover up their crimes; (v) testimony of various executives at

public companies and other firms regarding, among other things, the confidentiality of

information that Rajaratnam had obtained from one or more sources of inside information; and

(vi) summary charts reflecting Rajaratnam's telephone calls with his sources of inside

information, and the extensive trading by Rajaratnam and others based on that information.

The evidence at trial demonstrated that, despite his own financial worth, Rajaratnam committed his crimes out of greed, to beat his competition on Wall Street, to forestall investor redemptions, to attract more money to his fund, and to accrue even more personal wealth and power.

### 1.    Rajaratnam's Conspiracy With Anil Kumar

Rajaratnam's criminal conspiracy with Kumar started shortly after Rajaratnam agreed to pay Kumar approximately $500,000 a year for information.  (Tr. 264, 279-80).  Knowing that McKinsey did not permit Kumar to reveal corporate secrets or receive outside consulting money, Rajaratnam concocted a plan pursuant to which Rajaratnam would wire the money offshore to an account in someone's name other than Kumar, and Kumar would re-invest that money back into Galleon in the name of Kumar's housekeeper.  (Tr. 264-67).  As a result, Rajaratnam wired hundreds of thousands of dollars out of Galleon to offshore accounts in the name of Pecos Trading, and the money came back to Galleon in the name of Manju Das and later Ambit Ltd. (Tr. 283-84, 391-95).

In return, Kumar repeatedly provided Rajaratnam confidential information about his clients, including information relating to earnings, strategic plans, and mergers and acquisitions. Wiretapped recordings in 2008 captured Rajaratnam's illegal scheme at work.  For example, during a March 24, 2008 conversation, Rajaratnam asked about corporate secrets relating to AMD, and Kumar provided the information.  (GX 506, 506T).  Similarly, during a May 2, 2008 conversation, Kumar told Rajaratnam about a potential acquisition of Spansion.  (GX 523, 523T).  Rajaratnam, in turn, informed his employees, Chellam and Panu, and directed them to create a cover "email trail" so that they could justify any future trades in Spansion should

regulators ask any questions. (GX 524, 524T). Subsequent wiretap recordings showed that Kumar tipped Rajaratnam repeatedly about corporate secrets relating to a multi-billion dollar investment in AMD. (GX 22, 553, 553T, 559, 559T, 594, 594TR, 616, 616T, 625, 625TR). They also showed that Kumar tipped Rajaratnam about massive layoffs to be announced by eBay. (GX 647, 647T).

The evidence at trial also demonstrated that Kumar tipped Rajaratnam over and over again about AMD's acquisition of ATI, and that Rajaratnam traded based on that information and reaped millions of dollars in profits. (*See* GX 761, 815, 822, 826, 828, 836).

### 2.    Rajaratnam's Conspiracy With Rajiv Goel

Rajaratnam's criminal conspiracy with Goel crystallized when Goel provided Rajaratnam with material, nonpublic information about Intel in April 2007. Rajaratnam corrupted Goel through Rajaratnam's "charitable" gifts to Goel, through Rajaratnam's manipulative conduct, and through profitable trades in Goel's brokerage account. The evidence at trial showed that Goel was not even close to Rajaratnam's criminal league. Like Kumar, Goel had lived a life free of crime until he started providing Rajaratnam with inside information. Rajaratnam's loan to Goel in 2005 and cash gift to Goel in 2006 laid the foundation for Rajaratnam's subsequent pressure on Goel to provide him with inside information. (Tr. 1576-77). And indeed, by April 2007, Goel was violating his duties to Intel by providing Rajaratnam secret information about Intel's earnings. (Tr. 1651). Goel took these criminal steps because he felt indebted to Rajaratnam. Later, as demonstrated at trial, Rajaratnam manipulated Goel into providing still more inside information and then berated Goel in 2009 for failing to continue to provide Rajaratnam with inside information. (Tr. 2001-02, 2005-08).

7

Wiretapped recordings showed Goel revealing secret information to Rajaratnam in 2008 and Rajaratnam repaying Goel by trading in Goel's brokerage account with secret information about another public company, PeopleSupport.  Specifically, multiple recordings between Rajaratnam and Goel, and then Rajaratnam and Rengan, demonstrated that Rajaratnam received inside information from Goel about the multi-billion dollar investment in Clearwire in 2008, and that Rajaratnam and Rengan then traded based on that information.  (GX 7, 8, 502, 502T, 503, 503T, 504, 504T, 509, 509T).  Two additional recordings in 2008 proved that Rajaratnam informed Goel that Rajaratnam was making trades in Goel's brokerage account based on inside information about PeopleSupport that Rajaratnam learned through Galleon's seat on the board of directors of that public company.  (GX 19, 539, 539T, 654, 654TG, 1106, 1107R, 1117, 1120-21).

Goel also testified about his repeated tips to Rajaratnam concerning Intel's earnings in April 2007.  (Tr. 1647-54).  Normally, Goel did not have access to specific earnings information prior to Intel's public announcement.  (Tr. 1641-42).  Such information was kept in the hands of an extremely small group of executives and individuals in Intel's investor relations department.  However, in April 2007, Goel obtained this highly secretive earnings information from one of his friends in Intel's investor relations department.  (GX 2, 1070; Tr. 1642).  At first, Goel learned negative information about Intel's performance.  He passed it along to Rajaratnam, who shorted Intel stock based on that information.  (GX 2, 200, 1070).  Later, Goel obtained new, positive information about Intel's outlook and updated Rajaratnam. (GX 2, 200).  Based on Goel's new information, Rajaratnam reversed his short position and purchased two million shares of Intel, reaping over two million dollars in profits.  (GX 1, 2).

### 3.    Rajaratnam's Leadership of the Galleon Conspiracy

Through wiretap recordings, emails, trading records, and Smith's testimony, evidence at trial proved Rajaratnam's leadership of an insider trading conspiracy involving numerous Galleon employees.  The evidence at trial showed that Rajaratnam, as the head of Galleon, encouraged and promoted the use of inside information, rewarded those who obtained it for him, and caused countless securities trades to be executed at Galleon based on inside information. The evidence at trial also demonstrated that Rengan, Chellam, Panu, Smith, and Liu committed overt acts in furtherance of the conspiracy at Rajaratnam's direction.  The evidence further showed that Smith obtained inside information from the Morgan Stanley investment banker Kamal Ahmed with Rajaratnam's encouragement and support, and that Rajaratnam shared with others the inside information he had obtained from Gupta, Chiesi, Kumar, Goel, and Khan.  (GX 692, 692T).  Finally, the evidence showed that Rajaratnam and others at Galleon traded based on information coming from ultimate inside sources of information including, among others, Kieran Taylor (Akamai), Robert Moffat (IBM), Hector Ruiz (AMD), Deep Shah (Moodys re: Hilton), Shammara Hussain (Market Street Partners re: Google), and Sunil Bhalla (Polycom).

On wiretap recordings, Rajaratnam discussed how to corrupt another McKinsey consultant like Kumar and directed others to create paper trails to conceal potential trades based on inside information.  For example, during three recordings, Rajaratnam and Rengan discussed Rengan's efforts to corrupt another McKinsey consultant, and became giddy about the fact that, in their view, everybody was a "scumbag," willing to "play ball," and provide them with inside information.  (GX 562, 562T, 563, 563T, 565, 565T).  On another recording, Rajaratnam directed Chellam and Panu to create a false paper trail for any potential trades of Spansion based on

Kumar's inside information. (GX 524, 524T). The latter recording corroborated Smith's testimony that he received similar instructions from Rajaratnam relating to other securities.

Other wiretap recordings showed that Rajaratnam obtained inside information from Gupta relating to Warren Buffett's investment in Goldman Sachs and later about losses Goldman Sachs was suffering but had not yet reported publicly. (*See* GX 534, 534TR, 627, 627TR, GX 678, 678T). Those same recordings further showed that Rajaratnam directed his employees to make trades based on Gupta's information and informed another employee about Gupta's information. (GX 627, 627TR, GX 678, 678T).

### 4.   Rajaratnam's Conspiracy With Danielle Chiesi

Rajaratnam's criminal conspiracy with Chiesi was frequently caught on the wiretaps in 2008. During numerous recordings introduced at trial, Rajaratnam and Chiesi exchanged inside information relating to AMD, Akamai, and other securities. (*See* GX 41-45, 532, 532T, 543, 543T, 554, 554TR, 594, 594TR, 625, 625TR). They discussed how Chiesi was fearful of going to prison for her criminal conduct, and Rajaratnam provided advice on avoiding detection by trading in and out of stock. (*See*, *e.g.*, GX 554TR: "But we got to keep this radio silence" and GX 594TR: "I think you should buy and sell, and buy and sell. . . . On Akamai, or IBM, anything. Be radio silent. Like, you know, I get shit on lots of companies."). Rajaratnam thanked Chiesi for an illegal inside tip that Akamai was going to guide down. (See GX 543T: "I just wanted to say, thank you.").

### 5.   Rajaratnam's Conspiracy With Roomy Khan

Evidence about Rajaratnam's conspiracy with Roomy Khan to exchange inside information came from multiple witnesses, trading records, phone records, instant messages,

Kumar's testimony, and Goel's testimony. The evidence demonstrated that Khan repeatedly obtained inside information from insiders with access to material, nonpublic information; Khan traded based on that information; Khan communicated it to Rajaratnam; and Rajaratnam executed timely trades on the basis of Khan's information.

