UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- against -

RAJ RAJARATNAM,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**
**AND ORDER**

09 Cr. 1184 (RJH)

Richard J. Holwell, District Judge:

On May 11, 2011, a jury found defendant Rajaratnam guilty of five counts of conspiracy to commit securities fraud and nine counts of securities fraud.   Before the Court is Rajaratnam's renewed motion pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on all counts.  For the following reasons, the motion is denied in its entirety.

## BACKGROUND

On January 20, 2011, a grand jury returned a second superseding indictment charging Rajaratnam with five counts of conspiring to trade on the basis of inside information and nine substantive counts of insider trading.  Trial began on March 8, 2011 and continued for eight weeks.   The evidence adduced at trial is summarized in relevant part below.

On April 6, 2011, at the close of the government's case, Rajaratnam moved pursuant to Rule 29 for judgment of acquittal on all counts.  (*See* Tr. 3684.)  The Court reserved decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b).  On April 18, 2011, at the close of the evidence, Rajaratnam renewed his motion for judgment of acquittal on all counts.  (*See* Tr. 5142.)  The Court again reserved decision.

On May 11, 2011, the jury found Rajaratnam guilty on all counts.  On May 25, 2011, Rajaratnam again renewed his motion [280] for judgment of acquittal on all counts.

## LEGAL STANDARD

### A.  Rule 29

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  "A district court may enter a judgment of acquittal on this basis only if 'after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Ghailani*, 761 F. Supp. 2d 167, 171 (S.D.N.Y. 2011) (quoting *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002)).  Put another way, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt in order for a court to acquit." *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

This "standard places a heavy burden on the defendant. . . ." *United States v. Bullock,* 550 F.3d 247, 251 (2d Cir. 2008).  And this is particularly true in a conspiracy case where "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Santos,* 541 F.3d 63, 70 (2d Cir. 2008).

### B. Conspiracy

"The essence of conspiracy is the agreement and not the commission of a substantive offense." *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998). "The prosecution must establish three elements in order to prove a conspiracy: (1) an agreement between two or more persons to commit an unlawful act; (2) the defendant's knowing and intentional membership in the conspiracy; and (3) the commission of an 'overt act' in furtherance of the conspiracy." *United States v. Hamilton*, 538 F.3d 162, 174 (2d Cir. 2008). With respect to the first two elements, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). That is, "[t]he record must . . . permit a rational jury to find:  (1) the existence of the conspiracy charged, (2) that the defendant had knowledge of the conspiracy, and (3) that the defendant intentionally joined the conspiracy." *Santos*, 541 F.3d at 70 (internal citations omitted).

"Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *United States v. Stewart,* 485 F.3d 666, 671 (2d Cir. 2007). "However, in order to prove conspiracy . . . it is also true that the Government must show 'more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity.'" *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (quoting *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001)). Nevertheless, "coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the

plan." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).  In the context of a multi-level conspiracy to trade on the basis of inside information, these principles mean that "the most basic element of a single conspiracy" is "an agreement to pass inside information to [an immediate tippee] and possibly to another person, even if unknown." *Id.* at 138.

### C. Insider Trading

Section 10(b) of the Securities Exchange Act of 1934 makes it

. . . unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b–5 promulgated by the SEC makes it

. . . unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud. . . .

17 CFR § 240.10b–5(a) (1996).

Section 10(b) and Rule 10b-5 "are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.  Trading on such information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'"  *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (brackets in original) (quoting *Chiarella v. United States,* 445 U.S. 222, 228 (1980)).

"The ambit of Rule 10b-5's prohibition on insider trading extends beyond the insiders who themselves have a fiduciary duty, but also to the 'tippee' recipients of insider information from those who are insiders."  *SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 726 (S.D.N.Y. 2003).   "An individual is liable as a tippee under Rule 10b-5 if (1) the tipper possessed material nonpublic information regarding a publicly trade company; (2) the tipper disclosed this information to the tippee; (3) the tippee traded in securities while in possession of the information; (4) the tippee knew[1] . . . that the tipper had violated a fiduciary duty by providing the information to the tippee; and (5) the tippee benefitted from the disclosure of the information by the tipper."  *Id.* (citing *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998)).

"Information is material if 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'"  *Id.* (brackets in

---

[1] *Warde*, *Ballesteros Franco*, and other civil cases refer to "knew or should have known." *See Warde*, 151 F.3d at 47; *Ballesteros Franco*, 253 F. Supp. 2d at 726.   The courts do not appear to have squarely decided whether that scienter standard also applies in criminal cases, though several courts, including the Supreme Court, have used the "knew or should have known" language in criminal cases.  *See United States v. O'Hagan*, 521 U.S. 642, 675 (1997) ("To show that a tippee who traded on nonpublic information about a tender offer had breached a fiduciary duty would require proof not only that the insider source breached a fiduciary duty, but that the tippee knew or should have known of that breach."); *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (stating that "the Government was also required to prove that Hughes and Stacy, as tippees . . .  knew or should have known that Blackwell breached his fiduciary duty"); *United States v. Evans*, 486 F.3d 315, 324-25 (7th Cir. 2007) (stating that "in order to be liable, a tippee must have a derivative duty not to trade on material nonpublic information because the insider's disclosure was improper and the tippee knew or should have known that it was improper"); *United States v. Ruggiero*, 56 F.3d 647, 655 (5th Cir. 1995) (stating that "there was sufficient evidence for the jury to conclude that Parker knew or should have known that Ruggiero's information was gained via the breach of a fiduciary duty").  However, the Court need not resolve that question here because the Court instructed the jury that "the government must also prove beyond a reasonable doubt that Mr. Rajaratnam knew that the information had been disclosed by an insider in breach of a duty of trust and confidence."  No party objected to that instruction.

original) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988)); *see also United States v. Cusimano*, 123 F.3d 83, 88 (2d Cir. 1997) ("It is well settled that in order for information to be material' for purposes of § 10(b) and Rule 10b-5, there must be a substantial likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available.").  "This inquiry is guided both by the probability that an event will occur and the anticipated magnitude of the event relative to the totality of the company's activity." *Id.*

"Information becomes public when disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (quoting *Dirks*, 463 U.S. at 653 n.12), "or when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock.'" *Mayhew*, 121 F.3d at 50 (quoting *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)).  "The issue is not the number of people who possess it but whether their trading has caused the information to be fully impounded into the price of the particular stock." *Id.*  Thus "information may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it." *Id.*  That is because "[o]nce the information is fully impounded in price, such information can no longer be misused by trading because no further profit can be made." *Id.*

In addition, "[t]o constitute non-public information under the act, information must be specific and more private than general rumor." *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir. 1996).  Hence it is not the law that "any predictions made by an insider

can constitute the basis for insider trading simply because a tippee relies upon them and their source, and they subsequently come true." *Id.*

As for the required benefit to the insider/tipper, it can be financial or tangible: "there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient." *Dirks*, 463 U.S. at 664. However, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend." *Id.* In that case, "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Id.*

Finally, the Court is persuaded by Judge Sweet's decision in *State Teachers Retirement Board v. Fluor Corporation*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984), that "knowledge of tipper breach [of fiduciary duty] . . . necessitates tippee knowledge of *each element,* including the personal benefit, of the tipper's breach." *Id.* at 594 (emphasis in original). The Court reaches that conclusion because, under the Supreme Court's decision in *Dirks v. SEC*, 463 U.S. 646 (1983), "[d]erivative liability can attach only if the tippee recognizes that the relationship between tipper and tippee is such that the tippee has effectively become a participant after the fact in the insider's breach.'" *Fluor Corp.*, 592 F. Supp. at 594-95 (quoting *Dirks*, 463 U.S. at 659). "Consequently, unless the tippee knew . . . that the tipper had satisfied the elements of tipper liability, the tippee cannot be said to be a knowing participant in the tipper's breach." *Fluor Corp.*, 592 F. Supp. at 595.[2] The Court so instructed the jury here.

---

[2] While a direct tippee may readily be shown to have knowledge of a tippee's breach of fiduciary duty, problems of proof may arise in establishing that a remote tipper knows that a tip was the result of an indirect tipper's breach of a duty or trust.

**DISCUSSION**

**A.  Conspiracy Counts**

**1.  Count One: The Galleon Conspiracy**

Count One charged Rajaratnam with conspiring with certain then-current and former Galleon employees, and others, to commit insider trading.  With respect to this count, the government presented evidence that Rajaratnam agreed to trade on the basis of inside information he had received from several sources.

