UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X
                             :

UNITED STATES OF AMERICA,         :

                            :

      - v.-                     :

                            :    S2 09-CR-1184 (RJH)

RAJ RAJARATNAM,              :

                            :

         Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - X

 

## **REPLY SENTENCING MEMORANDUM ON BEHALF OF RAJ RAJARATNAM**

 

John M. Dowd (admitted *pro hac vice*)
Terence J. Lynam (admitted *pro hac vice*)
James E. Sherry (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

Samidh Guha (SG-5759)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

*Attorneys for Raj Rajaratnam*

September 9, 2011
New York, NY

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. THE ADVISORY GUIDELINES SHOULD NOT BE FOLLOWED IN THIS CASE
    BECAUSE THEY DO NOT REFLECT AN EMPIRICAL APPROACH BASED ON
    PAST PRACTICE AND OVERSTATE THE SERIOUSNESS OF THE OFFENSE .................5

III. THE GOVERNMENT MISAPPLIES THE ADVISORY GUIDELINES ..............................11

    1.      The Government's Gain Calculation is Flawed.................................................11
            a.      The Government's Calculations Overstate Gain.........................................12
            b.      The Court Should Not Consider "Losses Avoided"....................................14
            c.      The Government's Gain Calculation Overstates the Seriousness of
                  the Offense Because Mr. Rajaratnam Personally Realized Only a
                  Small Fraction of the Gain..........................................................................17
            d.      The Court Should Not Consider the CRS Trades .......................................18
    2.      No Leadership Enhancement Applies................................................................22
    3.      No Obstruction Enhancement Applies..............................................................24

IV. THE GOVERNMENT'S ALLEGATIONS OF "ADDITIONAL RELEVANT
    CONDUCT" ARE UNFOUNDED AND MISLEADING ......................................................27

    1.      The Government Has Not Proven that Mr. Rajaratnam Engaged in
            Criminal Conduct with Ali Far ........................................................................28
    2.      The Government Has Not Proven Mr. Rajaratnam Corrupted a Cisco
            Executive.........................................................................................................29
    3.      The Government Has Not Proven that Mr. Rajaratnam Engaged in
            Criminal Conduct with Zvi Goffer and Craig Drimal ..........................................32
    4.      The Government Has Not Proven that Mr. Rajaratnam Engaged in
            Criminal Conduct with Roomy Khan in the 1990s............................................34

V. THE CRIMINAL CONDUCT FOUND BY THE JURY DOES NOT WARRANT AN
    EXCEPTIONALLY SEVERE SENTENCE .....................................................................34

    1.      Respect for the Law and Acceptance of Responsibility.......................................34
    2.      Alleged Efforts to Conceal Criminal Activity .....................................................35
    3.      Unfounded Speculation About Undetected Criminal Conduct............................37
    4.      Alleged Corruption of Others .............................................................................39

VI. THE CIRCUMSTANCES OF THIS CASE WARRANT A SENTENCE
    SUBSTANTIALLY BELOW THE GUIDELINES RANGE ..................................................41

    1.      Mr. Rajaratnam's Extraordinary Record of Charitable Works Warrants
            Leniency.........................................................................................................41
    2.      The Purposes of Federal Sentencing Are Best Served by a Sentence
            Substantially Below the Advisory Guidelines Range ...........................................42

VII. MR. RAJARATNAM SHOULD BE ALLOWED TO REMAIN ON BAIL
      PENDING APPEAL........................................................................................................45

VIII. CONCLUSION .................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bronston v. United States*,
    408 U.S. 352 (1973)..................................................................................................................25

*Kimbrough v. United States*,
    552 U.S. 85 (2007)........................................................................................................6, 8, 9, 11

*Pepper v. United States*,
    131 S. Ct. 1229 (2011)...............................................................................................................6

*United States v. Adelson*,
    441 F. Supp.2d 506 (S.D.N.Y. 2006)..............................................................................5, 6, 11

*United States v. Chiesi*,
    S1 09 Cr. 1184 (S.D.N.Y.).......................................................................................................36

*United States v. Cruz*,
    977 F.2d 732 (2d Cir. 1992).....................................................................................................35

*United States v. Cuti*,
    No. 08 Cr. 972 (S.D.N.Y.).......................................................................................................12

*United States v. Cutillo*,
    10 Cr. 56 (S.D.N.Y.)................................................................................................................36

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)............................................................................................. *passim*

*United States v. Drimal*,
    S1 10 Cr. 56 (S.D.N.Y.)...........................................................................................................36

*United States v. Duffy*,
    479 F.2d 1038 (2d Cir. 1973)...................................................................................................35

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)..................................................................................6, 11

*United States v. Endo*,
    635 F.2d 321 (4th Cir. 1980) ...................................................................................................26

*United States v. Goldfarb*,
    S1 10 Cr. 56 (S.D.N.Y.)...........................................................................................................36

*United States v. Harris*,
    733 F.2d 994 (2d Cir. 1984).....................................................................................................29

*United States v. Hartstein,*
    500 F.3d 790 (8th Cir. 2007) ................................................................16

*United States v. Kurland,*
    S1 10 Cr. 69 (S.D.N.Y.)................................................................36

*United States v. Mizrachi,*
    48 F.3d 651 (2d Cir. 1995)................................................................ 22-23

*United States v. Nacchio,*
    573 F.3d 1062 (10th Cir. 2009) ................................................ 12-13

*United States v. Oakford Corp.,*
    No. 98 Cr. 144, 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ........................................ 17-18

*United States v. Olis,*
    429 F.3d 540 (5th Cir. 2005) ................................................................13

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977)................................................................29

*United States v. Rutkoske,*
    506 F.3d 170 (2d Cir. 2007)................................................................12

*United States v. Skilling,*
    638 F.3d 480 (5th Cir. 2011) ................................................................2

*United States v. Skilling,*
    No. 4:04-CR-00025 (S.D. Tex.)................................................................2

*United States v. Williams,*
    247 F.3d 353 (2d Cir. 2001)................................................................16

## STATUTES

18 U.S.C.
    § 3553................................................................................................ *passim*

## UNITED STATES SENTENCING GUIDELINES

    § 2A1.2................................................................................................5
    § 2A2.1................................................................................................5
    § 2A2.2................................................................................................5
    § 2A3.2................................................................................................5
    § 2A3.5................................................................................................5
    § 2B1.1................................................................................................7, 8
    § 3B1.1................................................................................................22

§ 3D1.2..................................................................................................................................22

§ 3E1.1 .................................................................................................................................35

**OTHER AUTHORITIES**

Frank O. Bowman, *The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments that Followed*, 1 Ohio. State J. of Crim L. 373 (2004) ......................................................... 7-9

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988) ................................................................7

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007)............................44

Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289 (1989).................................... 8-9

Ellen S. Podgor, *Throwing Away the Key*, 116 Yale L. J Pocket Part 279 (Feb. 21, 2007) ..........44

U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004) ........................................................................................................................7

## TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | Danielle Chiesi Plea Agreement (01/19/11) |
| 2 | Chart Reflecting Context of Stock Trades in Gain Calculation |
| 3 | All Hilton Trade Data from July 3, 2007 from Galleon OMS Database |
| 4 | Select Portions of Deposition of Sunil Bhalla (submitted under seal) |
| 5 | Letter from R. Brodsky (02/09/11) |
| 6 | Raj Rajaratnam EMC Trade Data from Galleon OMS Database |
| 7 | Raj Rajaratnam 3Com Trade Data from Galleon OMS Database |
| 8 | Mr. Rajaratnam's Letter Brief to Preclude Intel Witness Testimony of Roomy Khan Faxing Confidential Information to Rajaratnam (04/02/11) |

## I. INTRODUCTION

The government asks the Court to ignore Raj Rajaratnam the human being and to sentence a caricature instead.  The real Raj Rajaratnam – the man who emerges from the full record including the hundreds of letters the Court has received – is a kind, generous, and hard-working person, a dutiful son caring for his elderly parents, a loving husband and father, a loyal friend, and an exceptionally generous philanthropist.  Although the jury found that Mr. Rajaratnam crossed the line by engaging in insider trading while managing investment portfolios at Galleon, the record also shows that the trades in question accounted for less than 1% of his trading activity, and that Mr. Rajaratnam leveraged his personal success to help thousands of people in need, including family, friends, employees, acquaintances, and perfect strangers.  The government ignores all this, and instead of providing a fair and objective description of the defendant's conduct, resorts to unfounded *ad hominem* attacks, sketching a one-dimensional caricature driven by "greed," "arrogan[ce]," "hubris," and "egomaniacal desire" to commit crimes of "historic" proportions, comparable only to the vilest financial frauds – Enron, WorldCom, and the Madoff Ponzi scheme – each of which ruined the lives and livelihoods of scores of victims.

The government relies on this distortion because it requests a distorted sentence – 19 ½ to 24 ½ years of imprisonment.  At the high end, the requested sentence is more than four times longer than the longest sentence imposed in these cases to date and would guarantee Mr. Rajaratnam's death in prison.  The requested sentence is so disproportionate to the sentences imposed in other insider trading cases that the government cannot cite a *single* insider trading case as precedent, lest it reveal that no comparable sentence has ever been imposed.  Instead, it

relies on the sentences imposed on Jeffrey Skilling (which has been vacated[1]), Bernard Ebbers, and Bernard Madoff – defendants whose crimes left incalculable ruin and human suffering in their wake under circumstances very different from those presented here.  Those comparisons are as unfair as the sentence the government requests.

The government's request that Mr. Rajaratnam be imprisoned for an unprecedented 19 ½ to 24 ½ years must be put in context.  The average sentence imposed for manslaughter in 2010 was 73 months; for kidnapping and hostage-taking, 163 months; for sexual abuse, 109 months; for robbery, 77 months; for arson, 79 months, and for child pornography, 118 months.  *See* U.S. Sentencing Comm'n, 2010 Sourcebook of Federal Sentencing Statistics, tbl. 13 (2010).  The maximum sentence that the government is seeking in this case exceeds the average sentences imposed in all of these categories by *more than ten years*.  Indeed, of all the offenses for which the Sentencing Commission keeps statistics, the only category where the average sentence even approaches the sentence the government seeks here is murder, at 277 months – still 16 months shy of the upper end of the government's request.  *Id.*  This Court's statutory mandate is to impose a sentence that is "not greater than necessary," a bedrock principle of sentencing law that the government ignores completely.  18 U.S.C. § 3553.  That mandate cannot be fulfilled by a sentence longer than the average sentences for murder or the other violent offenses listed above.

In an attempt to justify the unprecedented sentence it now seeks, the government is forced to rely on overheated rhetoric and unfounded speculation about Mr. Rajaratnam's

---

[1] *See United States v. Skilling*, 638 F.3d 480 (5th Cir. 2011).  The government also fails to mention that the insider trading portion of Skilling's sentence accounted for only 52 months, less than 5 years of his total sentence of 24 years.  *See United States v. Skilling*, No. 4:04-CR-00025 (S.D. Tex., final judgment entered Oct. 25, 2006) (Docket No. 1155).  Notably, Mr. Skilling did not trade on the basis of tips.  He traded on the basis of insider knowledge of his own criminal fraud, personally profiting from insider knowledge of the very crimes that bankrupted Enron.

motivations.  For example, the government claims (without citation) that Mr. Rajaratnam was

motivated by an "egomaniacal desire" to "drive up his personal wealth through profitable

trading," to "make sure than investors did not pull their money out of Galleon," to "attract new

money to his fund," to "triumph over competitors," and to "conquer others on Wall Street."

