UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
:
:
UNITED STATES OF AMERICA, :
:
- v. - : S2 09 Cr. 1184 (RJH)
:
RAJ RAJARATNAM, :
:
Defendant. :
:
------------------------------x

## GOVERNMENT'S REPLY SENTENCING MEMORANDUM REGARDING PARTICIPANTS IN RAJARATNAM'S CRIMES

PREET BHARARA
United States Attorney for the Southern
District of New York

JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant U.S. Attorney
    - Of Counsel -

I.      **<u>Unknowing Participants</u>**

Application Note 3 to Guidelines Section 3B1.1 states that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." In *United States* v. *Carrozzella*, 105 F.3d 796, 802 (2d Cir. 1997), *abrogated in part on other grounds by United States* v. *Kennedy*, 233 F.3d 157, 160–61 (2d Cir. 2000), the Second Circuit repeated its holding from a prior case that "in using the term 'organization' in the commentary, the drafters did not intend to restrict the scope of the guideline to structured enterprises. It is more likely that they chose the word as a term of convenience, to denote any association of people involved in criminal activity." (quoting *United States* v. *Liebman*, 40 F.3d 544, 549 (2d Cir. 1994).

In determining whether a criminal activity is "otherwise extensive" because it is the functional equivalent of one involving five or more knowing participants, the *Carrozzella* Court held that district courts should analyze three factors: (1) the number of knowing participants because "a criminal scheme with four knowing participants that is aided by unknowing participants is more likely to be 'otherwise extensive' than a scheme with a single knowing participant"; (2) "the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent"—and offering the examples of sales people who unknowingly make false representations at a defendant's direction, and bank employees who unknowingly wire money acquired through illegal activities (as opposed to a taxi driver whose directions to drive the defendant to a particular meeting are not done with any specific criminal intent); and (3) "the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme"— "[l]awful services that are not peculiarly tailored and

necessary to a particular crime but are fungible with others generally available to the public are not the functional equivalent of knowing participation." *Id.* Subsequently, in *United States* v. *Manas*, 272 F.3d 159, 166 (2d Cir. 2001), the Court offered examples of such "lawful services [which] fall within U.S.S.G. § 3B1.1(a) when 'peculiarly tailored and necessary to a particular crime.'" They include unwitting casino employees who process transactions in furtherance of a money laundering scheme, *citing United States* v. *Napoli*, 179 F.3d 1, 13-15 (2d Cir. 1999), and unwitting accountants, bank officers, and lawyers used to perpetuate an embezzlement scheme, *citing United States* v. *Nolan*, 136 F.3d 265, 272-73 (2d Cir. 1998). The lawful services of casino employees, accountants, bank officers, and lawyers are not fungible with other services generally available to the public.

Based on the three-part test in *Carrozzella*, the Second Circuit has upheld four-level adjustments for "otherwise extensive" criminal conduct in cases where the defendant's criminal leadership and organization are comparable, if not less extensive, than Rajaratnam's schemes. In *United States* v. *Archer*, --- F.3d ---, 2011 WL 4360013, at *13 (2d Cir. Sept. 20, 2011), the Second Circuit recently upheld the district court's "otherwise extensive" finding where the scheme to defraud the Department of Homeland Security with false visa applications involved three knowing participants and eight unknowing participants who submitted applications and/or affidavits at the defendant's direction. In *United States* v. *Rittweger*, 274 Fed Appx. 78, 82 (2d Cir. 2008), the Court upheld the district court's "otherwise extensive" finding where the scheme to make false representations to investors about securities involved at least four knowing participants and somewhere between thirty and seventy-five unknowing participants, namely a network of brokers who made representations to investors at Rittweger's direction. In *United*

2

States v. Rubenstein, 403 F.3d 93, 99 (2d Cir. 2005), the Court upheld the district court's "otherwise extensive" finding where the scheme to violate work practice standards for asbestos under the Clean Air Act involved two knowing participants and seven unknowing participants, including three named workers and another four day laborers, who worked without protective clothing to cut out and package the asbestos. In *United States* v. *Nolan*, 136 F.3d 265, 272-73 (2d Cir. 1998), the Court upheld the district court's "otherwise extensive" finding where the scheme to embezzle pension plan assets involved two knowing participants and at least eight unknowing participants, including an accountant, bank officers, and various lawyers, whom the defendant used to execute transactions and transfers in furtherance of the scheme. In *United States* v. *Spencer*, 129 F.3d 246, 254 (2d Cir. 1997), the Court upheld the district court's "otherwise extensive" finding where the scheme to commit bankruptcy fraud involved four knowing participants and a large number of unknowing employees of a company controlled by the defendant, including people in the finance and accounting departments who paid a co-conspirator at the defendant's direction, advertising personnel who prepared advertising for a co-conspirator at the defendant's direction, and others who facilitated the defendant's ability to exercise control over the company.

