UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

         - against-

RAJ RAJARATNAM,

               Defendant.

09 Cr. 1184 (RJH)

**<u>OPINION</u>**

Richard J. Holwell, District Judge:

       On May 11, 2011 a jury returned a verdict of guilty on all fourteen counts in an indictment charging defendant Raj Rajaratnam with conspiracies to commit and the commission of various insider-trading schemes.

       On October 4, 2011 the Court heard argument on the calculation of defendant's guidelines sentence under the United States Sentencing Guidelines ("USSG" or the "Guidelines").

       On October 13, 2011 the Court sentenced Rajaratnam to a total of 132 months in prison on all counts.  Prior to imposing the sentence, the Court calculated the applicable Guideline range to be 235 to 293 months in prison based on a total offense level of 38 and a criminal history category of I.  (Tr. of Hr'g, Oct. 13, 2011, at 32.)  The Court indicated that it would issue an opinion setting forth the basis for that calculation.  The following opinion does so and considers the three Guideline issues that were contested by the parties:  (1) how to calculate Rajaratnam's "gain" pursuant to section 2B1.4(b) of the Guidelines; (2) whether section 3B1.1(a) of the Guidelines warrants an enhancement on the ground that Rajaratnam "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive";

and (3) whether section 3C1.1 of the Guidelines warrants an enhancement on the ground that Rajaratnam "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."

## A.    Calculating the Defendant's "Gain"

The parties agree that defendant's base offense level is eight (8) pursuant to USSG sections 2X1.1 and 2B1.4(a). *See* U.S. Sentencing Guidelines Manual ("USSG") §§ 2X1.1, 2B1.4(a) (2010).  Section 2B1.4(b) of the Guidelines provides, however, that "[i]f the gain resulting from the offense exceeded $5,000," the Court should "increase by the number of levels from the table in § 2B1.1 . . .  corresponding to that amount."  *Id.* § 2B1.4(b).   Under this guideline, "[i]nsider trading is treated essentially as a sophisticated fraud."  *Id.* cmt. background. Yet "[b]ecause the victims and their losses are difficult if not impossible to identify, the gain, *i.e.*, the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses."  *Id.*  Not unexpectedly, Rajaratnam and the government offer competing methods for calculating the "gain resulting from the offense."

### 1.  The Parties' Gain Calculations

The government relies on calculations performed by Special Agent James Barnacle. According to the government, Special Agent Barncale calculated Rajaratnam's "profit by taking the difference between the price at which a security was purchased (or sold short) on the basis of inside information, and the price at which it was later sold (or covered) following the relevant public announcement, and then multiplying by the number of shares."  (Gov't Mem. 32.)  For example, if Rajaratnam purchased 100,000 shares of Intel stock at $10 per share on June 1,

waited until the price rose to $15 per share when the price rose following the announcement of inside information on June 15, and then sold the shares on June 16 at that price, the government's calculation would result in a "gain" of $500,000 ($15-$10 = $5 x 100,000).

With respect to the stock of three companies—Intel, Google, and Goldman Sachs—the government alleged that Rajaratnam gained what he would have lost had he not sold his shares on the basis of negative inside information regarding those companies.  "In these instances, the gain was calculated by taking the difference between the price at [which] Rajaratnam sold stock (or covered a short position) on the basis of inside information, and the price at which the security traded at the open of the market on the day following the public release of the relevant information, and then multiplying by the number of shares."  (Gov't Mem. 32 n.8.)  For example, if Rajaratnam sold 100,000 shares of Intel stock at $10 per share on June 1 and the price declined to $5 per share when the price rose following the announcement of inside information on June 15, the government's calculation would result in a loss avoided, or "gain," of $500,000 ($10-$5 = $5 x 100,000).

Using these methods, the government has calculated Rajaratnam's total "gain" as $72,071,219.[1]

Rajaratnam challenges the government's method.  The core of Rajaratnam's argument is the premise that the phrase "gain resulting from the offense" requires "separating the gains

---

[1] At trial, Special Agent Barnacle calculated the total "gain," including losses avoided, as $63,812,164.  The government contends that documents Rajaratnam turned over at trial together with other evidence the government introduced show that Rajaratnam was responsible for insider trading in Akamai, Clearwire, Google, and Hilton under a code—CRS—that the government was not able to identify at the time that Special Agent Barnacle performed his calculations.  The government has calculated Rajaratnam's "gain" in trading under the CRS code as $8,259,055. However, the Court need not determine whether the Court should consider these "gains" because, assuming the Court can, there is no material difference between $72,071,219 and $63,812,164 for purposes of the offense level.  *See* USSG § 2B1.1 (providing for a 24 level increase for profits greater than $50 million but less than $100 million).

attributable to the prohibited conduct (*i.e.*, trading stock on the basis of material, nonpublic information) from gains attributable to factors unrelated to that conduct, such as gains caused by exogenous market movements or events unrelated to the material, nonpublic information." (Rajaratnam Mem. 20.)  Rajaratnam contends that including either of these factors in calculating his "gain" is improper "because the share price may fluctuate due to other market events, such as the launch of a new product or general market movement."  (*Id.* at 21.)

Rajaratnam contends that his expert witness, Dr. Gregg Jarrell, avoided that result by using an alternative methodology.   According to his sworn affidavit, Dr. Jarrell performed an event study—"a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price," *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 599 n.10 (S.D.N.Y. 2009)—to isolate the price increase or decrease in a company's stock attributable to the public announcement of inside information regarding a company from the price increase or decrease attributable to events that happened to coincide with the announcement.  (*See* Rajaratnam Mem. Ex. B, Aff. of Dr. G. Jarrell, July 11, 2011 ("Jarrell Aff.") ¶¶ 15-20.)  Dr. Jarrell then multiplied the price increase or decrease attributable to the public announcement of the inside information by Special Agent Barnacle's estimate of the number of shares held by Galleon.  (*See id.* ¶ 21.)

Using this method, Dr. Jarrell calculated Rajaratnam's gain as $41,710,839,[2] which would result in a lower increase in defendant's offense level calculation.

In Rajaratnam's view, "the government's methodology improperly includes:  (1) all movements in the stock price that occurred after the shares were initially purchased but before

---

[2] If as Rajaratnam contends, losses avoided are excluded, Dr. Jarrell calculated Rajaratnam's gain as $36,358,313.  The Opinion will consider in the next Section whether to include losses avoided.

the announcement of the alleged inside information; and (2) all movements in the stock price that occurred after the public reaction to the company's announcement of the alleged inside information until the date of sale, even if that date is days or weeks afterwards." (*Id.* ¶ 23.)  To address this argument the Court considers three hypothetical scenarios.

1) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1, waits until the price increases to $15 per share on June 15 following the announcement of positive inside information regarding its earnings, and sells the shares on June 16 at that price.

2) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1. Over the next two weeks, the price of Intel stock increases to $15 per share on news that several major smartphone manufacturers have signed agreements to use Intel chips in millions of smartphones.  On June 15, the price of Intel stock increases $5 per share to $20 per share following the positive earnings announcement, and Rajaratnam sells the shares on June 16 at that price.

3) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1. Over the next two weeks, the price of Intel stock decreases to $5 per share on news that several major smartphone manufacturers who have abandoned previously announced plans to use Intel chips in millions of smartphones.  On June 15, the price of Intel stock increases to $10 per share following the positive earnings announcement, and Rajaratnam sells the shares on June 16 at that price.

