UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RAJ RAJARATNAM,                              :

              Petitioner,               :
                                      15 Civ. 5325 (LAP)
      - v. -                                :         09 Cr. 1184 (LAP)

UNITED STATES OF AMERICA,                    :

              Respondent.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255 AND MOTION FOR A WRIT OF ERROR CORAM NOBIS

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Michael Ferrara
Assistant U.S. Attorney
    - Of Counsel -

## TABLE OF CONTENTS

Preliminary Statement....................................................................................................1

Factual and Procedural Background ...............................................................................3

    A.    The Government's Case...............................................................................4

        1.    Rajaratnam's Conspiracy with Kumar (Counts Four and Thirteen)............4

        2.    Rajaratnam's Conspiracy with Goel (Counts Three, Six, Seven, and Fourteen)...............................................................................................5

        3.    Rajaratnam's Leadership of the Galleon Conspiracy (Count One) ............6

        4.    Rajaratnam's Conspiracy with Chiesi (Counts Five, Eight, Nine, and Ten).....................................................................................................7

        5.    Rajaratnam's Conspiracy with Khan (Count Two) ...................................8

        6.    Rajaratnam's Use of Multiple Methods to Conceal His Crimes................10

    B.    The Defense Case .....................................................................................10

    C.    The Jury Instructions.................................................................................12

    D.    The Verdict and Sentencing.......................................................................13

    E.    The Direct Appeal......................................................................................13

    F.    Newman....................................................................................................14

Argument ....................................................................................................................15

    A.    Rajaratnam Procedurally Defaulted His Newman Claim Regarding Evidence of Personal Benefit and Is Not Actually Innocent of Any of the Challenged Counts of Conviction ..........................................................................................15

        1.    Applicable Law.........................................................................................15

            a.    Cause...............................................................................................16

            b.    Actual Innocence .............................................................................18

        2.    Discussion ................................................................................................19

            a.    There Was No Cause for the Procedural Default...........................19

                i.      Rajaratnam's Appellate Counsel Representation Did Not Fall Below an Objective Standard of Reasonableness.......20

                ii.     Rajaratnam Suffered No Prejudice ...................................21

        b.      Rajaratnam Cannot Show Actual Innocence ................................22

                i.      Count Two: Rajaratnam's Conspiracy with Khan .............24

                        I.      Benefits to Insiders ................................................24

                        II.     Rajaratnam's Knowledge of Those Benefits .........25

                        III.    Rajaratnam's Conviction Can Be Upheld on the Basis of Benefits to Any One Insider in the Khan Conspiracy ............................................................26

                ii.     Counts Five, Eight, Nine, and Ten: Rajaratnam's Conspiracy with Chiesi and Trades Involving Akamai .....27

                iii.    The ICST Trade ................................................................30

B.     No Vacatur of Counts Four and Thirteen Is Warranted as No Perjured Testimony Was Offered in Support of Those Counts............................................................33

    1.     Applicable Law.......................................................................33

    2.     Discussion ..............................................................................34

C.     Rajaratnam Is Not Entitled to the Issuance of a Writ of Error Coram Nobis ........38

    1.     Relevant Facts........................................................................39

    2.     Applicable Law.......................................................................40

    3.     Discussion ..............................................................................42

        a.      No Circumstance Compels Granting the Extraordinary Writ........42

        b.      Rajaratnam Has Failed to Justify His Delay in Seeking Relief .....43

        c.      Contorinis Is Inapposite .................................................44

Conclusion .................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

<u>Bailey</u> v. <u>United States</u>, 516 U.S. 137 (1995)..................................................................19

<u>Barnickel</u> v. <u>United States</u>, 113 F.3d 704 (7th Cir. 1997) .........................................42

<u>Bousley</u> v. <u>United States</u>, 523 U.S. 614 (1998) .................................................. passim

<u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619 (1993)...........................................................22

<u>Carlisle</u> v. <u>United States</u>, 517 U.S. 416 (1966).......................................................41

<u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722 (1991) ..........................................................16

<u>Engle</u> v. <u>Isaac</u>, 456 U.S. 107 (1982) ........................................................................16

<u>Fleming</u> v. <u>United States</u>, 146 F.3d at 88 (2d Cir. 1998)..........................................41

<u>Foont</u> v. <u>United States</u>, 93 F.3d 76 (2d Cir. 1996)..............................................41, 43

<u>Foreman</u> v. <u>United States</u>, 247 Fed. Appx. 246 (2d Cir. 2007) (summary order) ........41

<u>Harrington</u> v. <u>Richter</u>, 562 U.S. 86 (2011) ......................................................... 15-16

<u>Hedgpeth</u> v. <u>Pulido</u>, 555 U.S. 57 (2008) (per curiam)..............................................27

<u>Herrera</u> v. <u>Collins</u>, 506 U.S. 390 (1993) .................................................................18

<u>Jackson</u> v. <u>Leonardo</u>, 162 F.3d 81 (2d Cir. 1998)..............................................17, 20

<u>Jones</u> v. <u>Barnes</u>, 463 U.S. 745 (1983) .....................................................................17

<u>Kaminski</u> v. <u>United States</u>, 339 F.3d 84 (2d Cir. 2003)....................................... 41-42

<u>Kovacs</u> v. <u>United States</u>, 744 F.3d 44 (2d Cir. 2014) ...............................................44

<u>Maples</u> v. <u>Thomas</u>, 132 S. Ct. 912 (2012) ...............................................................20

<u>Mayo</u> v. <u>Henderson</u>, 13 F.3d 528 (2d Cir. 1994)............................................. 17-18, 20

<u>McCleskey</u> v. <u>Zant</u>, 499 U.S. 467 (1991) ...........................................................16, 18

<u>Murray</u> v. <u>Carrier</u>, 477 U.S. 478 (1986) ...........................................................16, 18

<u>Neder</u> v. <u>United States</u>, 527 U.S. 1 (1999)...............................................................22

<u>Reed</u> v. <u>Ross</u>, 468 U.S. 1 (1984)..............................................................................16

Reyes-Requena v. United States, 243 F.3d 893 (5th Cir. 2001)............................................. 18-19

Rosario v. United States, 164 F.3d 729 (2d Cir. 1999)...................................................15

Ryan v. United States, 645 F.3d 913 (7th Cir. 2011), rev'd on other grounds, 132 S. Ct. 2099
    (2012).....................................................................................................................22

Sapia v. United States, 433 F.3d 212 (2d Cir. 2005) ...................................................15

Schlup v. Delo, 513 U.S. 298 (1995)............................................................................18

Smith v. Murray, 477 U.S. 527 (1986) ...................................................................16, 21

Strickland v. Washington, 466 U.S. 668 (1984) ....................................................... 17-18

Underwood v. United States, 166 F.3d 84 (2d Cir. 1999) ............................................18

United States v. Addonizio, 442 U.S. 178 (1979) ........................................................15

United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012) ..................................... passim

United States v. Denedo, 556 U.S. 904 (2009).................................................... 40-41

United States v. Frady, 456 U.S. 152 (1982)..............................................................15

United States v. Gambino, 59 F.3d 353 (2d Cir. 1995) ...............................................34

United States v. Kalish, 626 F. 3d 165 (2d Cir. 2010)..................................................42

United States v. Monteleone, 257 F.3d 210 (2d Cir. 2001) ...........................................34

United States v. Morgan, 346 U.S. 502 (1954)...........................................................41

United States v. Newman, 773 F.3d 438 (2014), cert. denied, No. 15-137, 2015 WL 4575840
(U.S. Oct. 5, 2015) ................................................................................................ passim

United States v. Rajaratnam, 719 F.3d 139 (2d Cir. 2013), cert. denied, 134 S. Ct. 2820 (2014) 13

United States v. Reeves, Nos. 02 Civ. 9309 (LAP) & 96 Cr. 325 (LAP), 2005 WL 3288012
    (S.D.N.Y. Dec. 2, 2005)...................................................................................... 33-34

United States v. Sessa, Nos. 92-CR-351(ARR) & 97-CV-2079(ARR), 2011 WL 256330
    (E.D.N.Y. Jan. 25, 2011) .........................................................................................34

United States v. Vilar, 645 F.3d 543 (2d Cir. 2011)....................................................15

United States v. Wallach, 935 F.2d 445 (2d Cir.1991).................................................34

United States v. Whitman, --- F. Supp. 3d ----, No. 12 Cr. 125 (JSR), 2015 WL 4506507
(S.D.N.Y. July 22, 2015) ............................................................................ passim

Wainwright v. Sykes, 433 U.S. 72 (1977) ......................................................................16

Yates v. United States, 354 U.S. 298 (1957), overruled on other grounds by Burks v. United
States, 437 U.S. 1 (1978) ......................................................................................27

**Statutes**

18 U.S.C. § 981 ..........................................................................................................39, 42

28 U.S.C. § 2255 ...............................................................................................................1

28 U.S.C. § 2461 .............................................................................................................42

**Other Authorities**

Trial Tr., United States v. Rajarengan Rajaratnam, 13 Cr. 211 (NRB) (June 26-27, 2014).... 35-38

**Preliminary Statement**

Raj Rajaratnam reaped over $60 million in illegal profits and avoided losses over a six-year period thanks to inside information from corporate insiders and others with fiduciary duties of confidentiality—material, nonpublic information for which Rajaratnam typically paid handsomely. As the head of the Galleon Group, which operated a family of hedge funds, Rajaratnam oversaw a vast network of sources, analysts, portfolio managers, and traders, which helped Rajaratnam buy and sell securities in nearly 20 public companies based on inside information. To conceal his schemes, Rajaratnam directed the creation of false documents, arranged for misleading hedge trading to create a "cover story" for his illicit trading, and orchestrated payments to sources in the names of innocent third parties to avoid detection. Having been convicted at trial of five counts of conspiracy to commit securities fraud and eight counts of substantive securities fraud, and having lost his direct appeal, Rajaratnam now seeks to set aside his convictions on seven counts pursuant to 28 U.S.C. § 2255.

Rajaratnam principally relies on the Second Circuit's recent decision in United States v. Newman, 773 F.3d 438 (2014), cert. denied, No. 15-137, 2015 WL 4575840 (U.S. Oct. 5, 2015), which redefined the elements of insider trading in this Circuit. Although Rajaratnam does not challenge any of the counts of conviction for which he personally provided valuable pecuniary benefits to corporate insiders in exchange for material, nonpublic information, Rajaratnam remarkably argues that Newman compels the vacatur of those counts of conviction which involved tipping chains where Rajaratnam was one level removed from the insider—Counts Two, Five, Eight, Nine and Ten[1]—on the ground that there was an absence of proof of his

---

[1] Rajaratnam also argues that he is actually innocent of the trade involving Integrated Circuit Systems, Inc. ("ICST"), which was just one of the trades underlying Count One. (§ 2255 Mem. Law at 23-25.) Rajaratnam does not argue that his conviction on Count One should be overturned. (Id.)

knowledge that the insiders received pecuniary benefits from <u>others</u> in exchange for furnishing material, nonpublic information. (<u>E.g.</u>, § 2255 Mem. Law at 1.) As to two other counts of conviction—Counts Four and Thirteen—Rajaratnam selectively parses and excerpts trial testimony to suggest that one of the Government's cooperating witnesses, Anil Kumar, perjured himself at Rajaratnam's trial. Finally, in a separate motion for a writ of error coram nobis, Rajaratnam argues that forfeiture should be recalculated in light of <u>Newman</u> and <u>United States</u> v. <u>Contorinis</u>, 692 F.3d 136 (2d Cir. 2012).