Thus, on Polycom, the evidence showed that on January 9, 2006, Khan instructed Rajaratnam by instant message not to buy Polycom stock "[un]till I [g]et guidance; want to make sure guidance OK." (GX 64). From this statement, Rajaratnam knew that Khan was able to and going to obtain nonpublic information about Polycom's guidance so that she and Rajaratnam could trade on it. That same day, Bhalla, a Polycom executive, attended a meeting during which Bhalla learned positive information regarding Polycom's outlook. (See Tr. 3077-79). Bhalla's telephone contact with Khan, and the fact that Bhalla authorized Khan to trade in his brokerage account, showed the close relationship between Khan and Bhalla and Bhalla's incentive to provide inside information to Khan. (GX 64, 1472). From the timing of the communications between and the trades by Rajaratnam and Khan the following day, the evidence showed that Khan had obtained confidential information from Bhalla, that Khan immediately traded on that information, that Khan passed that information to Rajaratnam, and that Rajaratnam traded on it. (GX 64, 65-R, 67).

Khan also tipped Rajaratnam about the acquisition of Hilton. On the afternoon of July 2, 2007, Deep Shah learned through his work at Moodys that Hilton would be acquired. (Tr. 1223-24). At 3:06 pm, Shah started calling Khan repeatedly. (GX 48). At exactly 3:14 p.m., when Khan and Shah were on the phone together, Khan bought Hilton options. (GX 49). Less than an hour after Shah tipped Khan, Khan called Rajaratnam, but it was after the market had closed.

(GX 48).  Within minutes of the opening of the market on the next day, Rajaratnam began to purchase 400,000 shares of Hilton stock at an average price of $35 per share, for a total value of approximately $14 million. (GX 50).  Significantly, this was the first time that year that Rajaratnam had purchased Hilton stock.  Hours later, Hilton announced the acquisition, and Rajaratnam made millions.  (GX 55).

Finally, Khan tipped Rajaratnam about Google's negative earnings.  On July 11 and 12, 2007, Khan communicated on numerous occasions with Shammara Hussain, who had access to Google's confidential earnings information through her work at Market Street Partners, including that Google was about to announce unexpectedly poor financial results.  (GX 58, Tr. 3135-51).  On both of those days, Khan bought Google put options.  (GX 59).  On July 13, Khan called Rajaratnam and spoke with him for 22 minutes from 1:17 p.m. to 1:39 p.m.  (GX 58).  At the outset of that call, Rajaratnam had a long position of approximately 135,000 shares of Google stock, with a value of approximately $74 million.  (GX 61).  The minute his call with Khan ended, however, Rajaratnam instructed his trader to sell all of his Google stock, and Rajaratnam then took a short position worth approximately $25 million.  (GX 58).  As a result of Khan's call, Rajaratnam reversed course and changed his position by $100 million.  That evidence demonstrated that Rajaratnam not only traded based on Khan's inside information from Hussain but knew that Khan's information was nonpublic and significant.  The next week, Google announced earnings that missed expectations, and Rajaratnam, again, made millions.  (GX 62).

### 6.    Rajaratnam's Methods To Cover Up His Crimes

The evidence at trial showed that Rajaratnam used and instructed others to use numerous methods to cover up their criminal activities.  The following are some examples:

12

- Rajaratnam left false email and instant message trails in Galleon's files, and instructed others to do the same. (*See, e.g.*, GX 58, 524, 524T, 2402). Rajaratnam told two Galleon colleagues that the "best way to do these things"—referring to trading on inside information—was to create an email trail containing an alternative justification for a trade that was in fact based on inside information. (GX 524). Smith also testified about this practice. (Tr. 2630-31, 2636-40).

- Rajaratnam instructed Chiesi and Smith to buy and sell stock when in possession of inside information, showing a pattern of trading to create the false impression of not having inside information. (*See, e.g.*, GX 594, 594TR, 641, 641T; Tr. 2643). Rajaratnam himself followed this practice. (GX 20, 22, 27).

- Rajaratnam told Chiesi to remain "radio silent" when they exchanged inside information with each other. (GX 532, 532T, 554, 554TR, 594, 594TR).

- Rajaratnam paid Kumar through wire transfers to an offshore account not in Kumar's name and then invested Kumar's money at Galleon in the name of Manju Das. (Tr. 391-92).

- Rajaratnam approved of Rengan's efforts to make payments to another McKinsey consultant through that consultant's wife. (GX 563, 563T).

- Rajaratnam executed illegal inside trades in Goel's brokerage account, including purchases of stock in ATI, PeopleSupport, Hilton and @Road, using Goel's identification and password. (Tr. 1613-31; GX 654, 654TG). Rajaratnam offered to do the same for Kumar. (Tr. 545).

- Rajaratnam informed Kumar in late 2009, just weeks before they were arrested, that his sources were using prepaid phones because Rajaratnam suspected that Far was working with the Government. (Tr. 576-77).

This evidence showed that Rajaratnam knew what he was doing was wrong and illegal.

## B.    Additional Relevant Conduct

At trial, the Government presented evidence regarding insider trading in no fewer than 19 stocks. Yet even this evidence, as voluminous as it was, did not capture the extent of Rajaratnam's criminal conduct. There is still more. Below are examples of additional criminal

conduct by Rajaratnam that the Government chose not to present at trial in order to streamline the case for the jury. Before trial, the Government provided Rajaratnam with particulars relating to approximately 37 stocks. Shortly after jury's guilty verdict, Rajaratnam's counsel reportedly said to the media—referring to the fact that the Government had particularized 37 stocks while convicting Rajaratnam on 14 counts—that the defense was winning 23 to 14, as though the jury had acquitted Rajaratnam on 23 stocks. *See "Fund Titan Found Guilty,"* by Michael Rothfeld, Susan Pulliam, and Chad Bray, *Wall Street Journal* at A1 (quoting Rajaratnam's lead defense attorney stating: "The case started out with 37 stocks and is down to 14. The score is 23-to-14 in favor of the defense."). But the jury didn't acquit Rajaratnam of insider trading relating to any stock. Merely because the Government chose to simplify its proof at trial does not mean Rajaratnam is innocent of that conduct. As explained herein, much of that additional conduct is relevant to sentencing, and this Court may consider it as even further evidence of the astonishing breadth and depth of Rajaratnam's criminal conduct.

### 1.    Criminal Conduct With Ali Far

Ali Far was an analyst and portfolio manager at Galleon before leaving in 2007 to start his own fund. (Tr. 2653, 2735). In 2009, Far was intercepted providing Rajaratnam with inside information regarding Atheros Communications Inc. in connection with Atheros's earnings for the quarter ending in December 2008:[2]

- On December 29, 2008, an executive at Atheros named Ali Hariri received an email indicating that Atheros's revenue for the quarter ending    in December 2008 would be approximately $98.6 million. (Ex. C, at 5).

---

[2] Far and his source at Atheros, Ali Hariri, both pleaded guilty to insider trading charges. Copies of their allocutions are attached hereto as Exhibits A and B, respectively. Far is cooperating with the Government's investigation.

- On January 12, 2009, at 3:37 p.m., Hariri called Far and the call was intercepted. Hariri told Far that Atheros's quarterly revenue would "add up to 98 or 99 [million dollars].... I think it will be around 99 [million dollars] as they have posted in the books." (Ex. D).

- On January 12, 2009, at 3:42 p.m.—immediately after finishing the call with Hariri – Far called Rajaratnam and the call was intercepted. Far told Rajaratnam, "I met with, uh, Ali at Atheros.... Bottom line say 99 million for the December quarter." Far later added, "we could make a couple of bucks on it, Raj." (Ex. E, at 1-2). Notably, Far referred to his inside source—"Ali"—by first name, and stated that he worked "at Atheros."

- On January 13, 2009, Rajaratnam began to purchase Atheros stock in Galleon accounts using the portfolio manager code "TAM." (Ex. F).

- On February 2, 2009, Atheros announced quarterly earnings, including quarterly revenue of $98.3 million, consistent with Hariri's information. (Ex. G).

Far was also intercepted providing Rajaratnam with inside information regarding Marvell Technology Group ("Marvell") in connection with Marvell's quarterly earnings announcement for the quarter ending in July 2008:

- In 2008, Sam Miri worked at Marvell. (Ex. H).

- On August 4, 2008, at 1:41 p.m., Miri spoke on the phone with Ali Far (who was using a phone subscribed in the name of his wife), for approximately five minutes. (Ex. I).

- On August 6, 2008, at 10:41 a.m., Far called Rajaratnam and the call was intercepted. Far told Rajaratnam that he wanted to give him a "heads up" on Marvell. Far told Rajaratnam that "Sammy"—again referring to his inside source (Sam Miri) by first name—"said they'd probably beat it by a million or two on revenues...." Rajaratnam asked about guidance, and Far responded that "Next quarter, they don't feel too good.... It would be a stretch if they were to [provide guidance] in line [with expectations]." At the end of the call, Far told Rajaratnam, "I'll keep you, uh, before Marvell reports, I'll call you back, uh, if I get any more granularity about the outlook." (Ex. J).

15

- On August 6, 2008, at approximately 11:01 a.m.—within minutes of ending the call with Far—Rajaratnam began shorting Marvell stock in Galleon accounts using the portfolio manager code "TAM." (Ex. K).

- On August 28, 2008, Marvell announced quarterly earnings, including revenue that beat expectations and guidance that disappointed, consistent with Miri's information. (Exs. L and M).

- On January 12, 2009, Far called Rajaratnam and the call was intercepted. After discussing Atheros (as described above), the two discussed Marvell. Far again referred to his Marvell source by first name—"Sam"—and described how Sam had met with the "VP of Sales," who said that the quarter is going to be fine. (Ex. E, at 6).