First, the government sought to prove that Rajaratnam conspired to trade on the basis of inside information he received from Adam Smith, a Galleon analyst and portfolio manager with whom he worked closely.  Smith himself testified that he tipped Rajaratnam to inside information regarding merger activity at Integrated Circuit Systems (ICST), ATI Technologies, Inc. ("ATI"), and Vishay Intertechnology Inc ("Vishay").  Smith testified that he had learned this information from Kamal Ahmed, an investment banker at Morgan Stanley which served (or bid for contracts to serve) as a financial advisor in transactions with those companies.  This testimony was corroborated at least in part by a wiretapped phone call in which Smith told Rajaratnam that "Kamal" had told him that Morgan Stanley had bid to work on a transaction involving Vishay.  (GX 692, 692T.)  Smith also testified that Rajaratnam told him that he called Kris Chellam, an executive at Xilinx who later joined Galleon, to obtain Xilinx's revenue and earnings data before the company publicly announced that information. (Tr. 2614-15.)

"The law is well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'"

8

*United States v. Florez,* 447 F.3d 145, 155 (2d Cir. 2006) (quoting *United States v. Parker,* 903 F.2d 91, 97 (2d Cir. 1990)).  In addition, "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."  *Stewart,* 485 F.3d at 671.  A reasonable jury could have found Rajaratnam guilty as to Count One on the basis of Smith's testimony alone.

Rajaratnam argues that "there is no evidence before the jury . . . that Mr. Rajaratnam knew this was anything other than a routine channel check . . . that Mr. Smith was supposed to be doing as an analyst and later a portfolio manager at Galleon."  (Tr. 3686.)  Rajaratnam is incorrect.  For one, Smith testified that he understood Rajaratnam to have been aware that he was receiving inside information.  For another, Smith's reference to "Kamal" by his first name in the wiretapped call regarding Vishay suggested that Rajaratnam knew who "Kamal" was.  Indeed, Smith testified that it was his understanding that Rajaratnam knew that "Kamal" was Kamal Ahmed and that he and Rajaratnam had never discussed any other person named Kamal.  (Tr. 2604.)

What is more, the government introduced several e-mails in which Smith referred to ICST and its putative merger partner Integrated Device Technology ("IDT") as the "Eyes."  (GX 2454, 2455, 2456.)  Two of the e-mails contained phrases such as "we are still on track" and "game on" that appeared to refer to the progress of a transaction.  A third e-mail referred to "May 16" and the government introduced a contemporaneous e-mail received by Ahmed indicating that the company planned to announce the merger on that date.  (GX 2457.)  The cryptic homonym in these e-mails appears to suggest that Smith felt a need to conceal the names of the companies and that Rajaratnam would

understand the code—two facts from which the jury could infer that Smith and Rajaratnam had secret information.  Indeed, Smith testified that he used the code name to conceal the names of ICST and IDT and that Rajaratnam generally instructed him and others at Galleon to be vague when communicating sensitive information in writing.  (Tr. 2498, 2502, 2597).  Smith also testified that Rajaratnam asked him to send e-mails to establish a written record of "a reason other than the acquisition to buy the stock of" ATI. (Tr. 2597; *see also* GX 2402.)

The government also sought to prove that Rajaratnam conspired to trade on the basis of inside information he received from Rajat Gupta, a member of the board of directors of Goldman Sachs.  Specifically, the government sought to prove that Gupta tipped Rajaratnam regarding (1) Berkshire Hathaway's agreement on September 23, 2008 to invest $5 billion in Goldman Sachs during the onset of the financial crisis; and (2) Goldman Sachs's intention to announce losses for the third quarter of 2008—the first time that the firm had ever posted a loss.

On that score, the government presented evidence that Gupta called Rajaratnam just seconds after Goldman Sachs board meetings at which the Berkshire Hathaway investment and unprecedented losses had been discussed, and that Rajaratnam traded Goldman Sachs shares just minutes after his calls with Gupta.   The government also introduced three wiretapped calls.  In the first, Gupta told Rajaratnam about information discussed at a Goldman Sachs board meeting, statements which suggest that Gupta was willing to disclose the inner workings of the Goldman board.  (GX 534, 534TR.)  In the second call, Rajaratnam told George Lau, a Galleon employee based in Singapore, that he had received a call at 3:58 P.M.—the exact time that Gupta called following a board

meeting at which the Berkshire Hathaway investment was approved—"saying something good might happen to Goldman."  (GX 627, 627TR.)  And in the third call, Rajaratnam stated that he "heard yesterday from somebody who is on the board of Goldman Sachs that they are going to lose $2 per share."  (GX 678, 678T.)

Rajaratnam argues that relying on the calls and trading records without any direct evidence of the content of the calls asks the jury to engage in impermissible speculation. (Tr. 3688.)  However, the Court of Appeals has rejected that proposition.  *See McDermott*, 245 F.3d 133.

In *McDermott*, the Second Circuit considered the insider trading conviction of McDermott, a corporate executive, for tipping Gannon, with whom he was having an affair.  Neither McDermott nor Gannon (nor Pomponio, whom Gannon tipped during the course of another affair) testified.  Rather, "[t]he Government built its case against McDermott almost entirely on circumstantial evidence linking records of telephone conversations between McDermott and Gannon with records of Gannon's and Pomponio's trading activities."  *Id.* at 136.  Specifically, the government presented evidence

> (1) that McDermott and Gannon were having an affair involving incessant telephone conversations; (2) that Gannon, who was up until this point an amateur trader, opened a trading account funded by monies given to her by McDermott; (3) that during the alleged conspiracy period, Gannon traded twenty-one times in twelve different stocks based upon McDermott's recommendations; (4) that Gannon traded in non-blue chip stocks, many of which were banks subject to non-public negotiations with [McDermott's company]; (5) that Gannon was quite successful in her trading and in the timing of her trades; (6) that telephone conversations between Gannon and McDermott coincided with Gannon's trading activity; and (7) that Gannon shared her recommendations with Pomponio.

*Id.* at 138.  "Although the government was unable to produce direct evidence of the content of any conversation during which McDermott transferred material, non-public

information to Gannon," the Second Circuit held "that rational minds could infer such a conclusion from the above evidence."  *Id.* at 139.  That was because "[c]ircumstantial evidence is a legitimate form of evidence in this Circuit, and in fact-intensive cases . . . requiring careful examination of trading records and a myriad of public information, the jury is the appropriate body to determine a defendant's guilt or innocence."  *Id.*

The government's proof as to Rajaratnam and Gupta is materially indistinguishable from the proof in *McDermott*.  The government presented evidence that Rajaratnam and Gupta were friends, partners in a financial outfit called New Silk Route, and prospective colleagues in a new Galleon fund called Galleon International; that Gupta and Rajaratnam spoke within minutes of Goldman Sachs board meetings; and that Rajaratnam made substantial trades closely following these phone calls.  While Rajaratnam was surely not an amateur trader, the government introduced wiretapped calls in which Rajaratnam, like Gannon, shared the information with others.  This evidence was sufficient for the jury to conclude that Rajaratnam conspired to trade on the basis of inside information regarding Goldman Sachs.  Accordingly, the jury had evidence several times over to find Rajaratnam guilty beyond a reasonable doubt as to Count One.

### 2.  Count Two:  The Rajaratnam-Khan Conspiracy

Count Two charged that Rajaratnam conspired with Roomy Khan, a former Galleon employee, to trade on inside information regarding Polycom, Hilton and Google.  Specifically, the government alleged that Rajaratnam and Khan conspired to trade on the basis of information Khan obtained regarding (1) Polycom's January and April 2006 earnings announcements; (2) the Blackstone Group's acquisition of Hilton; and (3) Google's July 2007 earnings announcement.  The government alleged that Khan obtained

the inside information from Sunil Bhalla, a Polycom employee; Deep Shah, a Moody's analyst assigned to work on Hilton bond ratings; and Shumarra Hussein, an employee of Market Street Partners, an investor relations firm providing services to Google.

The government did not present any testimony by Khan or any inside source. Rather, the government presented witnesses from Polycom, Moody's, and Market Street Partners who testified that Bhalla, Shah, and Hussein had access to inside information; phone records showing that these three sources made numerous calls to Khan around the time of the events allegedly conveyed in the tips; phone records showing that Khan called Rajaratnam shortly after her calls with the three sources; and trading records showing that Khan and Rajaratnam traded Polycom, Hilton and Google shares shortly following their phone calls. The government also introduced evidence that Rajaratnam instructed his trader to sell his entire position in Google immediately after speaking with Khan.

In addition, the government introduced (1) Rajaratnam's own testimony before the SEC that he knew Khan from her work at Galleon and still had enough contact with her to know that she was a trader; (2) trading records showing that Rajaratnam had not traded Hilton stock in 2007 prior to making the trades following his calls with Khan; (3) FedEx records showing that Khan appeared to use a fake name to send a package to Hussein; (4) records that Khan had access to Bhalla's trading account; (5) an instant message from Khan to Rajaratnam telling him "Do not buy [Polycom] until I get guidance" (GX 64); (6) an instant message from Rajaratnam thanking Khan for the information (GX 64); (7) an instant message sent shortly after calls with Khan in which Rajaratnam asked one of his traders to sell all of his Google holdings (GX 1537); and (8) trading records showing that Rajaratnam not only sold his entire long position but also

took a short position (GX 58).  In addition, Kumar testified that Rajaratnam told him that

he knew that Google planned to announce surprisingly poor results in July 2007 and that

Rajaratnam seemed excited about that.  (Tr. 408.)