Gov't Mem. at 1, 48.  As the manager of a hedge fund in a competitive environment, Mr.

Rajaratnam of course wanted Galleon to be successful, but the record actually reflects that Mr.

Rajaratnam was *not* driven by any sort of consuming desire to maximize Galleon's profits or his

own wealth.  For example, Harlem Children's Zone President Geoffrey Canada describes in his

letter how Mr. Rajaratnam wanted to leave the hedge fund business and devote himself to public

service and helping others until Mr. Canada persuaded him to remain in the financial industry so

he could use his wealth to help deserving causes.  (07/12/11 Ltr. from G. Canada).  And Lukas

Sito's letter recounts how Mr. Rajaratnam refused to restrict investor redemptions during the

height of the 2008 financial crisis, even though that decision might place Galleon's very

existence at risk.  (05/05/11 Ltr. from L. Sito).  These are hardly the actions one would expect

from the sort of avaricious egomaniac the government portrays.  If anything, the prosecutors'

resort to this sort of stridency and overstatement says more about their own competitiveness than

it does about Mr. Rajaratnam.

  This Court's duty is to impose a fair, dispassionate, and proportionate sentence,

considering not only the conduct underlying the conviction but also the full picture of the

defendant as a human being.  And while the government may dub Mr. Rajaratnam "the modern

face of illegal insider trading," this Court's role is not to validate a prosecutorial public relations

effort, nor is it to single out one man to serve as the whipping boy for Wall Street misdeeds.  The

simple, salient fact, which the government completely ignores, is that nearly two dozen

individuals have been charged in these cases with offense conduct substantially similar to that at issue here.  A number of those individuals have been sentenced, but none of those sentences remotely approaches the sentence the government requests for this defendant.  Mark Kurland, who committed insider trading while running the New Castle hedge fund, and who directed his employee, Danielle Chiesi, to gather inside information from various sources, received 27 months.  Chiesi, who obtained inside information from a number of sources and used it to trade in the portfolio she managed for New Castle, received 30 months – a sentence which the government trumpeted as "steep" in its subsequent press release.[2]  Arthur Cutillo, an attorney who stole privileged client confidences and sold them to co-conspirators who he knew intended to trade on them, received 30 months.  Jason Goldfarb, an attorney who encouraged colleagues to steal privileged client confidences in order to trade on them, received 36 months.  And Craig Drimal, a stock trader who orchestrated the scheme to profit from the privileged confidences stolen by Cutillo and Goldfarb, received 66 months – the longest sentence imposed in these cases to date.  Every one of these people engaged in conduct similar to the conduct at issue here, including attempts to conceal their crimes and avoid detection – another commonplace feature of these cases.  Yet the government asks the Court to sentence Mr. Rajaratnam to a term of imprisonment more than four times longer than the longest of these sentences.  And it completely fails to explain why Mr. Rajaratnam deserves a sentence almost 20 years longer than the already "steep" sentences imposed on others who engaged in similar conduct.

Criminal sentencing requires an individualized assessment of each defendant and the circumstances of each case.  But the purposes of sentencing are the same in every case – to

---

[2] *See* U.S. Attorney's Office for the Southern District of New York, Press Release (07/20/11) (Chiesi "will now pay a steep price for repeatedly flouting the law…."), *available at* http://www.justice.gov/usao/nys/pressreleases/July11/chiesidaniellesentencingpr.pdf.

promote respect for the law, to provide just punishment, and to deter others from similar conduct. *See* 18 U.S.C. § 3553(a).  These considerations were equally important when judges of this Court sentenced Kurland, Chiesi, Goldfarb, Cutillo, Drimal and others to terms of imprisonment more than a decade shorter than the sentence the government requests here.  No just purpose can be achieved by singling out one man for grotesquely severe punishment among many others similarly situated, and the sentencing statute warns against just such unwarranted disparities.  18 U.S.C. §3553(a)(6).  That is not, as the government suggests, "just and fair punishment."  Gov't Mem. at 48.  It is the opposite.

## II.  THE ADVISORY GUIDELINES SHOULD NOT BE FOLLOWED IN THIS CASE BECAUSE THEY DO NOT REFLECT AN EMPIRICAL APPROACH BASED ON PAST PRACTICE AND OVERSTATE THE SERIOUSNESS OF THE OFFENSE

The Sentencing Guidelines simply do not provide a reasonable measure of culpability in this case because, under the government's calculation, they result in a piling on of points that puts Mr. Rajaratnam on par with the most serious violent offenders.  To compare, the offense level for second degree murder is 38 (USSG § 2A1.2); for attempted first degree murder resulting in life-threatening injury, 37 (USSG § 2A2.1); for aggravated assault in which a firearm was discharged resulting in life-threatening bodily injury, 26 (USSG § 2A2.2); for sexual abuse of a minor, 18 (USSG § 2A3.2); and for kidnapping, 32 (USSG § 2A4.1).  Although the crimes for which Mr. Rajaratnam has been convicted are serious, they simply do not merit punishment as severe as the punishments for murder, assault with a deadly weapon, or sexual abuse of a child.

It is precisely this sort of false equivalency that has led judges in this district and others to criticize the "inordinate emphasis" that the Guidelines place "on the amount of actual or intended financial loss" in economic crimes cases without providing any explanation of "why it is appropriate to accord such huge weight to [this] factor."  *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.).  In reality, and as this case demonstrates, the amount of

loss (or gain) is often "a kind of accident" providing a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (Lynch, J.). Yet the "overly-rigid loss table," *id.*, treats the amount of loss (or gain) as so overwhelmingly important that it escalates purely economic crimes – including those with no identifiable victims – to the level of the most serious violent offenses. The results are Guidelines calculations, like the one in this case, "that have so run amok that they are patently absurd on their face," *Adelson*, 441 F. Supp. 2d at 515.[3]

Although this Court is required to give the Guidelines "respectful consideration," *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011), it owes no deference to Guidelines that do not reflect "an empirical approach based on data about past sentencing practices." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010); *accord Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007). But that is precisely the problem with the Guidelines for economic crimes. Unlike Guidelines provisions that reflect "an empirical approach based on data about past sentencing practices," the Guidelines for economic crimes were born of the Commission's decision to abandon its usual empirical approach, and have been steadily ratcheted ever higher in the years

---

[3] The "accidental" relationship of the gain amount to the defendant's actual culpability surely explains why the government is willing to bargain away millions of dollars of gain in order to obtain guilty pleas by stipulating to gain calculations acceptable to both sides. For example, Mr. Rajaratnam and Danielle Chiesi were originally indicted together on charges of securities fraud and conspiracy. The Superseding Indictment charged that Mr. Rajaratnam's conduct resulted in $45 million of gain to Galleon and that Ms. Chiesi's conduct resulted in $4 million of gain to New Castle. *See* Superseding Indictment ¶ 56 (Docket No. 165, filed Feb. 9, 2010). But Ms. Chiesi's plea agreement stipulates that the amount of unlawful gain is *less than* $2.5 million – resulting in a Guidelines calculation 2 points *lower* than it would have been had she been held responsible for the $4 million charged in the indictment. *See* Chiesi Plea Agr. at 2 (attached as Ex. 1). In contrast, the government argues that Mr. Rajaratnam is responsible for $63 million of gain, nearly $20 million *more than* charged in the indictment, resulting in a Guidelines calculation 2 points *higher* than it would have been if the amount charged in the indictment had been used.

since, often in response to political pressure, without any regard to past sentencing practices or empirical analysis.  As such, the Guidelines applicable to this case are due no deference and should not be followed.

A brief review of the development of the Guidelines for economic crimes demonstrates this lack of an empirical approach.  Unlike most of the federal Sentencing Guidelines, which were originally formulated using an "empirical and historical" approach that "set out to reproduce the sentencing patterns in existence before the Guidelines," the Guidelines for economic crimes were "consciously" drafted "to increase sentences for crimes against property over pre-Guidelines levels."  Frank O. Bowman, *The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments that Followed*, 1 Ohio. State J. of Crim L. 373, 385 (2004).  From the very beginning, the Commission thus "decided to abandon the touchstone of prior past practice" when formulating the Guidelines applicable to economic offenses.  Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988).  Initially, the purpose of this deviation from the Commission's usual empirical approach was to ensure that white collar defendants served "short but definite" terms of imprisonment, instead of the probationary sentences that were common before the Guidelines went into effect.  U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 56 (2004).

But over the years, the Commission has steadily amended the fraud Guidelines, and in particular the loss table set forth in § 2B1.1, in a manner that results in recommended sentences for economic crimes that are neither short nor definite.  *See* Bowman, *supra*, at 387 (noting that

Guidelines amendments have "tended to increase guideline sentence levels for economic offenders" while becoming "increasingly complex and ever more difficult to apply").  The net consequence of these amendments are Guidelines that – far from reflecting "an empirical approach based on data about past sentencing practices," *Dorvee*, 616 F.3d at 184 – yield sentences for economic crimes vastly more severe than the sentences historically imposed for such offenses.  Professor Bowman illustrates the point by comparing the sentences that a hypothetical defendant convicted of a $110 million fraud would be subject to under the various historical iterations of the Guidelines:

| 1987 | 1989 | 1991 | 1998 | Nov. 2001 | Jan. 2003 |
|------|------|------|------|-----------|-----------|
| 57-71 mos. | 121-151 mos. | 121-151 mos. | 151-188 mos. | LIFE | LIFE |

*See* Bowman, *supra*, at 428.[4]

As with the crack cocaine Guidelines criticized in *Kimbrough*, 552 U.S. at 109-10, and the child pornography Guidelines criticized in *Dorvee*, 616 F.3d at 184, the Guidelines for economic offenses tend to yield these unduly severe sentences because they have been repeatedly stiffened in response to political pressure instead of empirical research.  For example, the 1989 amendments, which added four levels for losses or gains over $20 million (including the tier for amounts over $50 million, which the government argues should apply here), were instituted in response to "recent congressional enactments" that the Commission perceived as "oblique 'signals' to the Commission to increase fraud penalties."  Jeffrey S. Parker & Michael K. Block,

---

[4] The hypothetical defendant described by Bowman is the "CEO of large conglomerate, [who] in collusion with CFO and other members of management, engage in accounting fraud and stock manipulation causing bankruptcy of company and losses to shareholders and employee pension fund of $110 million."  Bowman, *supra*, at 427.  The sentences applicable to this hypothetical defendant are the result of various amendments to USSG §2B1.1, including but not limited to increases in the fraud loss table.

*The Sentencing Commission, P.M. (Post-*Mistretta*): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 319 (1989).  And in 2003, Congress packed the Sarbanes-Oxley legislation with "hasty, cut-and-paste" directives to the Sentencing Commission, resulting in various increases to the Guidelines for economic crimes, including the addition of even more levels to the upper end of the loss table.  Bowman, *supra*, at 406.  This is exactly the kind of political interference in the "Commission's exercise of its characteristic institutional role" criticized in *Kimbrough*, 552 U.S. at 575, and *Dorvee*, 616 F.3d at 188.