The following *nine* individuals were unknowing participants who, at Rajaratnam's direction, helped Rajaratnam with wire payments (*i.e.* bribes) to Kumar (in exchange for inside information) and/or with reinvesting that money for Kumar into Galleon funds in the account name of Manju Das:

      1.    Canestro, Lisa: Galleon investor relations employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 2010.

2. Fernandez, Tom: Galleon investor relations employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 2002, 2009, 2010, 2112.

3. Gianchandari (Reddy), Shireen: Galleon investor relations employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 775, 2017, 2021, 2027, 2030, 2050, 2057-2058, 2064-68, 2103, 2114, 2130, 2133, 2134; Tr. 394-95.

4. Lau, George: Galleon's chief operating officer who directed the transfer of $1 million from Galleon to Kumar. *See* Tr. 390-91; GX 772. At Rajaratnam's direction, Lau also provided Rajat Gupta with a letter dated August 12, 2008 regarding Gupta's and Rajaratnam's joint investment in the Voyager fund. *See* Tr. 2666-68; GX 2476.

5. MacIsaac, Mark: HSBC employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 2010, 2012, 2015-2016, 2024, 2050, 2103, 2109.

6. Silberman, Crescent-Maaz: Galleon investor relations employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 2000-2003.

7. Veksler, Anya: Galleon investor relations employee who assisted Rajaratnam and Kumar with the Manju Das account. *See* GX 2134.

8. Yogakumar, Jogalingam: Galleon employee who assisted Rajaratnam with wiring payments (*i.e.* bribes) to Kumar in the name of Pecos Trading. *See* GX 696, 696T, 763, 769-71, 2033-34, 2036, 2038, 2118; Tr. 328, 338, 455-47, 804.

9. Zugmeyer, Sally: Galleon employee who helped Rajaratnam and Kumar with the Manju Das account. *See* GX 2003, 2104.[1]

---

[1] The above-listed exhibits relating to the unwitting participants are attached to this submission.

The actions and roles of these eight Galleon employees and one HSBC employee are directly analogous to the unwitting accountants, bank officers, and lawyers used to perpetuate an embezzlement scheme in *Nolan* and the unknowing finance and accounting department employees who paid a co-conspirator at the defendant's direction and facilitated the defendant's ability to exercise control over the company in *Spencer*.

The following *twelve* individuals were (at a minimum) unknowing participants who helped Rajaratnam execute and/or book trades (which were made on the basis of inside information obtained by Rajaratnam). They are identified by their initials on Galleon's trading data: (1) IH (Ian Horowitz); (2) AM (Ananth Muniyappa); (3) PZ; (4) IM (Isvari Mahadeva); (5) AW (Adam Wolfberg); (6) JP (Justin Pollock); (7) GR (Gary Rosenbach); (8) RC (Robert Castello); (9) WL (William Lyons); (10) RJ (Rob Johnson); (11) MS (McCown Smith); and (12) MC (Michael Cardillo). *See* Government's October 6, 2011 Reply Sentencing Memo, Exh A. Their actions and roles are not only analogous to the unwitting participants in *Nolan* and *Spencer*, but also the unknowing participants in *Napoli, Archer, Rittweger*, and *Rubenstein*. These traders who executed or booked the trades are no different than casino employees in *Napoli* who processed transactions; accountants and bank officers in *Nolan* whose actions unknowingly helped a defendant embezzle money; brokers in *Rittweger* who spoke at investors at the defendant's direction; day laborers in *Rubenstein* who helped a defendant cut and move asbestos at the defendant's direction in violation of the Clean Air Act; and employees of the

defendant in *Spencer* who unknowingly helped the defendant with various administrative and other tasks in furtherance of the fraudulent scheme.[2]