In the first scenario, the government's method yields a gain of $500,000 ($15-$10 = $5 x 100,000).  In the second scenario, the government's method yields a gain of $1 million ($20-$10 = $10 x 100,000).  And in the third scenario, the government's method yields a gain of $0 ($10-

$10 = \$0$ x 100,000).   In other words, the government's method yields three different gain calculations that have nothing to do with the conduct constituting the offense and everything to do with smartphone manufacturers.

A method that yields three different gain calculations for the same conduct constituting an offense seems to make little sense as a way to calculate the "gain resulting from the offense" of insider trading.  The Tenth Circuit reached that conclusion in *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009).

In *Nacchio*, the defendant, former Qwest CEO Joseph Nacchio, received stock options with an exercise cost of $5.50.  *See id.* at 1065.  Nacchio received the options between 1997 and 2001.  *See id.*  In 2001, while in possession of inside information regarding Qwest's accounting, Nacchio sold the options at a price ranging from $37 to $42 for profits of just over $52 million on the sales.  *See id.* at 1065, 1067-68.  Nacchio also incurred some $7.3 million in brokerage costs for the sales.  *See id.* at 1067-68.

The government argued that the starting point for determining Nacchio's "gain" was his net profit, *i.e.*, the amount Nacchio earned from the sales minus the cost of making them, or $44.6 million.  *See id.* at 1068.  Nacchio argued that "to include for sentencing purposes the total amount he made on the stock sales as gain is punishing him for the normal appreciation in Qwest's shares from 1997 to 2001, which had nothing to do with the charged offense."  *Id.* at 1069.  Instead, like Rajaratnam, Nacchio submitted an "event study" by an expert witness that "estimated the portion of [his] proceeds from the sale of Qwest stock during the insider trading

period that was attributable to inside information concerning Qwest's financial guidance" and accounting. *Id.* at 1068. The district court disagreed and began from the $44.6 million figure.[3]

The Tenth Circuit reversed. Drawing on Judge Bright's dissent in *United States v. Mooney*, 415 F.3d 1093 (8th Cir. 2005), the Tenth Circuit began from the premise that "[t]he essence of *the offense* of insider trading is not the trading itself—standing alone, a lawful act—but trading *on the basis of inside information*." *Id.* at 1072 (emphasis in original). From that premise, "it logically follows that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence." *Id.* Rather, "[t]he plain language of § 2F1.2 [the identical predecessor to section 2B1.4(b)][4] supports the notion that an insider trading defendant's 'gain' should not consist of the total amount that the defendant realized from his or her stock sales, but should be limited more specifically to the gain that resulted from trading with insider knowledge." *Id.*

The *Nacchio* court acknowledged that the Guideline commentary referred to "the total increase in value realized through trading in securities. . . ." *Id.* at 1073 (quoting USSG § 2B1.4(b) cmt. background). However, the court noted that the commentary referred to this "total increase" in value as a description of "the gain," which in the guideline itself was followed by the words "resulting from the offense." *See id.* at 1073. Accordingly, like Judge Bright, the Tenth Circuit concluded that "the insider trading guideline specifically limits the gain to that 'resulting from the offense' and that "the 'total increase in value' commentary language specifies how to calculate *that* gain." *Id.* at 1073 (emphasis in original). In other words, the

---

[3] The district court ultimately calculated Nacchio's "gain" as approximately $28 million based on tax calculations that do not appear relevant here. *See Nacchio*, 573 F.3d at 1068-69.

[4] Section "2B.1.4 now contains the same language as former § 2F1.2. . . ." *Nacchio*, 573 F.3d at 1066 n.5.

commentary's "instruction is . . . applicable to the narrowly defined 'gain' that falls *within* the [Guideline] definition."  *Id.*  (emphasis in original).[5]

The Tenth Circuit further reasoned that "[t]he language of the guideline commentary supports the view that a stock's inherent value—i.e., the market's assessment of the stock's value, reflecting primarily the value of the firm's net assets and operations and its potential earnings and growth prospects—should not be a component of the gain amount:  rather than the 'total value realized,' the commentary describes gain as the total *increase* in value realized'—contemplating that there is a baseline stock value from which the gain (i.e. increase) is measured."  *Id.* at 1075 (emphasis in original).

Put another way, the *Nacchio* court analogized calculating insider trading gains to calculating loss causation in a securities fraud case under Rule 10b-5.  In such a case, a defendant's misrepresentation inflates the price of stock and investors lose money when the stock price declines in response to the defendant's revelation of the truth.  In similar terms, the Tenth Circuit stated that "Nacchio's benefit stemmed from the illicit, though speculative, effect of the material inside information on the value of Qwest stock."  *Id.* at 1076.  Further,

> [u]nder the government's prosecution theory, the market would have
> viewed the inside information in a negative light, and disclosure of that
> information would have detrimentally impacted the value of Qwest stock.
> Therefore, the nondisclosure of the information allowed the stock to
> maintain an artificially high value and allowed Mr. Nacchio to benefit
> from that value when he traded in the stock.  It is that illicit, artificially
> high value that should be reflected in the gain calculation, not the
> underlying value of the stock.

*Id.*

---

[5] In any event, the Tenth Circuit noted that, to the extent that the commentary conflicted with the guideline, the latter governed.  *See Nacchio*, 537 F.3d at 1073 n.10 (citing *Stinson v. United States*, 508 U.S. 36, 43 (1993)).

Finally, employing examples similar to those discussed above which resulted in different gain calculations for defendants who committed the same crime, *see id.* at 1082-84, the Tenth Circuit stated that "the district court's approach would divorce the sentencing assessment of gain from the defendant's individual culpability." *Id.* at 1082-84; *see also id.* at 1081 ("However, if the impact of unrelated twists and turns of the market is ignored in the sentencing calculus then an insider trading defendant is likely to suffer a sentence that is detached from his or her individual conduct and circumstances.").

Notably, in that regard, the *Nacchio* court distinguished cases in which "two otherwise equally culpable bank robbers may face different sentences based solely on the different amounts of money that tellers happened to place in their bags; and two otherwise equally culpable drug trafficking mules may face different sentences based only on the different quantities of drugs that unbeknownst to them were given to them for transport." *Id.* at 1081 n.16. While the court acknowledged that "different circumstances that produce these disparate sentencing outcomes may not have been within the control of the defendants or even within their ken," it concluded that "those circumstances nonetheless stem from, and are closely tied to, their individual criminal activity and the resulting harm—that is, their acts of robbing a bank and demanding money from the teller, and their acts of taking delivery of and ferrying illegal drugs." *Id.* "In contrast, the act of trading in securities" and "a whole host of factors can contribute to the gains or losses that a defendant incurs from trading in stock that have nothing to do with the *criminal* dimensions of his or her activity—factors that relate simply to the ordinary economics and psychology of the marketplace." *Id.*

The Tenth Circuit's decision in *Nacchio* makes a compelling case that the government's method could punish a defendant for exogenous market events and lead to unequal sentences for

equal crimes.  However, while the *Nacchio* decision seems correct to point out that the Guidelines refer to the "gain *resulting from the offense*," it is far from clear that the method that decision endorsed—and which Rajaratnam advances here—accurately calculates that gain.