Rajaratnam is in error in all respects and remains as guilty after the <u>Newman</u> decision as before it. Of all the insider trading defendants prosecuted in this district, few understood the value of inside information better than Rajaratnam—and Rajaratnam was only too happy to pay for it. Rajaratnam understood from experience that high-level corporate insiders required significant benefits to breach their duties and betray their companies. Rajaratnam knew because he routinely provided such benefits himself. For example, Rajaratnam gave one tipper a $500,000 consulting agreement. He gave another hundreds of thousands of dollars in cash. He provided other tippers with valuable investment information on which they could trade. His belated claims that there was insufficient evidence of his knowledge that <u>certain</u> insiders who breached their fiduciary duties expected a pecuniary or similarly valuable benefit, when Rajaratnam himself directly provided such pecuniary benefits to other insiders, should be rejected.

Moreover, far from perjury, Kumar's testimony was consistent in all material respects each time he testified, and constituted devastating evidence of Rajaratnam's guilt, including as to his own receipt of payments for corporate information. Finally, no adjustment of forfeiture is appropriate because Rajaratnam consented to the forfeiture amount and then failed to raise the

relevance of <u>Contorinis</u>—or any other case—until years had passed, and because <u>Contorinis</u> is inapplicable to the case here. Accordingly, Rajaratnam's requests for relief should be denied.

**<u>Factual and Procedural Background</u>**

The evidence at trial established that Rajaratnam was the head of Galleon Group ("Galleon"), which operated a family of hedge funds. Rajaratnam led multiple conspiracies to trade securities of 19 public companies based on material, nonpublic information ("Inside Information").

From 2003 through 2009, Rajaratnam participated in five insider trading conspiracies. First, Rajaratnam led a multi-year conspiracy with Kumar, a senior partner at McKinsey & Company, Inc. ("McKinsey"), and traded based on illegal tips from Kumar about Advanced Micro Devices, Inc. ("AMD"), ATI Technologies Inc. ("ATI"), eBay Inc. ("eBay"), Business Objects, and other companies. (<u>See</u> Indictment at 16-20, 27-28 (Counts Four & Thirteen).) Second, Rajaratnam led a multi-year conspiracy with Rajiv Goel, an Intel Corp. ("Intel") executive, and traded based on illegal tips from Goel about Intel and Clearwire Corp. ("Clearwire"). (<u>See id.</u> at 11-15, 25-27, 28-29 (Counts Three, Six, Seven & Fourteen).) Third, Rajaratnam led a multi-year conspiracy with former and current employees of Galleon, including Adam Smith, and traded based on illegal tips from multiple insiders at public companies. (<u>See id.</u> at 1-6 (Count One).) Fourth, Rajaratnam conspired with Danielle Chiesi, a portfolio manager at another hedge fund, and exchanged illegal tips with Chiesi relating to AMD, Akamai Technologies, Inc. ("Akamai"), and other companies. (<u>See id.</u> at 20-27 (Counts Five, Eight, Nine & Ten).) Fifth, Rajaratnam led a multi-year conspiracy with Roomy Khan, a former Galleon employee, and exchanged illegal tips with Khan relating to multiple stocks, including Hilton Hotels Corp. ("Hilton") and Google Inc. ("Google"). (<u>See id.</u> at 6-11 (Count Two).) The

evidence at trial demonstrated that, as a result of those schemes, Rajaratnam's Galleon hedge funds reaped over $60 million in illicit profits and avoided losses.

A.    **The Government's Case**

The evidence at trial against Rajaratnam included (1) wiretap recordings of Rajaratnam's phone conversations with Kumar, Goel, Smith, Chiesi, and others demonstrating that Rajaratnam schemed repeatedly to obtain and to trade based on Inside Information; (2) Kumar's testimony about his agreement to provide Rajaratnam with multiple illegal tips, including tips regarding AMD's acquisition of ATI in 2006, and Rajaratnam's elaborate schemes to conceal the bribes he paid to Kumar for those tips; (3) Goel's testimony about his agreement to provide Rajaratnam with multiple illegal tips relating to Intel's earnings in April 2007 and Intel's investment in Clearwire in 2008; (4) Smith's testimony about his agreement to share Inside Information with Rajaratnam and others at Galleon, and Rajaratnam's directives to conceal their crimes; (5) testimony of various executives at public companies and other firms regarding the confidentiality of information Rajaratnam obtained from many sources; and (6) summary charts reflecting Rajaratnam's phone calls with sources of Inside Information, and the extensive trading by Rajaratnam and others based on that information.

1.    **Rajaratnam's Conspiracy with Kumar (Counts Four and Thirteen)**

From 2003 through 2009, Rajaratnam traded securities based on illegal tips from Kumar. This conspiracy started shortly after Rajaratnam agreed to pay Kumar approximately $500,000 a year for information. (Tr. 264, 279-80.) Rajaratnam knew that McKinsey prohibited Kumar from disclosing corporate secrets or receiving outside money. Accordingly, Rajaratnam concocted a plan to pay Kumar pursuant to which Rajaratnam wired money to Kumar's offshore account in

the name of Pecos Trading Co. ("Pecos Trading"), and Kumar reinvested the money back into Galleon in the name of Kumar's housekeeper. (Tr. 264-67, 283-84, 391-95.)

In return, Kumar repeatedly provided Rajaratnam with confidential information about Kumar's clients relating to earnings, strategic plans, and mergers and acquisitions. For example, Kumar tipped Rajaratnam about AMD's secret planned acquisition of ATI in 2006. (Tr. 350-87.) Based primarily on Kumar's illegal tips, Rajaratnam purchased approximately $89,400,000 in ATI stock. Rajaratnam earned nearly $23 million after the public announcement of the deal. (Tr. 3425; GX 20, 20-R, 21.) After the deal was announced, Rajaratnam thanked Kumar for the information and said Kumar was a "hero." (Tr. 387.) Later that year, Rajaratnam gave Kumar a $1 million bonus. (Tr. 387-88.)

Wiretap recordings captured Rajaratnam's ongoing insider trading scheme with Kumar in operation. (See, e.g., GX 506-T.) For example, during a May 2, 2008 conversation, Kumar told Rajaratnam about a potential acquisition of Spansion. (GX 523-T.) Rajaratnam, in turn, directed his employees to create a cover "email trail" to justify any future trades in Spansion should regulators ask any questions. (GX 524-T-R at 18-19.) Subsequent wiretap recordings showed that Kumar tipped Rajaratnam repeatedly about corporate secrets relating to a multi-billion dollar investment in AMD, and that Rajaratnam traded based on that information. (GX 22, 553-T-K, 559-T, 594-T-R, 616-T, 625-T-R, 761, 815, 822, 826, 828, 836.) The evidence also showed that Kumar tipped Rajaratnam about massive layoffs at eBay prior to the company's public announcement, and that Rajaratnam traded based on that tip. (GX 23, 24, 25, 647-T.)

### 2. Rajaratnam's Conspiracy with Goel (Counts Three, Six, Seven, and Fourteen)

Goel provided Rajaratnam with Inside Information from 2007 through 2009. (Tr. 1568, 1636-43, 1647-58, 1675-82, 1911-2002, 2005-07.) Goel tipped Rajaratnam because (1) they

were close friends, (2) Rajaratnam had given Goel hundreds of thousands of dollars in cash, and (3) Rajaratnam executed profitable trades in Goel's brokerage account. (Tr. 1576-77.) For example, in April 2007, Goel obtained highly secret information about Intel's earnings from a friend in the company's investor relations department. (GX 2; Tr. 1642.) At first, Goel learned negative information about Intel's performance, and Rajaratnam shorted Intel stock (i.e., placed a bet that the stock price would decline) based on that information. (Tr. 1651-52, 1675-76; GX 2, 200, 1070.) Days later, Goel learned positive information about Intel's outlook and updated Rajaratnam. (Tr. 1652-53, 1677-78; GX 2, 200.) Based on Goel's new information, Rajaratnam reversed his short position and purchased two million shares of Intel, reaping over $2 million in profits. (GX 4, 5, 6.)

Wiretap recordings in 2008 also captured Goel revealing secret information to Rajaratnam about Intel's investment in Clearwire, and showed that Rajaratnam executed trades based on Goel's tips. (GX 7, 8, 9, 12, 502-T, 503-T, 504-T, 509-T; Tr. 1911-72.) Additional recordings and other evidence demonstrated that Rajaratnam purchased and sold shares of PeopleSupport in Goel's brokerage account, for the benefit of Goel, based on Inside Information that Rajaratnam had learned through Galleon's seat on that company's board of directors. (GX 19, 539-T, 654-T-G, 1106, 1107-R, 1117, 1120, 1121; Tr. 1978-98.)

### 3. Rajaratnam's Leadership of the Galleon Conspiracy (Count One)

From 2003 through 2009, Rajaratnam encouraged and promoted the use of Inside Information at Galleon, rewarded employees who obtained it for him, and caused countless securities trades to be executed based on Inside Information. (See, e.g., GX 524-T-R, 562-T, 563-T, 565-T-R, 692-T.) For example, in 2005, Smith provided Rajaratnam with Inside Information from a Morgan Stanley investment banker about the acquisition of Integrated Circuit

Systems, Inc. ("ICST"). (Tr. 2484-85, 2489-98, 2501-14.) Smith sent Rajaratnam coded email messages with updates. (A. 912-14.) Rajaratnam purchased over one million shares of ICST stock based on those tips, and Rajaratnam reaped $2,678,211 in illegal profits. (Tr. 3456-58; GX 27, 28.) Wiretap recordings and other evidence also showed that Rajaratnam traded based on Inside Information from Rajat Gupta, a member of the Board of Directors of Goldman Sachs & Co., relating to Warren Buffett's investment in September 2008 and negative earnings in October 2008. (GX 70, 71, 73, 627-T-R, 678-T.) During one conversation, Rajaratnam expressly stated he "heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share" and that he planned to trade based on that information, for the benefit to Goel. (GX 678-T at 2.)

####    4.    Rajaratnam's Conspiracy with Chiesi (Counts Five, Eight, Nine, and Ten)

Evidence of Rajaratnam's ongoing insider trading conspiracy with Chiesi in 2008 was frequently captured on the wiretaps. During numerous recorded conversations, Rajaratnam and Chiesi exchanged Inside Information relating to AMD, Akamai, and other public companies. (GX 40-45, 532-T, 543-T, 554-T-R, 594-T-R, 625-T-R.) They discussed how Chiesi feared being investigated, and Rajaratnam provided advice on how to avoid detection by trading in and out of a stock. (GX 594-T-R at 2; GX 641-T at 2.) Rajaratnam also thanked Chiesi for an illegal inside tip that Akamai was going to publicly announce a reduction in its earnings guidance. (GX 543-T at 1.)