### 2.    Corrupting a Cisco Executive

In the summer of 2008, the Government intercepted Rajaratnam attempting to corrupt an executive at Cisco Systems, Inc. ("Cisco") by probing for inside information about a possible acquisition while dangling a lucrative job offer with Galleon.

In late July 2008, there were rumors that Cisco might acquire EMC Corporation ("EMC"). Rajaratnam set about trying to determine whether these rumors were true. On July 21, 2008, Rajaratnam called Kumar and asked, "did you find out about the EMC thing?" (Ex. N). Kumar told Rajaratnam that he left a message for his guy in Boston (where EMC is headquartered). Around this time, Rajaratnam began buying EMC stock in Galleon accounts. (Ex. O). On July 23, 2008, Kumar told Rajaratnam that he "finally got through to my partner . . . his view is he knows absolutely nothing about it." (Ex. P).

On this occasion Kumar was not able to provide Rajaratnam with confirmation through his work at McKinsey. So Rajaratnam promptly set about corrupting a Cisco executive (the "Cisco Executive") who, like Kumar and Goel, had been Rajaratnam's classmate at business school. On July 30, 2008, Rajaratnam spoke with the Cisco Executive by phone. Rajaratnam

16

told him that he was traveling to California, and they arranged to meet.  (Ex. Q).  Toward the end

of the call, Rajaratnam brought up the "rumor" that Cisco might acquire EMC.  (Ex. Q, at 5).

Rajaratnam described why it might make sense; the Cisco Executive did not offer up any details.

That call was cut off, and then the Cisco Executive immediately called Rajaratnam back.  That

was when Rajaratnam made the Cisco Executive a lucrative offer:  Rajaratnam told the Cisco

Executive that "we might be raising a fund to go in and buy, uh, troubled companies."

Rajaratnam inquired as to whether the Cisco Executive might be "interested in the money

business."  Rajaratnam sketched out how the new fund could make "60 million [dollars] a year,"

and require no more than three or four people.  (Ex. R, at 1-3).

Later that day, Rajaratnam received a call from Rengan.  Rengan thanked Rajaratnam.

(This call occurred shortly after Akamai announced its quarterly earnings consistent with

Chiesi's tip.)  Later, Rajaratnam brought up the Cisco-EMC rumors.  Rajaratnam described how

he called the Cisco Executive and offered him a job at Galleon.  Rajaratnam and Rengan

discussed that Rajaratnam was going to travel to California to meet in person.  Rengan said that a

different Cisco executive ("Cisco Executive 2") would know about the deal.  Rajaratnam told

Rengan that he didn't want to call that person, but would rather meet him in person.  Rajaratnam

said, "I want to just get [Cisco Executive 2] all, you know, nice and prime. . . .  I'll own [Cisco

Executive 2] don't worry."  Rengan told Rajaratnam that he was going to go to California, too, to

meet with a certain individual in person.  Rengan said that traveling to see that person was "well

worth it because, when I was with him in person, he gave me all the dirt."  Rajaratnam replied,

"And that's what you gotta do. . . ."  (Ex. S, at 1, 3-6).

The week after these calls, Rajaratnam sold his position in EMC stock, and ultimately Cisco never acquired EMC. These calls therefore do not evidence a consummated inside trade. What they do evidence, however, is that Rajaratnam was constantly attempting to corrupt new sources of inside information. Rajaratnam's stable of inside sources may have been plentiful, but it was never enough.

### 3.    Criminal Conduct of Craig Drimal and Zvi Goffer

Two additional individuals working at Galleon committed numerous insider trading crimes in 2007 and 2008: Craig Drimal and Zvi Goffer. Drimal was a trader who used Galleon's office and traded securities in his personal account. Drimal was friends with Goffer. In late 2007, Rajaratnam hired Goffer to work as a trader at Galleon, and Goffer began working for Galleon by January 2008. Both Drimal and Goffer told others that Rajaratnam hired Goffer because Goffer had shown that he had access to inside information in late 2007. (*See* Ex. T, *United States* v. *Zvi Goffer et al.*, S1 10 Cr. 56 (RJS), transcript of David Slaine's Testimony at 648-649, 651; Ex. U, transcript of David Plate's Testimony at 845 (Goffer said "he had spoken to Raj, who was the founder, head of Galleon, and that he had given Raj the 3Com trade, the 3Com call, and Raj said that if 3Com took place, he would give Zvi a job."). Goffer's inside sources were, among others, two attorneys at Ropes & Gray (Arthur Cutillo and Brien Santarlas) who provided inside information about potential mergers and acquisitions to Goffer. In 2008, wiretap calls between Rajaratnam and Goffer showed that Goffer provided updates to Rajaratnam about inside information Goffer was receiving from the Ropes & Gray attorneys. (*See* Exs.V & W.) On or about April 26, 2011, Drimal pled guilty to five substantive insider trading counts, and one

count of conspiracy to commit insider trading.  On or about June 13, 2011, a jury found Goffer

guilty of two counts of conspiracy, and multiple substantive counts of insider trading.

### 4. Criminal Conduct in the Late 1990s With Roomy Khan

In or about 1997 and 1998, while working at Intel, Khan faxed Rajaratnam material,

nonpublic information about Intel's quarterly earnings.  *See* the Government's Opposition to

Rajaratnam's Letter Brief to Preclude Intel Witness Testimony of Roomy Khan Faxing

Confidential Information to Rajaratnam, April 4, 2011, Dkt. No. 258 (including the exhibits

attached thereto).

### C. Insider Trading:  Business as Usual for Rajaratnam

The Government proved at trial that illegal insider trading was part of Rajaratnam's

*modus operandi*.  Indeed, the evidence at trial showed that Rajaratnam's insider trading activities

spanned more than five years, and the Government presented the Court with evidence of

Rajaratnam's insider trading activities as early as 1997 and 1998.  Despite the number of years

during which Rajaratnam committed insider trading crimes and the number of individuals

involved in those crimes, a significant part of the evidence admitted at trial covered a portion of

just one year—2008—when the Government had a wiretap on Rajaratnam's cellphone.[3]  Even

then, however, the recordings over Rajaratnam's cellphone provided only a limited window into

Rajaratnam's business activities that year because, as proven at trial, Rajaratnam used many

phones for business purposes in Manhattan and elsewhere, including his office phone in

---

[3] The wiretaps over Rajaratnam's cellphone began on March 10, 2008 and ended on December 6, 2008, but were not continuous throughout that time period.  For example, the wiretap was not up from mid-June to mid-July.

Galleon's headquarters.  Common sense dictates that the Government's wiretap only caught a fraction of Rajaratnam's crimes.

Nevertheless, despite its limitations, the wiretap over Rajaratnam's cellphone provides the best view of Rajaratnam's conduct that the Government was able to obtain.  And what it saw through this window, however limited, was that Rajaratnam's insider trading was extensive.  It was a routine part of his business.  It was what he spent his time doing.

The graphic below shows the extent of Rajaratnam's criminal conduct captured on the wiretap over Rajaratnam's cellphone in 2008.  The conduct was so pervasive that his various schemes with Kumar, Goel, Chiesi, Smith, and others often overlapped with one another and required him to multi-task his criminal activities.  For example, on July 28, 2008, Rajaratnam bought PeopleSupport stock for Goel based on inside information (Count Eleven).  The next day, Rajaratnam bought Akamai based on inside information (Count Nine), and also discussed with Gupta what happened at a confidential Goldman Sachs board meeting (GX 534).  Then, the very next day, Rajaratnam bought more Akamai stock based on inside information (Count Ten), dangled money to the Cisco Executive (Exs. Q, R, S), and told Goel that the Ruias family had bid $12.25 per share for PeopleSupport (GX 539).

Rajaratnam was similarly active in early October 2008.  On Friday, October 3, 2008, Rajaratnam bought AMD based on inside information.  That *same day* he short sold eBay based on inside information from Kumar.  Then, just two trading days later (October 7, 2008), Rajaratnam bought PeopleSupport in Goel's brokerage account based on inside information that Rajaratnam obtained from Panu.  And that happened on the very day that AMD announced the corporate reorganization.  For Rajaratnam, insider trading was business as usual.

# Rajaratnam Insider Trading During Period of Wiretap Interception: March 10 – December 6, 2008

= Stock Market Closed All Day    = Stock Market Closed at 1:00 PM EST

- CLWR: Calls with Goel
- VSH: Call with Smith (talked to Kamal)
- SPSN: Call with Chellam (email trail)
- CSCO: Calls with Kumar
- AKAM: Call with Chiesi (guide down)
- GS: Calls with Gupta, Horowitz, Lau
- PSPT: Calls with Goel (made a firm bid)
- MRVL: Call with Far
- AMD: Calls with Kumar (shake hands)
- AMD: Calls with Chiesi (buy and sell)
- EBAY: Call with Kumar (layoffs)
- SYNA: Call with Liu (internal file)



## III.   **APPLICABLE LAW**

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in the federal sentencing process.  *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  Indeed, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.  *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

A sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims" *United States* v. *Booker*, 543 U.S. at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Section 3553(a) further directs the Court—in determining the particular sentence to impose—to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  *See United States* v. *Crosby*, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  *Id.*  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Id.* at 113.

IV.   **ANALYSIS**

For the reasons discussed below, Rajaratnam's illegal conduct warrants a significant term of imprisonment within the Guidelines range of 235 to 293 months' imprisonment.