Rajaratnam argues that a judgment for acquittal is warranted because "all the

government has established is that these three individuals had access to certain

information" (Tr. 3692), but "the trial record is completely devoid of evidence indicating

that Mr. Rajaratnam knew that Roomy Khan was speaking to any corporate insiders."

(Def.'s Br. at 5; *see also* Tr. 3697 ("The jury would have no basis to conclude that there

was some material nonpublic information because they never put in any proof of what it

is.").

That claim does not withstand scrutiny.  The government introduced an instant

message in which Khan told Rajaratnam "Do not buy Polycom until I get guidance."  The

record is replete with testimony that it is widely known on Wall Street that a company's

earnings guidance is generally not public until the company formally announces it.   The

record is equally replete with testimony that Rajaratnam was among the most

sophisticated investors on Wall Street.  It defies common sense to say that no reasonable

jury could find that Rajaratnam understood Khan's reference to "guidance" to refer to

inside information and that her instruction reflects some preexisting arrangement

regarding Polycom stock.

Rajaratnam argues that "professional analysts and portfolio managers routinely

attempt to 'get' accurate guidance numbers in advance of earnings announcements by

analyzing publicly available information."  (Def.'s Reply at 4.)  True enough, but the jury

was well within reason to conclude that "get guidance" is a rather strange way to refer to

"analyzing publicly available information" and that Rajaratnam had an elite group of analysts at his disposal if he was truly interested in analysis.   Accordingly, considering the instant message in light of the other circumstantial evidence, the jury was well within reason to interpret the message as a reference to obtaining guidance information from an inside source before it was announced.[3]  For the same reason, it is not the case that "[t]he jury would have no basis to conclude that there was some material nonpublic information because [the government] never put in any proof of what it is."  (Tr. 3697.)  Based on the timing of the instant messages and calls, a reasonable jury certainly could have found that Khan told Rajaratnam to wait until she had a tip on guidance; that she called Rajaratnam to inform him of the tip; and that Rajaratnam thanked her for it.

Neither of the cases cited by Rajaratnam, *SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365 (S.D.N.Y. 2002), and *SEC v. Truong*, 98 F. Supp. 2d 1086 (N.D. Cal. 2000), negates the logic of these inferences.  The court in *Gonzalez de Castilla* granted

---

[3] Rajaratnam also argues that the evidence "cannot support the further factual finding that Mr. Rajaratnam knew where Khan was getting her ideas, if indeed she was getting them from Bhalla, Hussain, and Shah."  (Def.'s Br. at 6.)  To the extent that Rajaratnam is arguing that he could not be convicted of conspiring with Khan to trade on inside information because he did not know who Bhalla, Hussain, and Shah were, that argument is misplaced.  In cases such as this one involving an initial tipper (Bhalla, Hussain, and Shah), an intermediate tippee (Khan), and a remote tippee (Rajaratnam), a remote tippee cannot be convicted of conspiring with the initial tipper unless the government can prove that the agreement between the tipper and intermediate tippee "include[d] trading by or for persons other than the small group of conspirators"; that the tipper and intermediate tippee "reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees"; or the initial tipper's "actual awareness of the remote tippees.  *United States v. Geibel*, 369 F.3d 682, 690 (2d Cir. 2004) (citing *United States v. McDermott,* 245 F.3d 133, 137-38 (2d Cir. 2001)).  However, that holding has no application to the existence of a conspiracy between the intermediate and remote tippees.  Indeed, the Second Circuit has upheld the conviction of a remote tippee for conspiring with an intermediate tipper even where it has reversed the conviction of the initial tipper for conspiring with the remote tippee.  *See United States v. McDermott*, 277 F.3d 240 (2d Cir. 2002).

summary judgment to the defendant on the SEC's insider trading claim where the defendant's trading occurred *before* the firm from whom he allegedly learned inside information regarding a tender offer learned of the transaction.  *See Gonzalez de Castilla*, 184 F. Supp. 2d at 377.   The court held that no inference of insider trading was warranted on the ground that the defendant somehow learned of the tender offer earlier where "[t]here [wa]s no evidence of a telephone call between [the defendant] and an insider during the relevant period" and the defendant "did not attend any meetings with anyone that possessed inside information during the relevant period." *Id.* at 377-78.  That is not the case here.  As Rajaratnam concedes (Def.'s Br. at 4), the government here presented evidence that Bhalla, Shah, and Hussein had access to inside information; that these individuals had contact with Khan; and that Khan had contact with Rajaratnam.

In *Truong*, the court merely held that "[s]uspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, *the first link on the information chain,* traded on the basis of material non-public information." *Truong*, 98 F. Supp. 2d at 1097 (emphasis added).  But that was not the government's theory here.  Rather, the government sought to prove that a conspiracy existed based in part on suspicious trading by Khan and Rajaratnam at the second level of the information chain.  *Truong* supports that inference.  The court in that case held that the SEC could not show that the alleged initial tipper had access to inside information merely because he worked in an area of the company's office where the information was likely to be discussed.  *See id.* at 1098-99. However, the court denied summary judgment as to trading following a meeting that the defendant attended on the ground that calls between the defendant and the tippees

followed by suspicious trading supported an inference of insider trading.  *See id.* at 1100-1.

It is just so here.  Khan's instant message telling Rajaratnam "Do not buy Polycom until I get guidance" strengthened the inference created by the phone and trading records.

Rajaratnam "doubt[s] that there has been any insider trading case . . . ever made without either of those people testifying . . . ."  (Tr. 3697-98.)  *McDermott* shows that Rajaratnam is incorrect.  Moreover, several other Courts of Appeals have sustained insider trading convictions based on circumstantial evidence in considering such factors as "(1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the tippee."  *United States v. Larrabee*, 240 F.3d 18, 21-22 (1st Cir. 2001).

In *Larrabee*, the defendant, an employee at a law firm, was convicted of tipping a stockbroker friend regarding a merger by one of the law firm's clients.  The First Circuit affirmed the district court's denial of the defendant's motion for acquittal where the tipper and tippee shared a "professional relationship"; the tippee traded shortly after receiving a call from the tipper shortly after the tipper had contact with his source; the tippee's "purchase was nearly twice as large as any of his previous trades"; and the tipper and tippee attempted to conceal their relationship and purchases.  *See id.* at 22-23.

The Sixth Circuit came to a similar conclusion in *United States v. Hughes*, 505 F.3d 578 (6th Cir. 2007).  In that case, defendants Stacy and Hughes, a husband and wife, were convicted of trading on inside information regarding an acquisition of a company

tipped to them by Blackwell, a member of the company's board.  The government introduced "evidence that Blackwell found out about the proposed buyout"; that "Hughes had a meeting with Blackwell" one month later; that "Hughes had a close relationship with Blackwell"; that in the month before the buyout, "Stacy and Hughes, previously cautious investors, bought thousands of shares of" the company; that "[a]s a knowledgeable investor, Hughes would have known that Blackwell was breaching his duty to the company's shareholders"; and that Stacy would have known the same through her relationship with Hughes.  *See id.* at 594.  On those facts, the court affirmed the district court's denial of defendants' Rule 29 motion as to the charge of conspiracy to commit insider trading.

Furthermore, both the Second and Ninth Circuits have noted that evidence of timely trading following calls connecting an insider and tippees, particularly in "situations in which unique trading patterns or unusually large trading quantities suggest that an investor had used inside information," gives rise to a strong inference of insider trading.  *See United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998) (citing as an example "an individual who has never before invested comes into possession of material nonpublic information and the very next day invests a significant sum of money in substantially out-of-the-money call options.").  *Cf. Warde*, 151 F.3d at 47-48 (rejecting challenge to the sufficiency of the evidence where second-order tippee made substantial, risky trades in company's stock in parallel with an intermediate tippee within a day of the intermediate tippee's meetings with a company board member regarding an acquisition).

The government has made a similar showing here.  An inference of insider trading may have been somewhat more equivocal if the government had merely shown that

Rajaratnam placed trades shortly after speaking with Khan, who in turn had just spoken with her sources.  But the government here corroborated the inference by showing that Rajaratnam not only traded close in time to these contacts but changed his positions in ways that were significant even for a hedge fund of Galleon's size.  That is, though Rajaratnam had not taken any position in Hilton stock in 2007, he purchased millions of dollars of Hilton shares immediately after speaking with Khan.  A reasonable jury could have inferred from this apparent exception to the rigorous analytical process Rajaratnam normally used before taking positions that Rajaratnam's Hilton trade was based a different kind of information.