These shortcomings in the process by which the fraud Guidelines have been adjusted over the years, and the undue severity of the sentences the Guidelines now yield, are on full display in this case.  For a multitude of reasons explained in detail in Mr. Rajaratnam's opening Sentencing Memorandum, the advisory Guidelines severely overstate the seriousness of the instant offenses, and would expose Mr. Rajaratnam to a sentence grossly out of proportion to the sentences imposed on other insider trading defendants.  Foremost among these defects is the manner in which the Guidelines apply the fraud loss table – dollar for dollar and point for point – to insider trading, substituting gain for loss as a proxy measure of culpability.  In this case, application of the loss table accounts for the vast majority of Mr. Rajaratnam's advisory Guidelines sentence – 24 of the government's 38 points.  Were it not for the loss table, Mr. Rajaratnam's advisory Guidelines range – *including* the enhancements for obstruction of justice and leadership that the government requests – would be 14, resulting in an advisory Guidelines sentence of 15-21 months.  Instead, the government asks for a sentence of up to 24 ½ years.

The advisory Guidelines also overstate the seriousness of the offense in this case because they fail to distinguish between defendants who trade *exclusively* on the basis of inside information and defendants for whom inside information is simply one factor – "however small"

9

– among many other factors influencing the decision to trade.  The point here is not to dispute the jury's finding that inside information was a factor in some of Mr. Rajaratnam's decisions to trade. But the jury's determination was to Mr. Rajaratnam's criminal liability, it was not to the level of his culpability.  And, as record reflects with regard to most of the stocks in this case, Mr. Rajaratnam already had a position in the stock before he was allegedly tipped and had sound reasons supported by Galleon's legitimate research for trading the way he did independent of the alleged tips.  *See* Ex. 2.  Accordingly, even accepting the jury's finding that some of Mr. Rajaratnam's trades were made on the basis of material, nonpublic information, it remains the case that he almost certainly would have realized much of the same gain even if he had never received the alleged inside information.  The Guidelines fail to take this fact into account, and would instead impose the same penalty on a defendant who trades exclusively on the basis of material, nonpublic information as it would impose on a defendant who trades regularly in a stock and spends considerable time, money, and energy on legitimate research and analysis, and for whom inside information is only a small factor in his decision-making.[5]

To repeat:  Mr. Rajaratnam does not deny that insider trading is a serious offense.  But one thing insider trading does *not* cause are the kinds of measurable losses to identifiable victims that conventional frauds cause, and which the loss table attempts to measure.[6]  Blind application of the "overly rigid" loss table to insider trading gains results in over-punishment, because it

_____

[5] At a minimum, this analysis  demonstrates that the government's "one-size fits all" model for calculating gain and loss avoided is not appropriate in a case such as this where there are numerous stock trades in question.  A more rigorous and individualized analysis of gain and loss avoided on a stock by stock basis is appropriate and is discussed in further detail below.

[6] The government suggests that the "particular investors on the other side of Rajaratnam's illegal trades" were victimized.  But there were no such "particular investors."  The counter-parties to Mr. Rajaratnam's trades were large market-making firms which maintained vast inventories of securities that they were obligated to buy and sell in order to create liquidity.

imports a degree of "moral seriousness" (*i.e.*, measurable harm to victims) that simply is not present in insider trading cases. *Emmenegger*, 329 F. Supp. 2d at 427-28. And even more than in conventional fraud cases, the amount of gain realized by insider trading is "a sort of accident" dependent on unpredictable factors entirely out of the defendant's control, and is thus a "weak indicator" of culpability. *Id.* But the fraud Guidelines give unreasonable and overwhelming significance to this one factor. Because those Guidelines were not drafted using the Sentencing Commission's usual empirical and historical approach, and now result in unreasonably severe advisory sentences, they are owed no deference by the Court and should not be followed in this case. *See Kimbrough*, 552 U.S. at 109-10; *Dorvee*, 616 F.3d at 184.

## III. THE GOVERNMENT MISAPPLIES THE ADVISORY GUIDELINES

The flaws inherent in the advisory Guidelines themselves are amplified and exacerbated by the government's flawed application of them. As a result of multiple errors in its Guidelines calculation – every one of which has the effect of increasing the advisory sentence – the government takes Guidelines which yield unduly severe sentences under the best of circumstances and uses them to reach a result "absurd on its face," *Adelson*, 441 F. Supp. 2d at 515 – *i.e.*, a recommended sentence in an insider trading case more severe that the average sentences for murder, kidnapping, arson, and child sexual abuse, and unlike any sentence ever imposed in an insider trading case.

### 1. The Government's Gain Calculation is Flawed

Foremost among the government's misapplications of the Guidelines is its calculation of gain, which improperly includes: (1) stock price movements not attributable to the offense conduct, *i.e.*, trading on the basis of material, non-public information; (2) speculative "losses

avoided"; and (3) gains not realized by Mr. Rajaratnam himself.[7]  The cumulative effect of these errors is a gain calculation of more than $63 million, which massively overstates the seriousness of the offense.[8]

### a.     The Government's Calculations Overstate Gain

As explained in detail in Mr. Rajaratnam's opening brief, the government's calculations overstate the amount of gain because they fail to segregate the gains attributable to unlawful exploitation of inside information from gains attributable to other factors.  Instead, the government's calculations indiscriminately include *all* changes in the stock's price between the time Mr. Rajaratnam bought it and the time he sold it, sweeping in changes attributable to unrelated events and exogenous market movements that occurred both before and after the market reacted to the public release of the inside information.  This is contrary to Second Circuit precedent holding that the gain or loss taken into account under the Guidelines in a securities fraud case "must be the result of the fraud," and must not include price movements unrelated to the offense.  *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007); *accord United States v.*

---

[7] The Pre-Sentence Report adopts the government's gain calculation.  But the Probation Officer's calculation of gain is not binding on the Court, and does not establish that the government has carried its burden of proof on the gain amount.  In a recent securities fraud case in this district, Judge Deborah Batts found that the government had failed to prove any loss amount attributable to the offenses of conviction, notwithstanding the fact that the Pre-Sentence Report adopted the government's position that a 22-level enhancement was appropriate for a loss of $28.5 to $35.5 million.  *See United States v. Cuti*, No. 08 Cr. 972 (S.D.N.Y., Mem. Order filed July 29, 2011) (Docket No. 162).  Judge Batts therefore declined to apply any enhancement for loss under the advisory Guidelines.  *Id.*

[8] The government suggests that its gain calculation is actually "conservative" because it does not include gains by Mr. Rajaratnam's "downstream tippees."  But it does not identify any of these "downstream tippees" or attempt to quantify any gains that they realized as a result of tips from Mr. Rajaratnam.  In fact, the evidence at trial, viewed most favorably to the government, suggested only one "downstream tippee," *i.e.*, Danielle Chiesi, who discussed the AMD "asset lite" reorganization with Mr. Rajaratnam.  But Ms. Chiesi and Mr. Rajaratnam both lost money on that transaction; neither realized any gain that could be added to the government's gain calculation.

*Nacchio*, 573 F.3d 1062 (10th Cir. 2009); *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005).

Without citing to any legal authority, the government baldly asserts that the FIFO method is

"generally accepted." Gov't Mem. at 32.  While this accounting methodology may be generally

accepted in other contexts, it is not so here.  The government simply ignores the principles that

the Second Circuit in *Rutkoske* and other courts have found applicable in calculating gain or loss

in securities fraud cases.

Clearly, price movements that occur long *after* the public release of previously nonpublic

information are not attributable to the fraud, which is surely why the government insists that "not

a single [one of its gain] calculation[s] includes profit that Rajaratnam realized by exiting a

position weeks or months after the relevant public announcement."  Gov't Mem. at 32.  This is

not correct.  The government's calculation of gain on Intel, for instance, includes gains from

stock sales that Mr. Rajaratnam made as long as two weeks after Intel's April 17, 2007 earnings

announcement.  *See* Def. Mem. at 24.  More to the point, it is improper to include *any* gains not

attributable to the release of the previously nonpublic information, whether those gains occurred

weeks after the announcement or the next day.  That is why the government's approach to

calculation should be rejected and the event study method used instead.

The same problem affects price movements that occurred between the time that Mr.

Rajaratnam purchased stock and the release of the previously nonpublic information.  In that

case, too, the government's gain calculation includes price movements attributable to events

wholly unrelated to the inside information.  The government no doubt contends that these

fortuitous gains should be counted because they would not have been realized "but for" the

illegal trading, but these are precisely the sort of "accidental" gains that render the Guidelines' loss table a poor measure of the "moral seriousness" of the offense.[9]

### b.     The Court Should Not Consider "Losses Avoided"

As to so-called "losses avoided," the government concedes that these amounts are speculative, requiring the Court to guess how long Mr. Rajaratnam would have held his positions if not for the insider tips.  As the government frankly admits with respect Mr. Rajaratnam's sale of Goldman Sachs shares on October 24, 2008, "there is simply no way of knowing when Rajaratnam would have sold his stock had he not received the tip on October 23."  Gov't Mem. at 34.  But that is precisely the problem with "losses avoided."  There is "no way of knowing" when Mr. Rajaratnam would have liquidated these positions, yet the government must select some date in order to calculate the amount of loss he allegedly avoided by liquidating them when he did.  In the case of Goldman Sachs, the government picks December 16, 2008, the date of Goldman's earnings announcement for the third quarter of 2008.  The theory, apparently, is that Mr. Rajaratnam bought shares of Goldman Sachs in October 2008, in the midst of the worst financial crisis since the Great Depression, with the intention of holding those shares through Goldman's earnings announcement nearly two months later, *no matter what*.  That is not only speculative, it is contrary to basic principles of sound investing.  It does not make sense to trade around earnings events by taking positions months in advance of the scheduled announcements,

---

[9] For example, consider a hypothetical defendant who trades based on an insider tip that Apple is going to announce disappointing earnings on Friday.  The defendant takes a short position based on this tip, expecting to make a few thousand dollars.  On Thursday, an earthquake strikes Cupertino, California, destroying Apple's headquarters, and the defendant reaps windfall gains as Apple's share price plummets.  Although the defendant would not have realized these gains had he not made the illegal trade, the *amount* of the gain is hardly an accurate measure of his culpability or of the moral seriousness of his crime.  Put simply, accidental gains do not justify an increased prison sentence.

thereby exposing one's investment to months of market risk.  This, of course, is particularly true during periods of precipitous market decline like October and November 2008.[10]

The government attempts to minimize the importance of these speculative assumptions by arguing that the Court is entitled to make a "reasonable estimate" of gain.  But that simply begs the question whether it is "reasonable" to "estimate" gain based on a date that bears no relation to the tip Mr. Rajaratnam allegedly received almost two months earlier, and one that would mean that Mr. Rajaratnam is oblivious to basic investment strategy and market conditions.[11]  It is not "reasonable" to do that, and the number that results is not an "estimate," it is a guess.  That is why the government attempts to shift the burden of proof by challenging the defense to "propose [an] alternative method to calculate Rajaratnam's gain."  Gov't Mem. at 34.  But the government alone must prove by a preponderance of the evidence the facts relevant to

---

[10] The government argues that Professor Jarrell was incorrect when he testified to the "decline in the global equity markets" that occurred after Mr. Rajaratnam sold his Goldman shares in October 2008.  According to the government, "the dramatic declines in the markets actually *preceded* Rajaratnam's inside trades," and the market was "generally flat" between October 24 and December 16, 2008.  Gov't Mem. at 33.  The government is wrong.  Although the market was "generally flat" if those two specific dates are compared, it declined significantly during that period, before recovering.  For example, between October 23 and November 20, the Dow Jones Industrial average was down 13.1%, the Nasdaq was down 17.9%, the S&P 500 was down 17.1% and the Financial Select Sector SPDR ETF (which includes a basket of financial stocks including Goldman Sachs) was down 35.2%.  The government's unreasonable and unsupported assumption is that Mr. Rajaratnam would have held his Goldman shares during this period of steep market decline.