## II. Knowing Participants

During oral argument, Rajaratnam incorrectly relied on *United States v. Paccione*, 202 F.3d 622 (2d Cir. 2000), and *United States v. Melendez*, 41 F.3d 797 (2d Cir. 1994), for the proposition that this Court must determine the number of knowing participants by looking at each count separately and including only those "participants" who could be charged based on the elements of each count. In doing so, Rajaratnam disregards the Second Circuit's inclusion of relevant conduct in assessing the defendant's role and express rejection of determining participants based on the narrow elements of each count.

In *Paccione*, the defendant was convicted of one count of conspiracy to commit arson and one substantive count of mail fraud in connection with subsequently defrauding an insurance company. The holding of the Court was that the defendant must be included within the calculation of the number of knowing participants. In discussing that holding, the Court stated: "The evidence suggests that certain other individuals identified by the government as possible participants - Michael Steinberg and Ernie Schaffer - either participated unwittingly or participated in the subsequent insurance fraud, but not the arson." 202 F.3d at 623-25. There was

---

[2] Any argument that the unknowing participants should not be included because they spent most of their time doing legitimate work at Galleon misses the mark. By definition, these individuals are "unknowing" participants who performed lawful services at Galleon. They are included within the calculation of unknowing "participants" because they performed tasks—at the direction of Rajaratnam—which, unbeknownst to them, assisted Rajaratnam in committing his crimes. The investor relations personnel, the chief operating officer, the traders, and others at Galleon took steps to assist Rajaratnam in bribing Kumar, reinvesting Kumar's bribes in Galleon funds, and executing and booking Rajaratnam's trades based on inside information.

no discussion of whether the arson and the insurance fraud should be grouped under the Guidelines; there was no discussion of whether once grouped the participants of the arson and insurance fraud should be included together within relevant conduct; and there was no discussion of whether the determination of the number of "participants" should be based on the elements of arson or insurance fraud and separately considered. The issue of whether to determine the number of knowing participants based on the elements of each count and separately from other counts was not simply addressed. In *Melendez*, the Court held that certain individuals who received stolen property were not alleged to have been involved with the crime of stealing public money to which the defendant pleaded guilty: "There is no evidence that the three individuals had advance knowledge of the theft, much less participated in its planning or execution. Nor does the record indicate that they expected to receive proceeds of the theft." 41 F.3d at 800. *Melendez* did not hold that the number of knowing participants is based solely on the elements of each charged crime. As with *Paccione*, Rajaratnam reads more into the *Melendez* decision than warranted.

Indeed, the Second Circuit has expressly rejected the argument that a role adjustment should be based on the charged conduct alone or the elements of the offense. *See United States* v. *Reese*, 328 Fed Appx. 686 (2d Cir. 2009) (upholding district court's refusal to make a minor role adjustment because the defendant's relevant conduct outside of the charged conspiracy demonstrated that he was not a minor participant); *United States* v. *Greer*, 285 F.3d 158, 181 (2d Cir. 2002) ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of [U.S.S.G.] § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of

conviction."); *United States* v. *Aponte*, 235 F.3d 802 (2d Cir. 2000) ("The district court must consider all relevant conduct when determining whether to assess increases under these sections."); Sentencing Guidelines, Part B - Role In The Offense, Introductory Commentary ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of the elements and acts cited in the count of conviction."). Given that this Court's determination of the defendant's role should not be based on the narrow elements of the charged crimes or just the acts within the crimes of conviction, the definition of participant as one who is "criminally responsible for the commission of the offense" cannot be limited to those who can be convicted under the elements of the charged crimes. Logically, it must include the insiders who, while not chargeable under *United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001), and its progeny in certain conspiracies, are nevertheless "criminally responsible" for the commission of the crime.