It is true that the offense in Section 10b-5 "is not the purchase of stock itself, but the *use of a manipulative or deceptive contrivance in connection with* the purchase."  *Mooney*, 425 F.3d at 1106 (Bright, J., dissenting) (quoting 15 U.S.C. § 78j(b)) (emphasis in original).  And for that reason there is some appeal to using the kind of event studies that courts use in fraudulent misrepresentation cases.  Indeed, both fraudulent misrepresentation and insider trading cases involve measuring the value of information to the market.  The former involve the value of the information that a company should have disclosed but did not; the latter involve the value of information that a company has lawfully chosen not to disclose but later will.  And in both cases, the change in the company's stock price that cannot be explained by other market factors has become an accepted measure for the value of information.

However, for purposes of determining the defendant's "gain resulting from the offense," there is an important difference between fraudulent misrepresentation and insider trading cases: the inside trader does not cause the price of a company's stock to move.  Of course, complicated financial models might show that the market reacts to the way that certain investors are trading.  But in general, one who trades in a company's stock does not affect its price the way that the company's announcements (or omissions from those announcements) do.

Another way of saying that is that when a stock declines after a company announces the truth, the decline results from the defendant's offense, namely, fraud.  That offense involves making a statement that inflates the price of stock above what its price would be if the market knew the truth.  Hence the decline in the stock price attributable to the revelation of the truth

measures the difference to investors between a world where the defendant lied and a world where the defendant told the truth.

Insider trading is different.  When an insider trades on the basis of material, non-public information, the insider usually does not cause any price inflation or deflation.  Indeed, the Tenth Circuit in *Nacchio* seemed to acknowledge as much in stating that "the non-disclosure of the information allowed the stock to maintain an artificially high value" rather than that Nacchio's trading gave the stock an artificially high value.  *Nacchio*, 573 F.3d at 1076.  Similarly, when a stock declines after a company announces worse than expected earnings or rises when a company announces better than expected earnings, the decline or rise itself does not result from the defendant's insider trading.  Rather, as the Tenth Circuit acknowledged, the fact that Qwest had not disclosed the inside information merely "allowed Mr. Nacchio to benefit from that value when he traded in the stock."  *Id.*

Where the rise or decline in the price of a stock in response to a public announcement does not result from any action of the defendant giving rise to the offense, it is hard to say that a defendant's gain from the rise or decline is a "gain resulting from the offense" of insider trading.  Indeed, the change in stock price following the public announcement of information that an insider traded on in advance does not measure the difference between a world in which the defendant acted lawfully and a world in which the defendant acted unlawfully.  An insider and a lawful investor who purchase stock at the same time will earn the same profit.[6]  The difference between them is not how each has affected the stock but what each knows about the company issuing it.   Measuring the change in stock price might measure the value of what an insider

_____

[6] For the same reason, it makes no more sense to say that, as compared to the innocent shareholder who sold to him, an insider trading defendant has earned only the increase in stock price following the announcement of positive news.  The innocent shareholder would have earned the entire increase in price.

knows, but that is not how the Guidelines measure the "gain." The commentary refers to the "value realized through trading in securities" not the value of the information used to do the trading. And the plain language of the "value realized through trading in securities" is the increase in the price of stock from the time that the defendant purchased it to the time he sold it.

Of course, as the Tenth Circuit took pains to point out, the commentary is only an interpretation of the phrase "gain" and the Guideline itself refers to "gain resulting from the offense." But measuring insider trading gains based on the value of the inside information misinterprets "offense" because it rests on the false premise that insider trading has legal and illegal parts for purposes of that term.

The *Nacchio* court distinguished between trading *vel non*—"standing alone, a lawful act" and "trading *on the basis of inside information*." *Nacchio*, 573 F.3d at 1072 (emphasis in original). That position—that the "gain" "should be limited . . . to the gain that resulted from trading with insider knowledge," *id.* at 1072—assumes that a single trade can be divided into "trading with insider knowledge" and trading on the basis of public information.

The Second Circuit, however, appears to have rejected that proposition. "Unlike a loaded weapon which may stand ready but unused, material information cannot lay idle in the human brain." *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993). Hence "[i]t does not follow, that when one such piece of information is revealed to be material, in and of itself, and the trader knows it to be material, the trader might somehow consider the information irrelevant to the whole." *Id.* at 121. Indeed, the Second Circuit has stated that "[i]t strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic—and who did not act in good faith in so doing—did not also trade on the basis of that information." *Id.*

Thus however logical it may be "that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence," *Nacchio*, 573 F.3d at 1072, where a defendant has traded on the basis of inside information, the defendant has not engaged in any "lawful trading."  Rather, the defendant has committed an "offense."  The fact that the defendant later earns profits that he would have earned if he had, in fact, traded lawfully does not change the fact that he has traded unlawfully.  And having made the decision to do so, it makes no more sense to insulate the insider trading defendant from the risk that he will earn more than he expects than to insulate the bank robber who robs a bank from the risk that the vault is full.

To be sure, there is a sense in which that result subjects an insider trading defendant to market mysteries that are far more elusive than whether the bank vault will have any money.  But that is hardly objectionable as a measure of the punishment for an offense that enables a defendant to avoid (or least minimize) those very same risks.

Because an insider trading defendant knows what is going to happen, he has a one-way ratchet.  Returning to the above example, suppose that Rajaratnam (a) knew that Intel was going to announce positive earnings results; (b) believes that Intel is about to renew its agreement with smartphone manufacturers to use Intel chips; but (c) fears the truth of rumors that the smartphone manufacturers will use AMD chips instead.   In that case, Rajaratnam can purchase Intel stock knowing that if he is wrong about the smartphone manufacturers, his losses will likely be minimized by the positive earnings results, whereas if he is right about the smartphone manufacturers, he will earn even more profits.

In the event that Rajaratnam is right about the smartphone but is caught, including his gain from the smartphone news only punishes him for realizing the benefits of his advantage over an investor who might not have had the confidence to purchase when Rajaratnam did.  It is

13

that advantage that truly lies at the core of the "offense" of insider trading, which is complete at the time that the defendant causes a trade to be executed.  And a punishment that subjects one who commits that offense to the very market fluctuations his criminality enabled him to avoid seems like justice *par excellence*.

In sum, the Guidelines refer to the defendant's "gain resulting from the offense."  That "offense" occurs when a defendant executes or causes to be executed trades, and inside information was a factor in the defendant's decision to do so.  Accordingly, since the defendant commits the "offense" when he trades, it makes perfect sense that the Guidelines calculate the "gain resulting from the offense" as "the total increase in value realized through trading in securities by the defendant."  Since the plain meaning of "increase in value" is the difference between the purchase and sale price, the government's method best accords with the plain language of the Guidelines.

### 2.  The Court's Gain Calculation For the Period Between the Public Announcement and a Later Sale

The following scenarios have been adapted to the facts of this case from Judge Bright's dissent in *Mooney*, 425 F.3d at 1097, discussed *infra*.

1) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1, waits until the price increases to $15 per share on June 15 following the announcement of positive inside information regarding its earnings, and sells the shares on June 16 at that price.

2) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1. Following the announcement of positive inside information on June 15, the price of Intel stock increases to $15 per share.  However, Rajaratnam does not sell.

Over the next two weeks, the price of Intel stock continues to rise on a series of reports that several major smartphone manufacturers have signed agreements to use Intel chips in millions of smartphones. By June 29, the price of Intel stock has risen to $25 per share and Rajaratnam sells his shares on that day at that price.