The jury also heard evidence of Chiesi's close friendship with Kiernan Taylor—the Akamai insider who passed Inside Information to Chiesi—and heard recorded phone calls in which Chiesi and Taylor exchanged Inside Information. For example, in a September 9, 2008 call, Chiesi encouraged Taylor to "buy AMD." (GX 698-T at 3.) Chiesi told Taylor that she had

"a big deal, the Dubai deal . . . and I think you could get a double on this, and the stock is trading below 6 and I got at 10." (Id. at 4.) Taylor thanked Chiesi for the information before she continued, "[N]othing is going to go wrong that I certainly won't know about cause the stock is getting hammered today and I'll tell you this if I didn't know IBM and speak to AMD I wouldn't be fucking buying the stock either . . . ." (Id.) Chiesi ended the conversation by telling Taylor, "I love you." (Id. at 6.)

In an October 10, 2008 call, Chiesi greeted Taylor, "Hi[,] my love." (GX 703-T at 1.) During that call, Chiesi again urged Taylor to invest in AMD, saying, "I love AMD right now." (Id. at 2.) Chiesi also told Taylor that she "owe[d]" him and said, "I will never steer you in the wrong direction. . . . I'm gonna give you an opportunity to . . . really jump." (Id. at 3.) Taylor immediately responded, "Danielle, I have a major present for you" (id.), and went on to explain that the present was "information" (id. at 4). Taylor insisted that he give the information to Chiesi "face to face" in a "clandestine" manner. (Id. at 3-4.) Chiesi told Taylor, "Oh baby[,] I love you so much, I'll come over there . . . tomorrow." (Id. at 5.)

The jury also heard Chiesi summarily describe to Rajaratnam the conversations she was having with Taylor. For example, Chiesi told Rajaratnam that she had "played him [i.e., Taylor, whom she called 'her guy' when speaking to Rajaratnam] like a finely tuned piano." (GX 532-T at 1.) Chiesi then went on to describe Inside Information Taylor had provided her, and she and Rajaratnam discussed how to trade on that information. (Id. at 1-2.)

### 5. Rajaratnam's Conspiracy with Khan (Count Two)

In 2006 and 2007, Rajaratnam exchanged Inside Information with Khan. Evidence about Rajaratnam's conspiracy with Khan came from multiple witnesses, trading records, phone records, and instant messages. (E.g., GX 48-50, 52-65, 65-R, 66-69; Tr. 1223-24, 1588-89, 3077-

79, 3135-51.) The following pattern repeated itself over and over again: Khan obtained Inside Information from someone breaching a duty of confidentiality; Khan traded based on that information; Khan communicated the information to Rajaratnam; and Rajaratnam executed timely trades on the basis of Khan's information. (GX 48-50, 52-65, 65-R, 66-69.) For example, on July 2, 2007, Khan learned from an insider at Moody's Investors Service that Hilton was going to be acquired. (Tr. 1223-24; GX 48, 49.) Khan immediately traded based on that tip. (GX 49.) Later that day, Khan told Rajaratnam, who then purchased $14 million of Hilton stock and made millions of dollars hours later when Hilton announced the deal. (GX 48-50, 55.)

Similarly, on July 13, 2007, Khan told Rajaratnam that she had learned from an insider— Shammara Hussain—that Google was going to announce unexpectedly poor financial results. (GX 58-59; Tr. 3127, 3135-51.) At the end of that call, Rajaratnam instructed his trader to sell all of his Google stock and then he took a $25 million short position. (GX 58, 61.) When Google announced its second-quarter results on July 19, 2007, its stock plummeted and Rajaratnam made millions of dollars in illegal profits. (GX 62; Tr. 3187.) That same day, July 19, a "Marlene," at Khan's work address, using a FedEx account that Khan also used, sent a FedEx envelope to Hussain for delivery on July 20. (Tr. 3186-88, 3501-02; GX 1406.)

A second Khan insider—Sunil Bhalla, an executive at Polycom—passed Inside Information to Khan, including material, nonpublic information that Polycom, in January 2006, would announce record revenues and an outlook better than Wall Street expected. (Tr. 3061, 3065-86, 3096-97, 3474-75, 3520-21; GX 46, 64, 66, 128, 1431-1432, 1440, 1446, 1452, 1470-1471.) Khan passed that information to Rajaratnam, who traded on it. (GX 64-65, 67, 1410, 1453-1469; Tr. 3478-79, 3516-25.) The jury also heard evidence that Khan had authority to trade in Bhalla's Lehman Brothers account. (GX 1472-R, 1538-1539; Tr. 3091-93, 3514-16.)

6.      **Rajaratnam's Use of Multiple Methods to Conceal His Crimes**

Rajaratnam used sophisticated methods to conceal his crimes, including the following:

•      Rajaratnam directed others to create false emails and instant messages that he could later point to as justification for trades based on Inside Information. (GX 58; GX 524-T-R at 18-19; Tr. 2630-31, 2636-40.)

•      Rajaratnam instructed portfolio managers to both buy and sell securities while in possession of Inside Information to create the false impression that they did not have Inside Information. (GX 20-R, 22, 27, 594-T-R, 641-T; Tr. 2642-43.)

•      Rajaratnam instructed Chiesi to remain "radio silent" when they exchanged Inside Information. (GX 532-T, 554-T-R, 594-T-R.)

•      Rajaratnam disguised his payments to Kumar. (Tr. 391-92.)

•      Rajaratnam encouraged an employee to pay a McKinsey consultant for Inside Information through that consultant's spouse. (GX 563-T.)

•      Rajaratnam executed trades based on Inside Information in Goel's brokerage account using Goel's identification and password, and he offered to do the same thing for Kumar. (Tr. 545, 1613-31.)

•      Rajaratnam suggested that a coconspirator use a prepaid cellphone to contact him, because Rajaratnam suspected that a former employee was cooperating with the Government. (Tr. 576-77.)

B.      **The Defense Case**

Rajaratnam called five witnesses and introduced hundreds of analyst reports and news articles in his defense. His first witness testified that Smith admitted after his guilty plea that, though Smith had committed insider trading with respect to some stocks, Smith claimed not to

have committed insider trading or to have executed trades based on Inside Information with respect to other stocks. (Tr. 3838, 3846-47.) The second witness was one of Rajaratnam's attorneys who worked on Rajaratnam's defense. (Tr. 3850-51.) He testified that Smith told Rajaratnam's counsel prior to Smith's guilty plea that Smith was not aware of any insider trading at Galleon. (Tr. 3854.)

Rajaratnam's third witness was the former president of Galleon's domestic business, Richard Schutte. (Tr. 3910.) Schutte testified generally about Galleon's investment philosophy and research process. (Tr. 3925 34.) Through Schutte, the defense introduced a large volume of research reports and news articles that were available to the public, including Galleon, at the time of the alleged crimes. On cross-examination, Schutte admitted that Rajaratnam's defense team showed him only a small portion of the analyst reports relating to each public company (Tr. 4376), that the analyst reports had conflicting views (Tr. 4377), and that he did not know whether the newspaper articles were in Galleon's files or had been seen by anyone at Galleon prior to Rajaratnam's arrest. (Tr. 4405-08, 4476). In addition, Schutte admitted that Rajaratnam had provided Schutte with $25 million of the $35 million under management in Schutte's new hedge fund shortly before the trial began. (Tr. 4654-55.)

Rajaratnam called an expert as his final witness. The expert testified generally about the number of trades Rajaratnam made at Galleon, the leakage of confidential information into the marketplace, and event studies suggesting that some of the alleged illegal tips were already public and impounded into the stock price. (Tr. 4686, 4702, 4714-21.) On cross-examination, the expert acknowledged that he had analyzed only public information that was consistent with the alleged illegal tips; that he excluded public stories inconsistent with the alleged tips; and that the

consulting firm for which he worked had been paid hundreds of thousands of dollars by

Rajaratnam for his work. (Tr. 4936-38, 5102).

C.      **The Jury Instructions**

At the close of the evidence, the Court instructed the jury as follows:

> With respect to Counts Six through Ten and Counts Thirteen
> through Fourteen, in order to find that the government has established this
> first of the three essential elements of the crime of insider trading, you
> must find beyond a reasonable doubt, A, that the insider or tipper involved
> in the counts you are considering had a relationship of trust and
> confidence with the company that owned the business information, and
> that as a result of that relationship was entrusted with information with the
> reasonable expectation that he would keep it confidential and not use it for
> personal benefit; B, that the insider or tipper, directly or indirectly
> breached that trust by disclosing material, non-public information and
> receiving a personal benefit for doing so; C, that the defendant knew that
> the information had been disclosed by an insider or tipper in breach of a
> duty to the owner of material information and, D, that the defendant used
> the material, non-public information to purchase or sell the security you
> are considering.

> \* \* \*

> The government must also prove beyond a reasonable doubt that
> the insider who disclosed the information personally benefited in some
> way, directly or indirectly, from disclosing that information. Benefit may
> be monetary or financial. The benefit, however, need not be a specific or
> tangible benefit received in exchange for the information. It can also
> include a reputational benefit that will translate into future earnings, or the
> satisfaction which comes from making a gift to a relative or friend. . . .

> To meet its burden of establishing an insider trading scheme, the
> government must also prove beyond a reasonable doubt that Mr.
> Rajaratnam knew that the information had been disclosed by an insider in
> breach of a duty of trust and confidence. The mere receipt of material,
> non-public information by the defendant from an insider is not sufficient.
> The government must show that Mr. Rajaratnam knew that the
> information was material, non-public information that if disclosed by an
> insider would directly or indirectly obtain some personal benefit from the
> disclosure.

(Tr. 5614, 5617-20, 5622-23 (emphasis added).)

Prior to the charge being given, defense counsel objected to then-United States District Judge Richard J. Holwell's instruction that "'the benefit to the insider can include the satisfaction that comes with making a gift to a relative or friend.'" (Tr. 5153.) Defense counsel raised no objection—to this or any other section of the charge—after the charge was delivered. (Tr. 5650.)

## D.      The Verdict and Sentencing

After deliberating for 12 days, the jury returned a verdict of guilty on all 14 counts. (Tr. 5712-13.)

On October 13, 2011, Judge Holwell sentenced Rajaratnam to a term of 132 months' imprisonment, to be followed by two years' supervised release. Judge Holwell also ordered Rajaratnam to pay a fine of $10 million, a $1,400 special assessment, and forfeiture in the amount of $53,816,434.

## E.      The Direct Appeal

Appellate counsel advanced two arguments on appeal: First, Rajaratnam argued that the wiretaps capturing his illegal schemes should be suppressed because the Government made material falsehoods or omissions in the relevant applications. E.g., Brief of Defendant-Appellant at 18-19, United States v. Rajaratnam, No. 11-4416-cr (2d Cir. Jan. 25, 2012). Second, Rajaratnam challenged Judge Holwell's instruction to the jury that it could convict Rajaratnam if the inside information was "a factor, however small" in his trading decisions. E.g., id. at 19-20. As Rajaratnam concedes, his appellate counsel "did not challenge the trial court's instruction on 'knowledge' and 'benefit,' or the sufficiency of the evidence of 'knowledge' or 'benefit.'" (§ 2255 Mem. Law at 12.)

The Second Circuit affirmed Rajaratnam's convictions by opinion dated June 24, 2013. United States v. Rajaratnam, 719 F.3d 139 (2d Cir. 2013), cert. denied, 134 S. Ct. 2820 (2014).