### A.      The Nature and Circumstances of Rajaratnam's Criminal Offenses

Rajaratnam's crimes were, simply put, brazen, arrogant, harmful, and pervasive. Rajaratnam corrupted multiple insiders, used his money and influence to gain an illegal edge over ordinary investors in the stock market, and contaminated his business with the pursuit of inside information. Rajaratnam completely disregarded the harm that his actions caused to the marketplace and the ordinary investor who did not and could not have obtained access to inside information. And Rajaratnam committed his crimes repeatedly—over and over and over again, year after year after year—with multiple corrupt insiders, subordinates looking for his approval and financial payback, and loyal co-conspirators. He committed these crimes all for the selfish purposes of increasing the profitable returns of his hedge fund, convincing investors to keep their money with the fund, attracting more money from investors, increasing his own personal wealth, and triumphing over his competitors on Wall Street. (*See, e.g.*, GX 543T (Rajaratnam telling Chiesi about making winning trades based on inside information: "[I]t's a conquest, right?")).

Rajaratnam's offense conduct was extraordinarily serious, multi-faceted, and damaging to the capital markets. For many years, Rajaratnam systematically and repeatedly lied and deceived public companies, their shareholders, and average investors by obtaining and then trading based on inside information from executives at the highest levels, outside consultants at the most prestigious consulting firm in the world, and anyone else who had access to inside information. As a veteran Wall Street analyst and trader, Rajaratnam knew full well that he was committing crimes each and every time he traded based on information from a source who was breaching a duty of trust and confidence. However, Rajaratnam did not care. Violating the law was of no moment to him. What mattered was not getting caught.

24

Rajaratnam was a manipulative and a corrupting influence. He corrupted employees like Smith, Chellam, and Panu—encouraging them to seek out and trade based on inside information, and then teaching them how to avoid detection. He corrupted corporate executives like Kumar through financial payments and friendship. He even corrupted his closest of friends like Goel, who looked up to and admired Rajaratnam for his purported business successes, by bestowing gifts on them, encouraging them to give him inside information, and then berating them if they were unable to provide inside information.

Knowing that his actions were criminal, Rajaratnam took extraordinary steps to evade detection, deceive regulators, and brazenly continue his criminal schemes even while regulators were looking into his conduct. Rajaratnam created false emails to disguise the real basis for his trades;[4] Rajaratnam wired money to offshore accounts in phony names to pay for inside information; Rajaratnam logged into brokerage accounts of others using their user identification and passwords to make trades based on inside information; Rajaratnam traded in and out of stocks when he had inside information, and instructed his co-conspirators to do the same;[5] Rajaratnam directed co-conspirators like Chiesi to keep quiet about inside information;[6] Rajaratnam avoided trading aggressively with call and put options to lower the chances of detection; and Rajaratnam told others to use prepaid cellular phones when he believed (correctly, as it turned out) that one of his former employees was recording conversations with him. The

---

[4]*See, e.g.*, GX 524TR: "the best way to do these things . . . so that we just protect ourselves . . . we just have a e-mail trail, right. . . ."

[5]*See, e.g.*, GX 594TR: "I think you should buy and sell, and buy and sell."

[6]*See, e.g.*, GX 594TR: "On Akamai, or IBM, anything. Be radio silent. Like, you know, I get shit on lots of companies."

steps Rajaratnam took to avoid getting caught reflects his disregard for the laws against insider trading, his lack of respect for the integrity of the capital markets, and his arrogance. Even when he knew that the SEC was investigating his insider trading and had taken his testimony in June 2007, Rajaratnam did not curtail, much less stop, his illegal actions. Indeed, less than one month later, in July 2007, Rajaratnam was trading Hilton and Google stock based on inside information provided by Khan (earning more than $20 million for Galleon) and Rajaratnam was using inside information about Hilton to benefit Goel in Goel's brokerage account.

By any measure—the seriousness of his illegal conduct; the pervasiveness of his criminal actions; the position he held as head of one of the world's largest hedge funds; the number of schemes he led to obtain and then trade based on inside information; the number of years during which he participated in the illegal schemes; the number of actual substantive crimes that he committed; the number of overt acts that he took in furtherance of his multiple illegal conspiracies; the number of employees, insiders, and other traders that he corrupted; the number of measures that he took and encouraged others to take to evade detection; the hubris and contempt for the law and the markets; and the purposes for which he committed these crimes—Rajaratnam's illegal insider trading crimes stand out as among the most egregious in the history of insider trading. Accordingly, the Government respectfully submits that the nature and circumstances of Rajaratnam's offenses warrant a sentence consistent with his Sentencing Guidelines offense level and with similar sentences imposed on heads of business and CEOs convicted of brazen fraudulent schemes.

**B.     History and Characteristics of the Defendant**

Notwithstanding the letters submitted to the Court by counsel opining on Rajaratnam's generosity, as the trial evidence demonstrated, Rajaratnam was a fundamentally deceptive and dishonest person.  His deceptive schemes were varied and audacious.  He believed that he could do whatever, whenever he wanted to accomplish his goal of increasing the profitable returns of his hedge fund.  Rajaratnam demonstrated an utter lack of respect for the law when he lied under oath when testifying during the SEC's investigation (*see* discussion below regarding obstruction of justice), and by implementing and directing others to implement measures to evade detection. In doing so, Rajaratnam never expressed any concern about the harm he was causing to the marketplace, to the ordinary investor, or to the insiders and employees he corrupted in the process.

**C.     The Need To Afford Adequate Deterrence**

One of the most important factors that this Court must consider in imposing a sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  Given the inherent difficulties in detecting and prosecuting illegal insider trading crimes and the evidence of rampant insider trading during the last several years, a substantial term of imprisonment for Rajaratnam is necessary, and indeed essential, to achieve the goals of general deterrence.

Just as Jeffrey Skilling and Bernard Ebbers represent the worst of accounting frauds and Bernard Madoff represents the worst of ponzi schemes, Rajaratnam represents the worst of illegal insider trading.  Skilling (24 years), Ebbers (25 years) and Madoff (150 years) were each sentenced to lengthy terms of imprisonment because, in part, the respective sentencing judges

wanted to send a message that such criminal conduct would not be tolerated.  Similarly, the Government respectfully submits that this Court should sentence Rajaratnam to a term of imprisonment within the Guidelines range to send a strong and clear message that the time for illegal insider trading to end is now.  Through counsel or otherwise, future defendants charged with and convicted of insider trading will surely compare their crimes to Rajaratnam's in seeking a lower sentence.  They will likely argue that Rajaratnam's sentence sets the benchmark against which their conduct should be measured.  Other corporate executives, CEOs of financial institutions, and heads of hedge funds will almost certainly look to the sentence imposed on Rajaratnam for the message as to how seriously courts will punish offenders for insider trading.  There is a significant danger that these executives and money managers may view a lighter sentence as an insufficient deterrent to insider trading, secure in the knowledge that if they are ever caught, they would be able to *go to trial* and argue at sentencing after conviction that whatever their conduct was, it had to have been less extensive than the crimes committed by Rajaratnam, and therefore worthy of a shorter sentence than him.  Thus, to effect the goal of general deterrence, the Court should impose a sentence commensurate with the nature and seriousness of Rajaratnam's crime, particularly given that Rajaratnam is quite likely the worst insider trading offender caught to date.  The Court should also consider the fact that Rajaranam's criminal conduct continued—and was most pernicious—*after* well-publicized corporate scandals and corporate reform efforts of a few years ago and a number of well-known prosecutions of insider trading.  A significant term of imprisonment is warranted to deter others from ignoring those same warnings today.

**D.    Application of the Sentencing Guidelines**

Although no longer binding upon the Court, the Sentencing Guidelines represent the considered judgment of the United States Sentencing Commission, a body of experts drawn from all areas of the legal profession, and specifically created to determine the appropriate sentence in particular types of cases. As Judge Lynch has recognized, it is important for "rational judges [to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission." *See United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004); *see also id.* (acknowledging the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record"). Both the *Booker* and *Crosby* courts stressed the continuing significance of the Guidelines under the new sentencing framework. In this case, the sentence called for by the Sentencing Guidelines is obviously a significant marker of the seriousness of the offenses committed by Rajaratnam.

The Guidelines range for Rajaratnam's criminal offenses is calculated as follows:

1.    Pursuant to U.S.S.G. § 3D1.2, because all of the counts are connected by a common criminal objective and the offense level is determined largely on the basis of the total amount of gain, all fourteen counts of conviction are grouped together into a single group.

2.    Pursuant to U.S.S.G. § 2B1.4, which is the applicable guideline for insider trading, the base offense level is 8. Significantly, in contrast to U.S.S.G. § 2B1.1 which

29

frequently applies to offenses involving fraud and deceit, U.S.S.G. § 2B1.4 does not have multiple potential offense level adjustments for various aggravating factors other than the gain from the offenses. For example, under U.S.S.G. § 2B1.1(b)(9), if a defendant participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials or the offense otherwise involved sophisticated means, a two-level enhancement would be warranted. That adjustment, however, is not found in U.S.S.G. § 2B1.4. A fair comparison of Sections 2B1.1 and 2B1.4 of the Guidelines show that the guideline applicable in this case for insider trading is much more conservative than the guideline for most other offenses involving fraud and deceit.

3.      Pursuant to U.S.S.G. § 2B1.4(b) and 2B1.1(b)(1)(M), as demonstrated at trial and explained below, the gain from the defendant's offenses is more than $50 million and thus Rajaratnam's offense level increases 24 levels.

4.      Pursuant to U.S.S.G. § 3B1.1(a), as explained below, because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, Rajaratnam's offense level is increased by 4 levels.