Rajaratnam points to evidence that he "traded in 213 other stocks *just one time* between 2005 and 2009" and argues that this evidence "completely dispels any suggestion that [his] single Hilton trade was unusual."  (Def.'s Reply at 4.)  That argument attempts to hit the mark by changing the target.  The question is not whether the jury could have drawn an inference of insider trading from evidence that Rajaratnam traded Hilton only once.  The question is whether the jury could have drawn an inference of insider trading from evidence that the only time Rajaratnam traded Hilton was just prior to the acquisition of that company and immediately after speaking with Khan, who had just spoken to Shah—one of the few people who knew about the acquisition at that time.   The answer to that question is certainly yes.

The same goes for Google.  Rajaratnam not only traded Google stock immediately after speaking with Khan; he sold his entire position and then purchased Google shares—a change of position equal to, according to Rajaratnam's own calculations, almost one-tenth of the value of the fund in which he placed the trades—

when other Galleon employees were taking an opposite position.  (GX 4503; Rajaratnam Reply at 5 n.3.)[4]  Having heard extensive testimony that Rajaratnam and the rest of Galleon's staff shared massive amounts of information at morning meetings among other channels, the jury had good reason to conclude that Rajaratnam knew something about Google that nobody else knew, and that he had learned it from Khan.

Accordingly, the government introduced evidence sufficient for a reasonable jury to find Rajaratnam guilty beyond a reasonable doubt as to Count Two.

### 3.  Count Three:  The Rajaratnam-Goel Conspiracy

Count Three charged that Rajaratnam conspired with Rajiv Goel, an employee of Intel Corporation ("Intel"), to obtain and trade on inside information regarding Intel and Clearwire.  Specifically, the government sought to prove that Rajaratnam and Goel conspired to trade on the basis of information Goel had obtained regarding (a) Intel's April 17, 2007 earnings announcement; and (b) Intel's investment in a mobile internet joint venture between Sprint and Clearwire.

With respect to this count, the government presented testimony by Goel himself. Goel testified that he and Rajaratnam had been friends since business school and that their families were friends and took vacations together.  Goel testified that he obtained from Intel executives information regarding Intel's earnings announcement and its

---

[4] The government contends that Rajaratnam's change in position was approximately $100 million in a $700 million fund, or one-seventh of the fund's value.  (Gov't Opp'n at 10-11.)  Rajaratnam counters that the fund was worth $1.1 billion in July 2007, though he does not provide any citation to the record for that number.  (Rajaratnam Reply at 5 n.3.) Yet even taking Rajaratnam's figure as the correct one, the jury would surely have been reasonable in finding significance in a change in position equal to almost ten percent of a fund's value.  Rajaratnam argues that neither "[a] sale of shares previously purchased" nor "a short sale worth approximately $26 million" should "be considered astounding." (Id.)  Even if that is true, Rajaratnam again asks the Court to examine his trades in isolation rather than in conjunction with the other circumstantial evidence.

investment in Clearwire and that he tipped Rajaratnam to that information.  As set forth above, a reasonable jury could have found Rajaratnam guilty of Count Three on the basis of Goel's testimony alone.  *See Stewart,* 485 F.3d at 671; *Florez,* 447 F.3d at 155.

However, the government also presented the testimony of Alex Lenke, an executive in Intel's Investor Relations department who largely corroborated Goel's testimony regarding the earnings announcement.  Lenke testified that Goel had approached him to inquire about Intel's upcoming earnings announcement.  Lenke testified that in early April, he learned that Intel would be reporting unusually disappointing quarterly revenue figures.  However, several days later, Lenke learned that, as part of the report, Intel would be announcing positive news regarding its gross margin—which the evidence showed was one of the key metrics for investors in Intel and which Lenke testified that any investor he dealt with would know was material, non-public information.  Lenke testified that he passed this information to Goel and told him that this made Goel "an insider."  (Tr. 944.)  Lenke further testified that he also had a third conversation with Goel the day before the earnings announcement in which he provided Goel with additional information.

The balance of the government's evidence regarding the earnings announcement consisted of showing that Lenke and Goel spoke in the days prior to Intel's earnings announcement; that Goel contacted Rajaratnam following—in some cases immediately after—these calls; and that Rajaratnam placed trades in Goel's Charles Schwab brokerage account following these calls.  (GX 2-4.)  Records also showed that Goel made numerous calls to Rajaratnam on the day prior to the announcement.

Rajaratnam argues that Goel "simply testified that in one quarter in 2007 he obtained Intel earnings information and he told Mr. Rajaratnam about it." (Tr. 3698.) Rajaratnam argues that Goel "couldn't describe specifically what it was" and therefore that the jury had no way to determine whether the information was material non-public information. (*Id.*) Rajaratnam overstates the case. Lenke testified that he and Goel talked about "how the earnings went for the quarter" and "about earnings and how the quarter was." (Tr. 933, 944.) And Goel testified that what Lenke told him "was around the revenue numbers, the margins," specifically "gross margin," as well as "about the business outlook." (Tr. 1647, 1676-77.) The fact that, four years later, neither Lenke nor Goel could identify precisely what the earnings information was might have given the jury reason to consider their testimony with caution, but it hardly made it unreasonable to credit it. In any event, the Court must "resolve all issues of credibility in favor of the jury's verdict." *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002). Moreover, the fact that Goel called Rajaratnam several times as the information changed suggests that he believed that Rajaratnam would have found the information important. And, again, that evidence merely corroborates the extensive testimony regarding the functioning of the securities markets and Rajaratnam's expertise. On the basis of that evidence, the jury surely could have inferred that Rajaratnam knew that Goel's information, like almost all earnings information in almost all cases before it is publicly announced, was material non-public information.

Rajaratnam also argues that there is no evidence of "any benefit to Mr. Goel" because Goel testified "that there was no nexus between" a loan he received from Rajaratnam and the tips he claimed to have passed in 2007. (Tr. 3698-99.) That

argument lacks merit.  Putting aside that an actual breach of a duty is not an element of conspiracy, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend."  *Dirks*, 463 U.S. at 664.   Goel repeatedly testified that he and Rajaratnam were good friends and that he tipped Rajaratnam for that reason.  What is more, the government presented extensive evidence that Rajaratnam had access to and traded on the basis of inside information in Goel's brokerage account at Charles Schwab.  The government also presented evidence that Goel earned several hundreds of thousands of dollars for these trades.  Accordingly, the government presented sufficient evidence for a jury to conclude beyond a reasonable doubt that any agreement between Rajaratnam and Goel to trade on the basis of inside information included an understanding that Goel—the tipper—was benefiting from making the tips.

With respect to Clearwire, Rajaratnam advances several reasons why no reasonable jury could find that an agreement to trade on the basis of information regarding the Clearwire transaction was a conspiracy to trade on the basis of material, nonpublic information.  On that point, it is worth noting at the outset that the "[d]etermination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976) ("The determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts . . . and these assessments are peculiarly ones for the trier of fact.") (quotation marks omitted).

Rajaratnam's first argument is that an agreement to trade on the basis of information regarding Intel's investment was not a conspiracy to trade on the basis of material, non-public information because that investment depended on the execution of an agreement between Clearwire and Sprint.  There are several reasons why that argument is misplaced.

First, the government introduced a series of wiretapped calls in which Goel provided Rajaratnam with numerous details regarding Intel's investment in Clearwire, including the size of its investment, the share of that investment in the whole, the identities of other investors in the venture, and the shares of their investments in the whole.  (*See* GX 502, 503, 504.)  Sriram Viswanathan, the Intel executive managing Intel's investment from whom Goel learned the information, testified that this information was material, non-public information at the time that Goel was providing it to Rajaratnam.  Moreover, it belies common sense to say that a reasonable investor would not want to know the size and share of an investment by Intel, one of the world's largest corporations and the premier manufacturer of microprocessors, in a groundbreaking wireless venture.

Second, the government introduced a wiretapped call between Rajaratnam and his brother, Rengan, regarding an article in the *Wall Street Journal* that almost entirely refutes this argument.  (GX 509.)  On the call, Rengan stated that they were in trouble because "[t]he Clearwire stuff" had "just hit the Wall Street Journal."  Rajaratnam's response suggests he agreed.  The jury could have inferred from these statements that the Rajaratnam brothers had hoped to take advantage of Goel's tip but found that their advantage would be minimized because the market had learned some of the information

in the tip.  Indeed, Rengan stated that he "[c]an't catch a break" because the news would cause the stock to "rip tomorrow."  If the information that had just become public was not material, there would have been no break to catch.