[11] The government argues that it is reasonable to select the date of Goldman's earnings announcement because this was "the announcement about which Rajaratnam was tipped."  Gov't Mem. at 34.  But that is not what the evidence showed.  Viewed in the light most favorable to the government, the evidence at trial suggested that on October 23, 2008, Mr. Rajaratnam learned how Goldman was doing financially *at that time*, *i.e.*, that Goldman's financial performance was worse than market expectations at that time.  But since Goldman was not due to announce earnings results till mid-December, that alleged tip could not be what that earnings announcement would be almost two months later.  This was not an eve-of-announcement tip, when the quarter is closed and the numbers are fixed and known to some insiders.  The quarter was far from over on October 23, 2008 and no one could predict how it would turn out, particularly in the midst of a financial crisis that was still developing.

sentencing, including the amount of gain.  *See United States v. Williams*, 247 F.3d 353, 358 n.1 (2d Cir. 2001); *United States v. Hartstein*, 500 F.3d 790 (8th Cir. 2007).  It cannot carry that burden by proposing dates which are "at least as plausible" as other dates in order to calculate losses avoided.  But that is exactly what the government has done here.  Gov't Mem. at 34.

The government also attempts to sweep these problems under the rug by arguing that Mr. Rajaratnam's "gain would still be considerable" had he sold his stock at some other date after October 24 but before December 16.  But here, the government simply pulls dates out of a hat, stating that Mr. Rajaratnam would have lost $3.3 million if he had held the stock for two weeks and $5.0 million if he had held it for three weeks.  But as the government concedes, "there is no way of knowing" what Mr. Rajaratnam intended to do with those shares as of October 23, 2008, and the government has offered no better reason to believe that he intended to hold them for two weeks or three weeks than to believe that he intended to hold them until December 16.  And its suggestion that the Court could employ the alternative approach of using the price at which Mr. Rajaratnam *bought* Goldman shares on November 11, 2008 to determine what he would have *sold* them at makes no sense; it is not reasonable to say that Mr. Rajaratnam would have sold the stock at the same price and time that he was buying the stock.  This sort of haphazard selection of dates and price points is not sufficient to carry the government's burden of proving the losses that it contends Mr. Rajaratnam avoided.[12]

---

[12] This is not to say that it is never possible to make a reasonable, fact-based estimate of losses avoided.  For example, if the evidence showed that the defendant had a pre-existing plan to sell his stock if it fell below a certain price, but instead sold before the stock reached that price based on information from an insider, it might be reasonable to conclude that the defendant avoided a certain amount of losses that he would have sustained had he held his shares pursuant to his original plan.  The problem in this case is that the government points to *no evidence* to support its assumptions about how long Mr. Rajaratnam intended to maintain these positions.

Exactly the same problem infects the government's calculations of "losses avoided" for

Google and Intel, which the government's brief does not even address.  In both cases, the

government's calculation of "losses avoided" depends critically on the unproven assumption that

Mr. Rajaratnam intended to hold his shares until a certain date, but abandoned that intention after

being tipped.  The government points to no actual evidence to support that assumption because

there is no evidence.  As with Goldman, the government has failed to carry its burden of proof

for the losses that it contends Mr. Rajaratnam avoided on Google and Intel. [13]

> **c.**   **The Government's Gain Calculation Overstates the Seriousness of the Offense Because Mr. Rajaratnam Personally Realized Only a Small Fraction of the Gain**

The government's gain figure – in addition to being wrong for the reasons already

discussed – greatly overstates the seriousness of the offense because it includes tens of millions

of dollars of gain that accrued, for the most part, to Galleon's investors, rather than Mr.

Rajaratnam individually.  Mr. Rajaratnam himself realized less than $7.5 million of gain from the

trades at issue (excluding "losses avoided").  And in truth, Mr. Rajaratnam realized no net gain at

all from the conduct found by the jury, since no performance fees were paid to Galleon in 2008

and the huge loss on AMD more than wipes out all of the gains alleged by the government.

Accordingly, even if the Court were to accept the government's argument that the Guidelines call

for the inclusion of all gains resulting from the trades (which it should not), it remains the case

that this calculation overstates the seriousness of the offense.  *See United States v. Oakford Corp.*,

---

[13] The government is incorrect when it states that Professor Jarrell did not propose "any alternative method" to calculate the gain (loss avoided) on Goldman Sachs or opine that the loss avoided calculations for Google and Intel were "unreasonable."  Gov't Mem. at 34 & n. 12.  In fact, Professor Jarrell opined that the government's FIFO method was not appropriate for any of the stocks at issue and he included new gain calculations for all the stocks.  *See* Jarrell Decl. at 3. He also included new loss avoided numbers for Goldman Sachs, Google and Intel using the event study method, as an alternative to the government's calculation.  *See* Jarrell Decl. at Ex. 2.

No. 98 Cr. 144, 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) (Guidelines overstated seriousness of offenses where "each of the defendants personally realized only a small portion of the overall gain or profits" of a scheme similar to insider trading).

> **d.**     **The Court Should Not Consider the CRS Trades**

The government's request that the Court find additional gain of $8,259,055 based on trades under the "CRS" codes (Gov't Mem. at 35-37) should be denied.  This alleged gain was not proven at trial and the government has not carried its burden of establishing it by a preponderance of the evidence.

The government relies on what it calls a "back office" document (Gov't Mem. Ex. BB), which it claims establishes that Mr. Rajaratnam used the portfolio manager code "CRS" for trades in the "Crossover" account that were not included in Agent Barnacle's initial calculations. Gov't Mem. at 35-36.  In a footnote, the government suggests that this document was a Galleon business record that Galleon failed to produce before trial, claiming no such document existed. Gov't Mem. at 36, n.15.  That is not the case.  As counsel for Galleon and Mr. Rajaratnam repeatedly informed the government at trial, this document was not a Galleon record properly responsive to any subpoena, but instead was protected attorney work product prepared at the express direction of Galleon's counsel long after Mr. Rajaratnam's arrest and the filing of the SEC's parallel civil suit against Mr. Rajaratnam and Galleon.  The document reflects counsel's attempt to list and identify manager codes used at Galleon for the purpose of joint defense, but it is not, and never was, a business record prepared in the ordinary course of business.  The document was prepared solely for the assistance of counsel in the joint defense of allegations against Mr. Rajaratnam and Galleon, and indeed was prepared long after Galleon had ceased active operations and business.

This document was used in a limited way at trial and was not admitted into evidence. During the direct examination of Galleon's COO Rick Schutte, defense counsel asked Mr. Schutte whether Mr. Rajaratnam was responsible for trades under another code (GLT), which Agent Barnacle had attributed to Mr. Rajaratnam for an extended period of time. Defense counsel used this document to refresh Mr. Schutte's recollection Mr. Rajaratnam was not responsible for trades under the GLT code during certain periods. Tr. 4285-86. The document was not used for any other purpose nor was it even offered in evidence. On cross-examination, the government asked Mr. Schutte if the document refreshed his recollection that Mr. Rajaratnam used yet another code (ASO). Tr. 4580. Mr. Schutte testified that it did not, and that it only refreshed his recollection on the GLT code. Tr. 4583. Significantly, the government did *not* ask Mr. Schutte if the document refreshed his recollection that Mr. Rajaratnam also used the CRS code, which is the code they are now attempting to tie to Mr. Rajaratnam, and Mr. Schutte never testified that that Mr. Rajaratnam used the CRS code. Other than refreshing Mr. Schutte's recollection about the GLT code, this document was never used at trial to establish that Mr. Rajaratnam used CRS or any of the dozens of other codes on it.

Indeed, the document itself shows that it cannot support the government's claim that Mr. Rajaratnam used the CRS code to place trades since it bears on its face indicia of unreliability about whether Mr. Rajaratnam used the CRS code. For example, in the "description" column across from "CRS," the document states "RAJ CROSS - UNCERTAIN—Rengan/Nat." Gov't Mem. Ex. BB. Likewise, the footer at the bottom of the document states: "There is no guaranty that the information is 100% accurate or complete…In some cases multiple managers used the same code and uncertainty exists regarding who the PM [portfolio manager] was at any given point in time as well as when the code transitioned from one PM to another." *Id.* The

government simply ignores these plain indicia of uncertainty as to whether Mr. Rajaratnam used the CRS code, which is undoubtedly why it never asked Mr. Schutte about the matter on cross-examination.

The government next claims that there was corroboration regarding the use of the CRS code because "Smith testified that the Crossover fund was Rajaratnam's responsibility." Gov't Mem. at 36. This claim is overstated. During his testimony, Smith was asked about the various funds at Galleon and what Mr. Rajaratnam's role was, as shown below:

> Q.  What were some of the other sector funds that Galleon ran?
>
> A.  Health care, financial services, energy, for instance.
>
> Q.  What was Raj Rajaratnam's role with respect to these funds?
>
> A.  He was ultimately responsible for the firm, but specifically responsible for the technology fund and some other funds.
>
> Q.  Which other funds was he primarily responsible for?
>
> A.  My understanding is the diversified fund was one.  I believe in some way the crossover fund was also his responsibility.

Tr. 2453.  Smith's clear statement that Mr. Rajaratnam was responsible for the diversified fund, as compared to his qualification that Mr. Rajaratnam was "in some way" responsible for the Crossover fund, indicates considerable uncertainty about exactly how Mr. Rajaratnam was responsible for that fund.  It is not clear from Smith's testimony whether he understood Mr. Rajaratnam to be responsible for general supervision of others and without specifically trading in the fund himself, whether he sometimes traded in the fund, or whether he was responsible for all trading in the fund.  Once again, the government did not attempt to get further clarification or otherwise ask about the Crossover fund when it had Smith on the stand.

The government also relies on an intercepted conversation (GX 524) in which it claims that Mr. Rajaratnam was discussing trades for the Crossover fund.  The conversation cited took

place between Mr. Rajaratnam, Kris Chellam and Krish Panu, and involves discussions of

several stocks and no reference to the Crossover fund other than an unclear reference to "Cross":

"But uhm…in terms of doing Cross…uh…uhm…like uh… a distressed um technology fund…"

GX 524 at 13:35-36.  There is simply no indication from this conversation that Mr. Rajaratnam

was responsible for the trades in the Crossover fund.

The government's final proffered corroboration is a claim that "trading by 'CRS' closely

mirrors trading by Rajaratnam's other codes," citing as proof that there were purchases of Hilton

stock at approximately the same time on July 3, 2007 under both the TMT code (which Mr.