Nevertheless, even applying Rajaratnam's narrow (and incorrect) view of limiting knowing participants to those individuals who could only be convicted under the elements of each charged offense, this Court should find that at least the following *six* individuals were knowing participants within the Galleon conspiracy: (1) Rajaratnam; (2) Panu; (3) Chellam; (4) Joe Liu; (5) Rengan Rajaratnam; and (6) Adam Smith. The Government proved by a preponderance of the evidence that each of these individuals participated in a conspiracy to obtain and then trade based on inside information for purposes of increasing the profits of Galleon funds and, in turn, their own profits as employees of Galleon. Among other things, the Government presented the following evidence to the jury relating to this conspiracy: (a) Smith

8

testified generally and specifically about Rajaratnam's instructions to analysts and others at Galleon to avoid putting inside information in writing (Tr. 2499-500); this testimony was strong proof that Rajaratnam was the leader of a conspiracy at Galleon to obtain and then trade based on inside information; (b) Smith testified about obtaining inside information from a Morgan Stanley banker about IDTI's acquisition of ICST (after which Rajaratnam promoted Smith from an analyst to a portfolio manager), AMD's acquisition of ATI, and the potential acquisition of Vishay Technologies, and providing inside information about these transactions to Rajaratnam for purposes of trading on them (Tr. 2501-13, 2573-86, 2594-98, 2602-09; GX 692, 692T); (c) Smith testified that Liu provided inside information relating to Synaptics to both Rajaratnam and Smith for purposes of trading based on that information, that Smith observed faxes with information from Liu to Rajaratnam, and that Rajaratnam and Smith talked about Liu's inside information (Tr. 2521-34, 2552-53); (d) A wire call on December 5, 2008 between Liu and Rajaratnam corroborated part of Smith's testimony relating to Liu (GX 684, 684T; Tr. 2556-59); (e) Smith testified that Chellam, while a senior executive at Xilinx, provided Rajaratnam with inside information relating to Xilinx's financial performance in 2006 and negotiated his employment with Galleon in the latter half of 2006 (Tr. 2613-18; GX 583); (f) During the May 2, 2008 recorded conversation, Rajaratnam told Panu and Chellam about Kumar's inside information relating to Spansion. *See* GX 524, 524TR; Tr. 442-52; (g) Smith testified that he spoke with Rajaratnam about creating a pattern of buying and selling a stock in case the Government asked about trades based on inside information (Tr. 2641-43); and (h) The wire calls between Rajaratnam and Rengan showed that Rengan was involved in insider trading relating to

Clearwire, obtaining inside information from Kumar, and corrupting another McKinsey employee for purposes of obtaining and then trading based on inside information.

Further, again applying a narrow (and incorrect) view of participants, this Court should find that at least the following *five* individuals were knowing participants within the Kumar conspiracy: (1) Rajaratnam; (2) Krish Panu: (3) Kris Chellam; (4) Rengan Rajaratnam; and (5) Kumar. Among other evidence, the wire call between Panu, Chellam, and Rajaratnam on May 2, 2008 during which Rajaratnam informed Panu and Chellam about Kumar's inside information relating to Spansion, and then directed them to create a false email to cover up potential trading based on that information proves by a preponderance of the evidence that Panu and Chellam were knowing participants in the Rajaratnam-Kumar insider trading conspiracy. *See* GX 524, 524TR; Tr. 442-52. Further, among other evidence, the wire calls between Rajaratnam and his brother Rengan on August 15, 2008 prove by a preponderance of the evidence that Rengan was another knowing participant in the Rajaratnam-Kumar insider trading conspiracy. *See* GXs 562, 562T, 563, 563T, 565, 565T; Tr. 486-492.

In sum, based on the trial record, this Court should find that there were at least five knowing participants. Although the Government respectfully submits that the introductory commentary to Part B and the Second Circuit's decisions in *Reese*, *Greer*, and *Aponte* call for the inclusion of relevant conduct within the analysis of the number of knowing participants and do not confine that analysis to the elements of the charged crimes, this Court need not reach that question. There were at least five knowing participants regardless of how they are counted—including or excluding relevant conduct; limiting or not limiting the analysis to the elements of each count; or grouping or not grouping the counts. Further, this Court should find

that Rajaratnam's conduct was "otherwise extensive" given the number of knowing participants and unknowing participants who took actions at Rajaratnam's direction that were peculiarly tailored and necessary for the commission of the crimes.

Dated: New York, New York
      October 7, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/ Reed M. Brodsky
JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
Tel: 212-637-2272/2492
ANDREW Z. MICHAELSON
Special Assistant U.S. Attorney

11