3) Rajaratnam purchases 100,000 shares of Intel stock at $10 per share on June 1. Following the announcement of positive inside information on June 15, the price of Intel stock increases to $15 per share. However, Rajaratnam does not sell. Over the next two weeks, the price of Intel stock falls on a series of reports that several major smartphone manufacturers who have abandoned previously announced plans to use Intel chips in millions of smartphones. By June 29, the price of Intel stock has fallen to $11 per share and Rajaratnam sells his shares on that day at that price.

In the first scenario, the government's method yields a gain of $500,000 ($15-$10 = $5 x 100,000). In the second scenario, the government's method yields a gain of $1.5 million ($25-$10 = $15 x 100,000). And in the third scenario, the government's method yields a gain of $100,000 ($11-$10 = $1 x 100,000). In other words, the government's method yields three different gain calculations that have nothing to do with the conduct constituting the offense and everything to do with smartphone manufacturers.

Again, a method that yields three different gain calculations for the same conduct constituting an offense seems to make little sense as a way to calculate the "gain resulting from the offense" of insider trading.

In *United States v. Mooney*, 425 F.3d 1093 (8th Cir. 2005), however, the Eighth Circuit disagreed. That case involved defendant Michael Mooney, a former United Healthcare

15

Corporation executive who was convicted of trading in United stock on the basis of inside information regarding United's acquisition of MetraHealth. *See id.* at 1095. In May and June 1995, while he was participating in confidential due diligence regarding the acquisition, Mooney purchased call options in United stock for $258,283.03. *See id.* at 1096. United announced the acquisition on June 26, 1995. *See id.* at 1097. On July 14 and October 4 and 5, 1995, Mooney sold his call options for a total of $532,482.49. *See id.* at 1096.

The district court calculated Mooney's "gain" as $274,199.46, or the difference between the price at which Mooney sold the options and the price at which he purchased them ($532,482.49 - $258,283.03). *See id.* at 1096. On appeal, Mooney contended that "the market would have reasonably absorbed his inside information by June 28, just two days after United announced its Metra acquisition, and that the information would have been reflected in the market value of his call options on that date." *Id.* at 1098. Accordingly, Mooney argued that his gains were only $50,467.47, or the difference between the market value of the call options when the inside information became public and the price at which he purchased the options. *See id.* at 1099.

Sitting *en banc*, the Eighth Circuit rejected Mooney's argument based on its reading of the plain language of Section 2B1.4. The court began from the premise that "Section 2B1.4 and its phrase 'gain resulting from the offense' are simple and straightforward. The guideline refers to the defendant's gain, not to market gain, and it ties gain to the defendant's offense." *Id.* at 1099. Moreover, the Eighth Circuit concluded that "any question about the guideline's meaning is decisively resolved by the authoritative definition provided in the commentary to § 2B1.4." *Id.* On that point, the Eighth Circuit reasoned that "[b]y use of the word realized, the

commentary makes clear that gain is the total profit actually made from a defendant's illegal securities transactions." *Id.*

Judge Bright dissented.  The core of his disagreement with the *Mooney* majority was that section 2B1.4 refers not only to the defendant's "gain" but to his "gain resulting from the offense."  Judge Bright reasoned that a court "cannot know what the 'gain resulting from the offense' is, without first knowing what 'the offense' is." *Id.* at 1105 (Bright, J., dissenting). Judge Bright went on to point out that the offense in Section 10b-5 "is not the purchase of stock itself, but the *use of a manipulative or deceptive contrivance in connection with* the purchase." *Id.* at 1106 (quoting 15 U.S.C. § 78j(b)) (emphasis in original).  Based on that definition of "the offense," Judge Bright reasoned as follows:

> The gain resulting from the deception stops when the deception stops, though there may be later gain (or loss) as the stock market gyrates along, unmolested by any deception.  If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public.  That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock.  After the market adjusts to this information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market—with no deception— and thus, no offense under 15 U.S.C. § 78j—involved.  Thus, if the person holds the stock for another five years after the insider knowledge has been made public, the value of the stock will continue to rise or fall regardless of the prior deception.

*Id*.

Judge Bright also concluded that, "[e]ven if the plain language of the statute did not clearly tell us what 'the gain resulting from the offense' is," the *Mooney* majority's conclusion would "not promote uniformity." *Id.*  "To the contrary," in Judge Bright's view, the majority's position "could result in unequal sentences for equal crimes." *Id.* at 1106-07.  To make that point, Judge Bright used a series of examples similar to those discussed in the previous subsection.  *See id.* at 1107.

17

As applied to measuring gains based on stock price movements after the announcement of inside information, Judge Bright's reasoning is persuasive in a way that the *Nacchio* court's is not.

Again, in a nutshell, the *Nacchio* court's reasoning rests on the false premise that a single trade can be divided into "trading with insider knowledge" and trading on the basis of public information. Where inside information is a factor in a defendant's decision to trade, that person has committed a crime. In deciding to do so, the defendant assumes the risk that factors beyond his or her control—here market conditions—will exacerbate the seriousness of that crime. And where the essence of the crime is gaining a risk-free advantage over other investors, there is nothing unjust about punishing a defendant when the very risks his crime enabled him to avoid have come to pass.

However, the core of Judge Bright's dissent is that once the inside information has become public the insider has lost his illegal advantage. That vitiates the justification for saddling a defendant with market risks.

When inside information has been announced, a defendant who has earned profits from trading on it has a choice: should he cash out his profits if the thinks that the stock will fall or should he hold on to his stock if he thinks that the price will rise? Assuming that the defendant has no other inside information, he faces the same choice as any other investor. Thus the defendant's decision to hold the stock is no less "lawful trading" than any other investor's decision to purchase it. *Nacchio*, 573 F.3d at 1072. Indeed, it is no less lawful than if the defendant decided to independently buy shares at the new price. Gains from that purchase would

hardly be the result of any offense.  Thus the defendant's gains from a decision that amounts to the same act are not the result of any offense, either.[7]

### 3.  Loss Avoidance as a Measure of Gain

Rajaratnam argues that the government's calculations improperly include losses that Rajaratnam allegedly avoided when he sold the stock of Intel, Google, and Goldman Sachs. Rajaratnam does not contest the propriety of including losses avoided *per se*.  Rather, he challenges the propriety of doing so in the circumstances of this case.  This subsection considers that challenge with respect to each stock in turn.

### i.  Intel

The government has calculated that Rajaratnam avoided losses of $882,915 when he covered a short position in Intel stock on April 13 and April 16, 2007 after receiving a tip from Rajiv Goel concerning Intel's upcoming earnings announcement.  Rajaratnam argues that it is "inherently contradictory" to hold him responsible both for these "losses avoided" and for gains from his purchase of Intel shares on April 16 and April 17, 2007.  (Rajaratnam Mem. 27.) Specifically, Rajaratnam argues that "the gain calculation is based on holding both short and long positions in the stock of Intel at the same time, which makes no sense."  (*Id.*)

It is Rajaratnam's argument that makes little sense.  The government's theory is not "based on the assumption that a short position would be held through the public announcement

---

[7] It is true that, viewed through a similar lens, a defendant who has traded on the basis of inside information is not merely a passive recipient of what the market gives him in the time period before the information has been announced.  But whereas a defendant deciding whether to cash out or maintain a position after inside information has been revealed faces the same decision as a legitimate investor, a defendant deciding whether to maintain a position he established on the basis of inside information before the information has been revealed faces a decision that is different from the decision facing a legitimate investor.  Indeed, the fact that the defendant knows inside information makes his decision to maintain his position little different than his initial decision to establish it.  In that sense, the defendant's insider trading—that is, his "offense"—repeats itself until the inside information has been announced.

and not eliminated by covering, while at the same time taking a long position by buying and holding shares before the announcement." (Rajaratnam Mem. 28.)   The government's theory is that had Rajaratnam not received the tip regarding the positive earnings announcement, Rajaratnam would have held his short position betting that Intel stock would decline *not* have purchased Intel stock betting that it would rise.   When the price of Intel stock in fact rose, Rajaratnam would have lost money on the short position and never taken a long position.   But Rajaratnam knew about the positive earnings announcement, covered his short position, and purchased stock to double down.   Accordingly, the measure of his gain from illegal trading is the loss he avoided by covering and his gain from purchasing.