**F.**     **Newman**

Todd Newman and Anthony Chiasson were hedge fund portfolio managers who traded securities with the assistance of a select number of analysts. Newman, 773 F.3d at 443. Those analysts, in turn, belonged to a small group of friends who conspired to obtain material non-public information so that they and their bosses could benefit by trading on it. Id. The circle had particular success in developing sources inside public companies—sources that had access to periodic earnings numbers before they were released to the public. Id. At trial, the evidence proved that Newman and Chiasson obtained inside information concerning earnings at two public companies—Dell, Inc. and NVIDIA Corp.—that netted Newman and Chiasson $4 million and $68 million in profits, respectively, for their hedge funds. Id. Both defendants were convicted at trial of securities fraud. Id. at 444.

On appeal, the primary question presented to the Second Circuit was whether the trial court improperly failed to instruct the jury that, in order to be held criminally liable, both defendants had to know that the insider-tippers' breaches were in exchange for a personal benefit. Id. at 447. One defendant, Newman, also argued that the Government failed to prove that the corporate insiders received a sufficiently meaningful personal benefit to support criminal liability. Brief of Appellant Todd Newman at 49-51, United States v. Newman, 13-1837(L) (2d Cir. Aug. 15, 2013).

The Second Circuit reversed Newman's and Chiasson's convictions and ordered the charges dismissed with prejudice. The Newman court offered two bases for reversal. First, the court held that in order for a tippee to be guilty of insider trading, the insider who breached his duty must have done so in exchange either for pecuniary gain or as part of a "meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents

at least a potential gain of a pecuniary or similarly valuable nature." 773 F.3d at 452. Second, the court concluded that a tippee must know of the tipper's personal benefit. Id. at 450. The court ultimately found insufficient the Government's evidence that the insider-tippers obtained a legally cognizable personal benefit in exchange for providing material, non-public information, and that Newman and Chiasson had the requisite knowledge of the insider-tippers' benefit. Id. at 455. In so holding, the court noted that both defendants were "several steps removed from the corporate insiders[.]" Id. at 443.

## Argument

### A.  Rajaratnam Procedurally Defaulted His Newman Claim Regarding Evidence of Personal Benefit and Is Not Actually Innocent of Any of the Challenged Counts of Conviction

As Rajaratnam implicitly concedes, his claim that Judge Holwell committed prejudicial instructional error in explaining at trial personal benefit and knowledge of benefit has been procedurally defaulted because it was never advanced on direct appeal. (See § 2255 Mem. Law at 2, 18.) Rajaratnam therefore must either meet the cause-and-prejudice standard to be relieved from the consequences of the default, or he must show actual innocence. He can do neither.

### 1.  Applicable Law

It is well settled that § 2255 is not designed as a substitute for a direct appeal, e.g., United States v. Frady, 456 U.S. 152, 165 (1982); United States v. Addonizio, 442 U.S. 178, 184-85 (1979); United States v. Vilar, 645 F.3d 543, 548 (2d Cir. 2011), and that a federal prisoner cannot use a § 2255 petition to litigate questions that could have been raised on direct appeal but were not, see, e.g., Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005); Rosario v. United States, 164 F.3d 729, 731 (2d Cir. 1999). Society's interest in repose of criminal judgments animates these procedural rules and compels their vigorous enforcement. See, e.g., Harrington v.

15

Richter, 562 U.S. 86, 103 (2011) (discussing repose in the context of petitions for habeas corpus from state prisoners); McCleskey v. Zant, 499 U.S. 467, 490-91 (1991). Thus, where a petitioner has procedurally defaulted a claim by failing to raise it at trial, sentencing, or on direct appeal, the claim may be raised through § 2255 only if the petitioner "can first demonstrate either 'cause' and 'actual prejudice,' or that he is 'actually innocent.'" Bousley v. United States, 523 U.S. 614, 622 (1998) (quoting Murray v. Carrier, 477 U.S. 478, 485, 496 (1986), Wainwright v. Sykes, 433 U.S. 72, 87 (1977), and Smith v. Murray, 477 U.S. 527, 538 (1986)).

### a.    Cause

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence. See, e.g., Coleman v. Thompson, 501 U.S. 722, 752 (1991) ("Cause" is "something external to the petitioner" which "cannot be fairly attributed to him"). "Cause" to excuse a procedural default may exist where a claim "is so novel that its legal basis [was] not reasonably available to counsel." Reed v. Ross, 468 U.S. 1, 16 (1984). A claim is "reasonably available," however, if at the time of the default, it was being raised by litigants and addressed by the courts. See Bousley, 523 U.S. at 622-23 (claim not "novel" where judicial decisions in the reporters show that the legal basis for the claim was "reasonably available").

The Supreme Court has long made clear that a petitioner cannot demonstrate "cause" for failing to raise a claim simply because doing so would have been futile. It matters not that the claim may have been doomed under prevailing law; even when the law is against a contention, a litigant must make the argument to preserve it. "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to the particular court at that particular time." Id. at 623 (quoting Engle v. Isaac, 456 U.S. 107, 130 n.35 (1982)).

Where, as here, a habeas petitioner argues that ineffective assistance of counsel excuses a procedural default, the petitioner must demonstrate both that (1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonability probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See, e.g., United States v. Whitman, --- F. Supp. 3d ----, No. 12 Cr. 125 (JSR), 2015 WL 4506507, at *3 (S.D.N.Y. July 22, 2015) (denying § 2255 motion raising Newman claims). "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. 668, 697 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700.

When analyzing the objective reasonableness of counsel's performance, such "performance must be assessed . . . as of the time of counsel's conduct without the benefit of hindsight." Id. (quotation marks omitted). Habeas courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In reviewing allegations of deficient performance by appellate counsel, reviewing courts are instructed "not to second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every 'colorable' claim on appeal." Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) (quotation marks omitted) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)). In attempting to demonstrate constitutional ineffectiveness by appellate counsel, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Instead, a habeas petitioner must establish that appellate counsel "omitted significant and obvious issues while pursuing issues that were

clearly and significantly weaker." Id. "Strategic choices" made by appellate counsel "after thorough investigation of law and facts relevant to plausible options" are "virtually unchallengeable." Strickland, 466 U.S. at 690-91.

       **b.**    **Actual Innocence**

If a petitioner cannot demonstrate "cause" for his procedural default, he can attempt to obtain review for his claim by establishing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." McCleskey, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that "fundamental miscarriage of justice," means the "actual innocence" of the petitioner. E.g., Herrera v. Collins, 506 U.S. 390, 404 (1993) (referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining that the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons"); Carrier, 477 U.S. at 495-96 (explaining that the exception is reserved for those extraordinary cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"). As the Court explained in Schlup v. Delo:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

513 U.S. 298, 321 (1995).

Furthermore, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623. This extremely narrow test is satisfied only if a petitioner can demonstrate that his acts "have been ruled not to constitute criminal conduct." Underwood v. United States, 166 F.3d 84, 88 (2d Cir. 1999); see also Reyes-Requena v. United States, 243 F.3d

893, 904 (5th Cir. 2001) (petitioner must establish that he or she "may have been convicted of a nonexistent offense"). For example, in <u>Bousley</u>, the Supreme Court remanded the case for a determination whether the petitioner had satisfied the "actual innocence" test. 523 U.S. at 624. There, the Court was considering whether Bousley could obtain relief based on <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137 (1995), in which the Court had curtailed the reach of the version of 18 U.S.C. § 924(c)(1) in effect at the time of Bailey's conduct and held that the term "use" of a weapon in the statute required "active employment" of the weapon. <u>Bousley</u>, 523 U.S. at 617. Bousley had failed to raise any <u>Bailey</u>-type claim; <u>Bailey</u> itself had been handed down after Bousley's appeal was complete. <u>Id.</u> at 622-23. The Supreme Court ruled that Bousley would be afforded the opportunity, on remand, to demonstrate "actual innocence"—that is, that he had not "used" a firearm within the meaning of the term adopted in <u>Bailey</u>—but that his claim would be procedurally barred absent such a demonstration. <u>Id.</u> at 624.

> **2.**      **Discussion**
>
> > **a.**      **There Was No Cause for the Procedural Default**

Rajaratnam argues that his appellate counsel's ineffectiveness excuses the procedural default. (§ 2255 Mem. Law at 26-26.) This argument is meritless. Rajaratnam was represented by extremely able appellate counsel, including at least five lawyers from a major international law firm, one of whom is now serving as a United States Circuit Judge. The Court should not accept Rajaratnam's invitation to second guess the decisions of able counsel who strategically raised certain nonfrivolous arguments on appeal to the exclusion of others.[2]

---

[2] Rajaratnam also appears to challenge in passing the quality of representation he received in the District Court. (<u>See, e.g.</u>, § 2255 Mem. Law at 26 (noting that counsel "failed to object to the charge as read or to pursue enforcement of the proper elements in summations"). Rajaratnam concedes, however, as he must, that trial counsel requested enhanced jury instructions on knowledge and benefit and received such an instruction on knowledge. While Judge Holwell's oral reading of the charge on knowledge differed in an immaterial respect from the written text,

i.      **Rajaratnam's Appellate Counsel Representation Did Not Fall
Below an Objective Standard of Reasonableness**

Rajaratnam's appellate counsel did not perform in an objectively unreasonable manner.
As mentioned above, Rajaratnam was represented on appeal by highly experienced counsel.
Though a lawyer's or her firm's reputation is not itself a sufficient reason to deny an ineffective
assistance claim, where there is "not even a hint of ineffective assistance," the "long history of
exemplary performance frequently attributed to" Rajaratnam's appellate counsel "simply serves
to highlight the absurdity" of Rajaratnam's claim of ineffective assistance. Whitman, 2015 WL
4506507, at *1 n.1 (citing Maples v. Thomas, 132 S. Ct. 912 (2012)). Confronted, after a trial of
several weeks, with a number of colorable issues that could be raised on direct appeal,
Rajaratnam's appellate counsel properly and soundly exercised their strategic judgment to
prioritize and advance those arguments they deemed most persuasive. Rajaratnam's appellate
counsel was not required to advance every nonfrivolous or colorable argument in order to
perform in an objectively reasonable fashion. Jackson, 162 F.3d at 85.

As with the collateral attack in Whitman—in which United States District Judge Jed S.
Rakoff concluded, among other things, that Whitman's appellate counsel was not ineffective for
failing to challenge the court's personal-benefit jury instruction in the Second Circuit—
Rajaratnam "does not even attempt to specify how his appellate counsel's choice not to appeal
the Court's instruction on personal benefit fell below an objective standard of reasonableness."
Whitman, 2015 WL 4506507, at *4 (quotation marks omitted). "'Generally, only when ignored
issues are clearly stronger than those presented, will the presumption of effective assistance of
counsel be overcome.'" Id. (quotation marks omitted) (quoting Mayo, 13 F.3d at 533). "But

---

this could not have resulted in prejudice to Rajaratnam. Indeed, the Newman panel itself cited
the Rajaratnam case as one in which knowledge of benefit to an insider had properly been
included as an element of insider trading. Newman, 773 F.3d at 449.

rather than address the comparative likelihood of success of an appeal of" Judge Holwell's personal benefit instruction with any of the points of error actually raised in his appeal, Rajaratnam, like Whitman, simply remarks that his appellate counsel's approach was inexplicable (§ 2255 Mem. Law at 26). <u>Whitman</u>, 2015 WL 4506507, at *4.