5.      Pursuant to U.S.S.G. § 3C1.1, as explained below, because the defendant willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice with respect to the investigation of the instant offenses, and the obstructive conduct related to (I) the defendant's offenses and any relevant conduct, and (ii) a closely related offense, Rajaratnam's offense level is increased by 2 levels.[7]

---

[7]The Government further notes that a 2-level enhancement for abuse of trust is arguably warranted pursuant to U.S.S.G. § 3B1.3. Because Rajaratnam controlled Galleon's seat on PeopleSupport' Board of Directors, Rajaratnam abused a position of special trust by obtaining

As a result, with a total offense level of 38 in Criminal History Category I, the Government respectfully submits that the Guidelines range for Rajaratnam is 235 to 293 months' imprisonment.

While the Guidelines themselves are not controlling, the fact that Rajaratnam's advisory guidelines are a little more than 19.5 years at the low-end of the Guidelines range reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to his conduct. Indeed, as set forth below, on nearly every applicable enhancement, Rajaratnam's criminal activities not only fit within each enhancement, but Rajaratnam's actions far exceed the minimum standards. In other words, Rajaratnam has earned each and every one of his 38 offense levels.

### 1.    Gain

Pursuant to U.S.S.G. §2B1.4(b), the base offense level for insider trading is increased by the "gain resulting from the offense" from the table in § 2B1.1(b)(1). The "gain" is "the total increase in value realized through trading in securities by defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . . ." U.S.S.G. §2B1.4. cmt. This Court need only make "a reasonable estimate" of the gain. U.S.S.G. § 2B1.1 cmt. n.3(C); *United States* v. *Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007).

---

and then trading stock based on material, nonpublic information regarding the acquisition of PeopleSupport. *See* U.S.S.G. § 2B1.4, note 1. Moreover, Galleon investors entrusted Rajaratnam with their money, and Rajaratnam abused that trust and caused those investors harm (in the form of holdbacks and other issues arising from his criminal conduct) by using their money in furtherance of his criminal schemes. Notwithstanding these arguments, the Government is not seeking an enhancement for abuse of trust.

At trial, the Government demonstrated that Rajaratnam gained approximately $63,812,164 million from insider trading.  (GX 1).  Special Agent James Barnacle calculated profit by taking the difference between the price at which a security was purchased (or sold short) on the basis of inside information, and the price at which it was later sold (or covered) following the relevant public announcement, and then multiplying by the number of shares.[8]  (Tr. 3386). Shares were matched using the generally accepted "first-in, first-out," or "FIFO" method.  (Tr. 3387).  With respect to each gain calculation, Rajaratnam realized the profit by closing out the position within a relatively short period of time following the public announcement, "generally within a week."  (Tr. 3514).  In other words, not a single calculation includes profit that Rajaratnam realized by exiting a position weeks or months after the relevant public announcement.[9]

### a.      Goldman Loss Avoidance

During the defense case, Professor Jarrell challenged the manner in which the Government calculated Rajaratnam's loss avoidance from selling Goldman stock in October

---

[8]  With respect to three stocks (Intel, Google and Goldman Sachs), a portion of Rajaratnam's gain occurred through so-called "loss avoidance," avoiding a loss by exiting an existing position on the basis of inside information that was contrary to that position (i.e., by selling stock upon learning negative inside information about the stock, or by covering a short position upon learning positive inside information about the stock).  In these instances, the gain was calculated by taking the difference between the price at which Rajaratnam sold stock (or covered a short position) on the basis of inside information, and the price at which the security traded at the open of the market on the day following the public release of the relevant information, and then multiplying by the number of shares.

[9]It is worth noting that while the Sentencing Guidelines clearly state that Rajaratnam should be held accountable for gains by people to whom he provided inside information (so-called "downstream tippees"), see U.S.S.G. § 2B1.4 cmt., the Government has not included such amounts in its gain calculation.  Accordingly, the Government's gain calculation is inherently conservative.

2008. (Tr. 4843). On October 23, following the close of the market, Rajaratnam learned from

Rajat Gupta that Goldman Sachs was losing $2 per share in the current quarter, below then-

current street consensus that Goldman would *make* about $2 per share. (GX 75, 678). The next

day, on October 24, Rajaratnam sold 150,000 shares of Goldman stock at prices ranging from

approximately $97.74 to $102.17 per share. On December 16, 2008, Goldman announced its

quarterly earnings, including a loss of $4.97 per share. On December 17, 2008, Goldman stock

opened for trading at $75.33 per share. (GX 138-T). Following the formula described *supra* at

footnote 9, *i.e.*, taking the difference between Rajaratnam's exit price (about $100 per share) and

the price at which Goldman opened on the day after the earnings announcement ($75.33), and

multiplying by the number of shares (150,000), Agent Barnacle calculated Rajaratnam's loss

avoidance at about $3.8 million. (GX 77).

Jarrell argued that due to "macroeconomic events" and a "decline in the global equity

markets" that occurred after Rajaratnam sold in October, it is unreasonable to contend "that Mr.

Rajaratnam would have held those shares all the way through these disastrous events." (Tr.

4843). Jarrell has his timing wrong: the dramatic declines in the markets actually *preceded*

Rajaratnam's inside trades. From the date of the trade (October 24) through the date of

Goldman's announcement (December 16), the markets were generally flat.[10] Financial sector

indices may have been down during this period, but that's the point: Rajaratnam gained by

learning, illegally, that a leading financial services company was doing worse than the market

expected.

---

[10] From October 24 through December 16, the Dow Jones was down about one percent
(from 8683.21 to 8565.65) and NASDAQ was *up* two percent (from 1493.79 to 1526.06).

Moreover, there is simply no way of knowing when Rajaratnam would have sold his stock had he not received the tip on October 23. During the three-week window that followed, the markets were generally flat or up while Goldman trended down. It is at least as plausible to conclude that Rajaratnam would have held his stock (since it was underperforming) as it is to conclude the opposite. But even if one were to assume that Rajaratnam would have sold it at some point, his gain would still be considerable. Assuming Rajaratnam would have held the stock for just two weeks (until November 7), loss avoidance is $3.3 million. If he held for three weeks (until November 14), loss avoidance is $5.0 million.[11]

For purposes of sentencing, the task for the Court is to make a "reasonable estimate" of Rajaratnam's gain. Agent Barnacle's approach is reasonable because it is based on an actual price at which Goldman traded following the release of the announcement about which Rajaratnam was tipped. This is how loss avoidance is generally calculated. Here, eight weeks passed between the trade and the announcement, giving rise to Professor Jarrell's concern that the stock's movement over that time was caused by general market movements unrelated to the inside information.[12] But here the value of the markets were generally flat over those eight weeks.

Jarrell did not propose any alternative method to calculate Rajaratnam's gain. This is perhaps because available alternatives lead to roughly the same result. For example, one could

---

[11] On November 7, Goldman closed at $77.78; ($100-77.78) x 150,000 = $3,333,000. On November 14, Goldman closed at $66.73; ($100-66.73) x 150,000 = $4,990,500.

[12] The other two instances of loss avoidance (relating to Intel and Google) that Agent Barnacle calculated both involved lapses of time far shorter. Jarrell did not opine that those calculations were unreasonable.

34

compare Rajaratnam's exit price (about $100) with the price of Goldman's stock at around the time when analysts' views came to reflect that Goldman might lose $2 per share rather than make it. On November 5, Morgan Stanley lowered its earnings estimate to -$1.09. The next day, J.P.Morgan lowered its estimate to -$0.58. Then, on November 10, Barclays lowered its estimate to -$2.50, but noted that the street consensus was still $1.62. (Exs. X, Y, and , respectively). On November 10, Goldman closed at $71.21. Using this as a point of comparison, Rajaratnam's gain (through loss avoidance) is approximately $4.3 million.[13]

Another alternative approach compares Rajaratnam's exit price ($100 per share) with the price at which Rajaratnam himself bought back Goldman stock. On November 11, 2008—the day after Barclays lowered its estimate to -$2.50—Rajaratnam *bought back* 200,000 shares, for $72.62 per share. (Ex. AA). Under this approach, Rajaratnam's gain (through loss avoidance) is approximately $4.1 million.[14] This is in the same ballpark as Agent Barnacle's figure ($3.8 million), and both are reasonable estimates of Rajaratnam's gain. Both underscore the truth of what happened here: Rajaratnam obtained, then traded on, highly valuable inside information and avoided losses in the multi-millions.

### b.    Additional Gain

During the defense case, the Government obtained for the first time a Galleon "back office" document establishing that Rajaratnam used a portfolio manager code—"CRS," for the

---

[13] ($100-71.21) x 150,000 = $4,318,500.

[14] The calculation is done as follows:  ($100-72.62) x 150,000 = $4,107,000.

"Crossover" account—that was not included in Agent Barnacle's calculations.[15]  (Ex. BB).

Additional evidence corroborates that Rajaratnam used the CRS code.  First, Smith testified that

the Crossover fund was Rajaratnam's responsibility.  (Tr. 2453).  Second, Rajaratnam was

intercepted discussing specific trades for the Crossover fund.  (*See, e.g.,* GX 524).  Third, trading

by "CRS" closely mirrors trading by Rajaratnam's other codes, so closely, in fact, that the trades

appear to have been ordered at the same time by the same person.  For example, TMT (a

Rajaratnam code) and CRS both purchase Hilton stock on July 3, 2007—400,000 and 100,000

shares, respectively—at the same prices, using the same trader (Ian Horowitz).  Both codes then

sell their shares on the same days, using the same trader, at the same prices.  (Ex. CC).