Rajaratnam further argues that any agreement to trade on the basis of information regarding the composition of the Clearwire board could not have been material because Rajaratnam himself told Goel that investors do not care about board composition.  That argument proves too little and too much.  It proves too little because Goel told Rajaratnam far more than the identity of the board members.  And the argument proves too much because, while Rajaratnam's statement is certainly relevant evidence of what a reasonable investor would have believed, it is hardly dispositive on that question.  Moreover, it would hardly have been illogical for the jury to infer that corporations seek the most talented board members because corporations, investors, or both believe there is a connection between board talent and corporate performance.  Indeed, Rajaratnam elicited testimony from Goldman Sachs CEO Lloyd Blankfein that "Goldman's board of directors are distinguished individuals" and "the most accomplished and highly regarded businessmen in the world."  (Tr. 1769.)   Accordingly, it is far from the case that no reasonable jury could have concluded that an agreement to trade on the basis of information regarding the Clearwire transaction was a conspiracy to trade on the basis of material, nonpublic information.

### 4.  Count Four:  The Rajaratnam-Kumar Conspiracy

Count Four charged that Rajaratnam conspired with Anil Kumar, a director at the global consulting firm of McKinsey & Company, to trade on the basis of inside information obtained from Kumar regarding McKinsey clients, including Advanced

Micro Devices ("AMD") and eBay, Inc. ("eBay").  Specifically, the government sought to prove that Rajaratnam conspired with Kumar to trade on the basis of inside information Kumar had obtained regarding (1) AMD's acquisition of ATI that was announced on July 24, 2006; (2) AMD's 2008 decision to sell its microprocessor factories, known as foundries, to Mubadala, a sovereign wealth fund owned by the government of Abu Dhabi; (3) a potential acquisition of Spansion; and (4) eBay's plan to lay off ten percent of its workforce in October 2008.

Kumar himself testified that he repeatedly tipped Rajaratnam regarding the AMD-ATI transaction, the AMD-Mubadala transaction, and eBay's workforce reduction.  In exchange, Kumar testified, Rajaratnam wired to Kumar's offshore accounts payments that were disguised as compensation for "consulting services" and reinvested in Galleon through the name of Kumar's housekeeper.  Kumar further testified that Rajaratnam suggested and was involved in setting up this cover arrangement to assuage Kumar's concern about McKinsey discovering their agreement.  A reasonable jury could have found Rajaratnam guilty as to Count Four on the basis of Kumar's testimony alone.  *See Stewart,* 485 F.3d at 671; *Florez,* 447 F.3d at 155.

The government, however, did more.  The government introduced e-mails showing that Kumar had received the information he allegedly passed to Rajaratnam.  It also introduced several wiretapped calls to corroborate Kumar's testimony that he had did, in fact, tip Rajaratnam as to that information:  calls in which Kumar told Rajaratnam about the progress of the Mubadala transaction, the potential Spansion transaction, AMD's revenue projections, and eBay's proposed layoffs (GX 506, 506T, 523, 523T, 553, 553T, 616, 616T, 647, 647T); a call in which Rajaratnam tipped his brother Rengan

regarding the progress of the Mubadala transaction and told Rengan that he was buying

AMD shares (GX 559, 559T); calls in which Rajaratnam told Danielle Chiesi, an

employee of a hedge fund called New Castle, what Kumar had told him about the

Mubadala transaction (GX 554, 554TR, 594, 594TR, 625, 625TR, 641, 641T); and a call

in which Rajaratnam told Panu and Chellam that Kumar had told him about the potential

Spansion acquisition.  (GX 524, 524T.)

These calls also contained other statements that were highly probative of an

insider trading conspiracy.  In the calls with Chiesi, Rajaratnam told Chiesi to maintain

"radio silence" regarding the information and, when Chiesi raised concerns about

regulatory investigations, instructed her how to disguise her trading by purchasing more

shares than she wanted and selling some off to create the appearance that she had no

more reason to trade one way than the other.  (GX 554, 554TR, 594, 594TR.)

Furthermore, Chiesi told Rajaratnam that she appreciated that he called her on a "secure

line."  In the call with Panu and Chellam, Rajaratnam advised the two of them to keep

confidential the Spansion-related information he had learned from Kumar, and instructed

them about how to create "an e-mail trail" to "protect ourselves."  (GX 524, 524T.).

In addition, the government introduced trading records showing that Rajaratnam

made substantial trades in AMD, ATI, and eBay stock shortly following his calls with

Kumar and others.  The government also introduced e-mails showing that Kumar sent

information regarding his housekeeper to Rajaratnam himself—evidence that tended to

show that Rajaratnam was involved in concealing the payments to Kumar, which in turn

tended to show that Rajaratnam was aware that the arrangement was illicit.  (GX 761.)  In

short, the government introduced overwhelming evidence that Rajaratnam conspired with

Kumar to trade on the basis of inside information.

Despite all of this evidence, Rajaratnam argues that Kumar's own testimony

fatally undermines the government's case as to Count Four.  Rajaratnam points to the

following testimony on cross-examination:

> Q.  And actual trading in stocks was not part of your agreement with Mr. Rajaratnam, was it, sir?
>
> A. No, sir, not at all.
>
> Q. You never agreed with Mr. Rajaratnam to engage in insider trading, did you, sir?
>
> A. No sir.  I would not have done it had I known he would ask me for that information, sir.

(Tr. 640.)  In context, this testimony was hardly the concession that Rajaratnam believes

it to be.   Kumar testified as follows on redirect just after Rajaratnam's counsel had

elicited the very testimony on which Rajaratnam relies:

> Q.  Were you referring to your state of mind back in 2003 when he first asked you or throughout the entire period when you were giving him information?
>
> A.  No, sir.  This was before the agreement, the arrangement and so on.  It was when he asked for the first time that, you know, will you do something, give me information.  And I, as I have said—I think I've tried to say many times, I first thought that information was going to generally and then, until he immediately started asking me inappropriate questions, sir.
>
> Q.  So, at the very beginning when he started asking you, you thought he was asking you for legitimate information?
>
> A.  Yes, sir.
>
> Q.  And once he started paying you he was asking you for confidential information?
>
> A.  That's correct, sir.
>
> Q.  And once he was paying you, you started giving it to him?

A.  Yes, that is correct, sir.  To my eternal regret.

(Tr. 922.)  If the jury credited Kumar's redirect testimony, the jury had reason enough to find Rajaratnam guilty beyond a reasonable doubt as to Count Four. [5]

### 5.  Count Five:  The Rajaratnam-Chiesi Conspiracy

Count Five charged that Rajaratnam conspired with Chiesi to trade on inside information about Akamai and AMD.  Specifically, the government sought to prove that Rajaratnam and Chiesi conspired to trade on the basis of (a) inside information regarding Akamai's plan to lower its earnings guidance for the third quarter of 2008 that Chiesi had obtained; and (b) inside information regarding AMD that Rajaratnam had obtained from Kumar.

With respect to this count, the government did not present any cooperating witness.  Rather, the government relied on wiretapped calls, phone records, and trading records.  The phone records showed that, on July 24, 2008, Kieran Taylor, an Akamai employee, called Chiesi while she was on the line with Rajaratnam and that Chiesi hung up to take the call.

In a wiretapped call from later on July 24, 2008, Chiesi told Rajaratnam that she "just heard from [her] guy" that Akamai would "guide down", that is lower, its earnings guidance for the upcoming quarter.  (GX 532, 532T.)  J.D. Sherman, an Akamai

---

[5] Rajaratnam also argues that no reasonable jury could find that the information regarding eBay's layoffs was nonpublic because the press had reported the exact magnitude of layoffs—10%—before eBay announced that percentage to the public.  (*See* Tr. 3705.)  It is true that inside "information must be specific and more private than general rumor." *Mylett*, 97 F.3d at 666.  The jury could have reasonably concluded that this was the case. However, even if Rajaratnam is correct that information regarding layoffs at eBay was not inside information, the government presented ample evidence regarding ATI and AMD on the basis of which a reasonable jury could have found Rajaratnam guilty beyond a reasonable doubt as to Count Four.

executive, testified that this was material, non-public information at the time.  On the call, Rajaratnam stated that "nobody expect[ed]" Akamai to do so and instructed Chiesi to remain "radio silent" with respect to the information.  (*Id.*)  The government introduced trading records to show that Rajaratnam tripled his short position in Akamai stock in the days after July 24, 2008.  (GX 42.)  On July 30, 2008, Akamai announced that it was lowering its guidance.  In another wiretapped call later that day, Rajaratnam called Chiesi and thanked her and the two had a discussion suggesting that they had profited from trades in Akamai stock.  (GX 543, 543T.)

Rajaratnam argues that this evidence was insufficient to prove a conspiracy because there was no evidence that Taylor actually tipped Chiesi regarding the information that she later conveyed to Rajaratnam.  That is slicing things too thin.  Based on the temporal proximity between the July 24 calls and on another wiretapped call in which Taylor told Chiesi that he had information for her, a reasonable jury could surely have concluded that Taylor was the "guy" Chiesi referred to in her July 24, 2008 call.