Rajaratnam used) and under CRS.  As support, the government attached Ex. CC, which is a

selective excerpt from Galleon's records of the trading in Hilton on July 3, 2007 showing only

the trades under TMT and CRS.  However, when the complete Galleon trading data for Hilton on

that date is reviewed, it is clear that there is no corroboration for Mr. Rajaratnam's supposed use

of CRS.  The complete data for the Hilton trading on that date shows that Hilton stock was

purchased under *seven* different manager codes *in addition to* TMT and CRS, using six different

trader codes other than IH (Ian Horowitz).  *See* Ex. 3.  The fact that the same trader code appears

for both TMT and CRS is also not unusual—the same trader code appears for multiple other

manager codes besides TMT and CRS which Mr. Rajaratnam is not alleged to have used.[14]

Many of these other trades in Hilton occurred within seconds or minutes of the trades under

TMT and CRS.  Therefore, the fact that Hilton was purchased under TMT and CRS is no more

---

[14] The fact that the trader code for Ian Horowitz appears for the Hilton trades that the
government selected is also not probative of whether Mr. Rajaratnam was responsible for them.
As the government's own exhibit shows, many of the other trades under CRS that the
government attempts to attribute to Mr. Rajaratnam have trader codes other than "IH"
(Horowitz's code).  *See* Gov't Mem. Ex. CC (listing trader codes such as AM for Akamai; JR for
Clearwire; and WL and JR for Google).   The trader codes are simply not probative of
which portfolio manager made the trade.

significant than the fact that it was purchased under BCG or BCC or any of the other codes at around the same time, which codes are not attributable to Mr. Rajaratnam.  In summary, neither the trading data nor the other evidence cited by the government establishes by a preponderance of the evidence that Mr. Rajaratnam was responsible for the trades made under the CRS code.  Therefore, the gain amount should not reflect the additional $8,259,055 that the government seeks.[15]

### 2.        No Leadership Enhancement Applies

Mr. Rajaratnam's opening brief explained in detail why no leadership enhancement should be imposed pursuant to USSG § 3B1.1.  Those arguments will not be repeated here, but Mr. Rajaratnam respectfully emphasizes the following points:

First, as anticipated, the government attempts to aggregate distinct conspiracies found by the jury in order to arrive at the number of "five or more participants" required for the enhancement to apply.  But it simply is not the case that the individuals identified by the government (Kumar, Goel, Chellam, Panu, Chiesi, Rengan Rajaratnam, Far, Goffer, Khan, Liu, Smith, Ahmed, and Gupta) all participated together in "a criminal activity" as required for them to be counted together under § 3B1.1.[16]  This is equally true of the eight individuals alleged to

---

[15] The government's gain calculation under CRS includes $2,951,250 in alleged "loss avoided" in Google.  For the additional reasons stated above in the section on "loss avoided", this amount should not be included in the gain calculation.

[16] The Second Circuit has held that separate offenses may be aggregated for purposes of the §3B1.1 leadership enhancement where the offenses are grouped together under § 3D1.2 because the offense behavior was "ongoing or continuous in nature."  *See United States v. Mizrachi*, 48 F.3d 651 (2d Cir. 1995).  In contrast, the parties here agree that the offenses should be grouped under § 3D1.2 because the offense level is determined largely on the basis of the total amount of gain, not because the offenses all constitute one continuous or ongoing fraud.  *See* Gov't Mem. at 29.  Because the basis for grouping the offenses here is different from the basis for grouping the offenses in *Mizrachi*, that case does not control, and for good reason.  In *Mizrachi*, it made sense to aggregate separately charged offenses for purposes of the leadership

have participated in the "Galleon conspiracy," which the evidence shows was actually a cluster of distinct conspiracies, no one of which involved five people.

Second, the government simply insists that Mr. Rajaratnam "led" these individuals in criminal activity, as though the allegation were self-evidently true, but the entire section of its memorandum addressing the leadership enhancement contains *not one* citation to any record evidence. *See* Gov't Mem. at 37-41. As explained more fully in Mr. Rajaratnam's opening brief, the evidence does not support the claim that Mr. Rajaratnam led all (or any) of these individuals in criminal activity, as opposed to merely conspiring with them as equals in the various tipper/tippee insider trading schemes found by the jury.

The government also argues that even if none of the criminal activities found by the jury involved five or more participants, the Count One "Galleon Conspiracy" was "otherwise extensive" because various Galleon employees were "unknowing participants" in the criminal activity. As the government puts it, again without any record citation, "Rajaratnam hired numerous traders to execute securities transactions based on material, nonpublic information; Rajaratnam caused portfolio managers to execute securities transactions based on material, nonpublic information; and Rajaratnam used numerous internal research analysts to provide cover for his illegal trades." Gov't Mem. at 41. The problem with all this is that there is no evidence for any of it. Although Galleon certainly employed traders, there is no evidence that Mr. Rajaratnam "hired" them to place trades on the basis of material, nonpublic information. And in reality, Mr. Rajaratnam usually placed his own trades through a single trader. *See* Tr. at 4461-62.

---

enhancement because those offenses, although charged in different counts, constituted a single "continuous and ongoing" fraud, *i.e.*, a single "criminal activity" involving five or more participants  The same is not true here, and it does not make sense to treat the distinct offenses found by the jury as a single "criminal activity" simply because the offense level is based largely on aggregate gain.

There is likewise no evidence that Mr. Rajaratnam "caused" any of Galleon's other portfolio managers to place trades on the basis of material, nonpublic information, and no evidence that Mr. Rajaratnam used Galleon's research analysts to provide "cover" for illegal trading. To the contrary, the evidence showed that Galleon's research analysts performed legitimate, *bona fide* research that Mr. Rajaratnam and Galleon's other portfolio managers routinely relied upon when making their trades, the vast majority of which have never been alleged to have been anything other than perfectly legal. And as the government itself acknowledged during its opening statement: "There were Galleon employees who weren't . . . involved in this criminal activity." Tr. at 40-41. Finally, to the extent Galleon's employees are counted as part of an "otherwise extensive" criminal activity in which they unwittingly participated by carrying out ministerial tasks such as executing Mr. Rajaratnam's trades, the leadership enhancement becomes duplicative of the (already very large) upward adjustment for gain, since the gains realized by Mr. Rajaratnam's trading were possible only because he was trading on behalf of a large hedge fund that employed others to perform such ministerial tasks.

**3.      No Obstruction Enhancement Applies**

Mr. Rajaratnam's first Memorandum also explained in detail why no enhancement for obstruction of justice should apply. Those arguments will not be repeated, but Mr. Rajaratnam respectfully emphasizes the following points:

First, the government is not able to seek this enhancement based on any conduct by Mr. Rajaratnam in connection with the criminal investigation or trial, so it is reaching back to testimony taken during a civil investigation years earlier. That investigation was captioned by the SEC as *In the Matter of Sedna Capital Management, LLC* and was ostensibly focused on trading at the Sedna firm (where Mr. Rajaratnam was an investor) and not at Galleon. This fact

is very pertinent to Mr. Rajaratnam's preparation for the deposition and his state of mind when answering the questions posed to him.  And while the government presses the Court to "send a strong message that lying under oath to the SEC will be punished severely," it has never considered the supposed perjury serious (or provable) enough to charge criminally.

Second, to the extent that the SEC questioned him about Galleon at that time, the government's claim of obstruction is not supported by the record.  Indeed, the government relied on portions of the SEC testimony to prove points in its case-in-chief at trial.  *See* GX 1350-1355. The government nevertheless asserts that Mr. Rajaratnam's alleged perjury was successful because he successfully hid from the SEC that Anil Kumar was one of his sources of inside information.  But during the very same deposition, and during his prior interview with the SEC's field examination staff, Mr. Rajaratnam did identify other individuals – including Roomy Khan and Rajiv Goel – whom the government contends were inside sources for Mr. Rajaratnam.  *See* Gov't Mem. Ex. EE at 113-14; Franks Hr'g Exs. Beaudreault 14, Michaelson 27-A.  And as the Court is aware from the *Franks* hearing, Galleon produced a number of records to the SEC identifying Anil Kumar as an investor in Galleon and as a contact of Mr. Rajaratnam's who worked at McKinsey & Co.  *See* Franks Hr'g Exs. Beaudreault 6 & 7, Michaelson 33 & 34.  Mr. Rajaratnam's frank and honest disclosures about Khan and Goel, and Galleon's transparent production of documents concerning Kumar, are completely inconsistent with the notion that Mr. Rajaratnam willfully attempted to obstruct justice by concealing Anil Kumar.

Third, the government misunderstands and misstates the federal law of perjury, arguing that witnesses may not "parse" when testifying.  In fact, they may.  *See Bronston v. United States*, 408 U.S. 352, 358-59 (1973).  An attorney examining a witness is entitled to literally truthful responses to the precise questions asked; the attorney is not entitled to assume that the witness

will freely expound whatever helpful information the attorney hopes to elicit.  Instead, our adversarial system of justice makes it "the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination."  *Id.*

In an attempt to make perjury out of Mr. Rajaratnam's answers to legally conclusory questions incorporating terms of art such as "material, nonpublic information," the government refers to Mr. Rajaratnam's testimony that "'material' information included information regarding a merger that contained definitive terms, as well as specific information regarding earnings."  Gov't Mem. at 44 n.19.  But to the extent this answer reflects Mr. Rajaratnam's understanding that "material" information is limited to information as concrete and substantial as the definitive terms of a merger or precise earnings numbers, then his understanding was wrong, inconsistent with the instructions given to the jury in this case, and much narrower than the definition the government itself would apply – but certainly not false or willfully intended to obstruct justice.  Mr. Rajaratnam's counsel even objected during portions of the deposition on the grounds that the government's questions were calling for Mr. Rajaratnam to provide legal conclusions in his answers.  See Gov't Mem. Ex. EE at 79-80.  This, of course, is precisely why a lay witness's answers to legally conclusory questions incorporating legal terms of art cannot constitute perjury under the federal definition, even where it appears that the witness was attempting to "parse" with his answers.  *See United States v. Endo*, 635 F.2d 321, 323 (4th Cir. 1980).

Fourth, the government relies on snippets of extensive answers that Mr. Rajaratnam gave in the deposition, conveying a misleading impression that false testimony was provided, without informing the Court what the question was.  For example, the government asserts that Mr. Rajaratnam was asked more questions about AMD than any other stock and that he lied "to

conceal his crimes with Kumar." Gov't Mem. at 43. As support, the government then cites a

snippet of testimony where, in the course of an answer, Mr. Rajaratnam asserts that AMD was

"simple because I followed [AMD] for twenty years." *Id.* It is misleading for the government to

suggest that this answer was designed to conceal anything about Kumar. The statement was part

of a lengthy answer in response to questions about the numerical models that both Galleon

developed and sell side firms provided—the precise question preceding this answer was "Do you

come up with a precise number in your head, do you think AMD's earnings per share will be X?"

Gov't Mem. Ex. EE at 137:3-4. The portion of the answer cited by the government is clearly

truthful when read as part of the complete answer in response to this question. Indeed, the

government does not specifically cite this answer as perjurious, but the misleading way it

attempts to utilize it illustrates the importance of careful scrutiny of questions and answers before

a perjury charge can be sustained.

     For all these reasons, and those previously stated in defendant's opening brief, no

Guideline enhancement under §3C1.1 is warranted.