Rajaratnam argues that "there is simply no factual basis on which to conclude that he would have held [the short] position – and incurred the losses that the government alleges – through the announcement date." (Rajaratnam Mem. 27.)   That is hardly true.   The government's evidence showed that Rajaratnam reversed his position in Intel stock immediately after speaking with Rajiv Goel who testified that he tipped Rajaratnam regarding Intel's earnings announcement.   Before speaking with Goel, Rajaratnam was short the stock, that is, betting that the stock would fall.   After speaking with Goel, Rajaratnam purchased the stock betting that it would rise.   That evidence creates an inference Goel's tip caused Rajaratnam to change his opinion about Intel stock.   Rajaratnam does nothing to rebut that inference.   Accordingly, the government has met its burden of proving by a preponderance of the evidence a fact relevant to sentencing. *United States v. Irving*, 554 F.3d 64, 72 (2d Cir. 2009).

### ii.    Google

Rajaratnam makes a similar argument with respect to Google.   The government has calculated that Rajaratnam avoided losses of $5,312,250 when he sold 135,000 shares of Google

stock on July 13, 2007 after receiving a tip from Roomy Khan that Google would report disappointing earnings figures.   Rajaratnam argues that it makes no sense to assume that he would have both retained these shares and shorted the stock as he did between July 13 and July 19, 2007.  (*See* Rajaratnam Mem. 29.)

Again, however, Rajaratnam takes the alternative universe only half way.  The government's theory is that had Rajaratnam not received the tip regarding the negative earnings information, he would have kept the Google shares betting the stock would rise and not shorted the stock betting that it would fall.  But Rajaratnam knew about the negative earnings announcement, sold his position, and shorted the stock to double down.  Accordingly, the measure of his gain from illegal trading is the loss he avoided by selling his long position and his gain from shorting the stock or betting that it would decline.

Rajaratnam argues that "[t]here is no factual basis to assume [the long positions] would have been held through the announcement."  (*See* Rajaratnam Mem 29.)   Again, that is hardly true.  The government's evidence showed that Rajaratnam reversed his position in Google stock immediately after speaking with Roomy Khan whom circumstantial evidence suggested tipped Rajaratnam regarding Google's earnings announcement.  Before speaking with Khan, Rajaratnam was long the stock, or betting that the stock would rise.  After speaking with Khan, Rajaratnam instructed his trader to sell his entire holdings of Google stock and later shorted the stock, or bet that it would fall.  That evidence creates an inference Khan caused Rajaratnam to change his opinion about Google stock.  Rajaratnam does nothing to rebut that inference. Accordingly, the government has met its burden of proving by a preponderance of the evidence a fact relevant to sentencing.  *Irving*, 554 F.3d at 72.

### iii.    Goldman Sachs

Rajaratnam also makes a similar argument with respect to Goldman Sachs.  The government has calculated that Rajaratnam avoided losses of $3,800,565 when he sold Goldman Sachs shares on October 24 after receiving a tip that Goldman Sachs would announce quarterly losses for the first time in its history.  Rajaratnam sold the shares for approximately $97 per share.  When Goldman Sachs announced its losses on December 16, the share price fell to $75 per share.  Rajaratnam argues that because any gain calculation that includes these losses avoided assumes that Rajaratnam would have held his shares until December 16, any such calculation "unreasonably assumes that [he] would have ignored the fact that Goldman Sachs' share price was falling precipitously during this period" just after the onset of the financial crisis.  (*See* Rajaratnam Mem. 30.)

Rajaratnam's argument with respect to Goldman Sachs stands on a somewhat different footing than his arguments with respect to Intel and Google.  True, the government can point to evidence suggesting that Rajaratnam learned from Rajat Gupta that Goldman Sachs would be reporting losses and immediately thereafter sold shares he had purchased just days before.  And that evidence creates an inference that speaking with Gupta caused Rajaratnam to change his opinion about Goldman Sachs stock. However, whereas Rajaratnam could not point to any evidence to rebut similar inferences with respect to Intel and Google, Rajaratnam argues that the onset of the financial crisis would have given Rajaratnam ample reason to sell before December 16.

The logic of that suggestion makes it tempting to credit.   At bottom, however, Rajaratnam's argument is the mirror of his argument that he should not be punished for the increase in value realized between his purchase of stock based on inside information and the time

the public learns that information.  In that vein, it is notable that Rajaratnam's argument that his "gain" does not include pre-announcement gains is not that the government cannot prove that he would not have lawfully purchased the stock some time before the announcement.  Indeed, the government has no such burden.  Rather, when inside information is a factor in a defendant's purchase of stock, the defendant has committed a crime, and the purchase cannot be separated into lawful and unlawful parts.

The same is true where inside information is a factor in a defendant's sale of stock.  And just as, for the reasons set forth above, there is nothing unjust about subjecting one who purchases stock on the basis of inside information to the risk that the market will make his trade more profitable than he expects, there is nothing unjust about subjecting one who sells stock on the basis of inside information to the risk that his trade will save him more than he expects.  For, like the defendant who purchases stock, a defendant who sells stock on the basis of inside information has an illegal advantage that allows him to minimize the risk of his sale.

Suppose that Rajaratnam (a) knew that Goldman Sachs was going to announce negative earnings results; (b) believed that the financial industry would experience a prolonged decline; but (c) believes it is possible that Congress may take measures that will stem the decline and cause financial stocks to rebound.   In that case, Rajaratnam could sell Goldman Sachs stock knowing that if he is right about the decline of the financial industry, he will avoid losses both from that decline and from the effect of Goldman Sachs's earnings announcement, whereas if Congress acts, the amount of profit he will have missed from the general rebound will be minimized by the decline in Goldman Sachs stock following the earnings announcement.

Again, in the event that Rajaratnam is right about the industry decline but is caught, including the losses he avoided from that decline only punishes him for realizing the benefits of

his advantage over an investor who might not have had the confidence to sell in an uncertain time.  It hardly seems unjust to include those benefits in the calculation of his gain from an offense whose core is benefitting from an informational advantage.  And the same logic should apply to Rajaratnam's arguments as to losses avoided with respect to Intel and Google.

### 4.  Rajaratnam's Share of Galleon's Gain

Rajaratnam further argues that even a calculation that excludes losses avoided nevertheless "overstates [his] culpability, since it represents the gain to Galleon and its investors rather than to Mr. Rajaratnam himself."  (Rajaratnam Mem. 31.)  This argument rests on two premises:  (1) the Guideline commentary refers to "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information," USSG § 2B1.4 cmt. background; and (2) Rajaratnam made the trades that the government has used to calculate his gain in Galleon accounts not his own accounts.