But there was nothing inexplicable about appellate counsel's decision. "The 'process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'" <u>Id.</u> (quoting <u>Smith</u>, 477 U.S. at 536). As in <u>Whitman</u>, a review of Rajaratnam's appellate brief "leads to the conclusion that its contents are a consequence of this type of 'winnowing,' not of oversight or ineffective assistance," <u>id.</u>

The arguments that Rajaratnam's appellate counsel did advance—(1) that wiretap evidence should have been suppressed, and (2) that Judge Holwell erroneously instructed the jury that it could convict if the inside information was "a factor, however small" in Rajaratnam's trading decisions—were grounded in the pretrial and trial record and were not, on their face, "clearly and significantly weaker" than the claim of instructional error regarding personal benefit or knowledge of the benefit. Indeed, the use of wiretap evidence in an insider trading case was a hotly contested issue at the time of Rajaratnam's direct appeal. As such, the prioritization of issues to raise on appeal was within the sound, strategic judgment of Rajaratnam's appellate counsel, and their failure to raise the instructional error on appeal was not objectively unreasonable.

### ii.    Rajaratnam Suffered No Prejudice

Because Rajaratnam has not shown that the performance of his appellate counsel was objectively unreasonable, the Court need not reach the prejudice prong of the ineffective

assistance of counsel standard. However, even if the Court were to determine that appellate counsel's performance was objectively unreasonable and were to reach the prejudice prong, Rajaratnam cannot prevail. Had Rajaratnam's counsel appealed Judge Holwell's failure to give a different benefit and knowledge of the benefit instruction, and had the Second Circuit issued a Newman-type decision on that appeal, that decision would not have resulted in the reversal of the challenged counts of Rajaratnam's conviction. For the same reasons that Rajaratnam cannot demonstrate his actual innocence, as described below, the evidence offered against Rajaratnam at trial on the challenged counts was sufficient to establish that Rajaratnam knew that insiders were receiving a pecuniary-like benefit in exchange for breaching their fiduciary duties. As a result, any instructional error by Judge Holwell was harmless because such an error did not, given the trial evidence, have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Neder v. United States, 527 U.S. 1, 18-20 (1999). Accordingly, Rajaratnam suffered no prejudice from any arguably deficient performance by his counsel, and the Court should reject his claim that his appellate counsel was ineffective.

### b.  Rajaratnam Cannot Show Actual Innocence

Rajaratnam's unexcused default means that, to prevail, he must demonstrate that he is "actually innocent." The standard is strict by design: The burden is on Rajaratnam to prove, based on the content of the entire trial record, that no reasonable juror would have convicted him. See Bousley, 523 U.S. at 623-24 (setting forth actual innocence standard); see also Ryan v. United States, 645 F.3d 913, 917 (7th Cir. 2011) ("Bousley afford[s] relief if a person is in prison for acts that the law does not make criminal. That standard depends on the content of the trial record, not the content of the jury instructions."), rev'd on other grounds, 132 S. Ct. 2099 (2012).

As discussed below, the trial record, viewed as a whole, clearly entitled the jury to infer that Rajaratnam knew that, with respect to the challenged counts, the insiders expected Newman-style benefits from the upstream tippees in exchange for the Inside Information, and Judge Holwell's jury instruction that Rajaratnam had to know of the benefit to the insiders ensured that the jury did so infer. The Court therefore should reject Rajaratnam's claim that he is actually innocent of the challenged counts.

Rajaratnam does not, because he cannot, challenge on Newman grounds any of the counts in which he personally provided pecuniary benefits to insiders. (See, e.g., Indictment, Counts One (Galleon Conspiracy), Four and Thirteen (insider trading with Kumar), Three, Six, Seven, and Fourteen (insider trading with Goel).) As set forth above, the jury heard overwhelming evidence that Rajaratnam personally paid multiple insiders hundreds of thousands of dollars for Inside Information. Yet Rajaratnam now essentially argues that he knew of pecuniary-like benefits to insiders only when he himself (or Galleon) personally provided them, and that no reasonable juror could have concluded that Rajaratnam understood that his upstream tippees—to whom Rajaratnam provided pecuniary-like benefits—were in turn providing pecuniary-like benefits to their tippers. Rajaratnam's argument defies reason and flies in the face of the trial evidence, which established beyond a reasonable doubt that Rajaratnam knew that Inside Information came at a price, whether that price was paid by Rajaratnam or an upstream tippee. Conversely, nothing in the record supports the inference that Rajaratnam implicitly asks the Court to draw: that Rajaratnam believed that Chiesi and Khan could obtain Inside Information for free.

Accordingly, this case is nothing like Newman. Newman and Chiasson were three or four levels removed from the insiders who provided the material, nonpublic information. Newman,

773 F.3d at 443. There was no evidence in that case that Newman or Chiasson personally paid insiders for information. In contrast, here, as described above, the jury heard extensive evidence that Rajaratnam himself paid insiders for Inside Information. As discussed below, <u>Newman</u> is inapposite, Rajaratnam is not actually innocent, and his motion should be rejected.

### i.      Count Two: Rajaratnam's Conspiracy with Khan

Rajaratnam asks the Court to vacate his conviction on Count Two, arguing that "the government did not try to prove that Mr. Rajaratnam was aware of any benefit received by the insider." (§ 2255 Mem. Law at 19.) Rajaratnam is incorrect: The Government proved that Khan provided benefits to the insiders in this scheme, and the jury was entitled to infer—and was instructed that to convict they had to find—that Rajaratnam was aware that benefits were being provided. Rajaratnam is therefore not actually innocent of the conspiracy charged in Count Two.

### I.      Benefits to Insiders

As described above, in 2006 and 2007, Rajaratnam received Inside Information from Khan. As proved at trial, Khan received that Inside Information from three sources: Bhalla, a Polycom executive (Tr. 3061); Deep Shah, a Moody's analyst (Tr. 1210); and Hussain, an analyst at a marketing firm for Google (Tr. 3127). The Government proved beyond a reasonable doubt that Khan provided pecuniary-like benefits to insiders, and that Rajaratnam understood that fact.

For example, on July 13, 2007, Khan told Rajaratnam that she had learned from an insider—Hussain—that Google was going to announce unexpectedly poor financial results. (GX 58, 59; Tr. 3127, 3135-51.) When Google announced its second-quarter results on July 19, 2007, its stock plummeted and Rajaratnam made millions of dollars in illegal profits. (GX 62; Tr. 3187.) That same day, July 19, a FedEx envelope was sent from Khan's work address, using a

FedEx account that Khan used, to Hussain for delivery on July 20 under the name "Marlene." (Tr. 3186-88, 3501-02; GX 1406.) The jury was entitled to infer, as the Government explicitly argued in its closing, that Khan, using the alias "Marlene," had sent something of value to Hussain to thank her for the Inside Information. (Tr. 5282-83.)

As another example, the jury heard evidence that, as to Bhalla, beginning in September 2003, Khan had authority to trade in Bhalla's Lehman Brothers account. (GX 1539 at [3]; Tr. 3093, 3514-16.) Bhalla gave Khan authority to trade in his account "[t]o utilize Roomy's investment expertise." (GX 1539 at [4]; Tr. 3516.) As the Government argued in its closing, Khan executed trades in Bhalla's account for the purpose of compensating him for his valuable Inside Information regarding Polycom. (Tr. 5284-85.)

## II.       Rajaratnam's Knowledge of Those Benefits

Though, with regard to the challenged tipping chains, Rajaratnam "may have lacked specific knowledge of the precise benefits the corporate insiders expected to receive," Whitman, 2015 WL 4506507, at *5, as opposed to the conspiracies in which Rajaratnam personally provided insiders with valuable pecuniary benefits, the evidence at trial powerfully showed that he was keenly aware that Khan's insiders "were breaching their fiduciary duties because they expected some actual or potential personal benefit," id. Among other things, the evidence established that Rajaratnam was a sophisticated businessman, that he was himself paying insiders, such as Kumar and Goel, for Inside Information, and that he was taking elaborate steps to hide his actions because he knew what he was doing was illegal.

Moreover, in those instances in which Rajaratnam participated in a tipping chain, such as the counts involving Khan, the evidence established that Rajaratnam personally benefited Khan, in the form of reciprocal material, nonpublic information. For example, on January 25, 2006,

Khan thanked Rajaratnam for information regarding "isil" (GX 64)—the ticker symbol for Intersil Corp. The next day, Rajaratnam thanked Khan for the Polycom "idea." (Id.) Evidence that Rajaratnam provided pecuniary-like benefits to his intermediate tippees was further proof that he understood that the kind of actionable Inside Information that Khan obtained came at a price.

When viewed in the context of the record as a whole, it would be perfectly reasonable for a jury to infer Rajaratnam's knowledge of the fact that Khan was providing pecuniary-like benefits to her insiders. As discussed above, there was overwhelming evidence that Rajaratnam understood that Inside Information could not be obtained for free, inasmuch as he provided pecuniary-like benefits to all those who provided him with valuable Inside Information, insiders and intermediate tippees alike.

### III.   Rajaratnam's Conviction Can Be Upheld on the Basis of Benefits to Any One Insider in the Khan Conspiracy

Moreover, even if the Court concludes that the evidence of Khan's close personal relationship with one or another of the three insiders at issue does not meet the Newman standard, the Court can and should uphold Rajaratnam's conviction on Count Two based on the benefits provided to at least one of them. As described above, it is Rajaratnam's burden to prove that he is actually innocent—i.e., factually innocent—of the challenged counts. Bousley, 523 U.S. at 623. It is not enough for Rajaratnam to establish "mere legal insufficiency." Id.

Rajaratnam simply cannot carry that burden on this record. As discussed, the jury heard direct evidence, or compelling evidence allowing them to reasonably infer, that Rajaratnam understood that Khan provided concrete benefits to at least Bhalla and Hussain. Khan helped Bhalla financially by trading in his Lehman Brothers account (GX 1539; Tr. 3093, 3514-16), and used a fake name to send a FedEx package to Hussain on the same day that Khan and

26

Rajaratnam made millions of dollars on Hussain's Inside Information regarding Google (GX 58, 59, 62, 1406; Tr. 3127, 3135-51, 3186-88, 3501-02). Therefore, Rajaratnam is not factually innocent of the charge in Count Two.

For all of these reasons, the Court should deny Rajaratnam's motion with respect to Count Two.[3]

### ii.   Counts Five, Eight, Nine, and Ten: Rajaratnam's Conspiracy with Chiesi and Trades Involving Akamai

Rajaratnam asks the Court to vacate his convictions on Counts Five, Eight, Nine, and Ten, arguing that "[t]he government's evidence gave no indication that Mr. Rajaratnam knew of any benefit obtained by Taylor," Chiesi's insider at Akamai. (§ 2255 Mem. Law at 22.)

As an initial matter, the Court could and should uphold Rajaratnam's conviction on Count Five even if there was no evidence of Rajaratnam's knowledge of a benefit to Taylor.[4] This is because the Count Five conspiracy is also predicated on Rajaratnam receiving Inside Information from Kumar, and in turn providing it to Chiesi. (Indictment at 20-25.) As to that aspect of the conspiracy, Chiesi was the downstream tippee and Rajaratnam was the upstream

---

[3] As described, Rajaratnam cannot carry his burden based on the evidence admitted at trial. To the extent the Court disagrees, the Government should be afforded the opportunity to offer additional evidence of Rajaratnam's guilt. See, e.g., Bousley, 523 U.S. at 624 ("[T]he Government is not limited to the existing record to rebut any showing that petitioner might make.") But again, no additional evidence is necessary because the trial evidence makes plain that Rajaratnam is not actually innocent of any challenged Count.