 This evidence clearly establishes by a preponderance that Rajaratnam directed trading

under CRS.  The following table reflects gains under the CRS trading code following Agent

Barnacle's methodology surrounding the same events:

| Security | CRS Profit and Loss Avoidance |
|---|---|
| Akamai | $      329,995 |
| Clearwire | 235,594 |
| Google | 6,660,811 |
| Hilton | 1,032,655 |
| **CRS Total:** | **$  8,259,055** |

---

[15]  Prior to trial, the Government repeatedly requested documents sufficient to show the trader codes used by Rajaratnam.  Galleon, however, informed the Government that no such document existed.  During Rick Schutte's testimony, such a document was used by Rajaratnam's counsel to refresh Schutte's recollection about codes used by Rajaratnam.  That document was identified as Defense Exhibit 4610 and is being used here to calculate additional trading profits under the CRS code of which the Government did not know during its case-in-chief.

(Ex. DD).

Adding these CRS gains to Agent Barnacle's trial calculations ($63,812,164) yields a total gain of $72,071,219. This corresponds to a 24-level increase. U.S.S.G. §2B1.1 (providing for a 24-level increase for gains greater than $50 million and less than $100 million).[16]

### 2.   Leadership Role Enhancement

Pursuant to U.S.S.G. § 3B1.1(a) of the Guidelines, Rajaratnam's offense level must be enhanced by four levels because Rajaratnam organized and led criminal activity that involved at least five other participants and was otherwise extensive. Indeed, the Government proved at trial that Rajaratnam was the indisputable head of Galleon through which much of the illegal activities flowed and the leader of each of the five charged conspiracies.

Section 3B1.1(a) directs a District Court to increase a defendant's offense by four levels where "the defendant was an organizer or leader of a criminal activity" and that criminal activity "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The decision to apply the enhancement thus involves a two-part determination: (1) whether the defendant was an "organizer or leader," and (2) whether the criminal activity involved at least five participants or was "otherwise extensive." *See United States* v. *Reed*, 2011 WL 1682036, at *4 (2d Cir. May 5, 2011).

First, the evidence at trial demonstrated that Rajaratnam was an organizer and leader of the insider trading schemes. In determining whether Rajaratnam was an organizer or leader, the

---

[16]It is important to note that this gain calculation does not include any of the additional criminal conduct discussed at pages 13 to 19 above that was not presented at trial. The Government has included that additional criminal conduct in this memorandum only to further show the breadth and depth of Rajaratnam's illegal insider trading activities. The additional criminal conduct is not being used in any way in the Government's Guidelines calculation.

Guidelines commentary states that factors the Court should consider include (1) "the exercise of decision making authority," (2) "the nature of participation in the commission of the offense," (3) the recruitment of accomplices," (4) "the claimed right to a larger share of the fruits of the crime," (5) "the degree of participation in planning or organizing the offense," (6) "the nature and scope of the illegal activity," and (7) "the degree of control and authority exercised over others." Guidelines § 3B1.1 Application Note 4. *See, e.g., United States* v. *Rigas*, 583 F.3d 108, 121 (2d Cir. 2009) (upholding four-level enhancement for the Rigases' roles in defrauding Adelphia); *United States* v. *Cabrera*, 379 Fed. Appx. 24, 27 (2d Cir. 2010) (finding leadership based on the recruitment and control of other participants in a conspiracy); *United States* v. *Sarpong*, 309 Fed. Appx. 464, 465 (2d Cir. 2009) (affirming leadership enhancement due to role recruiting, directing, and instructing others in the scheme); *United States* v. *Russo*, 281 Fed. Appx. 43, 48 (2d Cir. 2008) (upholding four-level enhancement because the defendant was "involved extensively in the criminal activity, hired accomplices to help him, and exercised control over them"); *United States* v. *Andino*, 277 Fed. Appx. 126, 128 (2d Cir. 2008) (affirming four-level enhancement due to defendant's role in overseeing filing of fraudulent tax returns, keeping a majority of the earnings, recruiting others to participate, and obtaining the information needed to file false returns); *United States* v. *Paccione*, 202 F.3d 622, 624 (2d Cir. 2000) (affirming leadership enhancement for defendants who "played a crucial role in the planning, coordination, and implementation of a criminal scheme"). Further, "[t]he four-level enhancement provision does not require the defendant to have organized or led all of the conspirators; what is needed instead is for the defendant to have been the organizer or leader of one or more participants, and for the conspiracy as a whole to have involved five or more persons." *United States* v. *Castillo*,

38

277 Fed. Appx. 77, 80-81 (2d Cir. 2008).

Here, all of the relevant factors show that Rajaratnam was an organizer and leader who planned the schemes, directed the schemes, recruited most participants, and benefitted the most from the schemes. Rajaratnam was the founder and head of Galleon and thus benefitted the most from the illegal profits flowing through that fund. Rajaratnam organized and led numerous individuals who participated in the fraudulent schemes, including, but not limited to, Kumar, Goel, Smith, Chellam, Panu, Chiesi, Rengan, Far, Goffer, Khan, and Liu. Rajaratnam paid hundreds of thousands of dollars to Kumar for inside information. Rajaratnam induced Goel to give inside information by giving Goel lavish gifts and executing securities transactions in Goel's brokerage account. Rajaratnam instructed and taught Chiesi, Smith, Chellam, and Panu how to cover up their criminal activities. Rajaratnam directed Kumar, Goel and Smith to obtain certain kinds of inside information that Rajaratnam wanted for purposes of trading stock. As the head of Galleon (and sizeable investor in Galleon funds), Rajaratnam had the right to the largest share of the fruits of this criminal conduct. He was the ultimate planner and schemer of almost every charged insider trading scheme. Rajaratnam rewarded those employees like Smith who participated in his schemes. Cheating through insider trading became Rajaratnam's business model. Because he was in the position of ultimate authority over his employees and other participants through his financial payments, Rajaratnam had the greatest degree of control and authority over other participants in these schemes. Indeed, at one point or another during the course of the illegal schemes, Rajaratnam was the supervisor and employer of no fewer than eight participants—Smith; Rengan; Chellam; Panu; Liu; Far; Goffer; and Khan.

39

Second, the evidence at trial demonstrated that Rajaratnam's criminal activity involved at least five participants or was otherwise extensive. With respect to the "five participants" prong of Section 3B1.1(a), the Guidelines commentary states that: "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Guidelines § 3B1.1 Application Note 1. The evidence at trial showed that the Galleon insider trading scheme, as charged in Count One, involved at least the following eight participants: (1) Rajaratnam; (2) Rengan Rajaratnam; (3) Kris Chellam; (4) Krish Panu; (5) Adam Smith; (6) Kamal Ahmed; (7) Rajat Gupta; and (8) Joe Liu. As demonstrated earlier, this scheme also involved Ali Far and Zvi Goffer. The evidence at trial further showed that Rajaratnam was engaged in insider trading schemes with at least the following ten additional participants: (9) Danielle Chiesi; (10) Kieran Taylor; (11) Robert Moffat; (12) Hector Ruiz; (13) Anil Kumar; (14) Rajiv Goel; (15) Roomy Khan; (16) Deep Shah; (17) Shammara Hussain; and (18) Sunil Bhalla.

Moreover, even if Rajaratnam's offenses somehow did not involve five or more participants (which it clearly did), it was "otherwise extensive" and therefore a 4-level enhancement still applies. The commentary to Section 3B1.1(a) states that: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." Guidelines § 3B1.1 Application Note 3. The extensiveness prong of Section 3B1.1(a) is "not so much about extensiveness in a colloquial sense as about the size of the organization in terms of persons involved that a defendant 'organize[d]' or 'le[d].' " *United States* v. *Carrozzella*, 105 F.3d 796,

803 (2d Cir. 1997).  The Second Circuit has set forth three factors in determining whether

criminal activity was "otherwise extensive": "(I) the number of knowing participants; (ii) the

number of unknowing participants whose activities were organized or led by the defendant with

specific criminal intent; [and] (iii) the extent to which the services of the unknowing participants

were peculiar and necessary to the criminal scheme."  *United States* v. *Rubenstein*, 403 F.3d 93,

99 (2d Cir. 2005) (quoting *Carrozzella*, 105 F.3d at 803–04); *see United States* v. *Bennett*, 252

F.3d 559, 566 (2d Cir. 2001) (finding that a scheme was "otherwise extensive" where

defendant's "frauds involved a wide array of witting or unwitting brokers, accountants, and

bankers").

 Here, the evidence at trial overwhelmingly showed that Rajaratnam's criminal activities

were "otherwise extensive."  There were at least eight knowing participants in the Galleon

insider trading scheme, as charged in Count One.  There were numerous unknowing participants

whose activities were organized and led by Rajaratnam with specific criminal intent.  For

example, Rajaratnam hired numerous traders to execute securities transactions based on material,

nonpublic information; Rajaratnam caused portfolio managers to execute securities transactions

based on material, nonpublic information; and Rajaratnam used numerous internal research

analysts to provide cover for his illegal trades.  The traders who executed Rajaratnam's trades

based on inside information and the portfolio managers who followed Rajaratnam's trades based

on inside information were essential to the crime.

 In short, Rajaratnam was an organizer or leader of a criminal activity that involved five or

more participants or was otherwise extensive.  A four-level enhancement for his leadership and

role in committing the offenses is required.

### 3.    Obstruction Enhancement

Pursuant to U.S.S.G. § 3C1.1, a two-level adjustment is warranted where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice..." and the obstructive conduct "related to [] the defendant's offense of conviction and any relevant conduct or a closely related offense." U.S.S.G. § 3C1.1. This enhancement applies to "committing . . . perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." U.S.S.G. § 3C1.1, note 4(b). To apply the adjustment, the District Court must find that "the defendant's statements unambiguously demonstrate an intent to obstruct justice." *United States* v. *Savoca*, 596 F.3d 154, 159 (2d Cir. 2010). Where the obstruction consists of perjury, the Court "must determine by clear and convincing evidence that the defendant provided 'false testimony concerning a material matter with the willful intent to provide false testimony.' " *Id.* (quoting *United States* v. *Kelly*, 147 F.3d 172, 178 (2d Cir. 1998).