Moreover, the government also introduced wiretapped calls suggesting that Rajaratnam and Chiesi conspired to trade on the basis of inside information regarding AMD.  In particular, these calls showed that, shortly after hearing from Kumar about the timing of the AMD-Mubadala deal, Rajaratnam called Chiesi to pass the information to her.  (*See* GX 553, 554, 554TR.)  As discussed above, the calls showed that Rajaratnam instructed Chiesi to maintain radio silence and instructed her as to how to conceal her trading in AMD.  (GX 594, 594TR.)   Moreover, these calls seemed to show that Chiesi was obtaining information regarding AMD from the company's CEO, Hector Ruiz, and Rajaratnam's comments on the calls—calling Ruiz Chiesi's "boy" and expressing

surprise that Ruiz was married—tended to show that Rajaratnam believed that Chiesi had an intimate relationship with Ruiz.  Accordingly, setting aside that the government's evidence of a conspiracy as to Akamai seems sufficient in itself, a reasonable jury had ample evidence to conclude beyond a reasonable doubt that Rajaratnam and Chiesi conspired to trade on the basis of inside information regarding AMD.

Rajaratnam also argues that, other than phone and trading records, there was no evidence of a conspiracy independent of the calls.  It is unclear precisely what Rajaratnam is arguing, but the Court can discern two possibilities.  First, Rajaratnam could be arguing that the calls were not properly before the jury because the government failed to establish by a preponderance of the evidence the existence of a conspiracy with evidence other than the calls.  That argument would misstate the law.  Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.  Fed. R. Evid. 801(d)(2)(E).  The Rule further provides that (a) "[t]he contents of the statement shall be considered" but (b) "are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E)."  Fed. R. Evid. 801(d)(2).  Here, the government introduced evidence that Taylor called Chiesi on July 24, 2008; that Chiesi called Rajaratnam later that day; and that Rajaratnam tripled his short position in Akamai stock in the days after those calls.  As set forth above, that circumstantial evidence is probative of an insider trading conspiracy.  And considered along with the calls themselves, the evidence was more than sufficient to establish a conspiracy by a preponderance of the evidence and thus send the calls to the jury.

Second, Rajaratnam could be arguing that the government cannot sustain a conspiracy conviction on the basis of hearsay evidence.  That argument is unpersuasive for three reasons.  First, as was just discussed, the government introduced other evidence to corroborate the conspiracy.  Second, Rajaratnam's argument that the calls are not enough cannot be squared with his argument that the government's evidence with respect to Count Two is insufficient because it does not include direct evidence of tipping.  Third, the argument again misstates the law.  Once the government has proven that a co-conspirator's statements are admissible under Rule 801(d)(2)(E), "the utterances go to the jury to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt."  *United States v. Mastropieri*, 685 F.2d 776, 788 (2d Cir. 1982).   And "there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."  *United States v. Bourjaily*, 483 U.S. 171, 180 (1987).  Here, the government introduced several wiretapped calls containing statements that were highly probative of a conspiracy between Rajaratnam and Chiesi as well as evidence of trading that corroborated the wiretap evidence.  That evidence was more than enough for a reasonable jury to find Rajaratnam guilty beyond a reasonable doubt as to Count Five.

## B.  Substantive Counts

### 1.  Counts Six and Seven:  Clearwire

Counts Six and Seven charged Rajaratnam with trading on the basis of inside information regarding Clearwire that he obtained from Goel.   The evidence with respect to those counts was largely summarized above with respect to Count Three.  Rajaratnam

advances three reasons why this evidence is insufficient to sustain his conviction as to Counts Six and Seven.

First, Rajaratnam argues that the government never proved that Goel received a benefit for tipping Rajaratnam regarding Clearwire.  However, as set forth above with respect to Count Three, Goel testified that he tipped Rajaratnam as a gift and the government presented evidence that Goel earned hundreds of thousands of dollars in profits from Rajaratnam's trading in his Charles Schwab account.  That evidence was more than sufficient to establish beyond a reasonable doubt that Goel received a benefit.

Second, Rajaratnam argues that, given the voluminous evidence he introduced regarding public discussion of the Clearwire-Sprint venture, "no rational jury could find that the information that was discussed later in March by Mr. Goel was non-public."  (Tr. 3711.)  That argument is not persuasive in light of the call between Rajaratnam and his brother Rengan regarding the *Wall Street Journal* article.  Rengan's statements that the article was "short on details" and did not contain the "equity splits," i.e., the percentage of the joint venture that Intel and the other investors would own which Rajaratnam had discussed with Goel on other wiretap calls, suggested that he and Rajaratnam knew that they knew something that the market did not know.

Third, Rajaratnam argues that his expert witness, Dr. Gregg Jarrell, "offered unrebutted testimony that any information provided to Mr. Rajaratnam about this transaction could not possibly have been material" because "Clearwire's stock price did not move a statistically significant amount upon the formal announcement of the joint venture with Sprint due to the amount of information already publicly available concerning the deal."  (Def.'s Br. at 7; *see also* Def.'s Reply at 6.)  Dr. Jarrell performed

a so-called event study, "a statistical regression analysis that examines the effect of an event"—here a public announcement by a public issuer—"on a dependent variable, such as a corporation's stock price.  This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock."  *In re Vivendi Universal, S.A. Secs. Litig.*, 605 F. Supp. 2d 586, 599 n.10 (S.D.N.Y. 2009).

Rajaratnam's argument regarding Dr. Jarrell is unpersuasive for two reasons.  The first is that, giving every inference to the government, the Court must "resolve all issues of credibility in favor of the jury's verdict."  *Desena*, 287 F.3d at 177.  Accordingly, the Court must assume that the jury discredited Dr. Jarrell's testimony as to this point.

The second reason is that, even if the jury credited Dr. Jarrell's testimony, the fact that the price of Clearwire stock did not change significantly when the joint venture was announced hardly means that a reasonable jury could not have concluded that the information was both (a) material and (b) non-public when Goel tipped Rajaratnam about it.  As discussed above with respect to Count Three, a jury would hardly be unreasonable in concluding that a multi-billion dollar joint venture between several major communications companies was material.

Dr. Jarrell did not testify that his event study would change that conclusion.  On the contrary, Dr. Jarrell testified that there were two reasons why the price of a stock might not move a statistically significant amount following a major announcement: (1) the information was not material; or (2) the information was material but already known to the market.  (Tr. 4915.)  In the latter case, Dr. Jarrell testified that "by the time the announcement itself is made the market has fully incorporated any valuation effects of

that announcement in the stock price. . . ."  (Tr. 4802.)  Accordingly, even if the jury credited Dr. Jarrell's testimony, that testimony was entirely consistent with a conclusion that Intel's investment in Clearwire was (a) material but (b) had become public by May 7, 2008.

To be sure, if Goel had tipped Rajaratnam on that date, a conviction might be open to doubt, since insider trading involves trading on the basis of information that is material *and* non-public.  However, Goel testified that he tipped Rajaratnam in March 2008, two months earlier.  Yet Dr. Jarrell admitted on cross-examination that his study did not examine the price movement of Clearwire shares in March 2008, when the government alleged that Goel tipped Rajaratnam regarding the Clearwire transaction. (Tr. 4944; 5082-83.)  And whether information was public in May 2008 says almost nothing about whether the same information was public in March.

With respect to that time frame, Rajaratnam argues that the government's own stock price charts show that this was not material non-public information in March 2008 because the price of Clearwire stock declined following publication of an article in the *Wall Street Journal* regarding the joint venture on March 26, 2008.  (*See* Def.'s Br. at 8.) But since the question is whether a tip is more "specific and more private than general rumor" *see Mylett*, 97 F.3d at 666, the reaction to the article would only measure whether Goel's tip was public if the article and the tip contained equally specific and reliable information.  Yet Rengan Rajaratnam said precisely the opposite in the wiretapped call where he referred to the *Journal* article:  the *Journal* did not have the equity splits.  (*See* GX 509.)

"As to materiality," Rajaratnam argues that "the only evidence in the record was Professor Jarrell's unrebutted testimony that the information was economically immaterial." (Def.'s Reply at 7.) Rajaratnam is incorrect. The jury heard evidence in the form of Rajaratnam and his brother's own words that what Goel had told them would have been important to the market. If Goel's tip was not something the market wanted to know, there would have been no "break" to "catch" by knowing it in advance: when the market learned the information, the stock would not "rip" and those who, like Rajaratnam, had purchased the stock would realize no gains. That Rengan believed the stock would "rip" and that he and his brother had lost a chance to "catch a break" strongly suggests that he believed that Goel had given them important information that provided an advantage in the market. That is very definition of material information. And the fact that both Rajaratnam brothers expressed disappointment about losing their advantage suggests that they intended to act on, that is, trade on it.

Accordingly, the jury had sufficient evidence to conclude beyond a reasonable doubt that Goel tipped Rajaratnam regarding the Clearwire joint venture and that the tips contained material non-public information. Rajaratnam did not seriously contest that he placed trades in Clearwire after he allegedly received these tips. Accordingly, the jury was well within reason to find Rajaratnam guilty beyond a reasonable doubt as to Counts Six and Seven.