## IV.  THE GOVERNMENT'S ALLEGATIONS OF "ADDITIONAL RELEVANT CONDUCT" ARE UNFOUNDED AND MISLEADING

     The government also raises a number of allegations that it describes as "additional

criminal conduct" by Mr. Rajaratnam. Gov't Mem. at 13-19. The government does not argue

that this conduct translates into any particular enhancements under the Guidelines, but asserts

that it is "relevant to sentencing" nonetheless. *Id.* at 14. Of course, the government has been

highly selective in its presentation of evidence outside the trial record. For example, although

the government repeats its theory that Mr. Rajaratnam traded on the basis of inside information

that Roomy Khan obtained from Polycom executive Sunil Bhalla, it does not mention that since

Mr. Rajaratnam's conviction, Bhalla has denied under oath in his testimony in the SEC's civil

27

enforcement action that he ever provided Khan with material, nonpublic information about Polycom. *See SEC v. Feinblatt et al.*, No. 11-CV-0170 (S.D.N.Y.), Dep. of S. Bhalla at 130, 165-66, 188, 189-90 (taken July 8, 2011) (relevant portions submitted under seal as Ex. 4).

More importantly, the government did not prove, or even address, any of this alleged additional criminal conduct at trial. The government claims that these omissions were for the purpose of "streamlin[ing]" its case. *Id.* But in reality, if the government made strategic decisions not to pursue certain allegations at trial, it was in order to prevent the defense from exposing the many serious flaws in those allegations. Having effectively denied the defense an opportunity to rebut these allegations at trial, the government should not now be permitted to re-package the flimsiest parts of its case as part of its sentencing brief.

1.     **The Government Has Not Proven that Mr. Rajaratnam Engaged in Criminal Conduct with Ali Far**

The government first claims that Mr. Rajaratnam engaged in criminal conduct with Ali Far, a former Galleon analyst and portfolio manager, in 2008 and 2009, when Far was intercepted providing Mr. Rajaratnam with information about Atheros and Marvell. Gov't Mem. 14-16. The government summarizes certain evidence which, it claims, shows that Far tipped Mr. Rajaratnam about Atheros's December 2008 earnings announcement and Marvell's July 2008 earnings announcement. *Id.* In addition to this evidence, Far is a cooperating witness who would have been required to testify at trial had the government chosen to call him. *Id.* at 14 n. 2.

Considering the evidence the government could have presented at trial – including emails, telephone records, intercepted telephone calls, and the testimony of Far himself – the obvious question is why it chose to abandon these allegations. The answer is that Far is a completely unreliable witness who admitted to the government that he simply made up many of the "tips" overheard on the intercepted telephone calls with Mr. Rajaratnam and whom the government

simply did not trust enough to call to testify.  In a letter to defense counsel dated February 9,

2011, the government disclosed that Far had admitted that much of what he told Mr. Rajaratnam

during the intercepted telephone calls was completely fabricated.  *See* 02/09/11 Ltr. from R.

Brodsky (attached as Ex. 5).[17]  Among other things, Far admitted that he repackaged published

analyst reports as insider tips and falsely claimed to have contacts inside various companies.  *Id.*

These admissions – which the government neglected to mention in its sentencing memorandum –

would have been fatal to any attempt to prove a criminal conspiracy between Far and Mr.

Rajaratnam because one cannot conspire with a person who merely "feigns agreement,"

"pretends to agree," or "secretly intends to frustrate the conspiracy."  *United States v. Rosenblatt*,

554 F.2d 36, 38 (2d Cir. 1977); *see also United States v. Harris*, 733 F.2d 994, 1005 (2d Cir.

1984) ("[U]nless at least two people commit the act of agreeing, no one does.").  There could

hardly be more compelling evidence of the *nonexistence* of an illegal agreement between Far and

Mr. Rajaratnam to commit insider trading than Far's admission that he made up many of the

"tips" intercepted by the wiretap.  Obviously, the government chose not to call Far, and not to

pursue this aspect of its case, because it did not want the jury to learn of Far's credibility

problems.  "Streamlining" its case had nothing to do with it.

### 2.    The Government Has Not Proven Mr. Rajaratnam Corrupted a Cisco Executive

The government's claim that Mr. Rajaratnam allegedly corrupted a Cisco Executive is not

supported by the evidence on which it relies.  Indeed, as the government has recently advised

defense counsel, the government has no memoranda reflecting any interviews with the Cisco

Executive.  Instead, the government speculates about two wiretapped conversations on July 30,

_____

[17] The January 12, 2009 telephone call between Far and Mr. Rajaratnam summarized on page 15 of the Government's memorandum is one of the recordings during which Far made statements that he later admitted may not have been true.

2008 between Mr. Rajaratnam and a Wharton business school classmate who worked at Cisco, during which Mr. Rajaratnam said he was going to be "out there" (in California) and inquired if they could get together.  During the call, Mr. Rajaratnam also discussed a broad range of topics involving the market, at one point mentioning the rumor that Cisco might buy EMC (to which the Cisco Executive simply responded that the rumor had been around for a while); and the possibility of raising a new fund to buy troubled companies; the need for someone with an operational background to be a part of such a fund in order to do operational due diligence; and he asked his friend whether he would be interested in talking to him when they got together about joining him as a partner in the fund "if [he was] interested  in the money business."  Gov't Mem. Ex. R at 1-2.  The friend was non-committal in response and the conversation continued with a discussion of how it would be a good time to buy troubled companies because of the market decline that had occurred by that time in 2008.  The conversation amounts to nothing more than two friends talking about plans to get together and discussing business and the state of the economy.  There is no evidence of an attempt to "corrupt" the individual.

The government's claim of "corruption" is based on a subsequent conversation later that day between Mr. Rajaratnam and his brother Rengan that the government selectively quotes out of context.  First, according to the government's description, Mr. Rajaratnam brought up the Cisco-EMC rumors and told Rengan that he had called the Cisco executive and "offered him a job at Galleon."  Gov't Mem. at 17.  However, the transcript of the conversation reveals that he actually told Rengan that his friend "was not in the loop" regarding the Cisco-EMC rumors.  Gov't Mem. Ex. S at 4:9-15.  Then, according to the government's description, Rengan told Mr. Rajaratnam about another Cisco executive and said that he was "going to California, too, to meet with a certain individual in person" because seeing that person was "well worth it, because when

I was with him in person, he gave me all the dirt." Gov't Mem. at 17. The implication the government makes is that Rengan is also going to meet a Cisco executive in California who will be helpful because he had given him "dirt" before, and that Mr. Rajaratnam is going to do the same when he meets his friend. However, the transcript of the conversation shows that when referring to someone who had been helpful to him before, Rengan was not referring to someone in California or even to a Cisco executive, but to someone he had met in Miami. As the transcript shows, before referring to the helpful individual, Rengan said, "Because first that, that, that, that guy was really helpful, like that trip to Miami". Gov't Mem. Ex. S at 5:22-23. The government's summary of the conversation omits the reference to the person in Miami.

In short, offering nothing more than its own interpretation of these calls, the government is relying, at best, on a disjointed conversation in which Rengan mentioned someone in Miami and then talked about going out to California and meeting a different individual. This is too thin a reed on which to conclude, even under a lower standard of proof, that because Mr. Rajaratnam, too, was going to travel to California to meet his friend at Cisco, he corrupted or attempted to corrupt that person. Therefore, it is not surprising that the government did not attempt to prove this recently-alleged corruption at trial. The Court should disregard it at sentencing.[18]

---

[18] The government's summary of Mr. Rajaratnam's trading in EMC is incomplete and misleading. It states that "around" the time of a call with Anil Kumar, Mr. Rajaratnam began buying EMC stock in Galleon accounts and that the week after the calls with the Cisco executive and Rengan Rajaratnam, he sold his position in EMC. Gov't Mem. at 16, 18. In fact, Mr. Rajaratnam purchased EMC stock at several different times in 2008, including purchases in January and February 2008. *See* Ex. 6. The government also fails to mention that the purchase in July 2008 was the day before EMC reported its quarterly earnings on July 23. After the earnings announcement, the position was trimmed as profits were taken, but additional purchases were also made several days later, which took advantage of price movements in the stock. *Id.* Mr. Rajaratnam's trading in EMC was typical of the many stocks that he traded around earnings announcements.

### 3.     The Government Has Not Proven that Mr. Rajaratnam Engaged in Criminal Conduct with Zvi Goffer and Craig Drimal

The government also insinuates – without ever actually stating – that Mr. Rajaratnam engaged in criminal activity with Craig Drimal and Zvi Goffer.[19]  As the government points out, Drimal and Goffer both used Galleon's office space, Goffer was employed by Galleon for a period, and Goffer has been convicted of conspiracy and insider trading based on tips that he received from attorneys working at Ropes & Gray.  Gov't Mem. at 18-19.  The government fails to mention, however, that Goffer was not convicted of, or even charged with, any criminal activity with Mr. Rajaratnam, and that Drimal, who pled guilty, has likewise never been charged with or adjudicated guilty of any criminal activity involving Mr. Rajaratnam.

The government nevertheless refers to testimony of two witnesses from the trial against Zvi Goffer.  The first piece of testimony, by David Slaine, indicates that Drimal told Slaine that he had given Mr. Rajaratnam unspecified information about a company named 3Com because "his guy," presumably Goffer, told him to do so.  Gov't Mem. Ex. T.  The second piece of testimony, by David Plate, indicates that Goffer told Plate that he had given Mr. Rajaratnam unspecified information about 3Com, and that Mr. Rajaratnam had told Goffer that he would give Goffer a job "if 3Com took place."  Gov't Mem. Ex. U.  Whatever this testimony may amount to, it certainly is not proof that Mr. Rajaratnam was engaged in criminal activity with Drimal or Goffer.  Completely absent from the snippets of testimony attached to the government's memorandum are: (1) any specification of what the 3Com information was; (2)

---

[19] Even the caption for this section of the government's brief is coy, reading simply "Criminal Conduct *of* Craig Drimal and Zvi Goffer."  Contrast this with the section on Ali Far, captioned "Criminal Conduct *With* Ali Far," and the section on Roomy Khan, captioned, "Criminal Conduct in the Late 1990s *With* Roomy Khan."  Apparently, the government cannot quite bring itself to allege that Mr. Rajaratnam actually engaged in criminal conduct *with* Craig Drimal and Zvi Goffer.

any indication that Mr. Rajaratnam traded the stock; or (3) any indication that Drimal or Goffer told Mr. Rajaratnam that the information came from insiders, if indeed it did.  The indisputable fact is that Mr. Rajaratnam did not have any position in 3Com stock at the time it was acquired on September 28, 2007.  *See* Ex. 7.  And 3Com was never included among the 37 stocks identified by the government in its repeatedly supplemented Bill of Particulars.  Simply put, money managers talk about stocks and investment ideas regularly, and this evidence is not sufficient to establish that Mr. Rajaratnam engaged in any kind of criminal conduct, if indeed Drimal or Goffer ever mentioned 3Com to him.  Moreover, it is doubtful whether the government would have been able to admit this testimony at trial against Mr. Rajaratnam, as it contains multiple levels of hearsay by individuals who have not been shown to have conspired with Mr. Rajaratnam (*i.e.*, Drimal told Slaine that he told Mr. Rajaratnam something because Goffer told him to do so).