The argument runs as follows.  Rajaratnam is not the only person who profits from increases in the value of Galleon accounts.  Indeed, not even Galleon Management L.P. earned all of the profits from Galleon trading accounts.  Rather, like many hedge funds, Galleon Management L.P. earned a two percent management fee on the amount of assets in its funds and twenty percent of any gains in the funds.  This is the so-called "two and twenty."  The rest of the profits go to investors.

Rajaratnam, of course, was both a partner in Galleon Management L.P. entitled to a percentage of its "two and twenty" after expenses and an investor in Galleon funds entitled to a percentage of gains in those funds.  Based on Rajaratnam's ownership interests in Galleon Management L.P. and various Galleon funds, Rajaratnam has calculated that his personal gain

from trading in Galleon accounts was $7,460,633 (or $8,535,836 if losses avoided are included, or $12,762,432 using the government's method of calculating the total gain from the trading).

Whether Rajaratnam is correct appears to turn on the meaning of "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information."  USSG § 2B1.4 cmt. background.  The phrase is not a model of clarity and unfortunately no court appears to have addressed its meaning.

The critical word appears to be "by":  does "by" refer to "value realized" or "trading in securities"?  Given that the commentary refers to "trading in securities by," the word "by" seems most logically to refer to "trading in securities" such that the entire phrase means "the total increase in value realized through the defendant's trading and trading by persons acting in concert with the defendant or trading by persons to whom the defendant provided inside information."

Rajaratnam's construction of the phrase appears to assume that "by" refers to "realized" such that the phrase means "the total increase in value realized by the defendant and persons acting in concert with the defendant or by persons to whom the defendant provided inside information through trading in securities."  The problem with that construction is that it leaves unmodified the phrase "trading in securities." That leaves open the question of who is doing the trading by which the defendant and others are realizing gains.

It might be argued that, because the Guideline itself refers to "gain resulting from *the offense*," USSG § 2B1.4 (emphasis added), the relevant "trading in securities" is the defendant's trading.   However, reading in that limitation leads to somewhat strange results.  If the phrase really means "the total increase in value realized by the defendant and persons acting in concert

25

with the defendant or by persons to whom the defendant provided inside information through trading in securities by the defendant," the "gain" would include value realized from the defendant's trading by "persons to whom the defendant provided inside information" and exclude value realized by those persons from their own trading based on that information. That is, Rajaratnam's construction would render the enhancement entirely inapplicable to a defendant convicted of tipping rather than insider trading. That result cannot be squared with the fact that section 2B1.4 refers without limitation to 15 U.S.C. § 78j and Rule 10b-5 pursuant to which both tipping and insider trading are crimes.

It makes far more sense to interpret the phrase "the total increase in value realized through *trading* in securities *by the defendant* and persons acting in concert with the defendant or to whom the defendant provided inside information," USSG § 2B1.4 cmt. background (emphasis added), as referring to the increase in value realized by the defendant or others' trading *vel non* rather than the value realized by the defendant himself from that trading. That interpretation would include gains from trading by "persons . . . to whom the defendant provided inside information" and thereby hold tippers responsible for gains by their tippees.

So construed, the commentary is indifferent to whether Rajaratnam, Galleon Management L.P., or Galleon investors took home that increase in value. Rather, the relevant number is the size of the increase, namely, the increase in the price of a company's shares from the time that Rajaratnam purchased them to the time that the public learned the inside information.

### 5.    Conclusion

In sum, Rajaratnam's "gain" for purposes of section 2B1.4 of the Guidelines is equal to the sum of:

(a) (the increase in the price of a company's shares from the time that Rajaratnam purchased them to the time that the public learned the inside information) x (the number of shares that Rajaratnam traded); and

(b) (the decrease in value from the time that Rajaratnam sold Intel, Google, and Goldman Sachs  shares on the basis of tips regarding those companies' earnings to the time that the public learned the earnings information) x (the number of Intel, Google, and Goldman Sachs shares that Rajaratnam sold).

By any calculation, Rajaratnam's gain falls between $50 and $100 million, thereby warranting a 24 level increase to the base offense level of eight (8).

## B.    Leadership Role Enhancement

Section 3B1.1(a) of the Guidelines provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the sentencing court should increase the offense level by 4 levels.  USSG § 3B1.1(a).  "Prior to imposing a leadership enhancement under section 3B1.1(a), a sentencing court must make 'specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive.'"  *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) (quoting *United States v. Escotto,* 121 F.3d 81, 85 (2d Cir. 1997)).

### 1.      Five or More Participants

"A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  USSG § 3B1.1 cmt. n.1.  *Cf. United States v. Ware*, 577 F.3d 442, 453 (2d Cir. 2009) (citing same).  Hence the Second Circuit has held that persons cannot "be considered 'participants' within the above Guidelines definition of that term" where there is "no indication in the record that they would be criminally liable."  *Ware*, 577 F.3d at 453.  "[A] defendant may properly be included as a participant when determining whether the criminal activity 'involved five or more participants' for purposes of a leadership role enhancement under § 3B1.1."  *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000).  However, it follows from the definition of a participant as someone criminally liable that "[i]n assessing whether a criminal activity 'involved five or more participants,' only knowing participants are included."  *Id.* at 624.

The government argues that three of the charged conspiracies involved at least five participants:  Count One (Rajaratnam, Rengan Rajaratnam, Kris Chellam, Krish Panu, Adam Smith, Kamal Ahmed, Rajat Gupta and Joe Liu); Count Two (Rajaratnam, Roomy Kahn, Sunil Bhalla, Shamarra Hussain and Deep Shah); and Count Five (Rajaratnam, Danielle Chiesi, Anil Kumar, Kieran Taylor, Robert Moffat and Hector Ruiz).

Rajaratnam counters that at most the government showed that he was a member in several conspiracies with one or two individuals but never with the knowing participation of five or more co-conspirators (including him).  Thus Rajaratnam takes a quite narrow view of the term "participant," interpreting the Guideline's definition of "a person who is criminally responsible for the commission of *the offense*," USSG § 3B1.1 cmt. n.1 (emphasis added), to exclude a person who may be criminally liable for some other offense for which the defendant has also

been convicted.  *See Paccione*, 202 F.3d at 624-25.  The government accuses Rajaratnam of over-reading *Paccione*, pointing out that the Second Circuit has rejected the argument that role adjustment should be based only on the offense charged as opposed to all relevant conduct. *United States v. Greer*, 285 F.3d 158, 181 (2d Cir. 2002).  Relevant conduct, according to the government, must include as participants insiders who may not be chargeable in a single conspiracy under *United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001), but who are directly involved in, and criminally responsible for directly related (relevant) conduct.  Thus in the government's view the fact that Moffet, for example, was unknown to Rajaratnam and, as a remote tipper, could not be indicted in the same count, does not preclude Moffet from being a "participant" in assessing a role adjustment for Rajaratnam in connection with Count Five.

The Court need not resolve the parties' dispute because even applying defendant's narrow view of limiting knowing participants to those who could be convicted of a particular charged offense, the Court finds that at least six individuals were knowing participants in the Galleon conspiracy (Count One):  Rajaratnam, Panu, Chellam, Liu, Rengan Rajaratnam and Adam Smith.  A preponderance of the evidence at trial showed that each of these individuals were members of the same conspiracy to trade on insider information to increase the profits of Galleon and thereby increase their own profits as employees of Galleon.