[4] Rajaratnam concedes that Count Five also was predicated on his "trading of shares of AMD in connection with the Mubadala investment," but claims that "his actual innocence of the Akamai trade is sufficient to invalidate the conviction on that Count" because it is impossible to know on which theory the jury relied. (§ 2255 Mem. Law at 23 n.14 (citing Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam); Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978)). But that is a standard used on direct appeal. Here, as discussed above, to overcome the procedural bar to his Newman claims, Rajaratnam must establish that he is actually innocent. To the extent Rajaratnam had knowledge of a pecuniary-like benefit to an insider with respect to any illicit trade predicating Count Five (or Count Two), he remains guilty of that Count and cannot carry his burden to show that he is in fact innocent. His Newman claims therefore are barred and he is entitled to no relief.

tippee directly paying the insider, Kumar, for the information. (<u>E.g.</u>, Tr. 264, 264-67, 279-80, 283-84, 387 88, 391-95 (Kumar testimony regarding pecuniary benefits he received from Rajaratnam).) Therefore, for the reasons discussed above with respect to Count Two, Rajaratnam cannot carry his burden of showing that he is actually innocent of the charge in Count Five, regardless of whether the Government proved Rajaratnam's knowledge of a pecuniary-like benefit to Taylor.

In any event, Rajaratnam is again wrong on the facts and cannot meet the actual-innocence burden: The Government proved that Chiesi provided benefits to Taylor, and the jury was entitled to infer—and instructed that to convict they had to find—that Rajaratnam was aware of those benefits. Rajaratnam is therefore not actually innocent of Counts Five, Eight, Nine, and Ten.

As described above, the jury heard evidence of Chiesi's close relationship with Taylor and heard recorded phone calls in which Chiesi and Taylor exchanged Inside Information. For example, in a September 9, 2008 call, Chiesi encouraged Taylor to "buy AMD." (GX 698-T at 3.) Chiesi told Taylor that she had "a big deal, the Dubai deal . . . and I think you could get a double on this, and the stock is trading below 6 and I got at 10." (<u>Id.</u> at 4.) Taylor thanked Chiesi for the information before she continued, "[N]othing is going to go wrong that I certainly won't know about cause the stock is getting hammered today and I'll tell you this if I didn't know IBM and speak to AMD I wouldn't be fucking buying the stock either . . . ." (<u>Id.</u>) Chiesi ended the conversation by telling Taylor, "I love you." (<u>Id.</u> at 6.)

In an October 10, 2008 call, Chiesi greeted Taylor, "Hi[,] my love." (GX 703-T at 1.) During that call, Chiesi again urged Taylor to invest in AMD, saying, "I love AMD right now." (<u>Id.</u> at 2.) Chiesi also told Taylor that she "owe[d]" him and said, "I will never steer you in the

wrong direction. . . . I'm gonna give you an opportunity to . . . really jump." (Id. at 3.) Taylor immediately responded, "Danielle, I have a major present for you" (id.), and went on to explain that the present was "information" (id. at 4). Taylor insisted that he give the information to Chiesi "face to face" in a "clandestine" manner. (Id. at 3-4.) Chiesi told Taylor, "Oh baby[,] I love you so much, I'll come over there . . . tomorrow." (Id. at 5.) The jury therefore was entitled to infer that Chiesi and Taylor had a "meaningfully close personal relationship," Newman, 773 F.3d at 452, that generated an exchange of Inside Information. Indeed, the jury heard evidence of Chiesi exchanging a benefit to Taylor in the form of material, nonpublic information regarding AMD.

Again, though Rajaratnam "may have lacked specific knowledge of the precise benefits the corporate insiders expected to receive," Whitman, 2015 WL 4506507, at *5, the evidence at trial showed that (1) Rajaratnam was aware that insiders do not give out Inside Information for free, inasmuch as Rajaratnam compensated insiders handsomely for such information; (2) Rajaratnam had a quid pro quo relationship with Chiesi; and (3) Chiesi obtained Inside Information from an insider, in breach of the insider's fiduciary duties, by providing pecuniary-like benefits.

For example, the Government proved that Rajaratnam and Chiesi exchanged Inside Information relating to AMD, Akamai, and other public companies. (GX 40-45, 532-T, 543-T, 554-T-R, 594-T-R, 625-T-R.) As with Khan, that evidence supported the reasonable inference that Rajaratnam knew that Chiesi's insiders were receiving similar, pecuniary-like benefits. That inference was strengthened by Rajaratnam's and Chiesi's acknowledgment that their conduct broke the law: Rajaratnam and Chiesi discussed how Chiesi feared being investigated, and Rajaratnam provided advice on how to avoid detection by trading in and out of a stock. (GX 594-

T-R at 2; GX 641-T at 2.) And Judge Holwell's instruction required the jury to find knowledge of the benefit to convict. (Tr. 5623.) There was thus ample evidence in the record for the jury to infer that Rajaratnam knew that Chiesi, like Rajaratnam, provided a pecuniary-like benefit for the Inside Information she shared with Rajaratnam.

For these reasons, the Court should deny Rajaratnam's motion with respect to Counts Five, Eight, Nine, and Ten as Rajaratnam is not actually innocent of the Chiesi conspiracy.

### iii.    The ICST Trade

Rajaratnam does not ask the Court to vacate his conviction on Count One. He cannot do so because of the overwhelming evidence that Rajaratnam and his Galleon co-conspirators directly provided pecuniary-like benefits to insiders in exchange for Inside Information. Rajaratnam does argue, however, that he is actually innocent with respect to a $2.8 million trade in ICST, and that that trade therefore should not be considered part of his offense conduct. (§ 2255 Mem. Law at 23-25.) The argument is meritless.

Again, as discussed above, because Rajaratnam cannot—and does not even attempt to— show that he is actually innocent of Count One, his claim regarding the ICST trade is procedurally barred and he is entitled to no relief, including resentencing at a lower offense level.

In any event, Rajaratnam also is wrong on the facts. Adam Smith was a cooperating witness who testified for the Government at trial. (E.g., Tr. 2447.) Smith had worked with Rajaratnam at Galleon from approximately February 2002 to November 2009. (Tr. 2443, 2445.) Smith testified, among other things, that he received material, nonpublic information regarding ICST from a former colleague at Morgan Stanley, Kamal Ahmed. (Tr. 2489-91.) Specifically, in early 2005, Ahmed told Smith that another company, Integrated Devices Technology ("IDT"), was in the process of acquiring ICST. (Tr. 2485, 2489.) Smith passed this information to

Rajaratnam, and told him it had come from Ahmed. (Tr. 2491.) In subsequent conversations, Ahmed told Smith that the deal was on track and when it would be announced. (Tr. 2492.) Smith shared all of this with Rajaratnam. (Id.; see also 2496-2504.)

Smith knew that Ahmed should not have disclosed the proposed merger. (Tr. 2491, 2498.) And in his communications with Rajaratnam regarding the ICST-IDT deal, Smith used coded language. For example, in a March 9, 2005 email to Rajaratnam, Smith wrote in the subject line of the email, "The two eyes," to refer to ICST and IDT. (GX 2454; Tr. 2497.) In that email, Smith told Rajaratnam. "I had a chance to update and we are still on track." (Id.) Smith disguised the names of the companies because he "didn't want to put sensitive information in written form," per Rajaratnam's instruction. (Tr. 2498-99; see also Tr. 2501-03; GX 2455, 2456.) Rajaratnam would "admonish" Smith and others not to put sensitive information in writing, but rather "to be more vague about it or just tell him directly or communicate sensitive information either verbally or on the phone, but not in written form." (Tr. 2499-500.) Rajaratnam did not "want to have a record basically in our computer system of any information that was non-public." (Tr. 2500.)

For his part, Smith provided Ahmed with valuable assistance. Specifically, Smith and Ahmed frequently discussed the market, including Smith's "thoughts about what was going on in the market and what issues there were in the marketplace with regard to certain stocks." (Tr. 2508.) Smith expected that Ahmed "would use that information to help in his communications with those executives to try and win business. If he was better educated about current issues, he would be more fluent and appear more experienced . . . ." (Id.) Even more concretely, Smith introduced Ahmed to executives at different companies, at least one of which Ahmed specifically

requested. (Id.) Smith also recommended Ahmed to executives at technology companies, describing Ahmed as a good banker and good person to do business with. (Id.)

Smith also tried to bring Ahmed in on Galleon deals. (Tr. 2508-09.) For example, if Galleon was investing in a private company, Galleon would have influence over which bank would represent the company were it to go public. (Tr. 2509.) Ahmed's job "was to win banking business, . . . and to the extent Galleon had any influence over the decisions of those executives, we would help him do his job." (Id.)

Though Smith testified on cross-examination that he did not offer Ahmed "any benefit for that information that he gave me at that time" (Tr. 2806), Smith made clear during his testimony that he was providing benefits to Ahmed in 2005 (Tr. 2988). And nothing in the record undermines Smith's testimony that he provided benefits to Ahmed throughout Smith's time at Galleon, including in 2005. Smith reaffirmed that testimony on redirect, explaining again that in 2005 he gave Ahmed his opinions about certain companies and their stocks, and would refer Ahmed to executives at technology companies. (Tr. 2988.) In any event, Newman "defines personal benefit in terms of expected or potential benefit as well as benefit actually received," Whitman, 2015 WL 4506507, at *5, and a reasonable jury could readily infer that Rajaratnam understood that Ahmed expected to benefit in exchange for the Inside Information.

Moreover, as described above, Smith testified that he repeatedly told Rajaratnam that the Inside Information was coming from Ahmed, and Smith used code when relating Ahmed's information, evincing Rajaratnam's understanding that the information was coming from an insider in violation of a fiduciary duty. In addition, Smith testified that "to the extent Galleon," collectively, "had any influence over the decisions of those executives," it would help Ahmed

win business. (Tr. 2509.) "Galleon" of course reasonably includes its head, Rajaratnam, and thus there was sufficient evidence that Rajaratnam knew of the benefit or expected benefit to Ahmed.

Rajaratnam is not actually innocent of Count One. His claim therefore is barred and he is not entitled to relief, including resentencing. In any event, the evidence of knowledge and benefit to the insider with respect to the $2.8 million trade in ICST was sufficient under Newman. For either or both of these reasons, the Court should deny Rajaratnam's motion.

* * *

Rajaratnam did not raise any of these arguments in the Second Circuit. Because he did not, and because he can establish neither cause-and-prejudice nor actual innocence, the Court must deny these claims as barred.

## B.   No Vacatur of Counts Four and Thirteen Is Warranted as No Perjured Testimony Was Offered in Support of Those Counts

Rajaratnam next argues that the Court should vacate his convictions on Counts Four and Thirteen because Kumar perjured himself at Rajaratnam's trial. As evidence that Kumar perjured himself, Rajaratnam points to Kumar's purportedly contradictory testimony at the later trial of Rajaratnam's brother, Rengan.

As described below, the argument is meritless for multiple reasons. Perhaps most importantly, Rajaratnam omits from his motion the numerous times throughout Kumar's testimony at Rengan's trial in which Kumar reaffirmed that he had engaged in a criminal insider trading conspiracy with Rajaratnam. The Court therefore should reject Rajaratnam's argument and deny his motion to vacate Counts Four and Thirteen.