The Second Circuit has affirmed the application of the enhancement where, as happened here, a defendant makes false statements in connection with a parallel SEC civil investigation. *United States* v. *Ware*, 577 F.3d 442, 454 (2d Cir. 2009) (defendant caused a false affidavit to be filed with the SEC); *United States* v. *Fiore*, 381 F.3d 89 (2d Cir. 2004) (defendant committed perjury under oath before the SEC); *see also United States* v. *Pirgousis*, 290 Fed. Appx. 388, 392 (2d Cir. 2008) (quoting *United States* v. *Carty*, 264 F.3d 191, 194 (2d Cir. 2001)) (affirming enhancement where defendant coached another to lie before the SEC).

On June 7, 2007, Rajaratnam appeared before the SEC to provide testimony under oath about insider trading. The very first stock that the SEC asked about was AMD. (Ex. EE, at 97-

98).  The SEC asked Rajaratnam about his basis for trading in AMD.  It asked about AMD

earnings announcements.  It asked about AMD's acquisition of ATI.  And it asked numerous

questions regarding whether any of Rajaratnam's contacts had access to inside information about

AMD.  The SEC asked more questions about AMD than any other stock.  (Ex. EE, at 97-141).

        At the time he responded to these questions, Rajaratnam had been receiving inside

information about AMD from Kumar for years.  Kumar was in the "very unusual and privileged

position" to be invited to AMD's "strategic counsel meetings."  (Tr. 333).  Kumar told this to

Rajaratnam, who responded that this was an opportunity for Kumar to obtain and share "useful

information."  (Tr. 333-34).  And Kumar did that.  Before Rajaratnam provided testimony to the

SEC, Kumar had tipped Rajaratnam about AMD's financial performance.  Kumar had tipped

Rajaratnam about AMD's acquisition of ATI.  Rajaratnam had paid Kumar as a consultant to

Galleon through soft dollar payments to "Pecos Trading."  Kumar had reinvested these payments

in Galleon in the name of his housekeeper, with Rajaratnam's knowledge.  And in January

2007—less than five months before the SEC testimony—Rajaratnam had paid Kumar a $1

million bonus for the ATI tip.  (Tr. 387-88; GX 772).

        Rajaratnam intentionally lied to the SEC to conceal his crimes with Kumar.  Rajaratnam

claimed that trading in AMD was "simple because I followed [AMD] for twenty years," and that

his trading was based on his model and a variety of information that was publicly available.  (Ex.

EE, at 100-101, 137).  Rajaratnam said, "You never know exactly what the [earnings per share]

number [is], you do your best guess."  (Ex. EE, at 137).  Rajaratnam specifically lied about

AMD's acquisition of ATI:

> Q: Did you have any reason to believe that AMD was going to acquire ATYT before the announcement of the acquisition?
>
> A: No.

(Ex. EE, at 114, lines 17-20).[17]

Rajaratnam also lied in response to a number of questions that, had he been truthful, could have revealed that he had a friend, investor, and paid consultant—Kumar—who worked as a consultant to AMD:

> Q: Do any investors in Galleon work for AMD?
>
> A: No.

(Ex. EE, at 138, lines 22-23).[18]

> Q: Do you have reason to believe that anyone with whom you do communicate about AMD has access to inside information about AMD?
>
> A: No.

(Ex. EE, at 141, lines 10-13).[19]

---

[17] Rajaratnam had in fact obtained inside information about ATI from not only Kumar, but also Smith.

[18] At trial, Kumar testified that he performed consulting work for AMD, and was a Galleon investor, in 2007. (Tr. 333, 394). By mid-2007, Kumar had been tipping Rajaratnam on AMD for years. (Tr. 333-37).

[19] Clearly an individual of Rajaratnam's sophistication understood what was meant by the term "inside information." And his understanding of the term was demonstrated through his own testimony. Rajaratnam testified that he was familiar with the term "inside trading," and that he knew it was wrong. (Ex. EE, at 77). When asked to describe Galleon's policies to deter inside trading, Rajaratnam replied, "If you get material, non-public information, you put it on the restricted list." (*Id.*). Rajaratnam further testified that he understood that "material" information included  information regarding a merger that contained definitive terms, as well as specific information regarding earnings. (Ex. EE, at 82).

> Q: Sitting here today are you aware of any investors in
> Galleon who are consultants to issuers?
>
> A: What do you mean by issuers?
>
> Q: Publicly traded companies.
>
> A: Not that I know of.

(Ex EE, at 84, lines 12-16).

> Q: To your knowledge does Galleon pay anybody to serve
> as a consultant to Galleon providing insight or analysis?
>
> A: I know we do but I don't know who.

(Ex. EE, at 85, lines 10-13).

All of this testimony was false.  As the Government proved at trial Rajaratnam well knew

that (a) Kumar had, for years, had access to inside information about AMD and regularly

communicated it to Rajaratnam; (b) Kumar was an investor in Galleon and a consultant to AMD

and other publicly traded companies; and (c) Galleon was paying Kumar to serve as a

"consultant" providing inside information.  Unbeknownst to the SEC, Rajaratnam was acting

behind the scenes to even further conceal Kumar:  Rajaratnam instructed Kumar that, because

"the SEC now is scrutinizing these things a lot more," Kumar should transfer his Galleon

investment out of the name of his housekeeper.  (Tr. 391-94; GX 2131).  Rajaratnam's perjurious

obstruction worked very effectively: by not mentioning Kumar in response to any of these

questions, Rajaratnam successfully hid him as a source from the SEC.  (At the *Franks* hearing,

SAUSA Andrew Michaelson testified that as of March 2008, the SEC "had not identified

[Kumar] as a source of inside information."  (Franks Tr. 315).)  It was only with the subsequent

wiretaps that the Government was able to uncover Kumar as a source of inside information.

Rajaratnam also lied to the SEC about Xilinx.  At trial, the Government proved that Rajaratnam received inside information about Xilinx from Chellam, including a tip regarding a Xilinx December 2006 business update regarding quarterly earnings.[21]  (GX 33-37; Tr. 2613-16). Rajaratnam falsely stated to the SEC that his Xilinx trades were based on his analyst and his own "understanding the market."  (Ex. EE, at 163).  When the SEC specifically asked about Chellam and the December 2006 update, Rajaratnam lied:

> Q: Did you base any of your decisions to trade in Xilinx on any information obtained from Kris Chellam?
>
> A: I would not compromise him.  I would not speak to Kris on Xilinx.
>
> Q: So your answer to that question is no?
>
> A: No.

(Ex. AA, at 164 line 25 to 165 line 5)

> Q: Did you have any communications with Kris Chellam regarding this release [Xilinx's December 2006 business update] before it came out?
>
> A: No.

(Ex. AA, at 167, lines 1-3)

Finally, Rajaratnam lied in response to general questions about insider trading:

> Q: Have you ever come into possession of material non-public information?
>
> A: Me personally, no.

---

[21]Chellam later joined Galleon and was intercepted discussing the creation of an "email trail" to conceal an inside trade.  (GX 524).

(Ex. AA, at 77, lines 16-18).[22]

> Q: Has Galleon ever made a trade on the basis of non-public information?
>
> A: Not to my knowledge.
>
> Q: Have you ever suspected that anyone at Galleon ever engaged in insider trading?
>
> A: No.

(Ex. AA, at 184, lines 6-11).

Rajaratnam lied with the specific intent to obstruct justice. Indeed, "[a] subject who decides upon perjury in an SEC proceeding will do so principally because the goal is to avoid all liability or criminal liability in particular." *Fiore*, 381 F.3d at 94-95.

The Government respectfully submits that Rajaratnam's lies and obstructive conduct must have consequences. Hedge fund managers and others must know that, if the SEC takes their testimony in connection with an investigation and they speak to the SEC, they must tell the truth. Testifying under oath is not a game in which deponents pick and choose the questions they want to answer truthfully and which ones they want to parse, obfuscate, and answer untruthfully. Hedge fund managers and others must know that they will not get a free pass for lying to the primary regulators of our securities markets. Accordingly, Rajaratnam's obstructive conduct and lies to the SEC must be reflected in his sentence to send a strong message that lying under oath to the SEC will be punished severely.

---

[22] As discussed *supra* at note 20, Rajaratnam understood that "material" information included information about mergers that had definitive terms. Given that Rajaratnam had received such information from Kumar regarding the ATI acquisition, Rajaratnam perjured himself in response to this question under his own understanding of the term "material."

47

### E.     The Appropriate Sentence

Rajaratnam's numerous schemes to defraud the investing public by obtaining and then trading based on material, nonpublic information over many years warrants a significant term of imprisonment. His sentence should reflect his leadership role in these schemes, as well as his obstructive conduct. Rajaratnam's criminal conduct was motivated by greed and the desire to conquer others on Wall Street. In terms of scope, length, sophistication, planning, harm, and potential benefit, Rajaratnam's crimes were serious and warrant substantial punishment. In terms of general deterrence, Rajaratnam's crimes demand a significant sentence. Accordingly, the Government respectfully submits that this Court should sentence Rajaratnam to a term of imprisonment within the Guidelines range of 235 to 293 months in order to reflect the seriousness of Rajaratnam's offenses, promote respect for the laws against insider trading, provide just and fair punishment for perhaps the worst insider trading offender (who has been caught to date) in history, and deter others from committing insider trading.