### 2. Counts Eight, Nine, and Ten: Akamai

Counts Eight, Nine, and Ten charged Rajaratnam with trading in on the basis of inside information regarding Akamai. With respect to these counts, the government introduced the evidence summarized above with respect to Count Five.

Rajaratnam advances two reasons why this evidence was insufficient.  First, Rajaratnam argues that the government "put nothing before the jury in terms of a benefit to Mr. Taylor. . . ."  (Tr. 3714.)  But the government introduced a wiretapped call from October 2008 in which Taylor told Chiesi that he had a "major present" of "information" for her.  (GX 703.)   Chiesi's and Taylor's statements on the call also suggested that they had a close personal relationship.  The jury could have reasonably inferred that Taylor's tips to Chiesi, including his July 24, 2008 tip regarding Akamai, were gifts sufficient to prove that Taylor received a benefit.  *See Dirks*, 463 U.S. at 664.  What is more, another wiretapped call showed that Chiesi tipped Taylor about the AMD-Mubadala deal.  (GX 698.)  A reasonable jury could infer from that call that Chiesi and Taylor had a *quid pro quo*.

Second, Rajaratnam argues that the alleged tip was public because it was well known in the market; Sherman, an Akamai executive, acknowledged that Akamai's business was experiencing pressure from competitors; and market analysts, including Goldman Sachs, recommended selling Akamai.  (*See* Tr. 3714.)  All of that is true but immaterial.  The jury had ample evidence from which to conclude that Rajaratnam traded Akamai stock on the basis of information Chiesi had obtained from Taylor that Akamai planned to lower its earnings guidance.  Whatever the market knew about Akamai's problems, the jury was well within reason to conclude that the market did not know that those problems would force Akamai to guide down.   Indeed, Rajaratnam and Chiesi discussed that nobody expected Akamai to do so.  Accordingly, there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Chiesi's tip conveyed material, nonpublic information.  And, again, the government did not have to

prove that Rajaratnam ignored what these others did know about Akamai; it only had to

prove that Rajaratnam did not ignore what only he and Chiesi knew.  The jury needed

only common sense to conclude that was so.

### 3.  Counts Eleven and Twelve:  PeopleSupport

Counts Eleven and Twelve charged Rajaratnam with trading in Goel's Charles

Schwab account on the basis of inside information regarding PeopleSupport.  In

particular, Counts Eleven and Twelve charged Rajaratnam with trading on inside

information regarding an acquisition of PeopleSupport by Aegis, a division of the

ESSAR Group, an Indian conglomerate owned by the Ruia family.  The government

sought to prove that Rajaratnam obtained the inside information from Panu, a Galleon

employee who also served on the board of directors of PeopleSupport.  Panu had been

offered a seat on the board after Galleon acquired a sizable position in PeopleSupport.

### a.  Count Eleven

With respect to Count Eleven, the government sought to prove that Rajaratnam

traded on the basis of a tip from Panu about Aegis's July 28, 2008 bid to acquire

PeopleSupport.  The government introduced a wiretapped call from May of 2008 in

which Panu informed Rajaratnam about the progress of the transaction (GX 524, 524T);

testimony from Lance Rosenzweig, PeopleSupport's CEO, that he was communicating

with PeopleSupport board members including Panu regarding negotiation of the ESSAR

Group transaction; trading records showing that Rajaratnam purchased PeopleSupport

stock in Goel's brokerage account; and a wiretapped call from July 30, 2008 in which

Rajaratnam told Goel that the Ruias had made a firm bid for PeopleSupport.  (GX 539,

539T.)

Rajaratnam points out that he placed the trade at issue earlier in the day on July 28, 2008 than when the board of directors of PeopleSupport was formally advised of the Ageis bid and two days before the call with Goel.  Rajaratnam therefore argues that there is no evidence that Rajaratnam had access, through Panu, to information regarding the bid before he made the allegedly illegal trade.  (*See* Tr. 3718.)  However, a reasonable jury could have concluded that the May 2008 Rajaratnam-Panu call showed that Rajaratnam had access via Panu to inside information regarding the transaction.  In addition, as the government pointed out in its closing, Rajaratnam told Goel on July 30 that "the Ruias made a firm bid now."  The word "now" and Goel's nonchalant response suggest this was not the first time that Rajaratnam had discussed the still confidential acquisition of PeopleSupport with Goel.  Indeed, Goel testified that he understood from Rajaratnam's statement that "he was talking about a company called PeopleSupport in the U.S. that was being acquired by the Essar Group for their information technology business."  (Tr. 1985.)  Based on that evidence, a reasonable jury could have concluded from the tenor and language of the Rajaratnam-Goel call that Rajaratnam had traded on the basis of inside information he received from Panu.

### b.  Count Twelve

With respect to Count Twelve, the government sought to prove that Rajaratnam traded on the basis of a tip from Panu on October 7, 2008 regarding the closing of the Aegis transaction.  On that day, PeopleSupport announced a delay in the closing.  The announcement caused a precipitous drop in the price of PeopleSupport stock.  Rosenzweig testified that, following that announcement, the board of directors of PeopleSupport, including Panu, was informed that ESSAR Group planned to place $41

million in escrow to secure the transaction.  The government introduced evidence that
Panu had called Rajaratnam at Galleon following the board meeting (GX 17) and shortly
thereafter Rajaratnam informed Goel in a wiretapped call about the escrow plan and
stated that "we know because, uh, one of our guys is on the board."  (GX 654, 654TR.)
On that call, Rajaratnam also told Goel that he had purchased 30,000 shares of
PeopleSupport stock in Goel's brokerage account because he believed this was an
opportunity to make some money for Goel.  (*See id.*)  And the government introduced
evidence that Goel earned $50,000 when the price of PeopleSupport shares rebounded
following an announcement later in the day that the transaction would close prior to the
end of October as planned.

Rajaratnam argues that this evidence does not support a conviction because (a)
Rajaratnam told Goel on the October 7 call that the transaction would close on October
7—a fact announced in the press release issued that morning announcing the delay.  (*See*
Tr. 3179.)  That argument is unpersuasive.  The wiretapped call suggests that Rajaratnam
knew not only the date of delayed closing but also knew information about plans for
escrow which suggested that the transaction was secure.  Given the precipitous fall in the
stock price and its recovery the following day, the market clearly was hoping to hear that
information.  "At the very least, these non-public facts would make a reasonable investor
less likely to believe that 'nothing' would happen."  *Mylett*, 97 F.3d at 666.

Rajaratnam also argues that the evidence does not support a conviction because
ESSAR Group never, in fact, placed $41 million in escrow.  (*See* Tr. 3722.)  With respect
to Rajaratnam's argument that the reassuring prediction regarding the $41 million in
escrow turned out to be inaccurate, that argument is foreclosed by the law in this Circuit

that materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968). "[B]ecause a merger is one of the most important events that can occur for a small company, information regarding a merger 'can become material at an earlier stage than would be the case as regards lesser transactions.'" *Mayhew*, 121 F.3d at 52 (quoting *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47 (2d Cir. 1976)). "Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, takes on an added charge just because it is inside information." *Id.* (quotation marks omitted).

Accordingly, even if what Rajaratnam knew was that the ESSAR Group was *considering* placing $41 million in escrow—information that was surely nonpublic—that information was something a reasonable investor fearing that the transaction was in jeopardy would have wanted to know. Indeed, Rajaratnam's statement to Goel that he saw the information as an opportunity to make money suggests that the information was material. *See Mayhew*, 121 F.3d at 52 ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it.") This is hardly a case where "the disclosed information is so general that the recipient thereof is still undertaking a substantial economic risk that his tempting target will prove to be a white elephant." *SEC v. Monarch Fund,* 608 F.2d 938, 942 (2d Cir. 1979) (quotation marks omitted). A reasonable jury certainly could have made these inferences from the evidence at trial and those inferences were sufficient to find Rajaratnam guilty beyond a reasonable doubt as to Count Twelve.

### 4.  Count Thirteen:  ATI

Count Thirteen charged Rajaratnam with trading in ATI shares on the basis of inside information regarding AMD's acquisition of ATI that was announced on July 24, 2006.  With respect to this count, the government introduced the evidence related to the transaction summarized above with respect to Counts One and Three.  That evidence included Kumar's testimony that he tipped Rajaratnam regarding information he had learned from AMD executives and Smith's testimony that he tipped Rajaratnam regarding information he had learned from Kamal Ahmed.