The government also refers to two wiretapped telephone calls between Goffer and Mr. Rajaratnam which it claims "sho[w] that Goffer provided updates to Rajaratnam about inside information Goffer was receiving from the Ropes & Gray attorneys."  Gov't Mem. at 18.  But the two transcripts attached to the government's memorandum (Gov't Exs. V & W) do not show any such thing.  Instead, each reflects that Goffer told Mr. Rajaratnam that an unidentified "friend" had told him certain details about an unidentified "deal" involving unidentified companies.  During the second call, Goffer even states that the "deal," whatever it was, had already been leaked to the press.  Whatever these calls amount to, they certainly are not proof that Goffer provided Mr. Rajaratnam with material, nonpublic information obtained from lawyers at Ropes & Gray.  Considering that Drimal, Goffer, and Mr. Rajaratnam worked in the same

building and were all wiretapped, it is telling that the government is forced to grasp as such straws in order to suggest a criminal enterprise among the three.

### 4.   The Government Has Not Proven that Mr. Rajaratnam Engaged in Criminal Conduct with Roomy Khan in the 1990s

Finally, with respect to the government's attempt to resurrect its suspicion that Mr. Rajaratnam engaged in criminal conduct with Roomy Khan in the late 1990s, Mr. Rajaratnam respectfully refers the Court to his April 2, 2011 Letter Brief to Preclude Intel Witness Testimony of Roomy Khan Faxing Confidential Information to Rajaratnam, which the Court granted. A copy of the letter is attached. *See* Ex. 8.

## V.   THE CRIMINAL CONDUCT FOUND BY THE JURY DOES NOT WARRANT AN EXCEPTIONALLY SEVERE SENTENCE

Throughout its memorandum, the government resorts to stridency and overstatement in an attempt to depict Mr. Rajaratnam as somehow different in kind from the typical insider trading defendant. The government devotes much of its brief to these arguments because it is seeking a sentence vastly more severe than the sentences ordinarily imposed for insider trading, including the sentences imposed on other defendants in these cases. But when the fog of hyperbole lifts, all that remains is a defendant convicted of participating as a tippee in a discrete number of insider trading schemes. That is a serious crime to be sure, but there is nothing about Mr. Rajaratnam's conduct, as found by the jury, to justify a sentence decades longer than the sentences ordinarily imposed in insider trading cases.

### 1.   Respect for the Law and Acceptance of Responsibility

The government repeatedly asserts that Mr. Rajaratnam had no respect for the law. *See* Gov't Mem. at 3, 24, 26, 27, 51, 52. But the same could be said of every person convicted of a crime. The jury found that Mr. Rajaratnam broke the law, but that hardly distinguishes him from any other person facing sentencing, including the other individuals sentenced in these cases.

More importantly, since his arrest in October 2009, Mr. Rajaratnam has demonstrated perfect respect for the law, including through his spotless compliance with all bail conditions, his oversight of Galleon's lawful and orderly winding-down, and his own conduct at trial.

The government also asserts that Mr. Rajaratnam "has not accepted responsibility for his crimes." Gov't Mem. at 3. But needless to say, Mr. Rajaratnam may not be penalized for exercising his right to stand trial or for refusing to plead guilty. *See United States v. Duffy*, 479 F.2d 1038, 1039 (2d Cir. 1973); *United States v. Cruz*, 977 F.2d 732, 733 (2d Cir. 1992). Those who do accept responsibility with a timely guilty plea are rewarded with a 3-point downward adjustment, USSG §3E1.1, a credit for which Mr. Rajaratnam claims no eligibility. But while it is permissible to provide a defendant who pleads guilty with this "discount" from the "sentencing norm," the "sentence imposed upon a defendant who stands trial *is that norm*; it is not an enhancement above the norm as a cost of standing trial." *Cruz*, 977 F.2d at 733-34 (emphasis added). Here, the government's requested sentence would still be grossly in excess of the "norm" in insider trading cases even if it were to be reduced by 3 levels for acceptance of responsibility, from 38 to 35, yielding an advisory Guidelines sentence of 168-219 months.

## 2.      Alleged Efforts to Conceal Criminal Activity

The government also places lingering emphasis Mr. Rajaratnam's alleged efforts to cover up his crimes. But however the Court views these allegations, they do not distinguish this case or this defendant from the average criminal case or defendant, including the other individuals who have been sentenced in these cases. The government conspicuously fails to mention that a number of the defendants already sentenced in these cases engaged in efforts to conceal their crimes, but none of them have received sentences remotely approaching the sentence the

government requests here.[20]   The fact that such behavior is commonplace does not excuse it, but it does mean that one criminal defendant should not be singled out for uniquely harsh punishment simply because that defendant engaged in efforts to conceal his crimes.

Some of the acts of concealment alleged by the government – such Mr. Rajaratnam's supposed use of prepaid cellular telephones – simply are not supported by the record.  Apart from Kumar's testimony about a remark supposedly made by Mr. Rajaratnam, the government produced absolutely no evidence to corroborate the claim that Mr. Rajaratnam ever used a pre-paid telephone.  Considering all of the evidence at the government's disposal – including the cooperation of multiple charged co-conspirators, comprehensive telephone records for dozens of people, and thousands of wiretapped telephone calls – it is telling that the government was never able to produce a shred of hard evidence to corroborate Kumar's testimony, such as a telephone bill showing calls to a number that a cooperating witness could identify as one used by Mr. Rajaratnam.  The government also lays heavy emphasis on a recorded telephone call in which Mr. Rajaratnam allegedly discussed the creation of a false "email trail" to conceal insider trading in Spansion.  But however one interprets this conversation, no evidence was ever presented that such an email trail was actually created (even though the government specifically subpoenaed

---

[20] *See United States v. Kurland*, S1 10 Cr. 69 (S.D.N.Y.), Sentencing Tr. at 20 (Docket No. 42, May 21, 2010) (noting government's argument that Kurland's crime involved "secrecy and concealment"); *United States v. Chiesi*, S1 09 Cr. 1184 (S.D.N.Y.), Gov't Sentencing Mem. at 4 (Docket No. 284, filed June 13, 2011) (noting that Chiesi took "numerous steps to conceal her extensive criminal conduct); *United States v. Goldfarb*, S1 10 Cr. 56 (S.D.N.Y.), Gov't Sentencing Mem. at 4-5 (Docket No. 235, filed Aug. 12, 2011) (noting Goldfarb's use of prepaid cellular telephones to evade detection); *United States v. Cutillo*, 10 Cr. 56 (S.D.N.Y.), Gov't Sentencing Mem. at 5 (Docket No. 194, filed May 5, 2011) ("Cutillo also took steps to cover up his crimes…."); *United States v. Drimal*, S1 10 Cr. 56 (S.D.N.Y.), Gov't Sentencing Mem. at 2, 3, 9-11, 21 (Docket No. 240, filed Aug. 24, 2011) (noting Drimal's use of various means to avoid detection, including lying to the SEC and the use of prepaid cellular telephones).

records from Galleon in an effort to discover it), and there is no dispute that Mr. Rajaratnam did

not trade Spansion stock around the time of this telephone call.

Finally, although Mr. Rajaratnam does not wish to dispute the jury's findings here, it is

worth noting that much of what the government identifies as "cover up" behavior is perfectly

consistent with legal conduct among professional investors. This is especially true of remaining

"radio silent" about trading strategies and positions, or engaging in "patterns" of buying and

selling small amounts of stock around large core positions. As Mr. Schutte testified, it is simply

sound investment management to exploit market movements by trading small amounts of stock

while accumulating a larger core position in the stock over time. *See* Tr. at 4080-81, 4145-46.[21]

### 3.   Unfounded Speculation About Undetected Criminal Conduct

The government argues that because it wiretapped only one of Mr. Rajaratnam's

telephones, and did so for "only" nine months, "[c]ommon sense dictates that the . . . wiretap

only caught a fraction of Rajaratnam's crimes." Gov't Mem. at 19-20. That argument rests on

the false premise that the wiretap was the only means the government had of detecting these

hypothetical crimes. In reality, the government had: (1) a nine-month wiretap on Mr.

Rajaratnam's telephone; (2) wiretaps on at least ten other individuals' telephones, including five

of Mr. Rajaratnam's alleged co-conspirators (Smith, Far, Chiesi, Goffer, and Drimal), four of

whom (Smith, Far, Goffer, and Drimal) worked, or used office space, at Galleon; (3) the

energetic cooperation of dozens of witnesses, including at least six of Mr. Rajaratnam's alleged

co-conspirators (Khan, Kumar, Goel, Smith, Far, and Galleon trader Michael Cardillo), three of

---

[21] The government also alleges that Mr. Rajaratnam attempted to conceal his crimes by logging into and placing trades in Rajiv Goel's personal brokerage account at Charles Schwab. But it is not clear how this conduct concealed, or was designed to conceal, anything. Certainly there was never any evidence, or even any allegation, that Mr. Rajaratnam placed those trades for his own benefit or that he received the profits from those trades.

whom (Smith, Far, and Cardillo) worked with Mr. Rajaratnam at Galleon during relevant periods; (4) comprehensive telephone and trading records; and (5) millions of documents, including hundreds of thousands of Mr. Rajaratnam's own emails, instant messages, and other written communications.  And if the government did not believe this was enough, there was nothing to stop it from seeking to wiretap Mr. Rajaratnam's other telephones.  If common sense dictates anything, it dictates that the government discovered all of the illegal activity there was to discover.

The balance of the evidence demonstrates that over 99% of Mr. Rajaratnam's trading activity was above suspicion, and that Galleon, far from being the den of criminality the government attempts to portray, was a well-run hedge fund.  As the Court learned from the testimony of Lindi Beaudreault at the *Franks* hearing, Galleon voluntarily registered with the SEC in 2006 and employed outside securities counsel to implement a compliance structure that included regular training for employees and a restricted list on which stocks were routinely placed when it was concluded that Galleon had come into material, nonpublic information.  *See* Franks Hr'g Tr. at 25, 45-46, 49, 59-61.[22]  The evidence also showed that Galleon's traders, analysts, and portfolio managers engaged in a huge volume of perfectly legitimate securities trading.  Even the government's (overblown) figure of $63 million in ill-gotten gains amounts to less than 1% of Galleon's $6.5 billion asset base over the same five-year period – about 0.2% per year.  This is why the government's demonstrative calendar, purporting to show Mr. Rajaratnam's alleged criminal "multi-tasking" in 2008 is so misleading.  *See* Gov't Mem. at 21.

---

[22] During his SEC deposition, Mr. Rajaratnam even discussed a specific instance where he directed that a stock (Cognos) be placed on the restricted list after a Galleon analyst came into possession of information about a potential acquisition candidate with a definitive price.  *See* Gov't Mem. Ex. EE at 77-80.

Omitted from that calendar are the more than 5,000 legitimate stock trades that Mr. Rajaratnam placed during the same period, the thousands of legitimate trades placed by Galleon's other portfolio managers, the daily morning meetings with Galleon's analysts, and the hundreds of *bona fide* reports prepared by those analysts. Notably, even the government's calendar shows two full months (April and November) and half of another (June) during which it was wiretapping Mr. Rajaratnam (and others) with no suspected criminal activity at all – months during which Mr. Rajaratnam was actively trading millions of shares of stock at Galleon. This fact alone belies the government's overheated claim that insider trading was "business as usual" for Mr. Rajaratnam or Galleon.