### 2.  Organizer or Leader

"Determining whether a defendant's role in an offense constitutes that of an organizer or leader requires that [a court] examine 'the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy.'" *Si Lu Tian*, 339 F.3d at 156 (quoting *United States v. Beaulieu*, 959 F.2d 375, 379-80 (2d Cir. 1992)).  *Cf.* USSG § 3B1.1

cmt. n.4 ("Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.").

"Evidence of a defendant's direct and immediate control over other participants obviously provides the strongest support for any aggravating role enhancement." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995). "Yet . . . direct and immediate control over other participants, though a crucial and perhaps even the most important factor, is neither a strict prerequisite for an enhancement . . .  nor the only factor a court should consider." *Id.*  Indeed, courts in this Circuit consider the defendant's "degree of discretion" and "the nature and degree of his participation in planning or organizing the offense" in addition to control.  *Si Lu Tian*, 339 F.3d at 156.  Thus "to be found 'responsible for organizing others,' and thereby subject to a § 3B1.1 enhancement, a defendant must have at least played a significant role in the decision to recruit or to supervise lower-level participants." *Greenfield*, 44 F.3d at 1146.

 "Defendant need have been an organizer or leader only with respect to any one of these participants for the § 3B1.1(a) enhancement to apply." *United States v. Gaskin*, 364 F.3d 438, 467 (2d Cir. 2004); *see also United States v. Chavez*, 549 F.3d 119, 136 (2d Cir. 2008) ("While the criminal activity must be found to have involved five or more participants, the defendant need not have been the leader of more than one other participant for this adjustment to apply.").

Here, the Government has easily shown that Rajaratnam led Adam Smith, Krish Panu, Kris Chellam and Joe Liu.  Rajaratnam argues that while it is "certainly true that [he] 'organized' and 'led' Galleon's employees in connection with Galleon's legitimate business, there is no

evidence that he did so in connection with criminal activity" and "the Court must distinguish between [his] legitimate role as the Managing Partner of Galleon and his alleged role as an organizer or leader of criminal activity."  (Rajaratnam Mem. 43-44.)  For that proposition, Rajaratnam cites *United States v. Burgos*, 324 F.3d 88 (2d Cir. 2003), in which the Second Circuit declined to extend its holding "that the owner of a legitimate business who actively participates in criminal activity through the business may be eligible for an aggravating role adjustment" to a situation where the government sought such "an adjustment solely on the basis that one of the company's employees also participated in the illicit business."  *Id.* at 93.

Consistent with the *Burgos* court's use of the word "solely," the Court of Appeals has merely read its decision in *Burgos* for the proposition that "enhancements should not be *automatically* imposed on business owners or executives."  *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (emphasis in original).  Here, however, "there is enough evidence of [Rajaratnam's] active involvement in the conspiracy at issue in this case to undercut [his] assertion that [his] role as [managing partner of Galleon] [i]s 'not relevant' to the role enhancement analysis."  *Id.*  Indeed, the government introduced evidence that Rajaratnam directed Adam Smith in concealing details regarding the IDT-ICST merger and told him that Kamal Ahmed was a "good contact," and instructed Krish Panu and Kris Chellam as to how to create a paper trail to give the false impression that Galleon trades were based on legitimate analysis.  Smith also testified that Liu provided inside information to both Rajaratnam and Smith and that Smith spoke with Rajaratnam about creating a pattern of buying and selling stock in the event the government began investigating their trades.  The wire calls between Rajaratnam and

Rengan show *in toto* the defendant's younger brother knowingly assisted defendant in advancing the Galleon conspiracy.[8]

Based on the foregoing, a four-level leadership role enhancement to the base offense level is warranted pursuant to Section 3B1.1(a) of the Guidelines.

## C.    Obstruction Enhancement

Rajaratnam testified under oath before the SEC on June 7, 2007.  The government contends that, during his testimony, Rajaratnam committed perjury, which pursuant to section 3C1.1 of the Guidelines warrants a two (2) level enhancement for the obstruction of justice.

### 1.    Governing Law

Section 3C1.1 of the Guidelines provides that "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense," the sentencing court should "increase the offense level by 2 levels."  USSG § 3C1.1.

"Application of § 3C1.1 generally requires findings of willfulness and materiality." *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997). "The willfulness requirement means

---

[8] Rajaratnam cites *United States v. Carter*, 449 F.3d 1287 (D.C. Cir. 2006) for the proposition that the "enhancement does not apply where . . . the defendant acted merely as a 'hub' or 'orchestrator' without actually controlling the other participants."  (Rajaratnam Mem. 42 (quoting *Carter*, 449 F.3d at 1299).).  That does not exactly state the law in this Circuit.  The D.C. Circuit "understand[s] the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision,' to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee," and has vacated enhancements instituted by district courts who "failed . . . to require any proof that [the defendant] was hierarchically superior to her co-conspirators."  *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004).  In this Circuit, however, "direct and immediate control . . . is neither a strict prerequisite for an enhancement . . . nor the only factor a court should consider." *Greenfield*, 44 F.3d at 1146.

that the enhancement 'is appropriate only upon a finding that the defendant had the specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.'" *Id.* (quoting *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir. 1994)). "Such obstruction can be accomplished in many ways, one of which is the giving of perjured testimony." *Id.* Indeed, the Guideline commentary lists "committing . . . perjury" as an example of obstructive conduct. USSG § 3C1.1 n.4(B).

The perjury giving rise to an obstruction enhancement can occur "during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." *Id.* Civil proceedings include civil investigations. "Where federal administrative and prosecutorial jurisdiction overlap, subsequent criminal investigations are often inseparable from prior civil investigations, and perjury in the prior proceeding necessarily obstructs—if successful, by preventing—the subsequent investigation." *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004). Hence perjury in an SEC investigation can give rise to an obstruction enhancement. *See id.* at 94-95; *United States v. Bennett,* 252 F.3d 559, 566 (2d Cir. 2001).

"If a court chooses to rely upon allegedly perjured testimony as a basis for application of the enhancement, however, it must make specific findings which indicate that the judge has considered all of the elements of perjury, including materiality, and has found that they have all been met." *Zagari*, 111 F.3d at 328. Thus, "in order to base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 329. Notably, this test means that "a sentencing court may only apply the enhancement upon making specific findings that the defendant intentionally gave false testimony which was material to the proceeding in which it was given, that the testimony was

made willfully, i.e., with the specific purpose of obstructing justice, and that the testimony was material to the instant offense." *Id.*

In other words, the enhancement requires the court to find that the defendant, with the specific purpose of obstructing justice, made a statement that (1) was false; (2) he knew was false; (3) was material to the proceeding in which it was made; and (4) was material to the offense for which he has been convicted.

### 2.    Discussion

The government contends that Rajaratnam, with the purpose of obstructing justice, provided several false answers to the SEC's questions that he knew were false and that were material to both the SEC's investigation and the crimes for which he has been convicted and that Rajaratnam made those statements.  One statement in particular was unambiguously perjurious.  At his SEC testimony, Rajaratnam testified as follows:

Q:  Did you have any reason to believe that AMD was going to acquire ATYT before the announcement of the acquisition?

A:  No.

(Gov't Mem. Ex. EE at 114:17-20.)  The government contends that Rajaratnam's answer was false and that he knew it was false because the overwhelming evidence at trial showed that both Anil Kumar and Adam Smith had tipped Rajaratnam regarding AMD's acquisition of ATI Technologies, a company whose ticker symbol was "ATYT."