### 1.   Applicable Law

"[A] petitioner is not entitled to a new trial based on a claim of perjury, unless he 'first demonstrate[s] that the witness in fact committed perjury.'" United States v. Reeves, Nos. 02

Civ. 9309 (LAP) & 96 Cr. 325 (LAP), 2005 WL 3288012, at *9 (S.D.N.Y. Dec. 2, 2005) (quoting United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001)). The movant bears the burden to prove perjury by a preponderance of the evidence. United States v. Sessa, Nos. 92-CR-351(ARR) & 97-CV-2079(ARR), 2011 WL 256330, at *44 (E.D.N.Y. Jan. 25, 2011). "Simple inaccuracies or inconsistencies" arising from "confusion, mistake, or faulty memory . . . do not rise to the level of perjury." Id. "Even a direct conflict in testimony does not in itself constitute perjury." United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995). Rather, a witness perjures himself by adducing "false testimony concerning a material matter with the willful intent to provide false testimony." Monteleone, 257 F.3d at 219.

"[A] new trial is not foreordained" whenever a petitioner satisfies his initial burden. Id. Instead, in evaluating whether perjurious testimony warrants a new trial, courts in this circuit apply the two, discrete standards of review set forth in United States v. Wallach, 935 F.2d 445 (2d Cir.1991). "Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected" the jury's judgment." Id. at 456. However, "[w]here the government was unaware of a witness'[s] perjury . . . a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Id.

> ## 2.    Discussion

Rajaratnam sets forth various instances of what he describes as "irreconcilable contradictions" between Kumar's testimony at Rajaratnam's and Rengan's trials. (§ 2255 Mtn. at 38-39.) But all of those purported examples miss the central point: At Rengan's trial, Kumar testified repeatedly that he had engaged in insider trading with Rajaratnam, just as Kumar had

testified at Rajaratnam's trial. This is unsurprising. Kumar's inculpatory testimony against Rajaratnam was corroborated in all material respects by independent evidence offered by the Government, such as intercepted calls between Rajaratnam and Kumar in which Kumar passed confidential information to Rajaratnam, trading records, and account statements and other records showing payments to Kumar. No hearing is required for the Court to conclude that Kumar did not commit perjury at Rajaratnam's trial.

For example, Kumar testified at Rengan's trial that, in 2004, he passed "confidential information" that he had "learned at McKinsey to [Raj] Rajaratnam." Trial Tr. at 821, United States v. Rajarengan Rajaratnam, 13 Cr. 211 (NRB) (June 26-27, 2014) ("Rengan Tr."). That same year, Kumar testified that he began receiving money from Rajaratnam. Id. at 824. Kumar testified that Rajaratnam suggested that payments go through the Pecos Trading account into a Galleon offshore account in Kumar's housekeeper's name, so that if McKinsey asked to see Kumar's tax return, it would not see that Rajaratnam had paid Kumar $500,000. Id. at 829-32. Kumar testified that Rajaratnam "devised" that payment scheme. Id. at 831.

Also at Rengan's trial, Kumar testified explicitly that in 2005 and 2006, he (Kumar) passed to Rajaratnam "a number of details that were confidential information" that Kumar had learned at McKinsey. Id. at 834. Kumar testified that at the end of 2006, Rajaratnam paid him $1 million because Rajaratnam had had such a profitable year. Id. at 835. Kumar repeated that in 2006 he had passed Rajaratnam confidential information. Id. Kumar also acknowledged violating McKinsey's confidentiality agreements by providing information regarding AMD to Rajaratnam. Id. at 837-38.

When cross-examined by Rengan's lawyer, Kumar again testified consistently that he had "shared confidential information with" Rajaratnam, and that Rajaratnam put money into an

account in the name of Kumar's housekeeper. Id. at 898. Later on cross-examination, Kumar testified about specific confidential information he had shared with Rajaratnam, including that AMD's 2008 first quarter total sales could be down 11 to 15%. Id. at 942-43. And Kumar acknowledged on cross-examination that in fact, that quarter, AMD's revenue was down 15%. Id. at 946-47.

That testimony—all of which implicated Rajaratnam in a criminal scheme and conspiracy to trade on Inside Information—was entirely consistent with Kumar's testimony at Rajaratnam's trial. This is not a case where an inculpatory witness later recanted testimony or otherwise exculpated a defendant—it is not even close to such a case. Indeed, Kumar testified on cross-examination at Rengan's trial that he had "told the truth" at Rajaratnam's trial, and acknowledged that his testimony at Rajaratnam's trial had been several years prior and that he was "trying [his] best." Id. at 958. (Kumar testified in Rajaratnam's trial in March 2011, and testified in Rengan's trial in June 2014.) Moreover, the Government called Kumar as a witness at Rengan's trial but Kumar had refused to prepare to testify with the assigned Assistant United States Attorneys. Id. at 805, 894-95. While this was of course his right, it is wholly unsurprising that his recollection faltered on the witness stand when he could not be refreshed with documents or recordings before trial. And United States District Judge Naomi Reice Buchwald found that certain, challenged portions of Kumar's testimony against Rengan were not inconsistent with his testimony against Rajaratnam. Id. at 889-92, 1039-44.

The purportedly inconsistent portions of Kumar's testimony challenged by Rajaratnam are either not inconsistent, irrelevant, or are easily explained as the best efforts of a witness to recollect events that occurred almost a decade prior to his testimony. As an example of all three, Rajaratnam claims that Kumar

36

falsely testified that it was Mr. Rajaratnam who proposed concealing the
consulting fees Kumar planned to receive by using Kumar's
housekeeper's name on the Galleon account into which Kumar planned to
deposit the fees. Kumar's admissions at Rengan's trial that McKinsey did
not prohibit side agreements eliminated the purported motivation for Mr.
Rajaratnam to circumvent any prohibition.

(§ 2255 Mem. Law at 38-39.)

Kumar indeed testified at Rajaratnam's trial that McKinsey prohibited side agreements
(Tr. 264), but testified at Rengan's trial that McKinsey did not prohibit such agreements, Rengan
Tr. at 822. McKinsey's view of side agreements, however, is entirely beside the point and
Kumar's testimony was consistent with someone making an honest mistake of recollection. On
the important points, Kumar was absolutely consistent: Kumar was not allowed to pass
confidential information to Rajaratnam, e.g., id. at 821, 825, 838, Kumar wanted no one to know
that he was being paid by Rajaratnam, id. at 822, 927, and it was Rajaratnam, not Kumar, who
proposed payments through an account in Kumar's housekeeper's name, id. at 829, 831.

Similarly, Kumar was consistent at both trials in testifying that the information he passed
to Rajaratnam was confidential, but that Rajaratnam had other sources of information about those
companies. For example, Kumar testified against Rengan that Rajaratnam "had for long been
telling me that he had other sources of a lot of information for AMD far in excess of these
particulars." Id. at 844. Kumar went on to testify that the other source was Chiesi: "In 2007,
[Rajaratnam] told me that my client that was the CEO of AMD, Mr. Hector Ruiz, had an intimate
relationship with Danielle," and that Chiesi "knows a whole lot more than you do, Anil, about
AMD, and she tells everyone on Wall Street." Id. at 850.

Kumar testified consistently at Rajaratnam's trial, explaining that in 2005, "Rajaratnam
was telling me that my advice to him was not as valuable, that I was not able to get him these
detailed quarterly financial results that he wanted from either AMD or my other clients." (Tr.

341.) Kumar also testified that there were "rumors in the marketplace" regarding the AMD deal (Tr. 461), and that, "repeatedly in 2007 and 2008," Rajaratnam told him that "Daniella [i.e., Chiesi] . . . had an intimate relationship with my client at AMD [i.e., Ruiz] and . . . was receiving all the information about AMD, certainly far more than I was able to provide him" (Tr. 473). Thus, Kumar's testimony on this point also was entirely consistent.

Rajaratnam also complains about testimony regarding Chiesi and Rengan. That testimony too was largely consistent, and had absolutely no bearing on Rajaratnam's guilt. For example, Kumar's belief at Rengan's trial that Rengan was not "part of any of [Kumar's] illicit activities with" Rajaratnam, or "involved in any scheme to trade on illegal inside information," Rengan Tr. at 1014, is entirely beside the point, and if anything, only goes to reaffirm Kumar's testimony that Rajaratnam, if not his brother, was in fact involved in "illicit activities." Or the claimed inconsistency regarding Kumar's conversation with Rajaratnam regarding David Palacek—it simply does not go to Rajaratnam's guilt and, in any event, Judge Buchwald concluded that that testimony was consistent with Kumar's testimony against Rajaratnam. Id. at 889-92, 1039-44.

A comparison of Kumar's testimony against Rajaratnam and Rengan makes plain that Kumar did not commit perjury in Rajaratnam's trial. As Rajaratnam cannot carry his burden of proving by a preponderance of the evidence that Kumar committed perjury, no hearing is necessary and the Court should deny Rajaratnam's motion.

## C.    Rajaratnam Is Not Entitled to the Issuance of a Writ of Error Coram Nobis

Rajaratnam is not entitled to the massive reduction in forfeiture that he seeks pursuant to the extraordinary remedy of the issuance of a writ of error coram nobis. Rajaratnam premises his claim that his approximately $53 million agreed-upon forfeiture order should be reduced by nearly $50 million on two grounds: that, because he is actually innocent of certain counts, as a

38

result of the Newman decision, his forfeiture order should be reduced accordingly; and that he should not be held responsible for firm or client profits as a result of the Contorinis decision.

Rajaratnam's Newman-based claims fail for the reasons described above: There was ample evidence of valuable benefits to insiders in the Khan and Chiesi conspiracies in exchange for material, nonpublic information, and the jury was entitled to infer that Rajaratnam knew that such benefits were being provided based on the abundance of facts established in the record. Thus, he is entitled to no reduction in forfeiture on that basis. Moreover, as discussed below, Rajaratnam's Contorinis argument fails because Contorinis is inapposite to this case, and because Rajaratnam cannot justify his delay in seeking relief. For all of these reasons, the Court should not issue the extraordinary writ.

### 1.       Relevant Facts

On October 13, 2011, the parties appeared before Judge Holwell for sentencing. As is relevant here, the Government represented that it had "negotiated forfeiture with the defense." (Sent. Tr. at 24.) The parties then confirmed that each had "agreed to . . . [and signed] a forfeiture order" in the amount of $53,816,434. (Id. at 29.) A final Order of Forfeiture ("Forfeiture Order") was filed on August 13, 2012.

On August 17, 2012, the Second Circuit issued its opinion in Contorinis. Contorinis had traded on inside information while employed as a portfolio manager and small equity owner of a hedge fund, and was ordered to forfeit the total amount of profits made, and losses avoided, by the fund as a result of those unlawful trades. 692 F.3d at 139-40, 145. In relevant part, the Second Circuit's ruling focused on the language of 18 U.S.C. § 981(a)(2)(B), and specifically the identity of the person or entity who had "acquired" the criminal proceeds. Id. at 146. Contorinis held that the defendant had never "acquired" all the proceeds received by the fund (and the

"innocent third part[ies]" who owned the fund) as a result of the unlawful trades, and thus could be ordered to disgorge only those funds that he and others acting in concert with him had obtained through the crime. Id. at 146-48. Importantly, the court also concluded that forfeiture in conspiracy cases may be based on any conduct by any co-conspirator that was reasonably foreseeable to the defendant. Id. at 147.