## V.     REMAND

Pursuant to Title 18, United States Code, Section 3143(b)(1), the Government respectfully submits that this Court should remand Rajaratnam and deny any request for bail pending appeal of his conviction and sentence. Rajaratnam cannot overcome the statutory presumption in favor of detention. Rajaratnam is a serious flight risk and unable to demonstrate by clear and convincing evidence that he is unlikely to flee. Moreover, Rajaratnam is unable to bear the heavy burden of demonstrating that his appeal raises a substantial question of law or fact likely to result in reversal, an order for a new trial, or a non-incarceratory sentence.

In order to succeed on a motion for bail pending appeal, Rajaratnam bears the burden of demonstrating: (1) by clear and convincing evidence that he is not likely to flee; (2) that his appeal raises a substantial question of law or fact; and (3) that the substantial question of law or fact will likely result in a reversal, an order for a new trial, or a non-incarceratory sentence. 18 U.S.C. §§ 3143(b).

There is a statutory presumption that a defendant who is sentenced to a term of imprisonment will be detained pending appeal.  *See United States* v. *Randell*, 761 F.2d 122, 124-25 (2d Cir. 1985) ("on all the criteria set out in subsection (b), the burden of persuasion rests on the defendant."); *United States* v. *Abuhamra*, 389 F.3d 309, 317 n. 5 (2d Cir. 2004) (there is a "heavier burden imposed by 18 U.S.C. § 3143(b)," which applies to bail pending appeal, compared to release pending sentencing under § 3143(a)); *United States* v. *Ciccone*, No. 07 Cr. 399 (DLC), 2008 WL 2498242, at *1 (S.D.N.Y. June 19, 2008) ("The statute, then, creates a "presumption that a defendant who has received a sentence of imprisonment will be detained pending appeal...."); *United States* v. *Weisberg*, No. 07-CR-66, 2008 WL 5114218, at *1 (W.D.N.Y. Nov. 25, 2008) ("The convicted defendant bears a heavy burden in arguing for release pending appeal" under this provision.); *United States v. Ramjohn*, No. 96 CR 767, 2008 WL 974580, at * 1 (E.D.N.Y. Apr. 8, 2008) (same). As the Second Circuit explained in *Abuhamra*, the Government had a "strong and obvious countervailing interest in detaining defendants who have been found guilty beyond a reasonable doubt of serious crimes: such detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by law."

49

*Abuhamra*, 389 F.3d at 319-20. Indeed, that was a "significant impetus" to the enactment of Title 18, United States Code, Section 3143. *Id.* at 320 (citing S. Rep. 225, 98ᵗʰ Cong., 1ˢᵗ Sess. 26 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News at 3209 (noting that "release of a criminal defendant into the community after conviction may undermine the deterrent effect of the criminal law")).

Given the statutory presumption in favor of detention and the burden on the defendant, courts in the Second Circuit have repeatedly and consistently denied motions for bail pending appeal in cases where defendants have received far lower sentences than the one Rajaratnam is facing. *See, e.g., United States* v. *Khalil*, No. 07-CR-111S (WMS), 2011 WL 194607, at *1 (W.D.N.Y. Jan. 20, 2011) (denying motion for bail pending appeal of four-month sentence); *United States* v. *Contorinis*, 09 Cr. 1083 (RJS) (S.D.N.Y. Oct. 7, 2010) (remanding portfolio manager of a hedge fund facing a sentence of 97 to 121 months' imprisonment for illegal insider trading); *United States* v. *Seminerio*, S1 08 Cr. 1238 (NRB), 2010 WL 3341887, at * (S.D.N.Y. Aug. 20, 2010) (denying motion for bail pending appeal of 6-year sentence based on purported impact of a recent Supreme Court decision striking down honest services mail fraud); *United States* v. *Daneman*, No. 06 Cr. 717 (AKH), 2008 WL 2260832, at *1-5 (S.D.N.Y. May 30, 2008) (denying motion for bail pending appeal of 25-month sentence for Mann Act violation following jury's guilty verdict); *United States* v. *Zafar*, No. 06–CR–289 (JG), 2008 WL 123954, *2 (E.D.N.Y. Jan. 11, 2008) (denying motion for bail pending appeal of 57-month sentence for conspiracy to commit securities fraud and securities fraud following the jury's guilty verdict); *United States* v. *Blake*, No. 05 Cr. 443 (NRB), 2007 WL 4249092, at *3 (S.D.N.Y. Nov. 29, 2007) (denying motion for bail pending appeal of 27-month sentence for wire fraud and

conspiracy to commit mail and wire fraud following the jury's guilty verdict); *United States* v. *Corrigan*, No. 3:07 Cr. 2 (JBA), 2007 WL 2255127 (D.Conn. Aug. 3, 2007) (denying motion for bail pending appeal of 8-month sentence for one count of mail fraud based on purported issues relating to the sentence following a guilty plea); *United States* v. *Amato*, No. 01 Cr. 58 (LTS), 2007 WL 1438771 (S.D.N.Y. May 17, 2007) (denying motion for bail pending appeal of sentence on fraud convictions following the jury's guilty verdict); *United States* v. *Gordon*, No. 03 CR. 1115-03 (RWS), 2007 WL 162491 (S.D.N.Y. Jan. 22, 2007) (denying motion for bail pending appeal of 37-month sentence for conspiracy to commit mail fraud and mail fraud following his guilty plea); *United States* v. *Campbell*, No. 04 CR. 452 (RMB), 2005 WL 2001882 (S.D.N.Y. Aug. 19, 2005) (denying motion for bail pending appeal of 5-month sentence for knowingly making false statements in connection with firearms purchases following a guilty plea); *United States* v. *Jailall*, No. 00 Cr. 69 (RWS), 2001 WL 406205 (S.D.N.Y. Apr. 20, 2001) (denying motion for bail pending appeal of 21-month sentence for bank fraud and credit card fraud following the jury's guilty verdict).

First, Rajaratnam cannot demonstrate by clear and convincing evidence that he is not likely to flee. 18 U.S.C. § 3143(b)(1)(A). Rajaratnam faces a substantial term of imprisonment. The applicable Guidelines range is appropriately high. The sentence imposed by this Court will undoubtedly provide a substantial incentive for Rajaratnam to flee. Further, Rajaratnam's deceptive conduct in committing his crimes reflects his willingness to evade the law and the sophistication to carry it out. His crimes were not a momentary lapse of judgment and did not arise out of a single event, but rather constituted repeated acts of fraudulent and deceptive conduct over many years. Rajaratnam knows how to move money around the globe to and from

accounts in phony names, and he knows how to cover his tracks. Moreover, Rajaratnam's lies under oath during the SEC's investigation reflect a willingness to obstruct justice and further violate the law in order to avoid civil charges and civil damages. The evidence shows that Rajaratnam has done and would do far more to avoid facing criminal sanctions. Finally, Rajaratnam has the financial means to flee, strong ties to Sri Lanka and other countries, and has traveled outside the United States extensively. Rajaratnam is of Sri Lankan heritage with significant assets located there, and there is a serious risk that the United States will not be able to extradite a defendant of Sri Lankan heritage who flees to Sri Lanka. In the 22 years that the United States has had an extradition treaty with Sri Lanka, not a single citizen has been extradited by Sri Lanka to face prosecution here.

Under similar circumstances, defendants have been detained. *See, e.g., United States* v. *Madoff*, 316 Fed. Appx. 58, 59 (2d Cir. 2009) ("As to the incentive to flee (based on his age and exposure to a lengthy imprisonment), we consider that such an incentive naturally bears upon and increases the risk of flight"); *United States* v. *Contorinis*, 09 Cr. 1083 (RJS) (S.D.N.Y. Oct. 7, 2010) (remanding portfolio manager of a hedge fund convicted of illegal insider trading because he had the means to flee, demonstrated a willingness to evade detection and conviction, and would not likely be extradited to the United States if he fled to Greece given his Greek citizenship); *United States* v. *Nouri*, No. 07 Cr. 1029, 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (noting that defendant "has engaged in dishonest and obstructive conduct, ... committed fraud [,] ... was less than forthright with his own colleagues....").

Second, Rajaratnam cannot demonstrate that his appeal raises a substantial question of law or fact likely to result in a reversal, an order for a new trial, or a non-incarceratory sentence.

52

18 U.S.C. § 3143(b)(1)(B).  Rajaratnam has argued that this Court's decision not to suppress the wiretaps raises a substantial issue on appeal. (Tr. 5717).  But Rajaratnam simply cannot meet his burden in this case.  While the Government will not rehash here all the arguments previously made on this issue, suffice it to say that the evidence offered at trial—and the vigorous defenses mounted to meet that evidence, including the defendant's supposedly innocent explanations for his trading—more than demonstrated the necessity of the wiretaps to prove not only Rajaratnam's criminal conduct, but that of his wide network of accomplices.

Rajaratnam cannot overcome the statutory presumption and meet the conditions for bail pending appeal set forth in Section 3143(b)(1)(B).  Accordingly, Court should remand the defendant upon sentencing him to any substantial term of incarceration.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that this Court should sentence Rajaratnam to a substantial term of imprisonment within the applicable guidelines range of 235 to 293 months.  Such a sentence is necessary to punish Rajaratnam for his extensive criminal activities, and to send a clear and unambiguous message to hedge funds and money managers that insider trading will not be tolerated.

Dated: New York, New York
        August 9, 2011

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                      By:    _____
                              JONATHAN R. STREETER
                              REED M. BRODSKY
                              Assistant United States Attorneys
                              Tel: 212-637-2272/2492
                              ANDREW Z. MICHAELSON
                              Special Assistant U.S. Attorney
                              Tel: 212-637-2348