Rajaratnam advances two principal reasons why this evidence is insufficient to sustain a conviction.  First, Rajaratnam argues that the evidence showed that Galleon employees, including Smith, had recommended purchasing ATI stock prior to the announcement of the acquisition.  (*See* Tr. 3723.)  The record on that score was, indeed, extensive.  But the government did not need to prove that Rajaratnam had no legitimate reason to purchase ATI stock; it only had to show that inside information was one of the reasons he did.  That is because information "exists in the mind of the trader.  Unlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain."  *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993).  Indeed, "[i]t strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic—and who did not act in good faith in so doing—did not also trade on the basis of that information."  *Id.* at 121.

Second, Rajaratnam argues that ATI's repurchase of its own shares in the months prior to the acquisition shows that the acquisition was not material non-public

information.  (*See* Def.'s Br. at 9.)  The argument runs as follows.  A corporation has the same duty as Rajaratnam and all other investors to disclose material non-public information about the company before trading in its own shares.  *Cf. Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203 (1st Cir. 1996) (citing *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994) ("Numerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them.") (collecting cases)); *see also Green v. Hamilton Int'l Corp.,* 437 F. Supp. 723, 728 (S.D.N.Y. 1977) ("[T]here can be no doubt that the prohibition against 'insider' trading extends to a corporation.")  Thus if the acquisition was material non-public information at that time, ATI had a duty not to trade.  But ATI traded in its own shares prior to the acquisition.  Accordingly, information regarding the acquisition must not have been material non-public information.

The argument is unpersuasive for two reasons.  First, the argument assumes that the jury would have been unreasonable in concluding that ATI did not also violate the securities laws.  That is hardly true.  Rajaratnam, not ATI, was on trial and there was virtually no evidence—never mind overwhelming evidence—that ATI did not believe information regarding the AMD transaction was material, non-public information.

Second, the argument founders because ATI only repurchased its own shares between March 24 and May 2, 2006.  Yet, as the government points out, Count Thirteen charged Rajaratnam with insider trading in ATI stock "[f]from on or about March 2006 to in or about *July* 2006. . . ."  (2d Superseding Indictment ¶ 39 (emphasis added).  The government presented evidence that Rajaratnam traded ATI shares in May, June and July

43

of 2006 and Kumar testified that between September 2005 and July 2006 he communicated regularly—via telephone and in person—with Rajaratnam regarding the progress of the transaction.  (GX 20; Tr. 356, 362-63.)  Specifically, Kumar testified that in May 2006 "he told Mr. Rajaratnam that AMD's management is very keen to do this deal, it is now just a question of negotiation. . . ."  (Tr. 373.)  But ATI's repurchases from March 24 to May 2 say nothing about whether the information was material non-public information after May 2.  And, for the reasons set forth above, there was ample evidence for a reasonable jury to conclude that information regarding the acquisition was material non-public information in that time period.

Rajaratnam argues that because evidence of the buyback undermined the inference that information regarding the acquisition was material, non-public information prior to May 2, 2006, "[t]he government's evidence . . . permitted the jury to convict Mr. Rajaratnam of insider trading based on trades which could not have been based on material, nonpublic information."  (Def.'s Br. at 8.)  That argument is too clever by half. The indictment alleged that the illegal action Rajaratnam committed from in or about March 2006 to in or about July 2006 was, "to wit:  [that he] caused Galleon [funds] to execute securities transactions in the securities of ATI on the basis of material, nonpublic information."  ((2d Superseding Indictment ¶ 39.)  The fact that Rajaratnam may have cast some doubt on whether he did so during some of the time period identified in Count Thirteen hardly means that the jury "convict[ed] Mr. Rajaratnam of insider trading in ATI securities while ATI itself was trading in its own securities while in possession of the same information. . . ."  (*Id.* at 8 n.4.)  Indeed, Rajaratnam concedes that "the jury could have based its verdict on trades that occurred at any time during this period."  (*Id.* at 8.)

"Where an indictment charges an offense using the 'on or about' formulation to allege the date, the government is not required to prove that the crime occurred on exactly the date named, but only that it occurred on a date that is reasonably near to the date stated."  *United States v. McGee*, 564 F.3d 136, 142 (2d Cir. 2009) (quotation marks omitted); *see also United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987) ("Where 'on or about' language is used, the government is not required to prove the exact date, if a date reasonably near is established.").  Moreover, where, as here, the crime charged is a scheme to defraud rather than fraudulent misstatement, the government need not prove every fact related to the scheme that is alleged in the indictment; it need only prove the elements of the scheme.   *See United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) (upholding conviction for wire fraud even where government proved wire transfers that had not been specified in the indictment); *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977) (rejecting argument to reverse mail fraud scheme conviction on the ground that "in proving a scheme to defraud by means of several misrepresentations, every misrepresentation charged in the indictment must be proved").[6]

---

[6] This is not a case such as *United States v. Natelli*, 527 F.2d 311 (2d Cir. 1975) where a single count of the indictment specified two allegedly false statements, as to one of which the jury had sufficient evidence to convict but as to the other the jury did not have sufficient evidence.  In that case, "[t]he verdict becomes ambiguous, for the jury could have rejected the specification which the appellate court holds sufficiently proved, and have convicted only on the specification held to be insufficiently proved."  *Id.* at 325.  Hence "there seems to be no alternative to remand for a new trial."  *Id.*  Here, by contrast, the indictment alleged that from in or about March 2006 to in or about July 2006 "to wit: [that] Rajaratnam caused Galleon [funds] to execute securities transactions in the securities of ATI on the basis of material, nonpublic information."  ((2d Superseding Indictment ¶ 39.)  And the jury had sufficient evidence to find beyond a reasonable doubt that Rajaratnam did so—evidence that was hardly rendered insufficient by the fact that ATI traded in its own stock.

Here Kumar's testimony alone provided the jury with sufficient evidence as to each element of the scheme to defraud, namely, insider trading.  Accordingly, Rajaratnam's defense based on ATI's buyback is no better than a partial alibi.  The indictment alleged that from in or about March 2006 to in or about July 2006 "to wit: [that] Rajaratnam caused Galleon [funds] to execute securities transactions in the securities of ATI on the basis of material, nonpublic information."  (2d Superseding Indictment ¶ 39.)  Where the jury had evidence that Rajaratnam traded in May, June, and July 2006 on the basis of inside information regarding ATI, the fact that his ATI trades in April 2006 may have not have been based on inside information no more absolves him of liability than does a bank robber's assertion that he was getting a haircut for one of the four hours during which an alleged robbery occurred.

### 5.  Count Fourteen:  Intel

Count Fourteen charged Rajaratnam with trading in Intel shares on the basis of inside information regarding Intel's April 17, 2007 earnings announcement.  With respect to this count, the government introduced the evidence summarized above with respect to Count Three.

Rajaratnam argues that the evidence was insufficient because "Lenke could not recall the substance of any information he provided to Goel, Goel could not recall the substance of any information that he provided to Mr. Rajaratnam, and the government offered no other evidence of what the substance of the information was."  (Def.'s Br. at 10.)  That argument lacks merit for the reasons discussed with respect to Count Three.

Rajaratnam points to what he calls "unrebutted expert testimony from Dr. Gregg Jarrell that any information communicated to Mr. Rajaratnam could not possibly have

been material given the statistically insignificant movement in Intel's share price after its earnings announcement on April 17, 2007." (Def.'s Br. at 11.)[7] Again, however, because the Court must "resolve all issues of credibility in favor of the jury's verdict," *Desena*, 287 F.3d at 177, the Court must assume that the jury did not credit Dr. Jarrell's testimony. And the jury would have had several reasons not to do so.

First, the government attempted to show on cross-examination that Dr. Jarrell had incorrectly analyzed the price movement only on the day after the announcement rather than in the two days following the announcement—an analysis that the government suggested would have revealed a statistically significant increase in the price of Intel shares. (Tr. 5076.) Second, the jury heard extensive testimony that Wall Street investors generally found earnings announcements important and that investors found that information particularly important with respect to Intel's gross margins. As discussed above with respect to Clearwire, the jury could have determined that Professor Jarrell did not find statistical significance in the post-announcement rise in the price of Intel shares because Goel's tip was material when Goel tipped and Rajaratnam traded, but the market had learned or accurately predicted the announcement by the time it was made.

_____

[7] Rajaratnam also argues that Smith admitted on the stand that he did not provide any benefit to Ahmed for the tip regarding ATI. (*See* Tr. 3723-24.) It is true that Smith testified that he "never offered [Ahmed] any benefit for that information that he gave me at that time." (Tr. 2806.) However, even if that statement is as categorical as Rajaratnam makes it out to be, the government alleged that Rajaratnam traded on the basis of information he received from both Smith and Kumar. And the jury had more than enough evidence in the form of Kumar's testimony and the documentary evidence to conclude that Kumar received a benefit when Rajaratnam wired hundreds of thousands of dollars to his offshore accounts.

## CONCLUSION

For the foregoing reasons, Rajaratnam's motion **[280]** pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal on all counts is DENIED in its entirety.

SO ORDERED.

Dated: New York, New York
      August **11**, 2011

Richard J. Holwell
United States District Judge