###    4.    Alleged Corruption of Others

The government argues that Mr. Rajaratnam was a "corrupting influence" on others, including Galleon's employees and the individuals who have pled guilty to conspiring with Mr. Rajaratnam. The government even includes Mr. Rajaratnam's confessed co-conspirators on the list of people he supposedly harmed. But this is another example of prosecutorial overreaching unsupported by the facts.

A complete response to the claim that Mr. Rajaratnam "corrupted" these people is that every single one of them engaged in criminal activity that did not involve Mr. Rajaratnam at all. Roomy Khan has confessed to extensive criminal activity not involving Mr. Rajaratnam. Danielle Chiesi confessed to criminal activity at New Castle not involving Mr. Rajaratnam. Ali Far confessed to criminal activity at Spherix not involving Mr. Rajaratnam. Adam Smith confessed to criminal activity that he engaged in at Rose Lane Capital, a firm he started after he left Galleon in 2009. Anil Kumar admitted to tax crimes not involving Mr. Rajaratnam. Rajiv Goel admitted that he, too, failed to disclose overseas accounts to the IRS in violation of the tax laws. Craig Drimal admitted to criminal conduct not involving Mr. Rajaratnam, and Zvi Goffer

was convicted of the same.[23] These people were all adults who made their own choices for their own reasons, and every single one of them was a well-educated, sophisticated businessperson in his or her own right.  If they were corrupt, it was not because Mr. Rajaratnam corrupted them. The government's attempt to portray them as so many babes in the woods, seduced into criminality by Mr. Rajaratnam, is impossible to reconcile with the fact that they all engaged in independent criminal activity having nothing to do with Mr. Rajaratnam.

The government also stretches the evidence in order to bolster its claim that Mr. Rajaratnam was a corrupting influence.  For instance, it claims that Mr. Rajaratnam "concocted a plan pursuant to which Rajaratnam would wire the money [paid to Kumar] offshore to an account in someone's name other than Kumar."  Gov't Mem. at 6.  But Kumar admitted that he was at least equally involved in setting up this arrangement, and that he enlisted the assistance of individuals abroad whom Mr. Rajaratnam did not even know.  *See* Tr. at 662-63.  The government also asserts that Mr. Rajaratnam "corrupted Goel through [his] 'charitable' gifts to Goel."  Gov't Mem. at 7.  But Goel admitted that the assistance he received from Mr. Rajaratnam was provided out of genuine friendship.  *See* Tr. 2042-43, 2066, 2069.  As reflected in the many letters that the Court has received, this assistance to someone in need is consistent with Mr. Rajaratnam's well-documented practice of helping friends and strangers alike.  Goel also testified that he provided Mr. Rajaratnam with inside information not because he was paid, but because he wanted to impress his friend.  *See* Tr. at 1575-76.  Indeed Goel testified that "there was no nexus between" the money he received from Mr. Rajaratnam and the tips he claimed to

---

[23] Even Rengan Rajaratnam was investigated for suspected unlawful "cherry-picking" activity at his hedge fund, Sedna, not involving Mr. Rajaratnam.

have passed.  Tr. at 3698-99.[24]  This testimony is flatly inconsistent with the government's claim

that Mr. Rajaratnam lured Goel into criminal conduct by giving him money.  In another example

of its overreaching, the government is unwilling to recognize Mr. Rajaratnam for his efforts to

help Goel, a close friend with an ailing father in need, despite Goel's own insistence that this was

so, and instead tries to twist Mr. Rajaratnam's generosity to fit its theory of wrongdoing.

## VI. THE CIRCUMSTANCES OF THIS CASE WARRANT A SENTENCE SUBSTANTIALLY BELOW THE GUIDELINES RANGE

### 1. Mr. Rajaratnam's Extraordinary Record of Charitable Works Warrants Leniency

The Court has received literally hundreds of letters from individuals whose lives have

been enriched in some way by Mr. Rajaratnam.  Many of these people have known Mr.

Rajaratnam for decades, and know him better than the government ever could.  The writers of

these letters are unanimous in their assessment of Mr. Rajaratnam as a kind, humble, and

unhesitatingly generous person.  In the government's estimation, these letters and the collective

judgment of the hundreds of people who wrote them count for nothing – no matter what they say,

Mr. Rajaratnam was an "egomania[c]" consumed by "greed" and "hubris."

This personal attack on Mr. Rajaratnam is simply not true.  The evidence does not

support it.  The evidence shows that Mr. Rajaratnam has been extraordinarily generous and

willing to help people and worthy causes and organizations.  It shows that he is a fundamentally

kind and caring person who never passed on an opportunity to help others – whether family,

friends, employees, acquaintances, or strangers.  Not only were his monetary contributions (over

$45 million) to deserving causes remarkable and commendable in their own right, he also lent his

time and hard work to help others in the United States and around the world, as with his five

---

[24] The Court noted much of this testimony in its opinion denying Mr. Rajaratnam's
Motion for a Judgment of Acquittal.  Order at 22-23 (08/16/11).

years of service on the Board of Directors of the Harlem Children's Zone and his efforts on the

ground in Sri Lanka following the 2004 tsunami.  This history of exemplary conduct is part of

"the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(2), and warrants leniency

at sentencing.

> **2.      The Purposes of Federal Sentencing Are Best Served by a Sentence
> Substantially Below the Advisory Guidelines Range**

This Court's statutory mandate is to impose a sentence no greater than necessary to

accomplish the purposes of federal sentencing.  *See* 18 U.S.C. § 3553(a).  The sentence requested

by the government is much greater than necessary to accomplish those purposes, all of which can

be achieved by a sentence substantially below the advisory Guidelines range.

Seriousness of the Offense, Respect for the Law, and Just Punishment.  The Court must

impose a sentence not greater than necessary to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment.  The offenses of which Mr. Rajaratnam has

been convicted are serious - there is no dispute about that.  But every felony offense is "serious,"

and that fact alone does not end the analysis.  Rather, § 3553 requires the Court to distinguish

between crimes of greater and lesser seriousness, and to choose a sentence no greater than

necessary to reflect the seriousness of the offenses committed by the defendant before the Court.

The sentence requested by the government – which puts Mr. Rajaratnam on par with the most

dangerous violent offenders – manifestly fails to distinguish between insider trading and offenses

of greater seriousness.  It does not diminish the seriousness of the offenses at issue in this case to

acknowledge that they are not as serious as murder, assault with a deadly weapon, or sexual

exploitation of a child.  A sentence that treats insider trading as equally serious as those offenses

undermines respect for the law and public confidence in the fairness of criminal sentences.  And

a sentence that imprisons Mr. Rajaratnam for decades longer than others who have committed similar offenses is unjust.

The government argues that Mr. Rajaratnam should received an exceptionally severe sentence because future insider trading defendants will compare themselves with Mr. Rajaratnam and request sentences shorter than the one imposed here.  But of course, sentencing judges always must make individualized assessments of culpability, and it is easy to imagine future insider trading defendants whose conduct could reasonably be deemed more culpable and deserving of a greater sentence.  For example, corporate executives like Jeffrey Skilling of Enron, who trade on the basis of secret knowledge of their own fraudulent and destructive business practices, thereby enriching themselves while ruining their companies, could easily be deemed more culpable than Mr. Rajaratnam.  And to the extent the Sentencing Guidelines result in sentences in economic cases that are so severe they are "absurd on their face," then future defendants will be *right* to argue that they deserve sentences below the advisory Guidelines range.

Affording Adequate Deterrence.  This Court must also impose a sentence not greater than necessary to provide adequate deterrence.  Once again, the sentence requested by the government is grossly in excess of the sentence necessary to accomplish this purpose.  These have been very public proceedings – in large part because of the "perp walks," photo ops, press conferences, and press releases that the government's P.R. machine has generated since the day of Mr. Rajaratnam's arrest nearly two years ago.  Anyone paying attention, and certainly any financial professional, is aware that the consequences of being charged with insider trading include utter personal and professional ruin.  The notion that this deterrent effect will be meaningfully increased by sentencing Mr. Rajaratnam to decades of imprisonment – or increased enough to

justify the tremendous suffering that such a sentence would impose on this defendant and his family – is absurd.  In reality, "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).  And the need to provide deterrence cannot justify the huge difference between the sentence the government is seeking here and the sentences imposed on other defendants in these cases.  Every one of those other sentences – 6 months for Robert Moffat, 18 months for Ali Hariri, 27 months for Mark Kurland, 30 months for Danielle Chiesi, 30 months for Arthur Cutillo, 36 months for Jason Goldfarb, and 66 months for Craig Drimal – was judged sufficient to afford adequate deterrence.

To Protect the Public from Further Crimes of the Defendant.  This factor is not relevant here, or in most white collar criminal cases.  White collar criminal defendants are much less likely to re-offend than defendants convicted of other kinds of crimes, because white collar defendants "are removed from the positions of authority that enabled them to commit crimes in the first place."  Ellen S. Podgor, *Throwing Away the Key*, 116 Yale L. J. Pocket Part 279 (Feb. 21, 2007).  The same is true here.  Whether this Court imposes a short sentence or a long one, Mr. Rajaratnam will never be able to trade stock again.

To Provide the Defendant With Needed Medical Care.  The Court must also impose a sentence sufficient to provide the Defendant with needed medical care.  As the Court is aware from the Pre-Sentence Report, Mr. Rajaratnam suffers from a constellation of serious and degenerative illnesses which require intensive ongoing medical attention and which even under the best of circumstances will almost certainly shorten his life considerably.  The sentence that

the government requests would ensure Mr. Rajaratnam's death in prison – a fate ordinarily reserved only for offenders who have caused the most grave, irreversible, and demonstrable harms to others.  Mr. Rajaratnam simply is not in that category, and does not deserve a sentence that separates him from his family forever.

## VII. MR. RAJARATNAM SHOULD BE ALLOWED TO REMAIN ON BAIL PENDING APPEAL

Mr. Rajaratnam will submit a separate motion addressing why the Court should permit him to remain released subject to his current bail conditions pending appeal.

## VIII. CONCLUSION

The Guidelines calculation proposed by the government (and reflected in the PSR) and the government's recommended sentence should not be followed in this case.  For the reasons stated, that Guidelines level is inaccurate and overstates the conduct at issue.  Even if the Court adopts a gain calculation and Guidelines level based on the amount received by Mr. Rajaratnam, a sentence that is substantially below the Guidelines is appropriate, especially when the Court considers the sentences imposed in related cases and in other insider trading cases, and when the health problems that Mr. Rajaratnam faces are taken into account.

Respectfully submitted,

*Terence J. Lynam*

John M. Dowd (admitted *pro hac vice*)
Terence J. Lynam (admitted *pro hac vice*)
James E. Sherry (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

Samidh Guha (SG-5759)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

(212) 872-1000

*Attorneys for Raj Rajaratnam*

September 9, 2011

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Reply Sentencing

Memorandum was served on September 9, 2011 via ECF filing notification and email on the

following counsel of record:

> AUSA Jonathan R. Streeter
> AUSA Reed Brodsky
> SAUSA Andrew Z. Michaelson
> United States Attorney's Office
> The Silvio J. Mollo Building
> Southern District of New York
> New York, NY 10007

s/ _Terence J. Lynam_

1