Rajaratnam does not deny the substance of that evidence.  Instead, he argues that "it is undisputed that there was a great deal of public discussion and rumor that ATYT was going to be acquired" and "[t]he fact that [he] did not even mention that public information shows that he did

not willfully intend to conceal material facts but instead interpreted the question as asking whether he knew for a fact that AMD was going to acquire ATYT."  (Rajaratnam Mem. 53.)

That argument strains credulity.  The SEC did not ask Rajaratnam whether he "knew that AMD was going to acquire ATYT"; the SEC asked him whether he had "any reason to believe that AMD was going to acquire ATYT."  Rajaratnam did not have to be a lawyer to understand the difference.  *Cf. United States v. Portac, Inc.*, 869 F.2d 1288, 1296 (9th Cir. 1989) (rejecting contention that question about whether defendant had "reason to believe" a fact was "inherently so ambiguous that it could not support a conviction").

Rajaratnam also argues that "[i]n the intervening year" between AMD's acquisition of ATI Technologies and his testimony he "had traded literally millions of shares of hundreds of different securities for just as many different reasons," "[i]t is unreasonable to infer from [his] answer that he willfully intended to conceal material facts about securities transactions that occurred a full year earlier." (Rajaratnam Mem. 53.)  But Rajaratnam's argument runs away from his own evidence and his own testimony.

At trial, Rajaratnam presented extensive testimony from his former Galleon colleague Rick Schutte as to Rajaratnam's prodigious memory for details about numerous companies, including details that his analysts had reported months before.  And at his SEC testimony, Rajaratnam was able not only to recall meeting with AMD's CEO and CFO regarding the acquisition after AMD had announced it, (Gov't Mem. Ex. EE at 105:17-109:4), but also to provide an extensively detailed explanation of three reasons why Galleon purchased the stock in the time period prior to the acquisition, (*see id.* at 115:17-123:15).  Those explanations included details regarding AMD's plans to launch a product called Opteron such as that the product had garnered excellent technical reviews, that market analysts were speculating that HP, Dell, and

IBM would use the product, and that AMD's competitor, Intel, was not yet ready to release a comparable product.  It would be an incredible coincidence if Rajaratnam remembered those details but could not remember what Smith and Kumar testified were regular and detailed discussions about the progress of the transaction.

Rajaratnam further argues that "the fact that [his] answer made no reference to the widespread and perfectly innocent public speculation about this acquisition suggests that by the time of his deposition in 2007 he simply did not recall the information he possessed about a possible ATYT acquisition in 2006."  (Rajaratnam Mem. 53.)  Hardly.  The fact that Rajaratnam did not mention the public speculation merely confirms that it had nothing to do with the question.

Rajaratnam does not contest—nor could he—that whether he had reason to believe that AMD would acquire ATI Technologies before the companies publicly announced the acquisition was material to his conviction for conspiring to trade and trading on inside information regarding the acquisition.

As to intent, the Second Circuit has stated that "a subject who decides upon perjury in an SEC proceeding will do so principally because the goal is to avoid all liability or criminal liability in particular."  *Fiore*, 381 F.3d at 95.  Rajaratnam does not contest that proposition *per se*.  Instead, he argues that he did not intend to obstruct justice in answering any questions about himself because he thought the investigation was about his brother Rengan.  In that regard, Rajaratnam  notes that "the SEC was ostensibly investigating events at Sedna, a fund run by [his] brother in which [he] was merely an investor"; that "[t]he subpoena compelling [his] attendance at the deposition carried a Sedna caption"; that he "and his counsel reasonably expected that the deposition would concern Sedna and [his] limited role as a passive investor at Sedna"; and that

"[h]e and his attorneys accordingly focused on Sedna" in preparing for the deposition.
(Rajaratnam Mem. 46.)

Perhaps so, but Rajaratnam cites no authority for the proposition that an investigation's caption governs the materiality of statements made during it. The Guidelines do instruct that the Court "should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." USSG § 3C1.1 n.2. But the evidence at trial showed and Rajaratnam testified before the SEC that he shared trading ideas with Rengan. (*See* GX 509; Gov. Mem. Ex. EE. at 90:14-18, 91:20-92:1, 97:17.) In fact, Rajaratnam was presented with a document in which Rengan asked him about whether he was going to hold on to AMD stock in early August, just after AMD had announced its acquisition of ATI. (*See* Gov. Mem. Ex. EE at 128:23-129:9.) Since Rajaratnam was surely aware that he and Rengan shared information about stocks, Rajaratnam had every reason to expect that an investigation into Rengan's fund would likely include questions about his own trading activities in companies such as AMD.

In sum, the facts show by a preponderance of the evidence that Rajaratnam was asked a simple question about a company with which he was very familiar in an investigation into somebody with whom he shared information. The only preparation Rajaratnam needed to answer that question was an understanding of his obligation to answer truthfully. But the overwhelming evidence at trial showed that Rajaratnam gave a false answer to the SEC and that he knew it to be false. Accordingly, a sentencing enhancement pursuant to section 3C1.1 for obstruction of justice is warranted.

## CONCLUSION

The Court calculates defendant's Sentencing Guideline Range as follows:

1.      Because defendant has no prior offenses, his Criminal History Category is I.

2.      Defendant's Total Offense level for his insider-trading crimes is 38 calculated as follows:

(a)      The Base Offense Level for the insider trading offenses is 8.

(b)      This is increased by 24 levels because a reasonable estimate of the total gains resulting from the offenses is greater than $50 million but less than $100 million.

(c)      In making this calculation I have included estimated actual gains based on the increase in price of a company's shares from the date of defendant's purchases to a time shortly after the public learned of the inside information.

(d)      The gain amount also includes estimated losses avoided in Intel and Google shares based on the decrease in price of the shares from the date defendant sold the shares to the time shortly after the public learned of the inside information.  Losses avoided on Goldman Sachs' stock were calculated based on the date certain analysts' estimates of Goldman's fourth quarter loss in 2008 were publicized.

(e)      The gain amount includes both the defendant's personal gains from insider trading as well as the much larger gains realized by Galleon investors who, of course, did not participate in any criminal activity but benefited thereby.

(f)      I have excluded any gains or losses avoided relating to the Galleon Crossover Fund.  There is insufficient evidence to conclude that all these trades originated with the defendant.  In any event, their inclusion would have no impact on the offense level calculation.

(g)     I also conclude that an additional four-level enhancement in the offense level is warranted because defendant played a leadership role in his crimes.  Specifically, the government has established that defendant was the organizer and leader of the conspiracy charged in Count I and that there were at least five knowing participants in the conspiracy alleged, (Smith, Panu, Chellam, Rengan, Rajaratnam and Liu.)

(h)     Finally, I conclude that a two-level enhancement is appropriate under the circumstances for obstruction of justice.  Specifically, I find that defendant acted with the specified intent to obstruct the SEC's investigation when, at his deposition, he was asked whether he had any reason to believe that AMD was going to acquire ATI before the public announcement of that acquisition.  His answer that he did not was clearly false and obviously pertained to an issue material both to the SEC's proceeding and to the crimes for which he has been convicted in this case.

3.     At a total Offense Level of 38 and a Criminal History Category of I, the Sentencing Guideline Range is properly calculated to be 235 to 293 months in prison.

SO ORDERED.

Dated:  New York, New York
        January **3 1**, 2012

_____
Richard J. Holwell
United States District Judge