On October 25, 2012, the Second Circuit heard argument on Rajaratnam's direct appeal. Though Rajaratnam filed an appellate brief on January 25, 2012, he failed to file any supplemental briefing addressing Contorinis either before or after oral argument. Nor did Rajaratnam cite the case during the argument itself.

In October 2014, more than two years after Contorinis was decided, Rajaratnam raised with the Government, for the first time, the potential impact of Contorinis on the Forfeiture Order. (Coram Nobis Mem. Law at 6.) The Government declined to recalculate and reduce his forfeiture obligation.

On June 16, 2015, Rajaratnam filed the instant motion for a writ of error coram nobis, arguing, among other things, that the Forfeiture Order violates Contorinis by "miscalculat[ing] the amount of forfeiture due from Mr. Rajaratnam by including trading proceeds to which Mr. Rajaratnam was never entitled and never retained." (Id. at 3.) Rajaratnam contends that the forfeiture amount should be reduced by nearly $50 million. (Id. (arguing that correct forfeiture amount is "approximately $4.3 million").)

### 2.    Applicable Law

"The writ of error coram nobis is an extraordinary writ; and an extraordinary remedy should not be granted in the ordinary case." United States v. Denedo, 556 U.S. 904, 917 (2009) (quotation marks and ellipsis omitted). "[J]udgment finality is not to be lightly cast aside; and

courts must be cautious so that the extraordinary remedy of <u>coram nobis</u> issues only in extreme cases." <u>Id.</u> at 916. Thus, "[c]oram nobis is essentially a remedy of last resort . . . ." <u>Fleming</u> v. <u>United States</u>, 146 F.3d at 88, 90 (2d Cir. 1998). Coram nobis relief was "traditionally available only to bring before the court factual errors material to the validity and regularity of the legal proceeding itself, such as the defendant's being under age or having died before the verdict." <u>Carlisle</u> v. <u>United States</u>, 517 U.S. 416, 429 (1966) (quotation marks omitted).

Coram nobis is "'not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid.'" <u>Foreman</u> v. <u>United States</u>, 247 Fed. Appx. 246, 248 (2d Cir. 2007) (summary order) (quoting <u>Foont</u> v. <u>United States</u>, 93 F.3d 76, 78 (2d Cir. 1996)); <u>accord</u> <u>Kaminski</u> v. <u>United States</u>, 339 F.3d 84, 90 (2d Cir. 2003) ("[C]oram nobis is an extraordinary remedy" that "can relieve an individual of the continuing noncustodial effects of a criminal conviction only when <u>fundamental</u> errors were made in obtaining that conviction.")

"The proceedings leading to the petitioner's conviction are presumed to be correct, and 'the burden rests on the accused to show otherwise.'" <u>Foont</u>, 93 F.3d at 78-79 (quoting <u>United States</u> v. <u>Morgan</u>, 346 U.S. 502, 512 (1954)). To obtain relief, Rajaratnam must demonstrate that (1) "there are circumstances compelling such action to achieve justice," (2) "sound reasons exist for failure to seek appropriate earlier relief," and (3) he "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." <u>Id.</u> at 79 (quotation marks and alteration omitted). "The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for the delay" in filing the coram nobis petition without reference to whether the Government can establish injury from the delay. <u>Id.</u> at 80.

Moreover, and more fundamentally, the Government is aware of no case holding that a motion for a writ of coram nobis is available to challenge forfeiture. Cf. Kaminski, 339 F.3d at 89-91 (Calabresi, J., writing only for himself, suggesting that a motion for writ of coram nobis might be used to challenge restitution); Barnickel v. United States, 113 F.3d 704, 706 (7th Cir. 1997) (noting that the Seventh Circuit has "approved the use of a writ of error coram nobis to challenge a restitution order that was based on inaccurate information").

### 3.   Discussion

#### a.   No Circumstance Compels Granting the Extraordinary Writ

Even assuming that Rajaratnam can obtain the relief he seeks through a writ of error coram nobis—a point the Government does not concede—Rajaratnam's motion fails on the merits. The forfeiture statute pertaining to securities fraud, mail and wire fraud, and conspiracy to commit those crimes broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation . . . ." 18 U.S.C. § 981(a)(1)(C).[5] For insider trading, the definition of proceeds is "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." Contorinis, 692 F.3d at 145 (quoting 18 U.S.C. § 981(a)(2)(B)). "[A] court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant." Id. at 147. And the Government may obtain a money judgment against the defendant to recover the amount of such proceeds. E.g., United States v. Kalish, 626 F. 3d 165,168-69 (2d Cir. 2010).

---

[5] Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a qualifying offense. 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) is made applicable to criminal cases by 28 U.S.C. § 2461. Contorinis, 692 F.3d at 145 n.2 ("While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c).").

Here, aided by sophisticated counsel, Rajaratnam negotiated and consented to the forfeiture amount. He raised no objection to forfeiture during the sentencing hearing, nor following the filing of the Forfeiture Order, which described the sum as "representing the amount of proceeds obtained as a result of the offenses charged in Counts One through Ten, Thirteen, Fifteen and Seventeen through Nineteen of the Indictment." (Forfeiture Order at 2.) Rajaratnam attempts to downplay his consent to the Forfeiture Order by noting that the forfeiture amount was "consistent with the District Court's determination on the Guidelines calculation," which he had contested. (Coram Nobis Mem. Law at 5.) But that is of no moment. While it may well have been a reasonable strategic decision not to object to the amount of forfeiture after litigating (and losing) arguments relevant to the Guidelines calculation, that does not change the fact that Rajaratnam did not object to the amount of forfeiture. Instead, the parties arrived at a joint proposal and the Court approved it.

Therefore, as Rajaratnam negotiated and agreed to the Forfeiture Order, he cannot now claim it an "error[] of the most fundamental character" which "rendered the proceeding itself irregular and invalid," Foont, 93 F.3d at 78, and the Court should deny his motion.

### b.      Rajaratnam Has Failed to Justify His Delay in Seeking Relief

Alternatively, Rajaratnam cannot justify his failure to seek timely relief. As set out above, Rajaratnam failed to challenge forfeiture on direct appeal, despite the fact that Contorinis was issued months before Rajaratnam's appellate argument, and nearly a year before the Second Circuit affirmed Rajaratnam's convictions. Rajaratnam never requested the opportunity to file supplemental briefing in the Second Circuit, never cited Contorinis at argument, and failed to raise the matter with any court until filing the instant motion.

Rajaratnam cites Kovacs v. United States, 744 F.3d 44, 54 (2d Cir. 2014), for the proposition that a defendant's petition may be deemed timely, in part, because of a defendant's "efforts to negotiate for an agreed-upon motion" prior to filing his petition. (Coram Nobis Mem. Law at 13). However, Kovacs, far from supporting Rajaratnam's position, illustrates a deficiency in his motion.

Kovacs, in an effort to provide "sound reasons" for his delay, "aver[red] that he has diligently pursued ways to reenter the country, but was unaware that a writ of coram nobis existed until October 2011—and contacted the Government soon thereafter." 744 F.3d at 54. Here, Rajaratnam's sophisticated counsel was aware or should have been aware of the writ yet, despite that fact that Contorinis was decided on August 17, 2012, Rajaratnam inexplicably waited until 2014 to contact the Government to discuss the case, and did not file a writ for coram nobis on the issue until earlier this year. For these reasons, Rajaratnam has not shown any justifiable reason for the delay in filing his motion for a writ of error coram nobis, and has failed to satisfy his burden of justifying his delay in seeking earlier relief, including on direct appeal. The Court therefore should deny Rajaratnam's motion.

### c.  **Contorinis Is Inapposite**

Finally, Contorinis is inapposite to the case at bar. Contorinis was employed as a co-portfolio manager, and did not control the hedge fund's disbursement of profits. 692 F.3d at 139. Moreover, Contorinis illicitly bought shares of only one company, Albertsons grocery store chain ("ABS"), based on material, nonpublic information regarding a single deal: the acquisition of ABS by another company. Id. at 139-41. The entirety of Contorinis's illegal conduct occurred between September 2005 and January 2006. Id. The Second Circuit emphasized that the forfeiture order at issue in Contorinis "include[d] funds to which appellant was never entitled."

44

<u>Id.</u> at 146. And "[b]ecause the 'proceeds' sought by the government" in <u>Contorinis</u> "were 'acquired' by the Fund over which appellant lacks control, it is difficult to square the statute with the forfeiture order." <u>Id.</u>

In contrast, here, the evidence showed that the forfeited proceeds were acquired by Galleon, which Rajaratnam very much controlled. Rajaratnam concedes, as he must, that he "was the founder and managing general partner of Galleon"—the hedge fund that received the fraudulently obtained investment profits (which were solicited by Rajaratnam's confederates in the fraud)—and "the portfolio manager for the funds at issue." (Coram Nobis Mem. Law at 4) And the evidence at trial established his control over the firm: There was testimony that Rajaratnam "ran" Galleon, "was the head of the firm, the CEO basically," and "was ultimately responsible for the firm." (Tr. 2443, 2453 (Smith testimony).) As Galleon's head, Rajaratnam "could do whatever he wanted." (Tr. 564.) The synonymy of Galleon and Rajaratnam is evidenced by the fact that Galleon closed as a result of Rajaratnam's arrest on October 16, 2009. (Tr. 3954 (Richard Schutte testimony).)

In short, Galleon was Rajaratnam's firm. He was no ordinary portfolio manager: Galleon literally could not continue to exist without him. And when Rajaratnam's investors profited, Rajaratnam profited. Rajaratnam thus "acquired" the entirety of the forfeited proceeds within the meaning of § 981 and <u>Contorinis</u>. Galleon earned tens of millions of dollars over six years from insider trading, involving several companies, including AMD, Hilton, Google, Goldman Sachs, Intel, PeopleSupport, Polycom, and Spansion. Rajaratnam not only foresaw the proceeds of insider trading, he personally benefited from them. <u>Contorinis</u> therefore is wholly inapposite to the circumstances of this case, and Rajaratnam has failed to demonstrate that justice compels issuance of the writ.

* * *

For any and all of the foregoing reasons, Rajaratnam cannot meet his burden of establishing that the circumstances of this case warrant the issuance of the extraordinary writ of error coram nobis. The Court therefore should deny the motion.

### Conclusion

The Court should deny Rajaratnam's motions in their entirety.

Dated:  New York, New York
        October 5, 2015

> Respectfully submitted,
>
> PREET BHARARA
> United States Attorney
> Southern District of New York
>
> By:    /s/ MICHAEL FERRARA
>        Assistant U.S. Attorney
>        212-637-2526

46

## AFFIRMATION OF SERVICE

MICHAEL FERRARA, pursuant to 28 U.S.C. § 1746, hereby declares under the penalty of perjury:

I am an Assistant U.S. Attorney in the Office of the United States Attorney for the Southern District of New York. On October 5, 2015, I caused an electronic copy of the Omnibus Memorandum of Law in Opposition to Petitioner's Motion Pursuant to 28 U.S.C. § 2255 and Motion for a Writ of Error Coram Nobis to be delivered by ECF and email to Christine H. Chung, Esq. (at christinechung@quinnemanuel.com) and Samidh Guha, Esq. (at sguha@jonesday.com).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
October 5, 2015

/s/ MICHAEL FERRARA
Assistant U.S. Attorney